JON L.R. DALBERG (State Bar No. 128259)
RODGER M. LANDAU (State Bar No. 151456)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com

Counsel for FirstFed Financial Corp.

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:10-bk-12927-ER |
| FIRSTFED FINANCIAL CORP., | Chapter 11 |
| Debtor and<br>Debtor-in-Possession. | **DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S PLAN OF LIQUIDATION** |
| | **Confirmation Hearing** |
| | **Date:** January 5, 2011<br>**Time:** 10:00 a.m.<br>**Place:** Courtroom 1568<br>225 East Temple Street<br>Los Angeles, CA 90012 |

# TABLE OF CONTENTS

PLAN OVERVIEW ................................................................................................ 1

   Note Regarding Distributions .......................................................................... 2

I. INTRODUCTION ......................................................................................... 3

   A.  Section 1125. ......................................................................................... 3

   B.  Voting Class. .......................................................................................... 4

   C.  Additional Information. ......................................................................... 5

   D. Disclaimer. ............................................................................................. 5

   E.  Balloting ................................................................................................. 6

   F.  Confirmation Hearing ............................................................................ 7

II. SUMMARY ................................................................................................. 7

   A.  The Debtor. ............................................................................................ 7

   B.  Overview of the Plan. ............................................................................ 8

   C. Recommendation .................................................................................... 8

III. BACKGROUND ......................................................................................... 8

   A.  The Debtor's Business. .......................................................................... 9

   B.  The Debtor's Financing ......................................................................... 9

      1.  Unsecured Indebtedness ................................................................... 9

      2.  Equity Interests ............................................................................... 10

   C.  Events Leading Up to Bankruptcy. ..................................................... 10

      1.   Declining Real Estate Market and Increasing Unemployment .................. 10

      2.  Initial Capital Raising Efforts in 2008 ........................................... 11

      3.  Common Stock Delisting from the New York Stock Exchange .................. 12

      4.  Regulatory Actions by OTS ........................................................... 12

      5.  Events Leading Up to September 30th Deadline ............................. 13

      6.  Debtor's Financial Condition at September 30th, 2009 ................. 16

      7.  Resignation of Grant Thornton as Debtor's Independent Auditors ............ 16

8. Contingency Plan: Raise Capital by December 2nd ................................................... 17

9. The FDIC's Marketing of the Bank .................................................................. 18

10. Improved Capital Ratios and Loan Delinquency Rates ........................................... 18

11. Seizure and Sale of Assets and Liabilities of Bank .............................................. 19

D. Debtor in Possession of Administration ................................................................ 20

   1. Employment Applications. ........................................................................... 20

   2. Change in Debtor's Management and Application to Employ Don Pelgrim as
      Chief Administrative Officer .......................................................................... 20

   3. Application to Employ Carl W. McKinzie as Debtor's Chief Executive Officer ........ 21

   4. Application to Employ Crowe Horworth, LLP as Accountants ............................... 22

   5. Application to Employ Rus Miliband & Smith as Attorneys to Investigate the
      Debtor's Potential Claims Against the Debtor's Prepetition Accountants. ................ 22

   6. Bar Date Motion ...................................................................................... 23

   7. Schedules and Statement of Financial Affairs ................................................. 23

   8. Tax Audit and Refunds .............................................................................. 23

   9. FDIC Proof of Claim ................................................................................. 23

E. The FDIC's Motion for Relief From Stay, the Debtor's 2004 Motion and the Filing
   of the Debtor's Federal Tax Return for the Year Ended December 31, 2009 ................. 24

F. Motion to Abandon Certain Claims. ..................................................................... 26

G. Prosecution of Estate Causes of Action ................................................................ 26

   1. Estate Causes of Action Against Third Parties ................................................. 26

   2. Recovery of Preferential or Fraudulent Transfers ............................................. 27

   3. Objections to Claims ................................................................................. 27

IV. THE PLAN OF REORGANIZATION .................................................................. 27

A. Summary of Certain Other Provisions of the Plan ................................................... 29

   1. Executory Contracts and Unexpired Leases. .................................................... 29

   2. Means of Implentation ................................................................................ 31

      a. From the Confirmation Date to the Effective Date ........................................ 31

      b. Vesting of Assets ................................................................................. 31

      c. Establishment of the Liquidating Trust ..................................................... 32

   i. Beneficiaries ................................................................................... 32

   ii. Implementation of the Liquidating Trust. ...................................... 32

   iii. Transfer of Debtor's Assets ............................................................ 33

   iv. Representative of the Estate ............................................................ 33

  3. No Liability of Liquidating Trustee ........................................................ 33

  4. Prosecution of Estate Causes of Action by the Liquidating Trustee. ............ 34

   a. Issuance and Execution of Plan Related Documents and Corporate Action ................................................................................... 35

   b. Cancellation/Surrender of Debentures and Related Agreements .................... 35

  5. Provision for Allowance of the Claims Asserted by the Indenture Trustee On Behalf of the Holders of the Debentures (the "Debenture Claims") ........................... 36

  6. Resolution of Disputed Claims ............................................................... 37

  7. Distributions Under the Plan .................................................................. 38

   a. General Provisions. .......................................................................... 38

   b. Delivery of Distributions, Address of Holder ................................ 38

   c. Record Date ..................................................................................... 38

  8. Conditions Precedent ............................................................................. 39

  9. Retention of Jurisdiction ........................................................................ 39

  10. Effective Date ....................................................................................... 39

  11. Amendment, Modification or Revocation of the Plan .......................... 39

  12. Post Confirmation Notice ..................................................................... 40

V. EFFECT OF PLAN CONFIRMATION ............................................................... 40

 A. Preservation of Rights of Action ................................................................ 40

 B. No Liability for Solicitation or Participation ............................................. 40

VI. CONFIRMATION PROCEDURE ........................................................................ 41

 A. Voting; Acceptance ..................................................................................... 41

 B. Confirmation Hearing. ................................................................................ 42

LANDAU
GOTTFRIED
& BERGER LLP

C. Feasibility ................................................................................................44

D. Best Interests Test ....................................................................................45

E. Risks ........................................................................................................46

VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN
OF REORGANIZATION.................................................................................46

A. Liquidation Under Chapter 7 ...................................................................46

B. Alternative Plan of Liquidation................................................................46

VIII. VOTING PROCEDURES ..............................................................................47

A. Procedures for Tabulation of Votes on the Plan .....................................47

B. Special Provisions With Respect to Voting by Beneficial Owners of the Debentures .......48

IX. CERTAIN FEDERAL INCOME TAX CONSQUENCES.....................................49

A. Introduction..............................................................................................49

B. Consequences to the Debtor .....................................................................50

C. Consequences to Holders of General Unsecured Claims.........................51

1. Recognition of Gain or Loss Generally.............................................51

2. Distributions in Payments of Accrued but Unpaid Interest...........53

3. Tax Treatment of the Liquidating Trust and Holders of Interests Therein .................53

4. Witholding....................................................................................56

X. FEES AND EXPENSES ..................................................................................57

XI. SUMMARY OF ADDITIONAL SOURCES OF INFORMATION...............................57

XII. RECOMMENDATION AND CONCLUSION ........................................................58

# PLAN OVERVIEW

The Plan[1] provides for the disposition of all assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code and the Plan. Remaining assets, to the extent not converted to cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of after the Effective Date, with all net cash proceeds to be distributed to Holders of Allowed Claims, as provided for in the Plan.

| Plan Summary | | | | |
|---|---|---|---|---|
| Class | Treatment | Property Distributed | Recovery (approx.) | Voting Status |
| **Class 1**: Other Priority Claims. **Class 1** will include any Allowed Claim of the Federal Deposit Insurance Corporation to the extent deemed to be a priority claim pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. *See* FDIC Proof of Claim, Exhibit H hereto. The FDIC claim presently is unliquidated. To the extent that it becomes an Allowed Class 1 priority claim it will reduce, and (if large enough) may eliminate, the amounts available for distribution to unsecured creditors. The Debtor disputes the FDIC's claim and reserves all rights with respect thereto. | Payment in Cash in full in accordance with the priorities set forth in Section 507(a) of the Bankruptcy Code. | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |

---

[1] Capitalized terms used in this Disclosure Statement shall, unless otherwise indicated, bear the meaning ascribed to them in the Plan of Liquidation, attached as Exhibit "A" hereto, ("Plan").

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 2:** Secured Claims | Retention of all legal, equitable and contractual rights | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 3:** General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust | Cash | | Impaired - entitled to vote |
| **Class 4:** FirstFed Common Stock Interests | Receives no distribution under the Plan unless and until Class 3 is paid in full; cancelled pursuant to the Plan | N/A | N/A | Impaired – **not** entitled to vote (deemed to reject) |

**Note Regarding Distributions:**

Distributions to holders of Administrative Expenses and Priority Tax Claims and holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the claim becomes an Allowed Claim. On June 29, 2010, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for First Federal Bank of California filed its Proof of Claim in the Debtor's Bankruptcy Case (the "FDIC POC"). As filed, the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. A copy of the FDIC POC is attached hereto as Exhibit "F"

TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM ENTITLED TO PRIORITY TREATMENT, IT WILL BE CLASSIFIED AS A CLASS 1 CLAIM. DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW. ANY SUCH ALLOWED CLASS 1 FDIC CLAIM WILL REDUCE, AND MAY COMPLETELY ELIMINATE, THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED CREDITORS OF THE DEBTOR. THE DEBTOR DISPUTES THE FDIC'S CLAIM. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE WITH RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

Distributions to Holders of Allowed Claims in Class 3 will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, provided, however, that distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

## I.    INTRODUCTION

FirstFed filed a voluntary petition for relief (the "Petition") under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), on January 6, 2010 (the "Petition Date"), thereby commencing the captioned Chapter 11 case (the "Chapter 11 Case"). FirstFed has operated as a debtor-in-possession since the Petition Date pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or Official Committee of Creditors Holding Unsecured Claims has been appointed in the Chapter 11 Case. The Debtor filed its Plan on October 1, 2010 (Docket No. 91). The Plan envisions a liquidation of all FirstFed's remaining assets pursuant to the provisions of the Bankruptcy Code and in accordance with the terms of the Plan.

### A.    Section 1125.

This *Disclosure Statement in Support of the Debtor's Plan of Liquidation* (as the same may be modified, amended, or supplemented, the "Disclosure Statement") is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings seeking confirmation of the Plan. A copy of the Plan is attached hereto as Exhibit A".

This Disclosure Statement sets forth information regarding, among other things, the history of FirstFed and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose is to provide the holders of impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in their entirety and consider them with such holder's legal and financial advisors in connection with the proceedings seeking confirmation of the Plan. No person has been authorized by FirstFed to utilize,

LANDAU
GOTTFRIED
& BERGER LLP

for purposes of solicitation, any information concerning FirstFed or its business, other than the information contained or referred to herein.

### B.    Voting Class.

Pursuant to the Bankruptcy Code, each holder of an Allowed Claim in Class 3 (the "Voting Class"), is entitled to vote on the Plan. Holders of Allowed Claims in Classes 1 and 2 are presumed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code because their Claims are not impaired under the Plan. Holders of Equity Interests in Class 4 are presumed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code because they will not receive a distribution under the Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Section II of the Plan entitled *"Classification and Treatment of Claims and Equity Interests."*

Except as described below, the Plan may be confirmed only if accepted by the Voting Class. The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class counting only those holders who cast Ballots (as defined below).

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLASS 3 CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF CLASS 3 CLAIMS VOTE TO ACCEPT THE PLAN.**

The Debtor anticipates that holders of Class 3 Claims will vote to accept the Plan. The Debtor reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this Disclosure Statement entitled *"Confirmation Procedure."*

///

///

### C.    Additional Information.

Attached as Annexes to this Disclosure Statement are copies of the following:

1. The Plan (Exhibit "A");

2. Projected Available Cash Proceeds Analysis (Exhibit "B");

3. Hypothetical Chapter 7 Liquidation Analysis (Exhibit "C");

4. List of Pending Litigation (Exhibit "D");

5. Potential Preference Payments (Exhibit "E");

6. Potential Third Party Estate Causes of Action (Exhibit "F"); and

7. The FDIC POC (Exhibit "G") .

Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan, are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this Disclosure Statement, and scheduling the confirmation hearing, the deadlines and procedures for voting, and for objecting to confirmation of the Plan, and related matters (the "Confirmation Notice"); and (ii) for each holder of an Allowed Claim in the Voting Class, the form of ballot for casting an acceptance or rejection of the Plan (the "Ballot").

### D.    Disclaimer.

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of its books and records, to enable hypothetical, reasonable investors typical of the holders of impaired Claims to make an informed judgment as to whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY**

STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE

STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE

DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES

MADE, TO THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER,

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A

DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY

EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING

CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR

REPRESENTED TO BE ACCURATE BY THE DEBTOR OR BY ANY OF ITS ADVISORS.

NOR HAS THE DEBTOR OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE

INFORMATION SET FORTH HEREIN.

ALTHOUGH THE DEBTOR'S PROFESSIONAL ADVISORS HAVE ASSISTED IN

THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL

INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND

ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT

INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE

NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

After carefully reviewing this Disclosure Statement and the Plan, including the respective

exhibits, each holder of an impaired Claim in the Voting Class (Class 3) should decide whether to

accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the

envelope provided.

E.    Balloting.

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN,

SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO

THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT.

PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT.

LANDAU
GOTTFRIED
& BERGER LLP

**ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.**

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Debtor's Ballot Tabulator, Katherine Moss, 1801 Century Park East, Suite 1460, Los Angeles, California, 90067, Facsimile: (310) 557-0056.

### F. Confirmation Hearing.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Notice accompanying this Disclosure Statement. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Notice. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

## II. SUMMARY

The following is a summary of certain information contained elsewhere in this Disclosure Statement. Reference is made to, and this Summary is qualified in its entirety by reference to, the more detailed information contained herein and in the exhibits hereto. Holders of impaired Claims are urged to read this Disclosure Statement, the Plan and their respective exhibits in their entirety.

### A. The Debtor.

The Debtor is a savings and loan holding company that was incorporated in Delaware on February 3, 1987, and commenced operations on September 22, 1987. Its principal business was to serve as the holding company for its wholly-owned subsidiary, First Federal Bank of California (the "Bank"), the Debtor's principal asset. As of December 2009, the Bank had 39 full-service banking

branches located in Southern California and engaged in single family, multi-family and commercial lending throughout California.

As a savings and loan holding company, the Debtor was subject to regulation by the Office of Thrift Supervision ("OTS"). The Bank's deposits were insured through the Deposit Insurance Fund ("DIF") of the FDIC, and the Bank was subject to regulation by the FDIC.

### B.    Overview of the Plan.

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "A". IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the assets of the Debtor and the distribution of the Available Cash to holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code, and in accordance with the Plan. The Plan does not provide for any distribution to holders of Allowed Equity Interests unless and until holders of Allowed Class 3 Claims have been paid in full, which -- as set forth in the projections attached as Exhibit "B" hereto-- is not projected to occur.

### C.    Recommendation.

The Debtor believes that the Plan provides the best feasible recoveries to holders of impaired Class 3 Claims and is in the best interests of such holders. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ALL SUCH HOLDERS ACCEPT THE PLAN.

### III.    BACKGROUND

As more fully described below, the Plan provides that all assets of the Estate remaining on the Effective Date will vest in the Liquidating Trust. The Available Cash will be distributed to the Debtor's creditors by the Liquidating Trustee in accordance with applicable provisions of the Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed to, among other things, handle prosecution of any and all potential claims that may bring cash into the Liquidating Trust, and sell any other assets that may have value, bring any potential avoidance actions, and object to any claims.

///

LANDAU
GOTTFRIED
& BERGER LLP

### A.    The Debtor's Business.

On December 18, 2009, the OTS closed the Bank and the FDIC was appointed as a receiver for the Bank's assets and liabilities.  Prior to that time, the Debtor's primary business was to serve as a holding company for the Bank.  Other than the business conducted by the Bank, on the Petition Date, the Debtor did not own or engage in any other operating businesses.  As a legal entity separate and distinct from its subsidiary Bank, the Debtor's principal source of funds was dividends that were paid by the Bank.

Upon its appointment as receiver for the Bank, the FDIC entered into a purchase and assumption agreement with OneWest Bank, FSB ("OneWest") to assume all of the Bank's deposits and certain other of its assets and liabilities.  As a result of the loss of its primary financial asset, the Debtor commenced this case under Chapter 11 of the Bankruptcy Code by filing its voluntary petition for relief on the Petition Date.

### B.    The Debtor's Financing.

#### 1.    Unsecured Indebtedness.

The bulk of Debtor's approximately $159,600,000.00 in indebtedness consists of the following (collectively, the "Senior Indebtedness"):

(a)    certain unsecured Fixed/Floating Rate Senior Debt Securities due 2015, 2016 and 2017 (collectively, the "Debentures"), issued by the Debtor in the original aggregate principal amount of $150,000,000.00, pursuant to certain Indentures, dated as of December 29, 2005, June 15, 2005, and April 26, 2007 (collectively, the "Indentures"), by and between the Debtor and Wilmington Trust Company as indenture trustee thereunder (when acting in such capacity, the "Indenture Trustee"); *plus*

(b)    approximately $9,600,000.00 in accrued but unpaid interest under the Debentures.

Other indebtedness includes franchise taxes owed to the State of Delaware (the jurisdiction of Debtor's incorporation), unliquidated intercompany claims that may be held by the Bank, unliquidated claims for pre-petition professional services rendered and other vendor claims.  Debtor does not have any secured indebtedness.

## 2.    Equity Interests.

The Debtor was formed as a savings and loan holding company to provide additional flexibility to the organization through the ability to serve a broader geographic area, expand its product offerings, access capital markets through the ability to issue debt and other financial instruments, and to gain certain tax benefits.  Upon its formation in 1987 it acquired all of the issued and outstanding securities of the Bank.  Its FirstFed Common Stock is traded in the over-the-counter market on the Pink Sheets under the symbol "FFEDQ.PK."

## C.    Events Leading Up to Bankruptcy.

### 1.    Declining Real Estate Market and Increasing Unemployment.

Prior to 2009, the principal business of the Bank was attracting checking and savings deposits from the general public and using those deposits, together with borrowings and other funds, to make real estate, business and consumer loans.  In the last several years, the Bank invested in a portfolio of single family residential loans on properties located throughout California.  These residential loans, the majority of which originated between 2004 and 2008, were obtained primarily from wholesale loan brokers, although residential loans were also offered in the Bank's branches.

A portion of the Bank's loan portfolio consisted of adjustable rate mortgages that allowed borrowers to make a minimum payment that was less than what would be required to pay for the interest due on the loan, resulting in "negative amortization" whereby the unremitted interest portion was added to the outstanding principal balance on the loan.  Once the maximum allowed negative amortization was reached, the loan would "recast," meaning that the payment would increase in accordance with the terms of the original note and borrowers would be required to remit that higher payment.

Beginning in late 2007, the single family housing market in California began to decline, a decline that continued precipitously throughout 2008 and most of 2009.  Moreover, California and the rest of the nation entered a recession during 2008, if not before, with a concomitant increase in unemployment.  The combination of a declining real estate market and increasing unemployment resulted in rising delinquencies and foreclosures in the Bank's loan portfolio during 2008 and 2009.

LANDAU
GOTTFRIED
& BERGER LLP

1  That portfolio included a significant number of adjustable rate loans that were reaching their

2  maximum allowed negative amortization, which exacerbated the effects of the recession on the loan

3  portfolio.  At the beginning of 2008, the Bank had a nonperforming asset ratio of 2.79%.  By the

4  end of that year, the ratio had risen to 7.00%, later climbing to 8.20% as of June 30, 2009.

### 2.    Initial Capital Raising Efforts in 2008.

6      The Debtor understood that the economic downturn would adversely affect not only its

7  capital ratios, which were its banking regulators' primary measurement of the Bank's stability, but

8  also its overall financial condition.  In the fall of 2008, the Debtor engaged the investment banking

9  services of Keefe, Bruyette & Woods ("KBW") to assist it in raising capital.  During December 2008,

10  the Debtor negotiated a letter of intent with a potential lead investor who anticipated an initial

11  investment of $300 million in the Debtor.  Given the substantial uncertainty in the marketplace in the

12  wake of the FDIC seizure of IndyMac Bank in July 2008 and Downey Savings and Loan in

13  November 2008, coupled with the subsequent collapse of large institutions such as Washington

14  Mutual Bank and the forced merger of Wachovia Bank with Wells Fargo Bank, N.A., the investor

15  sought, among other things, assurance from regulators that they would not take any adverse actions

16  against the Bank immediately after the consummation of an investment if the Debtor were successful

17  in raising proceeds sufficient to meet minimum requisite capital ratios.  Due to the regulators'

18  unwillingness to provide any such reasonable assurance, the transactions contemplated by the letter of

19  intent were never consummated.

20      Also in December 2008, at the express request of the OTS, the Debtor was required to hire

21  two additional investment banks:  First, at an up-front cost of $2,000,000.00, the Debtor engaged

22  Goldman, Sachs & Co. ("Goldman Sachs") to pursue a merger with or acquisition by another

23  federally insured institution.  As the Debtor feared at the time, this effort was unsuccessful and was

24  quickly abandoned by Goldman Sachs due to deteriorating conditions in the wider economy which

25  generally dampened the appetite for strategic transactions.  No portion of the $2,000,000.00 fee was

26  returned.

27  ///

28  ///

LANDAU
GOTTFRIED
& BERGER LLP

11

Second, at a monthly cost of $100,000, the Debtor was required to engage FBR Capital Markets & Co. ("FBR") for the express purpose of monitoring, and reporting on, the performance of the other investment banks retained by the Debtor.

Concurrently with these capital raising efforts, the Debtor timely submitted an application to the OTS for a TARP investment of $125,000,000 on October 24, 2008. The request was never acted on by the OTS.

### 3.    Common Stock Delisting from the New York Stock Exchange.

On February 26, 2009, NYSE Regulation, Inc. announced that it had determined that the Debtor's FirstFed Common Stock would be suspended from trading prior to market opening on Wednesday, March 4, 2009 due to the Debtor's failure to satisfy one of the continued listing standards of the New York Stock Exchange (the "NYSE"). Since March 4, 2009, the stock has been quoted on the over-the-counter market under the symbol "FFEDQ.PK."

### 4.    Regulatory Actions by OTS

On January 26, 2009, the OTS issued an Order to Cease and Desist to each of the Debtor and the Bank (the "Debtor Order" and the "Bank Order," respectively, and together, the "Orders"). The Debtor Order required the Debtor to notify, or in certain cases receive the permission of, the OTS prior to, inter alia, (i) declaring or paying any dividends or other capital distributions on its capital stock; (ii) incurring, issuing, renewing, repurchasing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; or (iii) making payments (including, without limitation, principal, interest or fees of any kind) on any existing debt. The Debtor Order also required that the Debtor submit to the OTS for its approval, within fifteen (15) days of the date of the Debtor Order, a detailed capital plan ("Capital Plan") to include a proposal as to how the Bank could remain "well capitalized" (as defined in 12 C.F.R. § 565.4) at each quarter-end through December 31, 2011, which Debtor timely submitted.

In an effort to comply with asset growth limitations contained in the Orders, the Bank immediately suspended lending for its own portfolio, resulting in the layoff of approximately 10% of the Bank's then-current workforce and significant continued downsizing throughout 2009. The

1   Debtor did not receive the necessary consent from the OTS to make the aggregate $2,300,000 in

2   interest payments due on the Senior Indebtedness on March 16, 2009, and therefore could not and

3   did not make those payments (for the same reason, Debtor failed to make the aggregate $2,300,000

4   in interest payments due on each of June 15, September 15 and December 15, 2009).

5          The OTS did not approve or reject the Capital Plan. Instead, on May 28, 2009, the OTS

6   issued an Amended Order to Cease and Desist to each of the Debtor and the Bank (together, the

7   "Amendments"). The Amendments required that the Debtor and the Bank submit to the OTS for its

8   approval, within thirty (30) days after the issuance of the Amendments, a detailed capital plan (the

9   "May Capital Plan") to address how the Bank expected to meet and maintain a minimum Tier 1

10  Core Capital ratio of 7% and a minimum Total Risk-Based Capital ratio of 14% by September 30,

11  2009. The Amendments provided that if the Bank failed to meet or maintain such capital ratios or

12  otherwise failed to comply with the May Capital Plan, as approved by the OTS, a contingency plan

13  to accomplish either a merger with or acquisition by another federally insured institution or holding

14  company thereof, or a voluntary liquidation of the Bank, would need to be submitted to the OTS.

15  The Debtor and the Bank did timely submit a May Capital Plan to the OTS as required by the

16  Amendments, which anticipated that outside capital would be raised during the third quarter of

17  2009.

18                    **5.       Events Leading Up to September 30th Deadline.**

19         The Debtor took its capital raising efforts very seriously. Having been advised by its then

20  primary financial advisor, KBW, that the Senior Indebtedness was impeding investment, in January

21  2009, the Debtor had first attempted to retire such indebtedness, initially offering to pay 33 cents on

22  the dollar to do so. Based on the highly diffuse ownership of the debentures, which had been

23  packaged into securities consisting of the debt of many other financial institutions and sold to

24  investors around the world, that offer received little traction.

25         On June 1, 2009, the Debtor terminated the relationship with KBW and immediately began

26  working with FBR, who advised the OTS on the Debtor's prior capital raising efforts.

27         On June 18, 2009, the Debtor launched a new tender offer and consent solicitation,

28  lowering its offer price to 20 cents on the dollar based on the recent adverse regulatory actions and

engaging Goldman Sachs to solicit bondholders on its behalf. The efforts of Goldman Sachs & Co.
yielded only slightly more successful results, with $64,500,000 of debentures offering to tender.
The Debtor terminated its engagement of Goldman Sachs & Co. and hired Hexagon Securities on
August 18, 2009. This second effort by Hexagon Securities would eventually result in the tender of
$143,000,000 million of the $150,000,000 million in outstanding principal amount of debentures.

In addition to the Debtor's activities to improve the opportunity for the investment by
outside capital, based in part on advice received from FBR, the Bank began an aggressive loan
modification outreach to further blunt the adverse effect of recasting adjustable rate mortgages on
delinquencies in its loan portfolio, which it had begun modifying based on borrower payment
difficulty beginning in late 2007. As a result of this outreach effort, the Bank was able to modify
over $1 billion in such mortgages by July 2009, substantially reducing the future financial
uncertainty that otherwise would have existed. Perhaps more important, the Bank's modified loan
portfolio was performing substantially better than published data of industry-average modified
portfolio performance.

Despite this and other demonstrable events showing progress, in early July 2009, the Debtor
was informed by the FDIC that potential bidders for the Bank's assets would be arriving that month,
implying that the regulators intended imminently to seize the Bank. Members of the Debtor's
executive management and Board went to Washington, DC to present to representatives of the OTS
and FDIC the Debtor's progress with respect to the debt tender offer and loan modifications, and
data demonstrating that the Debtor's financial condition was beginning to turn the corner (loan
delinquencies were decreasing after several months of increases and branch deposits were
increasing, even despite the publication of recent adverse regulatory actions against the Debtor and
the Bank). This meeting resulted in regulatory interest in the Bank's modification program, with the
FDIC sending examiners to the Bank on July 27, 2009 to undertake a review of it.

The Debtor worked diligently through August on its efforts to raise capital, presenting a
draft engagement letter from FBR to lead a public capital raise of the Debtor's common stock to the
OTS for its review and approval. Nonetheless, despite this progress, the efforts to raise capital
continued to face obstacles, in particular, the regulatory request near the end of August that the

LANDAU
GOTTFRIED
& BERGER LLP

14

1    Debtor revise its proposed May Capital Plan to provide for the influx of more capital than originally

2    anticipated based on regulatory concerns regarding the Bank's loan portfolio. A revised plan

3    ("September Capital Plan") was submitted for the approval of the OTS during the first week of

4    September. On September 2, 2009, having received the necessary OTS approval to do so, the

5    Debtor executed the engagement letter with FBR.

6        On September 3, 2009, even though the OTS was the Debtor's primary banking regulator,

7    the FDIC nonetheless issued a visitation report related to its recent review of the Bank's loan

8    modification program. After reviewing the report, the Bank's management noted that it contained

9    numerous significant factual and process errors which together led to a conclusion unsupported by

10    the actual and projected condition of the Bank. Based on further discussions and in response to the

11    Bank's request that the erroneous report be rescinded, the FDIC agreed to issue an amended report

12    which would correct the errors it conceded were contained in the initial version. Prior to the

13    issuance of the amended report, the Debtor's independent auditors began expressing concern

14    regarding the potential accounting ramifications of the original report, noting that the regulators

15    have the authority to require that adjustments be made to previously-issued financial statements.

16    The Debtor relayed this concern to the FDIC, noting that the Debtor was required to produce

17    financial statements in accordance with generally accepted accounting principles in the United

18    States of America ("GAAP") and that those principles were not in accord with the analyses

19    contained in the visitation report. The FDIC, acknowledging that its report was not in accordance

20    with GAAP, finally issued an amended visitation report a week and a half after it had been

21    promised. Unfortunately, while several of the more egregious errors had been remedied, many

22    which had been discussed and conceded by the FDIC were not reflected in the amended report,

23    which also contained new errors.

24        The Debtor held a special stockholder meeting on September 30, 2009, at which

25    stockholders agreed to increase the number of authorized shares of the Debtor's common stock

26    from 100 million to 5 billion and authorized a subsequent reverse stock split, which actions would

27    have enabled  the Debtor to proceed to raise capital in the public markets pursuant to a registration

28    statement the Debtor had been preparing to file with the Securities and Exchange Commission

1   ("SEC") in order formally to initiate its public raise.  Also on September 30th, the Debtor reached

2   the 75% minimum threshold on its debt tender offer, with $112,500,000 of the $150,000,000

3   agreeing to tender in exchange for 20 cents on the dollar.  By October 16, 2009, $143,000,000, or

4   95% of the bonds had agreed to tender.

5               **6.      Debtor's Financial Condition at September 30, 2009.**

6               As noted, the Orders and the Amendments required, *inter alia,* that the Debtor submit

7   proposed capital plans for the OTS's approval that would (in the case of the Capital Plan) result in

8   the Bank maintaining a minimum Tier 1 Core Capital ratio of 5% and a minimum risk weighted

9   capital ratio of 10% and (in the case of the May Capital Plan) maintaining an increased minimum

10  Tier 1 Core Capital ratio of 7% and a minimum Total Risk-Based Capital ratio of 14%, which

11  needed to be met by September 30, 2009.  As the recession continued, meeting these ratios became

12  increasingly difficult to achieve for many financial institutions, including the Bank.

13              The Bank failed to meet the capital ratios required by the Amendments on September 30,

14  2009 and, accordingly, as required by the Bank Order, the Bank submitted to the OTS a

15  contingency plan to accomplish either a merger of the Bank with, or an acquisition of the Bank by,

16  another federally insured institution or holding company thereof or a voluntary liquidation of the

17  Bank.

18              **7.      Resignation of Grant Thornton as Debtor's Independent**

19                      **Auditors.**

20              During the first week of October 2009, the Debtor's executive management team worked to

21  allay concerns expressed by its independent auditors, Grant Thornton LLP ("GT"), relating to the

22  FDIC visitation report.  At the Debtor's request, the FDIC issued a clarification letter which the

23  Debtor hoped would dispel GT's concern that the regulators would require a restatement of

24  previously-issued financial statements based on projected loss amounts in excess of those which the

25  Debtor used in such statements.  Unfortunately, Grant Thornton's reaction to the letter was

26  continued concern that its review work on the Debtor's quarterly financial statements would be

27  subject to regulatory adjustment.  Despite several subsequent telephone conferences, e-mails and

28  meetings during the next several weeks, GT's concerns intensified that regulatory action calling for

LANDAU
GOTTFRIED
& BERGER LLP

a restatement, while unjustified, would be issued. During this period, GT refused to undertake any of the necessary procedures to consent to the use of its previously audited financial statements in Debtor's SEC registration statement, which was complete and ready to file pending only receipt of such consent. The breakdown of these communications and the resultant unwillingness of GT to stand behind its previous review and auditing work in the face of regulatory scrutiny at this critical time would practically preclude the Debtor from raising capital in the public markets. GT formally resigned from its engagement as the Debtor's independent auditors on November 9, 2009.

### 8.    Contingency Plan: Raise Capital by December 2nd.

During the second week of October, the OTS requested that the Debtor's Board of Directors pass a resolution consenting to the marketing of the Bank by the FDIC, including allowing potential bidders to conduct diligence on the Debtor's premises. In its updates to the OTS on its continuing efforts to raise capital, the Debtor had represented its belief that if GT were able to become comfortable with the FDIC's intentions and issue its consent, capital could be committed by December 2, 2009 under an extremely aggressive timetable put forth by FBR. Although it had been supportive of such timetable during the Debtor's updates, the OTS represented that it was being forced to request the consent on behalf of the FDIC and that ultimately the Debtor had little choice in the matter.

On October 14, 2009, the Debtor's Board provided the FDIC with the consent to be effective only in the event that capital was not raised by December 2, 2009. Similarly, in the contingency plan the Debtor submitted to the OTS on October 15th, the Debtor agreed to consent to receivership within 10 days only in the event that its primary strategy of raising capital by December 2, 2009 was unsuccessful.

The following week, facing increasing pressure from its regulators, and despite its firm belief that any simultaneous marketing of the Bank by the FDIC would further hamper the Debtor's ability to raise capital, the Debtor's Board provided the FDIC with an immediately effective consent to such activity based on the FDIC's written commitment to maintain strict confidentiality with regard to such process. At the request of the OTS, the Debtor amended its previously

LANDAU
GOTTFRIED
& BERGER LLP

1   submitted contingency plan to state that its Board would consent to the appointment of a receiver on

2   December 4, 2009.

### 9.   The FDIC's Marketing of the Bank.

4   On October 29, 2009, the FDIC began its on-site marketing of the Bank. In its initial

5   meeting regarding such process with the FDIC, the Debtor's management expressed the concern of

6   its financial advisors and legal counsel that any leak of information regarding the existence of the

7   FDIC's marketing process would seriously adversely affect the Debtor's ability to raise capital.

8   The FDIC responded that any interested party that leaked information would be excluded from the

9   bidding process. Later that same day, the Debtor was advised by a former employee of the Bank

10   that, during an interview with OneWest, she had been informed that the Bank was being marketed

11   and that OneWest would be the successful bidder based on its discussions with the FDIC. Despite

12   the FDIC's persistent representations regarding confidentiality and an investigation which showed

13   the former employee's claims to be credible, there was no exclusion of the breaching bidder. As

14   would become clear in six weeks, OneWest was indeed the successful bidder. During that time,

15   several parties who had been interested in making a capital investment in the Debtor refocused their

16   efforts on participating in the FDIC process.

### 10.   Improved Capital Ratios and Loan Delinquency Rates.

18   The November 6, 2009 enactment of Worker, Homeownership, and Business Assistance

19   Act of 2009 (the "WHBAA"), which allows businesses to carry back net operating losses from

20   2008 and 2009 for up to five years, significantly improved the Debtor's capital position. Based on

21   the WHBAA, the Debtor expected to book a tax benefit estimated to be more than $100 million in

22   the fourth quarter of 2009 and anticipated receiving a federal income tax cash refund during the first

23   quarter of 2010. Had the WHBAA been effective in the third quarter, the Bank would have had

24   additional capital at September 30, 2009, which would have raised the Bank's core and risk-based

25   capital ratios at that date to 5.49% and 11.13%, respectively.

26   The Debtor's financial condition was showing signs of improvement independent of the tax

27   benefit, with loan delinquency levels continuing to trend downward. Unaudited, unconsolidated

28   monthly results as of October 31, 2009 showed a decline in delinquent loans of $58,700,000, or

LANDAU
GOTTFRIED
& BERGER LLP

1   16%, from the previous month. Indeed, October was the eighth consecutive month in which the

2   Bank's loan delinquencies decreased, resulting in total delinquencies less than half of historic peak

3   levels reported by Debtor in early 2009. In addition, California home prices had begun to show

4   signs of recovery.

5       The Debtor communicated its "well capitalized" capital position at September 30th on a

6   pro forma basis giving effect to the WHBAA to regulators promptly upon completing its analysis of

7   the financial effects thereof. Throughout November, the Debtor made several telephone calls and

8   wrote many letters to the OTS and FDIC, urging them to restrain from seizing the Bank given the

9   Debtor's improving overall financial condition, which would ease the path to private equity

10  investment and completely prevent any potential loss to the DIF.

11              **11.    Seizure and Sale of Assets and Liabilities of Bank.**

12      On December 2, 2009, the Debtor's management and Board met with FDIC and OTS

13  representatives in Washington, DC. In that meeting, the Debtor's financial advisor informed the

14  agencies of its belief that a successful capital raise would be all but inevitable if the Debtor were

15  given the latitude to complete it, despite the passage of the December 2nd planned completion date.

16      On December 4, 2009, at the request of the OTS, the Debtor's Board provided the FDIC

17  with a consent to a receivership of the Bank. The following week, on December 9, 2009, the OTS

18  stated that it would forestall FDIC takeover of the Bank and allow the Debtor further time in which

19  to raise capital if the Debtor's Chief Executive Officer and Chairman of the Board were to

20  relinquish her positions. The Debtor's CEO/Chairman accepted the proposal, given that it would

21  allow the Debtor to continue executing its capital enhancement strategies and protect against the

22  potential loss of hundreds of jobs and millions of dollars of equity held by stockholders in the event

23  the Bank were closed.

24      Despite the Debtor's cooperation and agreement to the terms put forward by the regulatory

25  agencies, on December 18, 2009, the Bank was placed into receivership with the FDIC and certain

26  assets and liabilities of the Bank were thereafter sold to OneWest. As a result, the Debtor was left

27  with no other option but to file the Petition.

28  ///

LANDAU
GOTTFRIED
& BERGER LLP

19

### D.    Debtor in Possession Administration.

The Debtor commenced its Chapter 11 Case on the Petition Date to implement the liquidation of the Debtor's assets and operations. The Debtor has taken the following steps to efficiently administer its Chapter 11 Case to date:

#### 1.    Employment Applications.

On January 20, 2010, the Debtor filed applications to employ Landau Gottfried & Berger, LLP ("LGB") as its bankruptcy counsel and Manatt, Phelps & Phillips, LLP ("Manatt") as its special corporate, banking and litigation counsel. By Orders entered on February 17, 2010, the Bankruptcy Court approved the employment of LGB (Docket No. 25) and Manatt (Docket No. 26).

On March 2, 2010, the Debtor filed its application to employ Hutchinson & Bloodgood LLP ("H&B") to review, consolidate and electronically file (but not to prepare) the Debtor's federal tax returns for the tax year ended December 31, 2009, for a flat fee of $23,000.00. (Docket No. 30). The Court approved the employment of H&B by Order entered on July 22, 2010. (Docket No. 55).

#### 2.    Change in Debtor's Management and Application to Employ Don Pelgrim as Chief Administrative Officer.

As of the Petition Date, the Debtor had two officers who continued to serve as officers of the Debtor as Debtor-in-Possession: Babette Heimbuch, who served as the Debtor's Chief Executive Officer and Chief Financial Officer, and Vikas Arora, who served as the Debtor's General Counsel. Subsequent to the commencement of the case, the OTS notified the Debtor's Board of Directors ("Board") that it intended to take regulatory action against the Board and its members in connection with Ms. Heimbuch's appointment because the Board allegedly had failed to give the OTS 30 day's prior notice of Ms. Heimbuch's appointment. Although Ms. Heimbuch, FirstFed and its Board believed that the appointment was in accordance with the OTS's regulations because the commencement of the Bankruptcy Case was an exigent circumstance that obviated the need for compliance with the 30-day notice requirement, Ms Heimbuch nonetheless, after discussions between the Board and the OTS, acceded to the OTS's pressure and voluntarily resigned from her position as CEO and CFO of the Debtor, effective mid-May. Shortly thereafter,

1  Mr. Arora resigned to take up a post elsewhere. Accordingly, FirstFed was left with no officer to

2  act on its behalf in the bankruptcy case.

3        To fill this vacuum, FirstFed's Board acted quickly to identify possible candidates to serve

4  as Chief Administrative Officer for FirstFed, including Mr. Donald H. Pelgrim, who had first-hand

5  experience of the bank holding company bankruptcy process, having served as Chief

6  Administrative Officer ("CAO") of Vineyard National Bancorp. ("VNB") during VNB's Chapter

7  11 Bankruptcy Case. Based on this experience and Mr. Pelgrim's extensive background in banking

8  the Board selected Mr. Pelgrim, and entered into an agreement ("Pelgrim Employment

9  Agreement") with Delta Corps, Inc. ("Delta Corps") to provide the Debtor with Mr. Pelgrim's

10 services as CAO of the Debtor. The Board also appointed Brian Argrett to serve as FirstFed's

11 Chief Executive Officer and Secretary. Mr. Argrett is a member of FirstFed's Board. The

12 combined compensation of Mr. Pelgrim and Mr. Argrett represented a 20% savings to the Debtor's

13 estate, when compared with the salaries that were paid to Ms. Heimbuch and Mr. Arora.

14        On June 25, 2010, the Debtor filed its application to employ Delta Corps for the services of

15 Mr. Pelgrim as CAO. (Docket No. 46). On July 12, 2010, the FDIC filed its written objection to

16 Mr. Pelgrim's employment. (Docket No. 53) ("FDIC Delta Corps Objection"). The Debtor's

17 counsel contacted counsel for the FDIC to attempt to resolve the FDIC's Delta Corps Objection.

18 However, although the Debtor was able to provide the FDIC with additional information relating to

19 the employment application, the FDIC ultimately was reluctant to withdraw the FDIC Delta Corps

20 Objection, and Mr. Pelgrim elected to withdraw from his position with the Debtor.

21            **3.        Application to Employ Carl W. McKinzie as Debtor's Chief**

22                    **Executive Officer.**

23        Following the withdrawal of Mr. Pelgrim, the Debtor again mounted a search for a suitable

24 candidate to fill the role of Chief Executive Officer of the Debtor. The Debtor's Board ultimately

25 selected Mr. Carl McKinzie, an experienced lawyer and respected member of the legal community in

26 Los Angeles, to fill that post. The Debtor filed its Application to Employ Mr. McKinzie with the

27 Court on September 20, 2010 (Docket No. 88)("McKinzie Employment Application"). On October

28 20, 2010, the Court entered its Order granting the McKinzie Employment Application and

1    authorizing the Debtor's employment of Mr. McKinzie as Chief Executive Officer of the Debtor

2    (Docket No. 99). Mr. Argrett continues to serve as the Debtor's Secretary and is a member of the

3    Debtor's Board of Directors.

4                    **4.**       **Application to Employ Crowe Horwath, LLP as Accountants.**

5        As noted, one of the principal assets of the Debtor is its right to receive a refund of its

6    federal taxes estimated to be in an amount of more than $100 million ("Refund") as a result of the

7    enactment, in November of 2009, of the WHBAA and the promulgation of Revenue Procedure

8    2009-52, which permit companies to carry back Net Operating Losses ("NOL") and Alternative

9    Minimum Tax Net Operating Losses ("ATNOL") incurred in either the 2008 or 2009 tax years for a

10    period of 5 years versus the 2 year period under the old rule.

11        However, the amount of the Refund is not certain, and some or all of it may be claimed by

12    the FDIC as receiver for the Bank, thus raising complex legal and accountancy issues. Having

13    previously obtained an extension of time through September 15, 2010 in which to file its 2009

14    return, the Debtor, on May 18, 2010, filed its application to employ Crowe Horwath, LLP ("Crowe

15    Horwath") as its accountants to prepare the Debtor's 2009 tax returns and its application for the

16    Refund, as well in connection with any other tax matters. (Docket No. 39). Crowe Horwath was

17    retained on account of its experience in the banking sector and its direct experience, gleaned in

18    other bank holding company bankruptcy cases, of the legal and accountancy issues arising in

19    connection with the Refund. On July 22, 2010, the Court entered its Order approving the

20    employment of Crowe Horwath (Docket No. 57).

21                    **5.**      **Application to Employ Rus Miliband & Smith as Attorneys to**

22                          **Investigate the Debtor's Potential Claims Against the Debtor's**

23                          **Prepetition Accountants.**

24        On July 6, 2010, the Debtor filed its application to employ Rus, Miliband & Smith

25    ("RMS") as special litigation counsel to investigate and evaluate potential claims that the Debtor

26    may have against GT, subject to payment of a post-petition retainer in the amount of $50,000.00 to

27    RMS, the amount of which would also serve as the maximum amount to be paid to RMS for such

28    investigation and analysis. (Docket No. 49). On July 30, 2010, the Court entered its Order

1  approving the Debtor's employment of RMS upon the terms set forth in the RMS engagement letter

2  and employment application. (Docket No. 59).

### 6. Bar Date Motion.

4  On February 22, 2010, the Debtor filed its *Notice of Motion and Motion for Entry of an*

5  *Order (I) Establishing Bar Dates for Filing Proofs of Claim or Interest; and (II) Approving the*

6  *Form and Manner of Notice Thereof* (Docket No. 28) ("Bar Date Motion"). Pursuant to an Order

7  of the Bankruptcy Court entered on April 15, 2010 (Docket No. 34), the Bar Date Motion was

8  approved and the Bar Date for filing proofs of claim was fixed as May 20, 2010 (the "Bar Date").

9  The last date for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file

10  proofs of claim was set for July 5, 2010. On April 16, 2010, the Debtor served on all creditors,

11  equity holders and other parties-in-interest and filed with the Bankruptcy Court its *Notice of Bar*

12  *Date for Filing Proofs of Claim or Interest against Debtor and Debtor-in-Possession FirstFed*

13  *Financial Corp.* (Docket No. 35).

### 7. Schedules and Statement of Financial Affairs.

15  On the Petition Date, the Debtor filed its Schedules and Statement of Financial Affairs with

16  the Bankruptcy Court.

### 8. Tax Audit and Refunds.

18  As noted previously, the Debtor may be eligible to claim a Refund of its federal taxes in an

19  amount of estimated to be more than $100 million due to a change in the tax law promulgated under

20  Revenue Procedure 2009-52 permitting companies to carry back NOLs and ATNOLs incurred in

21  either the 2008 or 2009 tax years for a period of 5 years versus the 2 year period under the old rule.

22  However, the amount of such Refund is not certain and some or all of the Refund may be

23  claimed by the FDIC as Receiver for the Bank. Further, there can be no guaranty that the Refund

24  will be allowed by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver

25  for the Bank, will receive any, or any material portion of, any such Refund.

### 9. FDIC Proof of Claim.

27  On June 29, 2010, the FDIC filed the FDIC POC in the Debtor's Bankruptcy Case. As filed,

28  the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims pursuant

to 11 U.S.C. § 507(a)(9) and/or other applicable authority. A copy of the FDIC POC is attached hereto as Exhibit "G."

TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM, IT WILL BE CLASSIFIED AS A CLASS 1 PRIORITY CLAIM. DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW. ANY SUCH ALLOWED CLASS 1 FDIC CLAIM WILL REDUCE AND MAY COMPLETELY ELIMINATE THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO OTHER UNSECURED CREDITORS OF THE DEBTOR. THE DEBTOR DISPUTES THE FDIC'S CLAIM. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE WITH RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

### E. The FDIC's Motion for Relief From Stay, the Debtor's 2004 Motion and the Filing of the Debtor's Federal Tax Return for the Year Ended December 31, 2009.

On August 13, 2010, the FDIC filed its *Notice of Motion and Motion for Relief From the Automatic Stay Under 11 U.S.C. §362* (the "FDIC RFS Motion"), seeking, *inter alia*, an order of the Bankruptcy Court granting the FDIC relief from the automatic stay under Section 362 of the Bankruptcy Code to exercise certain rights (referred to in the FDIC RFS Motion as the "Tax Rights") under Section 6402(k) of Title 26 of the United States Code (the "Internal Revenue Code" or "IRC") and related regulations set forth at 26 C.F.R. § 301.6402-7 (the "Treasury Regs") relating to the filing of federal tax returns for the Debtor and the Bank for the tax year ended December 31, 2009. The FDIC based the FDIC RFS Motion in part on the FDIC's stated concern that the Debtor would not timely complete the return before the extended September 15, 2010 deadline by which it had to be filed in order to preserve certain NOLs essential to the Refund. A hearing before the Bankruptcy Court to consider the FDIC RFS Motion was set for September 7, 2010 at 10:00 a.m. (the "FDIC RFS Hearing")

///

By its *Debtor's Opposition to FDIC Motion for Relief from Stay* and related Declarations (together, "Debtor's Opposition") filed with the Bankruptcy Court and served on August 24, 2010 (Docket No. 67), the Debtor opposed the FDIC RFS Motion, on various grounds, including that any delay in completing the 2009 return was caused by the FDIC because information required to complete the return lay within the control of the FDIC, which had not provided such information to the Debtor despite requests therefor; that the Debtor intended to, could, and would, file a return in a timely fashion in order to protect the Debtor's NOLs against loss to the fullest extent possible, even if the FDIC failed to provide the Debtor with the information necessary to complete the return; and that the scope of the relief sought by the FDIC was overly broad and vague.

Also on August 24, 2010, Wilmington Trust filed its *Statement of Joinder of Wilmington Trust Company as Indenture Trustee to Debtor's Opposition to FDIC Motion for Relief from Stay* (Docket No. 68) ("Joinder").

On August 23, 2010, the Debtor filed its *Notice of Motion and Motion Pursuant to Fed R. Bankr. P. 2004 for an Order Requiring the Production of Documents by and Examination of FDIC* and related Declaration (Docket No. 66) ("Debtor's 2004 Motion") seeking production by the FDIC of documents and information necessary to complete the 2009 tax return. An order of the Bankruptcy Court granting the Debtor's 2004 Motion was entered on August 28, 2010 (Docket No. 69) ("2004 Order").

On August 31, 2010, the FDIC filed its *Reply of the Federal Deposit Insurance Corporation to* the Debtor's Opposition (Docket No. 71) and related Declarations (together, the "FDIC Reply").

Although the FDIC had, prior to the FDIC RFS Hearing, produced certain documents to the Debtor in response to the 2004 Order, the Debtor and its accountants determined that the information so provided was inadequate to allow the Debtor to file a complete federal return for the tax year ended December 31, 2009. On September 7, 2010, in order to preserve the Debtor's NOLs and rights to the Refund to the greatest extent possible, the Debtor filed as complete a return as possible without complete information from the FDIC. ("Debtor's 2009 Return"). The Debtor reserves the right to amend and/or supplement the Debtor's 2009 Return to the extent appropriate in light of any relevant information that the Debtor may obtain from the FDIC.

LANDAU
GOTTFRIED
& BERGER LLP

1    Following the FDIC RFS Hearing, the Bankruptcy Court entered its Order granting the FDIC

2    RFS Motion to the extent set forth in the Court's tentative ruling on the Motion and as reflected in the

3    record of the FDIC RFS Hearing.

4              **F.    Motion to Abandon Certain Claims.**

5    Upon the instructions of the Debtor, the Debtor's counsel, commencing in the first week of

6    September, 2010, conducted an investigation of the Debtor's books, records and certain publicly

7    available documents, including the Debtor's pre-petition public filings with the Securities and

8    Exchange Commission, to determine whether the Debtor had, and could reasonably pursue, claims

9    against the Debtor's pre-petition directors and officers, including under the relevant directors and

10   officers insurance policies of the Debtor ("D&O Claims").  Based on that investigation and, in part,

11   on consideration of the impact of the decision in *Biltmore Associates, LLC v. Twin City Fire*

12   *Insurance Company,* 572 F.3d 663 (9th Cir. 2009) that the so-called "insured versus insured"

13   exclusion to coverage in a directors and officers liability policy ("D&O Policy") would operate to bar

14   a trustee of a liquidating trust under a confirmed plan of liquidation under Chapter 11 of the

15   Bankruptcy Code from asserting a claim under the D&O Policy, the Debtor determined that there

16   were no viable D&O Claims that should be pursued on behalf of the Debtor's estate.

17   Accordingly, on October 6, 2010, the Debtor filed with the Bankruptcy Court and served its

18   *Notice of Intent to Abandon* (Docket No. 94) ("Abandonment Notice").  No objection was timely

19   filed to the Abandonment Notice.

20             **G.    Prosecution of Estate Causes of Action.**

21                   **1.    Estate Causes of Action Against Third Parties.**

22   The Debtor and its professionals have made a diligent effort to identify in Exhibit "D" to

23   this Disclosure Statement, all Estate Causes of Action against third parties other than

24   preference/fraudulent transfer actions and objections to Claims.  No reliance should be placed on

25   the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D" and "F"

26   because the lists are non-exclusive and may be amended prior to the Confirmation Date to provide

27   for additional disclosures.  The Liquidating Trustee may seek to investigate, file and prosecute

28   Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of

LANDAU
GOTTFRIED
& BERGER LLP

1   Action are identified in the Disclosure Statement. As reflected in Section V.B.3 of the Plan, on the

2   Effective Date, any and all Estate Causes of Action the Estate may have against any third parties

3   shall be vested in the Liquidating Trust and Section V.B.4 of the Plan provides that the Liquidating

4   Trustee has the authority to prosecute these Estate Causes of Action.

5                        **2.       Recovery of Preferential or Fraudulent Transfers.**

6           The Liquidating Trustee will investigate whether certain prepetition payments to creditors

7   may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or applicable

8   State law. Exhibit "F" to the Disclosure Statement lists and/or identifies (i) all payments to

9   creditors made within ninety days of the Petition Date, (ii) all payments to insiders made within one

10  year of the Petition Date, and (iii) all distributions given to an insider of the Debtor, including

11  compensation in any form, bonuses, loans, stock, redemptions, and options exercised, also within

12  one year of the Petition Date. Each transfer listed therein and all other prepetition transfers and

13  obligations of the Debtor will be evaluated to determine whether the transfer or obligation is

14  avoidable on any grounds. Any creditor or party in interest that received a transfer from the Debtor

15  within four years prior to the Petition Date or in whose favor the Debtor incurred an obligation may

16  be the subject of an Estate Causes of Action on account of such transfer or obligation if grounds

17  exist to avoid the transfer or obligation. The Liquidating Trustee has the authority to prosecute

18  preferential and fraudulent transfers. See Section V.B.3 of the Plan.

19                                  **3.       Objections to Claims.**

20          To date, the Debtor has not filed any objections to Claims. As set forth in Section V.B.3 of

21  the Plan, after the Effective Date, the Liquidating Trustee has the authority to object, prosecute, and

22  settle Claims.

23  **IV.     THE PLAN OF REORGANIZATION**

24          A DETAILED CHART SETTING FORTH EACH CLASS DESIGNATED UNDER THE

25  PLAN, THE PROPOSED TREATMENT UNDER THE PLAN OF EACH CLASS, THE

26  PROJECTED RECOVERY UNDER THE PLAN FOR EACH CLASS, AND WHETHER A

27  CLASS IS ENTITLED TO VOTE, IS SET FORTH AT THE OUTSET OF THIS DISCLOSURE

28  STATEMENT. *See* **Plan Summary**.

LANDAU
GOTTFRIED
& BERGER LLP

27

The Plan envisions a liquidation of all remaining assets of the Debtor's Estate by the Liquidating Trustee. The assets of the Estate will vest in the Liquidating Trust upon the Effective Date and will be distributed consistent with the Bankruptcy Code priority scheme and in accordance with the terms of the Plan and the Liquidating Trust Agreement.

The Debtor believes that through the Plan: (x) holders of impaired unsecured Claims will obtain a greater recovery than would be available if the Debtor's assets were liquidated in any other manner under the Bankruptcy Code or if any other feasible alternatives were pursued; and (y) the value of the assets of the Estate will be maximized by converting the assets of the Estate into Cash in the most efficient and economical manner.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS ACCEPT THE PLAN.

In accordance with the Bankruptcy Code, the Plan classifies Claims and Equity Interests separately and provides, separately for each Class, that Holders of Claims or Equity Interests in the Class will receive various types of consideration, thereby giving effect to the different rights of the holders in each Class.

In general, under the Plan, on the Effective Date, all of the Estate's assets will vest in the Liquidating Trust and the Allowed Administrative Expenses, Allowed Priority Tax Claims, and the Allowed Class 1 Claims and Allowed Class 2 Claims will receive payment from the Liquidating Trustee in full in Cash or as otherwise noted in the Plan.

Each Holder of an Allowed Class 3 Claim will receive, as soon as practicable in the discretion of the Liquidating Trustee a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution"). In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata interim distributions (the "Interim Distributions") of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions. Pro Rata distributions relating to Disputed Claims will be placed in the

LANDAU
GOTTFRIED
& BERGER LLP

28

Disputed Claims Reserve. Based upon the Debtor's estimate of the total General Unsecured Claims in Class 3 of approximately $159,652,188 and the Debtor's estimate of the Available Cash, the Debtor estimates that holders of Allowed Claims in Class 3 will receive a percentage recovery of approximately 1.3% of the face amount of their Allowed Claims.[2] The actual percentage recovery will vary depending upon, among other things, the actual amount of Allowed Claims and the actual amount of Available Cash realized, such that the actual recovery may be different than the Debtor's estimate. Based upon the Debtor's estimates, the Available Cash are not sufficient to pay the Allowed Class 3 Claims in full. See Exhibit "B" to this Disclosure Statement.

Holders of Allowed FirstFed Common Stock Interests in Class 4 are junior in priority to Allowed Class 3 Claims and will not receive a distribution under the Plan unless and until the Holders of Allowed Class 3 Claims are paid in full. Since no distribution is expected to be made on account of Allowed Class 4 Claims, Allowed FirstFed Common Stock Interests in Class 4 will be deemed to receive nothing on account of their interests under the Plan, and such FirstFed Common Stock Interests will be deemed cancelled upon confirmation of the Plan.

THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING. THE PLAN IS ATTACHED HERETO AS EXHIBIT "A," AND FORMS A PART OF THIS DISCLOSURE STATEMENT.

### A.   Summary of Certain Other Provisions of the Plan.

#### 1.   Executory Contracts and Unexpired Leases.

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers the Debtor to assume, assume and assign, or reject executory contracts and unexpired leases. As a general matter, an "executory contract" is a contract under which material performance remains due by each party. If an executory contract or unexpired lease is rejected by the Debtor, the other party to the agreement may file a Claim for any damages incurred by reason of the rejection. In the case of rejection of employment agreements and leases of real property, such damage Claims are subject

---

[2] This estimate does not take into account any proceeds of, or costs of recovery of, the Debtor's Tax Refund Claims, Estate Causes of Action or avoidance claims arising under Chapter 5 of the bankruptcy Code or costs of distribution, all of which remain unknown at this time.

to certain limitations imposed by the Bankruptcy Code.  If an executory contract or unexpired lease is assumed, the debtor generally has the obligation to perform its obligations thereunder in accordance with the terms of such agreement.  If an executory contract is assumed and assigned, the assignee generally has the obligation to perform the obligations of the debtor thereunder in accordance with the terms of such agreement.

Section VII of the Plan discusses the assumption and rejection of executory contracts in further detail.  Executory contracts and unexpired leases to be assumed pursuant to the Plan and the projected Cure Payments, if any, are listed in Exhibit "1" to the Plan.  The procedures for disputing a Cure Payment or objecting to the assumption of such executory contracts or unexpired leases are discussed in further detail in Section VII.B of the Plan.  The Debtor reserves the right to delete any contract or lease from Exhibit "1" to the Plan, thereby rejecting the contract or lease, up to and including the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Exhibit "1" to the Plan and by giving notice to counsel for the Indenture Trustee and counsel for the non-debtor party to the contract or lease.

All executory contracts and unexpired leases which have not previously been rejected, which are not specifically assumed, either pursuant to the Plan or by separate order in the Chapter 11 Case, or which are not the subject of a motion to assume pending on the Effective Date, are deemed rejected pursuant to the Plan as of the Effective Date (or as of such earlier date as announced by the Debtor at the Confirmation Hearing).  Exhibit "2" to the Plan contains a nonexclusive list of executory contracts and unexpired leases to be rejected under the Plan.  Section VII.D sets forth the procedures for filing a Claim arising from the rejection of an executory contract or unexpired lease.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, will be treated as Allowed Class 3 Claims under the Plan.

///

///

///

### 2.    Means of Implementation.

#### (a)    From the Confirmation Date to the Effective Date.

Although the Plan will become effective only on the Effective Date, on and after the Confirmation Date and until the Effective Date, the Debtor shall take or cause to be taken all actions which are necessary or appropriate to enable the Plan to become effective on the Effective Date and to implement and perform the Plan on and after the Effective Date.

#### (b)    Vesting of Assets.

Unless otherwise expressly provided under the Plan, on the Effective Date, the Debtor's Assets, including all of the Estate Causes of Action, will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan. On and after the Effective Date, the transfer of the Debtor's Assets from the Estate to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.

In connection with the foregoing:

(i)    On the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property of the Liquidating Trusts free of any restrictions imposed under the Bankruptcy Code;

(ii)    The Confirmation Order will provide the Liquidating Trustee with express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of Action; and

(iii)    As of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

///

///

LANDAU
GOTTFRIED
& BERGER LLP

### (c)    Establishment of the Liquidating Trust.

On the Effective Date the Liquidating Trust Agreement will become effective, establishing the Liquidating Trust. The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). As of the Effective Date, the Liquidating Trustee will be responsible for liquidating the assets of the Liquidating Trust. The Liquidating Trustee shall commence his duties as Liquidating Trustee on the Effective Date for the purpose of carrying out all responsibilities and making distributions provided for under the Plan and Liquidating Trust Agreement.

### (i)    Beneficiaries.

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries ("Beneficiaries") of the Liquidating Trust will be the Holders of all Allowed Claims against and, to the extent Allowed Claims are paid in full with interest, Allowed Interests in the Debtor. The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement. The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

### (ii)    Implementation of the Liquidating Trust.

On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as Exhibit "3" to the Plan, take all such actions as required to transfer from the Debtor and the Estate the Debtor's Assets (except as specifically set forth herein). From and after the Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as required to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or otherwise resolving Estate Causes of Action and causing Distributions from the Liquidating Trust to be made to the Beneficiaries.

(iii)    **Transfer of Debtor's Assets.**

On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtor is authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee all of that Debtor's and its Estate's right, title and interest in and to its Assets, including all Estate Causes of Action, free and clear of all liens, Claims, encumbrances or interests of any kind in such property, except as otherwise expressly provided in the Plan. To the extent required to implement the transfer of the Debtor's Assets from the Debtor and its Estate to the Liquidating Trust, all Persons will cooperate with the Debtor and the Estate to assist the Debtor and the Estate to implement said transfers.

(iv)    **Representative of the Estate.**

The Liquidating Trustee will be appointed as the representative of the Estate pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to the Liquidating Trust Agreement) to inter alia: (i) object to Claims against and Equity Interests in the Debtor; (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iii) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Case. As the representative of the Estate, the Liquidating Trustee will be vested with all of the rights and powers of the Debtor and the Estate with respect to all Estate Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtor and/or the Estate, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

3.    **No Liability of Liquidating Trustee.**

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents"), and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained, will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related

LANDAU
GOTTFRIED
& BERGER LLP

33

to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. The Liquidating Trustee, the Liquidating Trustee's Agents and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Section X.A of the Plan is necessary to, *inter alia*, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate or the Liquidating Trust. The Confirmation Order's approval of the Plan will also constitutes a *res judicata* determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing herein or in Section X.A of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person.

### 4.    Prosecution of Estate Causes of Action by the Liquidating Trustee.

Pursuant to the Confirmation Order, on the Effective Date, the Debtor irrevocably assigns, transfers and conveys to the Liquidating Trust all property of the Estate, including, but not limited to, all Estate Causes of Action. Subject to the provisions of Section V.B.1 of the Plan, the Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all such Estate Causes of Action, with all recoveries derived therefrom to be included within Available Cash.

Therefore, the Estate Causes of Action described in Exhibit "F" (potential preference payments), Exhibit "E" (litigation against third parties) and the pending litigation claims described on Exhibit "D", if any, will be investigated and may be prosecuted by the Liquidating Trustee thereafter. Additionally, the Liquidating Trustee will investigate and may object to Claims after the Effective Date. The Debtor and its Professional Persons have made a diligent effort to identify in Exhibits "D," "E" and "F" to this Disclosure Statement, all potential Estate Causes of Action

(other than objections to Claims). However, no reliance should be placed on the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D," "E", or "F". The Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the Disclosure Statement.

With the sole exception of the potential D&O Claims abandoned pursuant to the Abandonment Notice described in Section III.F, above, neither the Debtor nor the Liquidating Trustee waives, relinquishes, or abandons any right or cause of action which constitutes property of the Debtor's Estate, whether or not such right or cause of action is an Estate Cause of Action has been listed or referred to in the Schedules or in this Disclosure Statement and whether or not such right or cause of action is currently known to the Debtor or the Liquidating Trustee. The Debtor submits that the reservation of Estate Causes of Action herein is sufficient to preserve such Estate Causes of Action and shall not give rise to any release, waiver, extinguishment, forfeiture or other impairment of any Estate Cause of Action against any party, nor shall same subject the Estate or the Liquidating Trustee to any claims or defenses of *res judicata*, equitable estoppel or any other similar doctrines or theories in connection with any of the Estate Causes of Action.

(a)    **Issuance and Execution of Plan Related Documents and Corporate Action.**

Pursuant to Section V.B of the Plan, as of the Effective Date, the Liquidating Trustee will be authorized to execute such amendments, modifications, supplements, and other documents as provided for in the Plan. From and after the Effective Date, the Debtor shall be dissolved and the Liquidating Trustee shall be authorized to take all action necessary to dissolve the Debtor. On the Effective Date, the employment, retention, appointment and authority of all Officers, Directors, Employees and Professionals of the Debtor shall be deemed to terminate.

(b)    **Cancellation/Surrender of Debentures and Related Agreements.**

As of the Effective Date, (a) the Indentures and the Debentures shall immediately and automatically terminate and have no further force or effect, and (b) neither the Debtor nor the other

parties thereto shall have any further rights, obligations or duties thereunder, except that each of the

Indentures and the Debentures shall continue to remain in effect for the following:

(i)    allowing a holder of an Allowed Class 3 Claim (including the

Indenture Trustee, and holders of Debentures) to receive a distribution provided for under this Plan in

accordance with the distribution provisions contained in the Indentures;

(ii)    the right of the Indenture Trustee to exercise its charging lien

rights under Sections 5.4 and 6.6 of the Indentures against any recoveries which are or may be due

and payable to any holders of the Debentures as Allowed Class 3 Claims; and

(iii)    the right of the Indenture Trustee to be indemnified pursuant to

the provisions of Section 6.6 of each of the Indentures.

Following the Effective Date, holders of Allowed Class 3 Claims will receive from the

Indenture Trustee or its designee specific instructions regarding the time and manner in which the

Debentures are to be surrendered.  Pending such surrender, such Debentures will be deemed cancelled

and shall represent only the right to receive the distributions to which the holder is entitled under this

Plan.  Any such holder who fails to surrender or cause to be surrendered such Debenture or fails to

execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent

or the respective indenture trustee (including the Indenture Trustee), agent or servicer, as the case

may be, within six (6) months after the Effective Date, shall be deemed to have forfeited all rights and

claims in respect of such Debenture and shall not participate in any distribution hereunder, and all

cash in respect of such forfeited distribution, including interest accrued thereon, shall revert to

distributions to be made to other holders of Debentures.

**5.       Provision for Allowance of the Claims Asserted by the Indenture
Trustee On Behalf of the Holders of the Debentures (the
"Debenture Claims").**

As set forth in further detail in Section IV.A. of the Plan, a beneficial owner of the

Debentures of record as of the seventh (7th) Business Day following entry of the Confirmation

Order (the "Record Date") shall, for purposes of distributions under the Plan, be deemed to have an

Allowed Class 3 Claim for the outstanding principal amount of the Debentures owned by such

1  beneficial owner plus accrued and unpaid interest as of the Petition Date, and need not file a proof

2  of claim with respect thereto.

3       With respect to distributions to be made to holders of the Debentures classified in Class 3,

4  the Indenture Trustee shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to

5  holders of the Debentures which are classified as Allowed Class 3 Claims; (iii) be solely

6  responsible for making distributions to holders of Allowed Class 3 Claims arising from such

7  Debentures; and (iv) be authorized to deduct the Indenture Trustee's Fees and Expenses from the

8  consideration provided to holders of Allowed Class 3 Claims to the extent so provided for in the

9  Indentures.

10        **6.    Resolution of Disputed Claims.**

11       As set forth in Section IV of the Plan, after the Effective Date and subject to the provisions

12  of the Plan and Liquidating Trust Agreement, the Liquidating Trustee will review all Claims and

13  determine if any grounds exist to object to such Claims.  Only Allowed Claims will be paid.

14  Distributions relating to Disputed Claims will be placed into the Disputed Claims Reserve until

15  such time as such Disputed Claim is adjudicated or otherwise settled.  Any Disputed Claim that

16  becomes an Allowed Claim after the Effective Date will be paid from the Disputed Claims Reserve.

17  If such Disputed Claim fails to become an Allowed Claim, money placed in the Disputed Claims

18  Reserve on behalf of such Disputed Claim shall be deemed to be Available Cash and shall be

19  distributed to holders of Allowed Class 3 Claims.

20       Additionally, any Claims filed by the Debtor's officers and directors seeking

21  indemnification from the Debtor pursuant to employment agreements, by-laws or otherwise, shall

22  be channeled, subject to any defenses thereto and 11 U.S.C. 510(b) and (c), to the Debtor's

23  applicable directors' and officers' insurance policies including but not limited to:   U.S. Specialty

24  Insurance Company, Policy # 14-MGU-09-A20123; National Union Fire Insurance Company of

25  Pittsburgh, Pa. Policy # 00-245-05-68.

26  ///

27  ///

28  ///

### 7.    Distributions Under the Plan.

#### (a)    General Provisions.

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court, distributions to be made on the Effective Date on account of Allowed Claims, other than Allowed Class 3 Claims, shall be made on the Effective Date or as soon as practicable thereafter. Each Holder of an Allowed Class 3 Claim shall receive an Initial Class 3 Distribution, as soon as practicable in the discretion of the Liquidating Trustee, comprising a Pro Rata Share of the Available Cash. Notwithstanding the foregoing, no distributions will be made on a Claim unless it is an Allowed Claim or, in the case of a Disputed Claim, an order of the Bankruptcy Court has been entered estimating the Claim for purposes of distribution; and, provided further, however, distributions on Allowed Claims may be delayed as a result of, or the allowance or estimation of, Disputed Claims, or the expiration of time for filing a proof of claim.

#### (b)    Delivery of Distributions, Address of Holder.

For purposes of all notices and distributions under the Plan, and except as provided in Section 5 above, the Liquidating Trustee shall be entitled to rely on the name and address of the Holder of each Claim as shown on, and distributions to Holders of Allowed Claims shall be made by regular U.S. first class mail to, the following addresses: (a) at the addresses set forth in the proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notices of address change delivered to the Debtor or to the Liquidating Trustee after the date on which any related proof of Claim was Filed; or (c) the address reflected on the Schedules if no proof of Claim or proof of Equity Interest is Filed and the Debtor or the Liquidating Trustee has not received a written notice of a change of address. The Liquidating Trustee shall be under no duty to attempt to locate Holders of Allowed Claims who are entitled to unclaimed distributions.

#### (c)    Record Date.

Pursuant to Bankruptcy Rule 3021 and effective as of 5:00 p.m. (Pacific time) on the Record Date, the transfer ledgers for the Indentures and the Equity Interests shall be closed, and there shall be no further changes in the record holders of such Debentures and Equity Interests. The Liquidating Trustee shall have no obligation to recognize any transfer of any such Debentures

LANDAU
GOTTFRIED
& BERGER LLP

and/or Equity Interests occurring after the Record Date, but shall instead be entitled to recognize and deal for all purposes with only those holders of record stated on the applicable transfer ledgers as of the Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Record Date.

### 8.    Conditions Precedent.

The Plan provides that it will not become effective until the Confirmation Order has been entered on the docket of the Bankruptcy Court and no stay of the Confirmation Order is in effect, unless this condition has been waived in writing by the Debtor.

### 9.    Retention Of Jurisdiction.

The Plan provides for the retention by the Bankruptcy Court of jurisdiction over the Chapter 11 Case as specified in the Plan.

### 10.    Effective Date.

The Effective Date is the first date that the Plan becomes effective under Section IX.A. of the Plan.

### 11.    Amendment, Modification or Revocation of the Plan.

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Debtor.  After the Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.   If the Debtor revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or its Estate or any other person or to prejudice in any manner the rights of the Debtor, the Debtor or its Estate or any person in any further proceedings involving the Debtor.

///

///

LANDAU
GOTTFRIED
& BERGER LLP

### 12.    Post Confirmation Notice.

From and after the Effective Date, any person who desires notice of any pleading or document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as to which the Bankruptcy Code requires notice to be provided, shall file a request for post-confirmation notice and shall serve the request on the Liquidating Trustee; provided, however, the Office of the United States Trustee in this district ("OUST"), counsel to the Debtor and counsel to the Indenture Trustee shall be deemed to have requested post-confirmation notice.

## V.    EFFECT OF PLAN CONFIRMATION

### A.    Preservation of Rights of Action.

Except to the extent any rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case: (i) any and all Estate Causes of Action vesting with the Liquidating Trust under the Plan shall remain Liquidating Trust Assets, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Estate Causes of Action have been listed or referred to in this Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtor nor the Estate waives, releases, relinquishes, forfeits, or abandons (nor shall either be estopped or otherwise precluded or impaired from asserting) any Estate Cause of Action that constitutes property of the Debtor's Estate: (a) whether or not such Estate Cause of Action has been listed or referred to in the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such Estate Cause of Action is currently known to the Debtor or the Liquidating Trustee, and (c) whether or not a defendant in any litigation relating to such Estate Cause of Action filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan.

### B.    No Liability for Solicitation or Participation.

In accordance with section 1125(e) of the Bankruptcy Code and as more fully set forth in Section X.A of the Plan, on the Effective Date, the Debtor, the Indenture Trustee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents

and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case (including, for example, proposal and solicitation of acceptances for the Plan), except for acts or omissions which constitute willful misconduct or gross negligence.

## VI.    CONFIRMATION PROCEDURE

HOLDERS OF IMPAIRED CLAIMS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN (INCLUDING THE EXHIBITS THERETO) IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met. These include, among others, the requirements that the Plan: (i) is accepted by all impaired classes of Claims; (ii) is feasible; and (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Bankruptcy Court and, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement. The Plan, the Disclosure Statement, Ballots, and other solicitation materials approved by the Bankruptcy Court were distributed to all known holders of impaired Claims in the Voting Classes. A Confirmation Hearing with respect to the Plan is scheduled to commence as set forth in the Confirmation Notice included in the solicitation materials and served on all creditors and parties in interest. At the confirmation hearing, the Debtor will request the Bankruptcy Court to confirm the Plan on the basis that all confirmation requirements have been satisfied.

### A.    Voting; Acceptance.

Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent, unknown, or unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the

1   Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been

2   disallowed for voting purposes by the Bankruptcy Court, or is disallowed under the Plan. The

3   Record Date for determining which Holders of the Debentures is a "Record Holder" for voting

4   purposes will be January 5, 2010. A vote may be disregarded if the Bankruptcy Court determines,

5   after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in

6   good faith or in accordance with the provisions of the Bankruptcy Code.

7        The Voting Class of Claims (*i.e* Class 3) will be deemed to have accepted the Plan if the

8   Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in

9   number of the Claims of such Class (excluding certain Claims designated under section 1126(e) of

10  the Bankruptcy Code) that will have voted to accept or reject the Plan.

11       THE INDENTURE TRUSTEE IS NOT PERMITTED TO VOTE ON BEHALF OF THE

12  HOLDERS OF THE DEBENTURES. FOR PURPOSES OF VOTING, THE BENEFICIAL

13  HOLDER OF A DEBENTURE SHALL BE TREATED AS THE HOLDER OF ITS RESPECTIVE

14  SHARE OF DEBENTURE CLAIMS AND SHALL BE ENTITLED TO VOTE WITH RESPECT

15  TO THE PLAN. CONSEQUENTLY, THE DEBTOR WILL SEND A BALLOT DIRECTLY TO

16  SUCH BENEFICIAL HOLDER IN ACCORDANCE WITH THE DIRECTION OF THE

17  INDENTURE TRUSTEE AND SUCH BENEFICIAL HOLDER MUST SUBMIT ITS OWN

18  BALLOT IN ACCORDANCE WITH THE TERMS OF THE INDENTURE IN ORDER FOR ITS

19  VOTE TO COUNT.

20       Class 3 is the only Voting Class because Classes 1 and 2 are not impaired and therefore are

21  deemed to accept the Plan and Class 4 is impaired but deemed to reject the Plan because it will not

22  receive a distribution under the Plan.

23                **B.    Confirmation Hearing.**

24       Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

25  hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Confirmation

26  Hearing may be postponed from time to time by the Bankruptcy Court without further notice except

27  for an announcement of the postponement made at the Confirmation Hearing. Section 1128(b) of

28  the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

LANDAU
GOTTFRIED
& BERGER LLP

1   Objections must be made in writing, specifying in detail the name and address of the person or

2   entity objecting, the grounds for the objection, and the nature and amount of the Claim or Equity

3   Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy

4   Rules and Local Bankruptcy Rules.  Objections must be filed and served pursuant to the

5   Confirmation Notice in the manner set forth therein, on or before the time and date designated in

6   the Confirmation Notice as being the last date for serving and filing objections to confirmation of

7   the Plan.

8           UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED

9   IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED

10  BY THE BANKRUPTCY COURT.  AS SET FORTH IN THE CONFIRMATION NOTICE, THE

11  BANKRUPTCY COURT MAY NOT CONSIDER ANY OBJECTIONS THAT ARE NOT

12  TIMELY RAISED.

13          At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

14  whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code

15  have been satisfied:

16          1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

17          2.      The Debtor has complied with the applicable provisions of the Bankruptcy

18  Code.

19          3.      The Plan has been proposed in good faith and not by any means proscribed

20  by law.

21          4.      Any payment made or promised by the Debtor for services or for costs and

22  expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident

23  to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made

24  before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the

25  confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as

26  reasonable.

27          5.      The Debtor has disclosed the identity and affiliations of any individual

28  proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, and the

1 | appointment to, or continuance in, such office of such individual is consistent with the interests of

2 | creditors and with public policy, and the Debtor has disclosed the identity of any insider that will be

3 | employed or retained by the Debtor and the nature of any compensation for such insider.

4 |       6.     Each Holder of an impaired Claim and each Holder of Equity Interests

5 | either has accepted the Plan or will receive or retain under the Plan on account of such Holder's

6 | Claims or Equity Interests, as the case may be, property of a value, as of the Effective Date, that is

7 | not less than the amount that such entity would receive or retain if the Debtor's Estate were

8 | liquidated on such date under chapter 7 of the Bankruptcy Code.

9 |       7.     Unless the Debtor proposes a nonconsensual plan of liquidation, each class

10 | of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

11 |       8.     Except to the extent that the holder of a particular Claim has agreed to a

12 | different treatment of such Claim, the Plan provides that Administrative Expenses and such Other

13 | Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full

14 | on the Effective Date and that holders of Priority Tax Claims will receive on account of such

15 | Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

16 |       9.     At least one impaired class of Claims has accepted the Plan, determined

17 | without including any acceptance of the Plan by any insider holding a Claim in such class.

18 |       10.     The Plan contemplates the disposition of all of the assets of the Estate and

19 | the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity

20 | Interests in order of priority and as provided for in the Plan.

21 |       The Debtor believes that, upon acceptance of the Plan by the Voting Class, the Plan

22 | will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has

23 | complied or will have complied with all of the requirements of Chapter 11, and that the Plan is

24 | being proposed and will be submitted to the Bankruptcy Court in good faith.

25 |       **C.   Feasibility.**

26 |       The Bankruptcy Code requires that, in order for the Plan to be confirmed by the

27 | Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be

28 | followed by the liquidation or the need for further financial reorganization of the Debtor, unless a

liquidation is contemplated by the Plan. Here, the Plan contemplates the orderly sale or disposition of all of the assets of the Debtor and the distribution of the proceeds therefrom in accordance with the Plan. The Debtor has prepared a Projection of the Available Cash (see Exhibit "B" hereto). Exhibit "B" includes a detailed schedule of the sources and uses of Cash and property at the assumed Effective Date. The sources of funds for such cash payments will be cash on hand at the Effective Date. The Debtor believes that, based upon the assumptions made, such available funds will be adequate to fund the Plan.

> **D.    Best Interests Test.**

As referred to in subparagraph 6 of Section VI.B. above, confirmation of the Plan requires that each Holder of an impaired Claim either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor's Estate were liquidated under chapter 7 of the Bankruptcy Code.

The Debtor has determined that confirmation of the Plan will provide each Holder of a Claim with a recovery that is not less than that which it would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. This determination is based upon a consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders.

Conversion of this case to one under chapter 7 at this stage would simply add another layer of administrative expenses which would only serve to diminish the distributions to all creditors in this case. In a chapter 7 case, the chapter 7 trustee will incur fees and expenses of professionals that will be paid prior to any chapter 11 Claims. Accordingly, the distributions to creditors will likely be larger under the Plan. Moreover, initial distributions to creditors contemplated by the terms of the Debtor's Plan will be made quicker than any likely distribution that would be made by a Chapter 7 Trustee because a Chapter 7 Trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Debtor's Estate.

Based on the foregoing, the Debtor believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a chapter 7 case and the appointment of a chapter 7 trustee therein.

///

### E.    Risks.

Because the final amount of monies that will be collected and the final amount of Allowed Administrative, Priority, Secured, General Unsecured Claims, and Debenture Claims have not yet been determined, the amounts for distribution to holders of Allowed Class 3 Claims and the percentage that each holder of an Allowed Class 3 Claim may receive on account of its Allowed Claim could be less than the percentage estimated herein.

## VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

The Debtor believes that the Plan affords Holders of Claims the potential for the greatest feasible realization out of the Debtor's assets, and, therefore, is in the best interest of such holders. The Debtor has considered alternatives to the Plan, such as a liquidation in the context of a chapter 7 case. In the opinion of the Debtor, such alternatives would not afford Holders of Claims a return greater than that achieved under the Plan.

### A.    Liquidation Under Chapter 7.

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recovery by holders of Claims is set forth above in the section entitled "Best Interests Test."

### B.    Alternative Plan of Liquidation.

If the Plan is not confirmed, the Debtor could attempt to formulate a different plan. With respect to an alternative plan, the Debtor has explored various other alternatives in connection with the negotiation process involved in the formulation and development of the Plan, but concluded that the Plan provides the best feasible recoveries attainable under the circumstances. The Plan provides

LANDAU
GOTTFRIED
& BERGER LLP

for an orderly disposition of the assets of the Estate on a timetable, and on terms, which maximizes the value of the Estate. Any alternative liquidation under chapter 11 or under chapter 7, is likely to result in a lower recovery.

////

THE DEBTOR BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.

## VIII.   VOTING PROCEDURES

The Debtor is providing, or causing to be provided, copies of the Confirmation Notice, this Disclosure Statement, the Plan, and/or Ballots or master ballots ("Master Ballots"), as applicable, to all known Holders of impaired Claims in the Voting Class, including registered holders as of the Record Date of the Debentures (or, if applicable, to those holders who are listed as participants in a clearing agency's position). Registered holders may include brokerage firms, commercial banks, trust companies, or other nominees (the "Nominees"). If such Nominees do not hold for their own account, they should follow the procedures described in Section VIII.B below. Any beneficial owner who has not received a Ballot should contact such owner's Nominees, or write to the Debtor's Ballot Tabulator. Ballots must be returned to the Ballot Tabulator by no later than the Voting Deadline set forth in the Ballot.

### A.      Procedures for Tabulation of Votes on the Plan.

Solely for purposes of voting to accept or reject the Plan, and not for the purpose of the allowance of, or distribution on account of, a Claim and without prejudice to the rights of the Debtor in any other context, the Debtor proposes that each Claim within the Voting Class that is entitled to vote to accept or reject the Plan be temporarily allowed in accordance with the following rules (collectively, the "Tabulation Rules"):

1.      Ballots and Master Ballots that fail to indicate an acceptance or rejection on the Ballot will not be accepted or counted by the Debtor in connection with the Debtor's request for

confirmation of the Plan.  Ballots that indicate both an acceptance and a rejection of the Plan will be treated as an acceptance of the Plan and will be counted as such;

        2.      Creditors shall not split their vote within a Claim; thus, each creditor shall be deemed to have voted the full amount of its Claim either to accept or reject the Plan;

///

        3.      Original executed Ballot or Master Ballot is required.  Delivery of a Ballot or Master Ballot by facsimile, email or any other electronic means will not be accepted;

        4.      If multiple Ballots or Master Ballots are received from or on behalf of an individual holder of a claim with respect to the same Claims prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

        5.      If a Claim for which a proof of claim has been timely filed is marked as contingent, unliquidated or disputed on the face of the proof of Claim, such Claim will be temporarily allowed for voting purposes in the amount of $1.00, unless otherwise ordered by the Court, after notice and a hearing;

        6.      If a proof of Claim has been filed but such Claim is considered by the Debtor to be a Disputed Claim, such Disputed Claim will not be counted for purposes of voting on the Plan if the Debtor files an objection to such Disputed Claim no later than fourteen (14) days prior to the Voting Deadline, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a);

        7.      If a Claim holder identifies a Claim amount on its Ballot that is less than the amount otherwise calculated in accordance with the Tabulation Rules, the Claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot; and

        8.      If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing.

        **B.**    **Special Provisions With Respect to Voting by Beneficial Owners of the**

**Debentures**

As stated above, the Indenture Trustee is not permitted to vote on behalf of the beneficial holders of the Debentures. Accordingly, the Debtor shall retain an appropriate noticing agent to (a) provide such beneficial holders (or their Nominees, if held in "street name") with copies of the Disclosure Statement, the Plan, Confirmation Notice and the Ballot (collectively, the "Solicitation Package") as directed by the Indenture Trustee, and (b) request that such Nominees (if held in "street name") distribute to such beneficial holders the Solicitation Package , and (c) such holders shall vote on the Plan in accordance with the terms of the relevant Indentures.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction.

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Holders of Class 3 Claims. The following summary does not address the federal income tax consequences to Holders of any other Claims and Claims that are not Impaired by the Plan, or to Holders of Equity Interest. The following summary is based on the IRC), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. Further, any discussion of the Liquidating Trust and the powers, obligations and/or actions of the Litigating Trustee that may be set forth below is subject to the applicable provisions of the Plan and the Liquidating Trust Agreement; if and to the extent that there is any inconsistency between such discussion on the one hand and the Plan and the Liquidating Trust Agreement on the other hand, the terms of the latter documents shall control. Holders of Claims and Equity Interests should read the Plan and the Liquidating Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt. In addition, this summary does not

1   address foreign, state or local tax consequences of the Plan, nor does it purport to address the

2   federal income tax consequences of the Plan to special classes of taxpayers (such as foreign

3   taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small

4   business investment companies, regulated investment companies, tax-exempt organizations,

5   investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or

6   conversion transaction, Holders who acquired their Claims as compensation, and Holders who do

7   not hold their Claims as capital assets).

8          ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME

9   TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A

10  SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE

11  INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR

12  INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT

13  THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX

14  CONSEQUENCES APPLICABLE UNDER THE PLAN.

15         TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE

16  INFORM YOU THAT (A) ANY WRITTEN UNITED STATES FEDERAL TAX ADVICE

17  CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENT) IS

18  NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, FOR

19  THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY

20  SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF

21  THE TRANSACTION OR MATTER ADDRESSED HEREIN AND (C) ALL HOLDERS OF

22  CLAIMS AND/OR EQUITY INTEREST SHOULD SEEK ADVICE BASED ON THEIR

23  PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

24         **B.     Consequences to the Debtor**

25         As discussed below, under the Plan, the Debtor will be treated for U.S. federal income tax

26  purposes as transferring the Assets directly to the Holders of Allowed Class 3 Claims, who will

27  then be treated as transferring such assets to the Liquidating Trust.  Accordingly, the Debtor's

28  transfer of Assets may result in the Debtor recognizing gain or income, depending in part on the

LANDAU
GOTTFRIED
& BERGER LLP

1  value of such assets on the Effective Date and the adjusted basis of such assets on the Effective

2  Date.

3  ///

4  ///

5  ///

6  ### C.    Consequences to Holders of General Unsecured Claims

7  #### 1.    Recognition of Gain or Loss Generally

8       Pursuant to the Plan, on the Effective Date, each Holder of an Allowed Class 3 Claim will

9  receive an interest in the Liquidating Trust, which is a beneficial interest in the Liquidating Trust,

10  entitling the holder thereof to distributions from the Liquidating Trust as provided for in the Plan

11  and in the Liquidating Trust Agreement.  Except to the extent that the holder of a Class 3 Claim or

12  beneficial interest agrees to a different treatment, said Persons will receive on account of their

13  Allowed Class 3, in full and complete satisfaction thereof, from the Liquidating Trust, one or more

14  Pro Rata Distributions of the Available Cash based upon the amount of the respective Holder's

15  Allowed Claim.  In general, each holder of an Allowed Claim will recognize gain or loss in an

16  amount equal to the difference between (i) the sum of the amount of any Cash and the fair market

17  value of any other property (including, as discussed below, its undivided interest in the Liquidating

18  Trust Assets) that such holder receives in satisfaction of its Claim (other than in respect of any

19  Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed

20  interest due to the post-Effective Date Distribution of such consideration upon the resolution of

21  Disputed Claims), and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for

22  accrued but unpaid interest).  For a discussion of the U.S. federal income tax consequences of any

23  Claim for accrued interest, see Section 2 below.

24       As discussed below, the Liquidating Trust has been structured to qualify as a "grantor

25  trust" for U.S. federal income tax purposes.  Accordingly, each holder of an Allowed Claim

26  receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax

27  purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating

28  Trust Assets (see section 3 below).  As set forth in the Liquidating Trust Agreement, as soon as

LANDAU
GOTTFRIED
& BERGER LLP

51

practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all parties, including the Holders of Class 3 Claims, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidating Trust may receive more than one Distribution subsequent to the Effective Date (due to the subsequent disallowance of certain Disputed Claims or unclaimed Distributions), the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

After the Effective Date, any amount that a Holder receives as a Distribution from the Liquidating Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) should not be included for federal income tax purposes in the Holder's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the Liquidating Trust.

Where a Holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been so held, whether the Holder had acquired the Claim at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis

1    with respect to any market discount instrument, any gain recognized on the exchange of such Claim

2    (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of

3    the accrued market discount on such Claim as of the date of the exchange.

4          In general, a Holder's tax basis in any beneficial interest received (and undivided interest in

5    the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate

6    share of the Liquidating Trust Assets on the Effective Date.  The holding period for such assets

7    generally will begin the day following the Effective Date.

8                **2.**       **Distributions in Payment of Accrued but Unpaid Interest**

9          Distributions to any Holder of an Allowed Claim will be allocated first to the original

10    principal portion of such Claim as determined for federal income tax purposes, and then, to the

11    extent the consideration exceeds such amount, to the portion of such Claim representing accrued

12    but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for

13    federal income tax purposes.

14          To the extent a Holder of debt receives an amount of Cash or property in satisfaction of

15    interest accrued during its holding period, such Holder generally recognizes taxable interest income in

16    such amount (if not previously included in the Holder's gross income).  Conversely, a Holder

17    generally recognizes a deductible loss to the extent any accrued interest claimed was previously

18    included in its gross income and is not paid in full.  Each Holder is urged to consult its tax advisor

19    regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal

20    income tax purposes.

21              **3.**       **Tax Treatment of the Liquidating Trust and Holders of**

22                        **Interests Therein**

23          On the Effective Date, the Liquidating Trust will be established for the benefit of Holders of

24    all Allowed Class 3 Claims.  The Liquidating Trust is intended to qualify as a liquidating trust for

25    federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather

26    is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  However,

27    merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust

28    for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set

LANDAU
GOTTFRIED
& BERGER LLP

forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries of the Liquidating Trust) are required for federal income tax purposes to treat the Liquidating Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as a transfer of such Liquidating Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust. Consistent therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax purposes. Each such Person will have a tax basis in its proportionate share of the Liquidating Trust Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

1       Accordingly, except as discussed below (in connection with pending Disputed Claims),

2  each holder of a Class 3 Claim receiving a beneficial interest in the Liquidating Trust will be

3  required to report on its U.S. federal income tax return its allocable share of any income, gain, loss,

4  deduction, or credit recognized or incurred by the Liquidating Trust, in accordance with its relative

5  beneficial interest.  The character of items of income, deduction, and credit to any holder and the

6  ability of such holder to benefit from any deduction or losses may depend on the particular situation

7  of such holder.

8       The U.S. federal income tax reporting obligations of a Holder are not dependent upon the

9  Liquidating Trust distributing any Cash or other proceeds.  Therefore, a Holder may incur a federal

10 income tax liability with respect to its allocable share of the income of the Liquidating Trust

11 regardless of the fact that the Holder has not received any prior or concurrent Distribution.  Other

12 than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the

13 Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said

14 Beneficiaries because they already are regarded for federal income tax purposes as owning the

15 underlying Liquidating Trust Assets.

16      Subject to the Liquidating Trust Agreement, absent definitive guidance from the IRS or a

17 court of competent jurisdiction to the contrary (including the issuance of applicable Treasury

18 Regulations, the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating

19 Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not

20 contested by the Liquidating Trustee), the Liquidating Trustee will:

21              (i)      treat all Liquidating Trust Assets of the Liquidating Trust allocable

22 to, or retained on account of, Disputed Claims, as a discrete trust for federal income tax purposes,

23 consisting of separate and independent shares to be established in respect of each Disputed Claim,

24 in accordance with the trust provisions of the IRC (sections 641 *et seq.* of theIRC);

25              (ii)      treat as taxable income or loss of these separate trusts with respect to

26 any given taxable year the portion of the taxable income or loss of the Liquidating Trust that would

27 have been allocated to the holders of such Disputed Claims had such Claims been Allowed on the

28

LANDAU
GOTTFRIED
& BERGER LLP

Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved);

        (iii)     treat as a distribution from these separate trusts any increased amounts distributed by the Liquidating Trust as a result of any Disputed Claim resolved earlier in the taxable year, to the extent such distribution relates to taxable income or loss of these separate trusts determined in accordance with the provisions hereof, and

        (iv)     to the extent permitted by applicable law, report consistently for state and local income tax purposes.

In addition, pursuant to the Liquidating Trust Agreement, all Beneficiaries are required to report consistently with such treatment.  Accordingly, subject to issuance of definitive guidance, the Liquidating Trustee will report on the basis that any amounts earned by these separate trusts and any taxable income of the Liquidating Trust allocable to them are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year.  Any amounts earned by or attributable to the separate trusts and distributed to a Beneficiary during the same taxable year will be includible in such Beneficiary's gross income.

### 4.    Withholding

All Distributions to Holders of Allowed Class 3 Claims are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## X.      FEES AND EXPENSES

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings have been and will be borne by the Debtor's Estate.  The solicitation has been and is being made principally by mail.  Arrangements also have been or will be made with brokerage houses and other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and other pertinent materials to the beneficial holders of the Debentures.  The Debtor has reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses incurred by them, but no compensation has been or will be paid for their services.

In addition to the foregoing, the estate is obligated to pay fees and reimburse expenses for the various professionals employed in connection with the Chapter 11 Case to the extent such fees and expenses are allowed by the Bankruptcy Court.

## XI.     SUMMARY OF ADDITIONAL SOURCES OF INFORMATION

Additional sources of information regarding the Debtor's Estate and documents relating to the Plan are available to holders of Claims and Equity Interests.  The following is a summary of certain documents and the places they can be reviewed or obtained:

A.      Both prior to and after the Petition Date, the Debtor filed documents with the SEC in accordance with the informational requirements of the 1934 Act.  Copies of such material can be obtained from the Public Reference Section of the Commission at 450 Fifth Street, NW, Washington, D.C. 20549, at prescribed rates.  Certain of such material may be accessible via online computer.

B.      Orders of the Bankruptcy Court and related papers pertaining to transactions outside of the Debtor's ordinary course of business may be inspected at the office of the Clerk of the Bankruptcy Court located at the Edward A. Roybal Federal Building and Courthouse, 225 East Temple Street, Room 940, Los Angeles, California 90012.

LANDAU
GOTTFRIED
& BERGER LLP

1    C.    The Debtor's Schedules of Assets and Liabilities, Statement of Affairs, List

2  of Old Equity Security Holders, and Schedules of Executory Contracts and Unexpired Leases, as

3  amended, may be inspected at the office of the Clerk of the Bankruptcy Court located at the Edward

4  A. Roybal Federal Building and Courthouse, 225 East Temple Street, Room 940, Los Angeles,

5  California 90012.

6  ///

7  ////

8    D.    Periodic post-petition financial reports as filed with the OUST may be

9  inspected at the Office of the OUST located at 725 South Figueroa Street, Suite 2600, Los Angeles,

10  California 90017.

11  **XII.    RECOMMENDATION AND CONCLUSION**

12    The Debtor believes that confirmation and implementation of the Plan are preferable to any

13  of the feasible alternatives because the Plan will provide substantially greater recoveries for holders

14  of Claims.  Accordingly, the Debtor urges holders of Claims in the Voting Class to accept the Plan.

15

16  DATED: November 12, 2010         DEBTOR AND DEBTOR-IN-POSSESSION
         FIRSTFED FINANCIAL CORP.

17

18         By: _____

19                 Carl W. McKinzie
                 Chief Executive Officer

20

21

22  **SUBMITTED BY:**

23  LANDAU GOTTFRIED & BERGER LLP

24  By:    /s/ Jon L. R. Dalberg

25         JON L.R. DALBERG
         Attorneys for Debtor FirstFed Financial Corp.

26

27

28