1  JON L.R. DALBERG (State Bar No. 128259)
2  RODGER M. LANDAU (State Bar No. 151456)
   LANDAU GOTTFRIED & BERGER LLP
3  1801 Century Park East, Suite 1460
   Los Angeles, California 90067
4  Telephone: (310) 557-0050
   Facsimile: (310) 557-0056
5  jdalberg@lgbfirm.com
   rlandau@lgbfirm.com
6
7  Counsel for FirstFed Financial Corp.

8
                UNITED STATES BANKRUPTCY COURT
9
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
                     LOS ANGELES DIVISION
11

12  In re                          | Case No. 2:10-bk-12927-ER

13  FIRSTFED FINANCIAL CORP.,       | Chapter 11

14          Debtor and             | **DISCLOSURE STATEMENT IN SUPPORT**
            Debtor-in-Possession.   | **OF THE DEBTOR'S PLAN OF**
15                                  | **LIQUIDATION DATED**
                                    | **AS OF JANUARY 5, 2011**
16

17
                                    | **Confirmation Hearing**
18
                                    | **Date:** January 5, 2011
19                                  | **Time:** 10:00 a.m.
                                    | **Place:** Courtroom 1568
20                                  |         225 East Temple Street
                                    |         Los Angeles, CA 90012
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PLAN OVERVIEW ................................................................................................ 1

    Note Regarding Distributions ............................................................................ 3

I.  INTRODUCTION ........................................................................................... 3

    A.  Section 1125 ............................................................................................. 4

    B.  Voting Class. ............................................................................................ 4

    C.  Additional Information. ........................................................................... 5

    D. Disclaimer .................................................................................................. 6

    E.  Balloting .................................................................................................... 7

    F.  Confirmation Hearing .............................................................................. 8

II.  SUMMARY ................................................................................................. 8

    A.  The Debtor. ............................................................................................... 8

    B.  Overview of the Plan. .............................................................................. 8

    C. Recommendation ...................................................................................... 9

III.  BACKGROUND ......................................................................................... 9

    A.  The Debtor's Business. ............................................................................ 9

    B.  The Debtor's Financing ......................................................................... 10

        1.  Unsecured Indebtedness ................................................................. 10

        2.  Equity Interests .............................................................................. 10

    C.  Events Leading Up to Bankruptcy. ....................................................... 11

        1.  Declining Real Estate Market and Increasing Unemployment ...... 11

        2.  Initial Capital Raising Efforts in 2008 .......................................... 11

        3.  Common Stock Delisting from the New York Stock Exchange ..... 13

        4.  Regulatory Actions by OTS ........................................................... 13

        5.  Events Leading Up to September 30th Deadline. ........................... 14

        6.  Debtor's Financial Condition at September 30th, 2009 ................ 17

        7.  Resignation of Grant Thornton as Debtor's Independent Auditors ............ 17

8. Contingency Plan: Raise Capital by December 2nd .................................................... 18

9. The FDIC's Marketing of the Bank .......................................................................... 19

10. Improved Capital Ratios and Loan Delinquency Rates. ........................................... 19

11. Seizure and Sale of Assets and Liabilities of Bank ................................................. 20

D. Debtor in Possession of Administration ......................................................................... 21

1. Employment Applications. ....................................................................................... 21

2. Change in Debtor's Management and Application to Employ Don Pelgrim as
   Chief Administrative Officer .................................................................................... 21

3. Application to Employ Carl W. McKinzie as Debtor's Chief Executive Officer ....... 22

4. Application to Employ Crowe Horworth, LLP as Accountants ................................. 23

5. Application to Employ Rus Miliband & Smith as Attorneys to Investigate the
   Debtor's Potential Claims Against the Debtor's Prepetition Accountants. ................ 23

6. Bar Date Motion ...................................................................................................... 24

7. Schedules and Statement of Financial Affairs .......................................................... 24

8. Tax Audit and Refunds ............................................................................................ 24

9. FDIC Proof of Claim ................................................................................................ 24

E. The FDIC's Motion for Relief From Stay, the Debtor's 2004 Motion and the Filing
   of the Debtor's Federal Tax Return for the Year Ended December 31, 2009 ................. 25

F. Motion to Abandon Certain Claims. .............................................................................. 27

G. Prosecution of Estate Causes of Action ......................................................................... 27

1. Estate Causes of Action Against Third Parties ......................................................... 27

2. Recovery of Preferential or Fraudulent Transfers .................................................... 28

3. Objections to Claims ................................................................................................ 28

IV. THE PLAN OF REORGANIZATION ............................................................................... 28

A. Summary of Certain Other Provisions of the Plan ......................................................... 30

1. Deadline for Filing Certain Administrative Tax Claims ............................................ 30

2. Executory Contracts and Unexpired Leases ............................................................. 31

3. Means of Implentation ............................................................................................. 32

   a. From the Confirmation Date to the Effective Date ............................................... 32

   b. Vesting of Assets .................................................................................................. 32

LANDAU
GOTTFRIED
& BERGER LLP

c. Establishment of the Liquidating Trust.............................................. 33

   i. Beneficiaries ................................................................... 33

   ii. Implementation of the Liquidating Trust. ................................... 34

   iii. Transfer of Debtor's Assets .................................................. 34

   iv. Representative of the Estate ................................................. 34

4. No Liability of Liquidating Trustee.................................................... 35

5. Prosecution of Estate Causes of Action by the Liquidating Trustee. ........... 36

   a. Issuance and Execution of Plan Related Documents and Corporate
     Action ........................................................................... 37

   b. Cancellation/Surrender of Debentures and Related Agreements............... 37

6. Provision for Allowance of the Claims Asserted by the Indenture Trustee On
   Behalf of the Holders of the Debentures (the "Debenture Claims")............ 38

7. Resolution of Disputed Claims ........................................................ 38

8. Distributions Under the Plan........................................................... 39

   a. General Provisions. ........................................................... 39

   b. Delivery of Distributions, Address of Holder................................. 39

   c. Record Date.................................................................... 40

9. Conditions Precedent .................................................................. 40

10. Retention of Jurisdiction .............................................................. 40

11. Effective Date ......................................................................... 40

12. Amendment, Modification or Revocation of the Plan ............................... 41

13. Post Confirmation Notice ............................................................. 41

V. EFFECT OF PLAN CONFIRMATION ....................................................... 41

A. Preservation of Rights of Action ....................................................... 41

B. No Liability for Solicitiation or Participation......................................... 42

VI. CONFIRMATION PROCEDURE ............................................................ 42

A. Voting; Acceptance .................................................................... 43

B. Confirmation Hearing.................................................................. 44

LANDAU
GOTTFRIED
& BERGER LLP

C. Feasibility ................................................................................................ 46

D. Best Interests Test ..................................................................................... 46

E. Risks ......................................................................................................... 47

VII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN
OF REORGANIZATION ........................................................................... 47

A. Liquidation Under Chapter 7 .................................................................... 47

B. Alternative Plan of Liquidation ................................................................. 47

VIII.  VOTING PROCEDURES ............................................................................. 48

A. Procedures for Tabulation of Votes on the Plan ........................................ 49

B. Special Provisions With Respect to Voting by Beneficial Owners of the Debentures ....... 50

IX.  CERTAIN FEDERAL INCOME TAX CONSQUENCES ................................. 50

A. Introduction .............................................................................................. 50

B. Consequences to the Debtor ...................................................................... 52

C. Consequences to Holders of Class 3 General Unsecured Claims ............... 52

    1. Recognition of Gain or Loss Generally .................................................. 52

    2. Distributions in Payments of Accrued but Unpaid Interest ..................... 54

    3. Tax Treatment of the Liquidating Trust and Holders of Interests Therein ....... 55

    4. Tax Reporting ....................................................................................... 57

    5. Witholding ........................................................................................... 59

X.  FEES AND EXPENSES ................................................................................. 59

XI.  SUMMARY OF ADDITIONAL SOURCES OF INFORMATION ................... 60

XII.  RECOMMENDATION AND CONCLUSION ............................................... 61

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LANDAU
GOTTFRIED
& BERGER LLP

## **PLAN OVERVIEW**

The Plan[1] provides for the disposition of all assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code and the Plan.  Remaining assets, to the extent not converted to cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of by the Liquidating Trustee after the Effective Date, with all net cash proceeds to be distributed to Holders of Allowed Claims, as provided for in the Plan.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

---

[1] Capitalized terms used in this Disclosure Statement shall, unless otherwise indicated, bear the meaning ascribed to them in the Plan of Liquidation, attached as Exhibit "A" hereto, ("Plan").

| **Plan Summary** | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 1**: Other Priority Claims. **Class 1** will include any Allowed Claim of the Federal Deposit Insurance Corporation to the extent deemed to be a priority claim pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. *See* FDIC Proof of Claim, Exhibit H hereto. The FDIC claim presently is unliquidated.  To the extent that it becomes an Allowed Class 1 priority claim it will reduce, and (if large enough) may eliminate, the amounts available for distribution to unsecured creditors. The Debtor disputes the FDIC's claim and reserves all rights with respect thereto. | Payment in Cash in full in accordance with the priorities set forth in Section 507(a) of the Bankruptcy Code. | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 2**:  Secured Claims | Retention of all legal, equitable and contractual rights | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 3**: General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust | Cash | | Impaired - entitled to vote |
| **Class 4**: FirstFed Common Stock Interests | Receives no distribution under the Plan unless and until Class 3 is paid in full; cancelled pursuant to the Plan | N/A | N/A | Impaired – **not** entitled to vote (deemed to reject) |

LANDAU
GOTTFRIED
& BERGER LLP

**Note Regarding Distributions**:

Distributions to holders of Administrative Expenses and Priority Tax Claims and holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the claim becomes an Allowed Claim. On June 29, 2010, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for First Federal Bank of California filed its Proof of Claim in the Debtor's Bankruptcy Case (the "FDIC POC"). As filed, the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. A copy of the FDIC POC is attached hereto as Exhibit "F"

TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM ENTITLED TO PRIORITY TREATMENT, IT WILL BE CLASSIFIED AS A CLASS 1 CLAIM. DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW. ANY SUCH ALLOWED CLASS 1 FDIC CLAIM WILL REDUCE, AND MAY COMPLETELY ELIMINATE, THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED CREDITORS OF THE DEBTOR. THE DEBTOR DISPUTES THE FDIC'S CLAIM. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE WITH RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

Distributions to Holders of Allowed Claims in Class 3 will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, provided, however, that distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

## I.     INTRODUCTION

FirstFed filed a voluntary petition for relief (the "Petition") under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), on January 6,

2010 (the "Petition Date"), thereby commencing the captioned Chapter 11 case (the "Chapter 11

Case"). FirstFed has operated as a debtor-in-possession since the Petition Date pursuant to §§ 1107

and 1108 of the Bankruptcy Code. No trustee, examiner, or Official Committee of Creditors Holding

Unsecured Claims has been appointed in the Chapter 11 Case. The Debtor filed its Plan on October

1, 2010 (Docket No. 91). The Plan envisions a liquidation of all FirstFed's remaining assets pursuant

to the provisions of the Bankruptcy Code and in accordance with the terms of the Plan.

### A.    Section 1125.

This *Disclosure Statement in Support of the Debtor's Plan of Liquidation* (as the same may

be modified, amended, or supplemented, the "Disclosure Statement") is submitted pursuant to section

1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings

seeking confirmation of the Plan. A copy of the Plan is attached hereto as Exhibit A".

This Disclosure Statement sets forth information regarding, among other things, the history of

FirstFed and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose

is to provide the holders of impaired Claims adequate information to assist them in making an

informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim

should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in

their entirety and consider them with such holder's legal and financial advisors in connection with the

proceedings seeking confirmation of the Plan. No person has been authorized by FirstFed to utilize,

for purposes of solicitation, any information concerning FirstFed or its business, other than the

information contained or referred to herein.

### B.    Voting Class.

Pursuant to the Bankruptcy Code, each holder of an Allowed Claim in Class 3 (the "Voting

Class"), is entitled to vote on the Plan. Holders of Allowed Claims in Classes 1 and 2 are presumed

to accept the Plan pursuant to 1126(f) of the Bankruptcy Code because their Claims are not

impaired under the Plan. Holders of Equity Interests in Class 4 are presumed to reject the Plan

pursuant to 1126(g) of the Bankruptcy Code because they will not receive a distribution under the

Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the

1   Plan, see Section II of the Plan entitled "*Classification and Treatment of Claims and Equity*

2   *Interests.*"

3        Except as described below, the Plan may be confirmed only if accepted by the Voting

4   Class. The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as

5   acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of

6   the Allowed Claims in such class counting only those holders who cast Ballots (as defined below).

7   **THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE**

8   **RECOVERIES TO THE HOLDERS OF IMPAIRED CLASS 3 CLAIMS AND THAT**

9   **ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE**

10  **DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF CLASS 3 CLAIMS VOTE**

11  **TO ACCEPT THE PLAN.**

12       The Debtor anticipates that holders of Class 3 Claims will vote to accept the Plan. The

13  Debtor reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy

14  Code.

15       For a more detailed description of the requirements for acceptance of the Plan and of the

16  criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this

17  Disclosure Statement entitled "*Confirmation Procedure.*"

18        C.    **Additional Information.**

19       Attached as Annexes to this Disclosure Statement are copies of the following:

20            1.   The Plan (Exhibit "A");

21            2.   Projected Available Cash Proceeds Analysis (Exhibit "B");

22            3.   Hypothetical Chapter 7 Liquidation Analysis (Exhibit "C");

23            4.   List of Pending Litigation (Exhibit "D");

24            5.   Potential Preference Payments (Exhibit "E");

25            6.   Potential Third Party Estate Causes of Action (Exhibit "F"); and

26            7.   The FDIC POC (Exhibit "G") .

27       Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan,

28  are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this

Disclosure Statement, and scheduling the confirmation hearing, the deadlines and procedures for

voting, and for objecting to confirmation of the Plan, and related matters (the "Confirmation

Notice"); and (ii) for each holder of an Allowed Claim in the Voting Class, the form of ballot for

casting an acceptance or rejection of the Plan (the "Ballot").

### D.    Disclaimer.

The Bankruptcy Court has approved this Disclosure Statement as containing adequate

information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature

and history of the Debtor and the condition of its books and records, to enable hypothetical,

reasonable investors typical of the holders of impaired Claims to make an informed judgment as to

whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE.**

**EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE DEBTOR OR BY ANY OF ITS ADVISORS.**

1    NOR HAS THE DEBTOR OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE

2    INFORMATION SET FORTH HEREIN.

3        ALTHOUGH THE DEBTOR'S PROFESSIONAL ADVISORS HAVE ASSISTED IN

4    THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL

5    INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND

6    ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT

7    INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE

8    NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

9        After carefully reviewing this Disclosure Statement and the Plan, including the respective

10    exhibits, each holder of an impaired Claim in the Voting Class (Class 3) should decide whether to

11    accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the

12    envelope provided.

13            E.    Balloting.

14        TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN,

15    SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO

16    THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT.

17    PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT.

18    ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR

19    REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH

20    THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED.  BALLOTS WHICH

21    INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE

22    TREATED AS A VOTE TO ACCEPT THE PLAN.

23        If you have any questions about the procedure for voting, or if you did not receive a Ballot,

24    received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of

25    this Disclosure Statement, please write to the Debtor's Ballot Tabulator, Katherine Moss, 1801

26    Century Park East, Suite 1460, Los Angeles, California, 90067, Facsimile: (310) 557-0056.

27    ///

28    ///

LANDAU
GOTTFRIED
& BERGER LLP

### F.    Confirmation Hearing.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Notice accompanying this Disclosure Statement.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Notice.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

### II.    SUMMARY

The following is a summary of certain information contained elsewhere in this Disclosure Statement.  Reference is made to, and this Summary is qualified in its entirety by reference to, the more detailed information contained herein and in the exhibits hereto.  Holders of impaired Claims are urged to read this Disclosure Statement, the Plan and their respective exhibits in their entirety.

### A.    The Debtor.

The Debtor is a savings and loan holding company that was incorporated in Delaware on February 3, 1987, and commenced operations on September 22, 1987.  Its principal business was to serve as the holding company for its wholly-owned subsidiary, First Federal Bank of California (the "Bank"), the Debtor's principal asset.  As of December 2009, the Bank had 39 full-service banking branches located in Southern California and engaged in single family, multi-family and commercial lending throughout California.

As a savings and loan holding company, the Debtor was subject to regulation by the Office of Thrift Supervision ("OTS").  The Bank's deposits were insured through the Deposit Insurance Fund ("DIF") of the FDIC, and the Bank was subject to regulation by the FDIC.

### B.    Overview of the Plan.

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "A".  IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the assets of the Debtor and the distribution of the Available Cash to holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code, and in accordance with the Plan. The Plan does not provide for any distribution to holders of Allowed Equity Interests unless and until holders of Allowed Class 3 Claims have been paid in full, which -- as set forth in the projections attached as Exhibit "B" hereto-- is not projected to occur.

### C.    Recommendation.

The Debtor believes that the Plan provides the best feasible recoveries to holders of impaired Class 3 Claims and is in the best interests of such holders. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ALL SUCH HOLDERS ACCEPT THE PLAN.

### III.    BACKGROUND

As more fully described below, the Plan provides that all assets of the Estate remaining on the Effective Date will vest in the Liquidating Trust. The Available Cash will be distributed to the Debtor's creditors by the Liquidating Trustee in accordance with applicable provisions of the Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed to, among other things, handle prosecution of any and all potential claims that may bring cash into the Liquidating Trust, and sell any other assets that may have value, bring any potential avoidance actions, and object to any claims.

### A.    The Debtor's Business.

On December 18, 2009, the OTS closed the Bank and the FDIC was appointed as a receiver for the Bank's assets and liabilities. Prior to that time, the Debtor's primary business was to serve as a holding company for the Bank. Other than the business conducted by the Bank, on the Petition Date, the Debtor did not own or engage in any other operating businesses. As a legal entity separate and distinct from its subsidiary Bank, the Debtor's principal source of funds was dividends that were paid by the Bank.

Upon its appointment as receiver for the Bank, the FDIC entered into a purchase and assumption agreement with OneWest Bank, FSB ("OneWest") to assume all of the Bank's deposits and certain other of its assets and liabilities. As a result of the loss of its primary financial asset, the

1    Debtor commenced this case under Chapter 11 of the Bankruptcy Code by filing its voluntary

2    petition for relief on the Petition Date.

3                        **B.**        **The Debtor's Financing.**

4                                **1.**        **Unsecured Indebtedness.**

5          The bulk of Debtor's approximately $159,600,000.00 in indebtedness consists of the

6    following (collectively, the "Senior Indebtedness"):

7                                        (a)        certain unsecured Fixed/Floating Rate Senior Debt Securities

8    due 2015, 2016 and 2017 (collectively, the "Debentures"), issued by the Debtor in the original

9    aggregate principal amount of $150,000,000.00, pursuant to certain Indentures, dated as of

10   December 29, 2005, June 15, 2005, and April 26, 2007 (collectively, the "Indentures"), by and

11   between the Debtor and Wilmington Trust Company as indenture trustee thereunder (when acting

12   in such capacity, the "Indenture Trustee"); *plus*

13                                        (b)        approximately $9,600,000.00 in accrued but unpaid interest

14   under the Debentures.

15   Other indebtedness includes franchise taxes owed to the State of Delaware (the jurisdiction of

16   Debtor's incorporation), unliquidated intercompany claims that may be held by the Bank,

17   unliquidated claims for pre-petition professional services rendered and other vendor claims.  Debtor

18   does not have any secured indebtedness.

19                                **2.**        **Equity Interests.**

20         The Debtor was formed as a savings and loan holding company to provide additional

21   flexibility to the organization through the ability to serve a broader geographic area, expand its

22   product offerings, access capital markets through the ability to issue debt and other financial

23   instruments, and to gain certain tax benefits.  Upon its formation in 1987 it acquired all of the

24   issued and outstanding securities of the Bank.  Its FirstFed Common Stock is traded in the over-the-

25   counter market on the Pink Sheets under the symbol "FFEDQ.PK."

26   ///

27   ///

28   ///

## C.    Events Leading Up to Bankruptcy.

### 1.    Declining Real Estate Market and Increasing Unemployment.

Prior to 2009, the principal business of the Bank was attracting checking and savings deposits from the general public and using those deposits, together with borrowings and other funds, to make real estate, business and consumer loans.  In the last several years, the Bank invested in a portfolio of single family residential loans on properties located throughout California.  These residential loans, the majority of which originated between 2004 and 2008, were obtained primarily from wholesale loan brokers, although residential loans were also offered in the Bank's branches.

A portion of the Bank's loan portfolio consisted of adjustable rate mortgages that allowed borrowers to make a minimum payment that was less than what would be required to pay for the interest due on the loan, resulting in "negative amortization" whereby the unremitted interest portion was added to the outstanding principal balance on the loan.  Once the maximum allowed negative amortization was reached, the loan would "recast," meaning that the payment would increase in accordance with the terms of the original note and borrowers would be required to remit that higher payment.

Beginning in late 2007, the single family housing market in California began to decline, a decline that continued precipitously throughout 2008 and most of 2009.  Moreover, California and the rest of the nation entered a recession during 2008, if not before, with a concomitant increase in unemployment.  The combination of a declining real estate market and increasing unemployment resulted in rising delinquencies and foreclosures in the Bank's loan portfolio during 2008 and 2009.  That portfolio included a significant number of adjustable rate loans that were reaching their maximum allowed negative amortization, which exacerbated the effects of the recession on the loan portfolio.  At the beginning of 2008, the Bank had a nonperforming asset ratio of 2.79%.  By the end of that year, the ratio had risen to 7.00%, later climbing to 8.20% as of June 30, 2009.

### 2.    Initial Capital Raising Efforts in 2008.

The Debtor understood that the economic downturn would adversely affect not only its capital ratios, which were its banking regulators' primary measurement of the Bank's stability, but

also its overall financial condition.  In the fall of 2008, the Debtor engaged the investment banking

services of Keefe, Bruyette & Woods ("KBW") to assist it in raising capital.  During December 2008,

the Debtor negotiated a letter of intent with a potential lead investor who anticipated an initial

investment of $300 million in the Debtor.  Given the substantial uncertainty in the marketplace in the

wake of the FDIC seizure of IndyMac Bank in July 2008 and Downey Savings and Loan in

November 2008, coupled with the subsequent collapse of large institutions such as Washington

Mutual Bank and the forced merger of Wachovia Bank with Wells Fargo Bank, N.A., the investor

sought, among other things, assurance from regulators that they would not take any adverse actions

against the Bank immediately after the consummation of an investment if the Debtor were successful

in raising proceeds sufficient to meet minimum requisite capital ratios.  Due to the regulators'

unwillingness to provide any such reasonable assurance, the transactions contemplated by the letter of

intent were never consummated.

Also in December 2008, at the express request of the OTS, the Debtor was required to hire

two additional investment banks:  First, at an up-front cost of $2,000,000.00, the Debtor engaged

Goldman, Sachs & Co. ("Goldman Sachs") to pursue a merger with or acquisition by another

federally insured institution.  As the Debtor feared at the time, this effort was unsuccessful and was

quickly abandoned by Goldman Sachs due to deteriorating conditions in the wider economy which

generally dampened the appetite for strategic transactions.  No portion of the $2,000,000.00 fee was

returned.

Second, at a monthly cost of $100,000, the Debtor was required to engage FBR Capital

Markets & Co. ("FBR") for the express purpose of monitoring, and reporting on, the performance of

the other investment banks retained by the Debtor.

Concurrently with these capital raising efforts, the Debtor timely submitted an application to

the OTS for a TARP investment of $125,000,000 on October 24, 2008.  The request was never acted

on by the OTS.

///

///

///

### 3. Common Stock Delisting from the New York Stock Exchange.

On February 26, 2009, NYSE Regulation, Inc. announced that it had determined that the Debtor's FirstFed Common Stock would be suspended from trading prior to market opening on Wednesday, March 4, 2009 due to the Debtor's failure to satisfy one of the continued listing standards of the New York Stock Exchange (the "NYSE"). Since March 4, 2009, the stock has been quoted on the over-the-counter market under the symbol "FFEDQ.PK."

### 4. Regulatory Actions by OTS

On January 26, 2009, the OTS issued an Order to Cease and Desist to each of the Debtor and the Bank (the "Debtor Order" and the "Bank Order," respectively, and together, the "Orders"). The Debtor Order required the Debtor to notify, or in certain cases receive the permission of, the OTS prior to, inter alia, (i) declaring or paying any dividends or other capital distributions on its capital stock; (ii) incurring, issuing, renewing, repurchasing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; or (iii) making payments (including, without limitation, principal, interest or fees of any kind) on any existing debt. The Debtor Order also required that the Debtor submit to the OTS for its approval, within fifteen (15) days of the date of the Debtor Order, a detailed capital plan ("Capital Plan") to include a proposal as to how the Bank could remain "well capitalized" (as defined in 12 C.F.R. § 565.4) at each quarter-end through December 31, 2011, which Debtor timely submitted.

In an effort to comply with asset growth limitations contained in the Orders, the Bank immediately suspended lending for its own portfolio, resulting in the layoff of approximately 10% of the Bank's then-current workforce and significant continued downsizing throughout 2009. The Debtor did not receive the necessary consent from the OTS to make the aggregate $2,300,000 in interest payments due on the Senior Indebtedness on March 16, 2009, and therefore could not and did not make those payments (for the same reason, Debtor failed to make the aggregate $2,300,000 in interest payments due on each of June 15, September 15 and December 15, 2009).

The OTS did not approve or reject the Capital Plan. Instead, on May 28, 2009, the OTS issued an Amended Order to Cease and Desist to each of the Debtor and the Bank (together, the

"Amendments"). The Amendments required that the Debtor and the Bank submit to the OTS for its approval, within thirty (30) days after the issuance of the Amendments, a detailed capital plan (the "May Capital Plan") to address how the Bank expected to meet and maintain a minimum Tier 1 Core Capital ratio of 7% and a minimum Total Risk-Based Capital ratio of 14% by September 30, 2009. The Amendments provided that if the Bank failed to meet or maintain such capital ratios or otherwise failed to comply with the May Capital Plan, as approved by the OTS, a contingency plan to accomplish either a merger with or acquisition by another federally insured institution or holding company thereof, or a voluntary liquidation of the Bank, would need to be submitted to the OTS. The Debtor and the Bank did timely submit a May Capital Plan to the OTS as required by the Amendments, which anticipated that outside capital would be raised during the third quarter of 2009.

### 5.       Events Leading Up to September 30th Deadline.

The Debtor took its capital raising efforts very seriously. Having been advised by its then primary financial advisor, KBW, that the Senior Indebtedness was impeding investment, in January 2009, the Debtor had first attempted to retire such indebtedness, initially offering to pay 33 cents on the dollar to do so. Based on the highly diffuse ownership of the debentures, which had been packaged into securities consisting of the debt of many other financial institutions and sold to investors around the world, that offer received little traction.

On June 1, 2009, the Debtor terminated the relationship with KBW and immediately began working with FBR, who advised the OTS on the Debtor's prior capital raising efforts.

On June 18, 2009, the Debtor launched a new tender offer and consent solicitation, lowering its offer price to 20 cents on the dollar based on the recent adverse regulatory actions and engaging Goldman Sachs to solicit bondholders on its behalf. The efforts of Goldman Sachs & Co. yielded only slightly more successful results, with $64,500,000 of debentures offering to tender. The Debtor terminated its engagement of Goldman Sachs & Co. and hired Hexagon Securities on August 18, 2009. This second effort by Hexagon Securities would eventually result in the tender of $143,000,000 million of the $150,000,000 million in outstanding principal amount of debentures.

///

In addition to the Debtor's activities to improve the opportunity for the investment by outside capital, based in part on advice received from FBR, the Bank began an aggressive loan modification outreach to further blunt the adverse effect of recasting adjustable rate mortgages on delinquencies in its loan portfolio, which it had begun modifying based on borrower payment difficulty beginning in late 2007. As a result of this outreach effort, the Bank was able to modify over $1 billion in such mortgages by July 2009, substantially reducing the future financial uncertainty that otherwise would have existed. Perhaps more important, the Bank's modified loan portfolio was performing substantially better than published data of industry-average modified portfolio performance.

Despite this and other demonstrable events showing progress, in early July 2009, the Debtor was informed by the FDIC that potential bidders for the Bank's assets would be arriving that month, implying that the regulators intended imminently to seize the Bank. Members of the Debtor's executive management and Board went to Washington, DC to present to representatives of the OTS and FDIC the Debtor's progress with respect to the debt tender offer and loan modifications, and data demonstrating that the Debtor's financial condition was beginning to turn the corner (loan delinquencies were decreasing after several months of increases and branch deposits were increasing, even despite the publication of recent adverse regulatory actions against the Debtor and the Bank). This meeting resulted in regulatory interest in the Bank's modification program, with the FDIC sending examiners to the Bank on July 27, 2009 to undertake a review of it.

The Debtor worked diligently through August on its efforts to raise capital, presenting a draft engagement letter from FBR to lead a public capital raise of the Debtor's common stock to the OTS for its review and approval. Nonetheless, despite this progress, the efforts to raise capital continued to face obstacles, in particular, the regulatory request near the end of August that the Debtor revise its proposed May Capital Plan to provide for the influx of more capital than originally anticipated based on regulatory concerns regarding the Bank's loan portfolio. A revised plan ("September Capital Plan") was submitted for the approval of the OTS during the first week of September. On September 2, 2009, having received the necessary OTS approval to do so, the Debtor executed the engagement letter with FBR.

On September 3, 2009, even though the OTS was the Debtor's primary banking regulator, the FDIC nonetheless issued a visitation report related to its recent review of the Bank's loan modification program. After reviewing the report, the Bank's management noted that it contained numerous significant factual and process errors which together led to a conclusion unsupported by the actual and projected condition of the Bank. Based on further discussions and in response to the Bank's request that the erroneous report be rescinded, the FDIC agreed to issue an amended report which would correct the errors it conceded were contained in the initial version. Prior to the issuance of the amended report, the Debtor's independent auditors began expressing concern regarding the potential accounting ramifications of the original report, noting that the regulators have the authority to require that adjustments be made to previously-issued financial statements. The Debtor relayed this concern to the FDIC, noting that the Debtor was required to produce financial statements in accordance with generally accepted accounting principles in the United States of America ("GAAP") and that those principles were not in accord with the analyses contained in the visitation report. The FDIC, acknowledging that its report was not in accordance with GAAP, finally issued an amended visitation report a week and a half after it had been promised. Unfortunately, while several of the more egregious errors had been remedied, many which had been discussed and conceded by the FDIC were not reflected in the amended report, which also contained new errors.

The Debtor held a special stockholder meeting on September 30, 2009, at which stockholders agreed to increase the number of authorized shares of the Debtor's common stock from 100 million to 5 billion and authorized a subsequent reverse stock split, which actions would have enabled the Debtor to proceed to raise capital in the public markets pursuant to a registration statement the Debtor had been preparing to file with the Securities and Exchange Commission ("SEC") in order formally to initiate its public raise. Also on September 30th, the Debtor reached the 75% minimum threshold on its debt tender offer, with $112,500,000 of the $150,000,000 agreeing to tender in exchange for 20 cents on the dollar. By October 16, 2009, $143,000,000, or 95% of the bonds had agreed to tender.

///

LANDAU
GOTTFRIED
& BERGER LLP

1                **6.**     **Debtor's Financial Condition at September 30, 2009.**

2        As noted, the Orders and the Amendments required, *inter alia,* that the Debtor submit

3 proposed capital plans for the OTS's approval that would (in the case of the Capital Plan) result in

4 the Bank maintaining a minimum Tier 1 Core Capital ratio of 5% and a minimum risk weighted

5 capital ratio of 10% and (in the case of the May Capital Plan) maintaining an increased minimum

6 Tier 1 Core Capital ratio of 7% and a minimum Total Risk-Based Capital ratio of 14%, which

7 needed to be met by September 30, 2009. As the recession continued, meeting these ratios became

8 increasingly difficult to achieve for many financial institutions, including the Bank.

9        The Bank failed to meet the capital ratios required by the Amendments on September 30,

10 2009 and, accordingly, as required by the Bank Order, the Bank submitted to the OTS a

11 contingency plan to accomplish either a merger of the Bank with, or an acquisition of the Bank by,

12 another federally insured institution or holding company thereof or a voluntary liquidation of the

13 Bank.

14                **7.**     **Resignation of Grant Thornton as Debtor's Independent**

15                      **Auditors.**

16        During the first week of October 2009, the Debtor's executive management team worked to

17 allay concerns expressed by its independent auditors, Grant Thornton LLP ("GT"), relating to the

18 FDIC visitation report. At the Debtor's request, the FDIC issued a clarification letter addressing

19 GT's expressed concern that the regulators would require a restatement of previously-issued

20 financial statements based on projected loss amounts in excess of those which the Debtor used in

21 such statements. Unfortunately, Grant Thornton's reaction to the letter was continued expressed

22 concern that its review work on the Debtor's quarterly financial statements would be subject to

23 regulatory adjustment. Despite several subsequent telephone conferences, e-mails and meetings

24 during the next several weeks, GT continued to express concern that regulatory action calling for a

25 restatement, while unjustified, would be issued. During this period, GT performed and billed the

26 Debtor for, but refused to complete the necessary procedures to consent to the use of its previously

27 audited financial statements in Debtor's SEC registration statement, which was complete and ready

28 to file pending only receipt of such consent. The resultant refusal of GT to stand behind its

previous review and auditing work in the face of regulatory scrutiny at this critical time would practically preclude the Debtor from raising capital in the public markets. GT formally resigned from its engagement as the Debtor's independent auditors on November 9, 2009.

### 8.    Contingency Plan:  Raise Capital by December 2nd.

During the second week of October, the OTS requested that the Debtor's Board of Directors pass a resolution consenting to the marketing of the Bank by the FDIC, including allowing potential bidders to conduct diligence on the Debtor's premises. In its updates to the OTS on its continuing efforts to raise capital, the Debtor had represented its belief that if GT were able to become comfortable with the FDIC's intentions and issue its consent, capital could be committed by December 2, 2009 under an extremely aggressive timetable put forth by FBR. Although it had been supportive of such timetable during the Debtor's updates, the OTS represented that it was being forced to request the consent on behalf of the FDIC and that ultimately the Debtor had little choice in the matter.

On October 14, 2009, the Debtor's Board provided the FDIC with the consent to be effective only in the event that capital was not raised by December 2, 2009. Similarly, in the contingency plan the Debtor submitted to the OTS on October 15th, the Debtor agreed to consent to receivership within 10 days only in the event that its primary strategy of raising capital by December 2, 2009 was unsuccessful.

The following week, facing increasing pressure from its regulators, and despite its firm belief that any simultaneous marketing of the Bank by the FDIC would further hamper the Debtor's ability to raise capital, the Debtor's Board provided the FDIC with an immediately effective consent to such activity based on the FDIC's written commitment to maintain strict confidentiality with regard to such process. At the request of the OTS, the Debtor amended its previously submitted contingency plan to state that its Board would consent to the appointment of a receiver on December 4, 2009.

///

///

///

LANDAU
GOTTFRIED
& BERGER LLP

18

### 9.    The FDIC's Marketing of the Bank.

On October 29, 2009, the FDIC began its on-site marketing of the Bank.  In its initial meeting regarding such process with the FDIC, the Debtor's management expressed the concern of its financial advisors and legal counsel that any leak of information regarding the existence of the FDIC's marketing process would seriously adversely affect the Debtor's ability to raise capital. The FDIC responded that any interested party that leaked information would be excluded from the bidding process.   Later that same day, the Debtor was advised by a former employee of the Bank that, during an interview with OneWest, she had been informed that the Bank was being marketed and that OneWest would be the successful bidder based on its discussions with the FDIC.  Despite the FDIC's persistent representations regarding confidentiality and an investigation which showed the former employee's claims to be credible, there was no exclusion of the breaching bidder.  As would become clear in six weeks, OneWest was indeed the successful bidder.  During that time, several parties who had been interested in making a capital investment in the Debtor refocused their efforts on participating in the FDIC process.

### 10.    Improved Capital Ratios and Loan Delinquency Rates.

The November 6, 2009 enactment of Worker, Homeownership, and Business Assistance Act of 2009 (the "WHBAA"), which allows businesses to carry back net operating losses from 2008 and 2009 for up to five years, significantly improved the Debtor's capital position.  Based on the WHBAA, the Debtor expected to book a tax benefit  estimated to be more than $100 million in the fourth quarter of 2009 and anticipated receiving a federal income tax cash refund during the first quarter of 2010.  Had the WHBAA been effective in the third quarter, the Bank would have had additional capital at September 30, 2009, which would have raised the Bank's core and risk-based capital ratios at that date to 5.49% and 11.13%, respectively.

The Debtor's financial condition was showing signs of improvement independent of the tax benefit, with loan delinquency levels continuing to trend downward.  Unaudited, unconsolidated monthly results as of October 31, 2009 showed a decline in delinquent loans of $58,700,000, or 16%, from the previous month. Indeed, October was the eighth consecutive month in which the Bank's loan delinquencies decreased, resulting in total delinquencies less than half of historic peak

LANDAU
GOTTFRIED
& BERGER LLP

levels reported by Debtor in early 2009.  In addition, California home prices had begun to show signs of recovery.

The Debtor communicated its "well capitalized" capital position at September 30th on a pro forma basis giving effect to the WHBAA to regulators promptly upon completing its analysis of the financial effects thereof.  Throughout November, the Debtor made several telephone calls and wrote many letters to the OTS and FDIC, urging them to restrain from seizing the Bank given the Debtor's improving overall financial condition, which would ease the path to private equity investment and completely prevent any potential loss to the DIF.

### 11.    Seizure and Sale of Assets and Liabilities of Bank.

On December 2, 2009, the Debtor's management and Board met with FDIC and OTS representatives in Washington, DC.  In that meeting, the Debtor's financial advisor informed the agencies of its belief that a successful capital raise would be all but inevitable if the Debtor were given the latitude to complete it, despite the passage of the December 2nd planned completion date.

On December 4, 2009, at the request of the OTS, the Debtor's Board provided the FDIC with a consent to a receivership of the Bank.  The following week, on December 9, 2009, the OTS stated that it would forestall FDIC takeover of the Bank and allow the Debtor further time in which to raise capital if the Debtor's Chief Executive Officer and Chairman of the Board were to relinquish her positions.  The Debtor's CEO/Chairman accepted the proposal, given that it would allow the Debtor to continue executing its capital enhancement strategies and protect against the potential loss of hundreds of jobs and millions of dollars of equity held by stockholders in the event the Bank were closed.

Despite the Debtor's cooperation and agreement to the terms put forward by the regulatory agencies, on December 18, 2009, the Bank was placed into receivership with the FDIC and certain assets and liabilities of the Bank were thereafter sold to OneWest.  As a result, the Debtor was left with no other option but to file the Petition.

///

///

///

### D.     Debtor in Possession Administration.

The Debtor commenced its Chapter 11 Case on the Petition Date to implement the liquidation of the Debtor's assets and operations.  The Debtor has taken the following steps to efficiently administer its Chapter 11 Case to date:

### 1.     Employment Applications.

On January 20, 2010, the Debtor filed applications to employ Landau Gottfried & Berger, LLP ("LGB") as its bankruptcy counsel and Manatt, Phelps & Phillips, LLP ("Manatt") as its special corporate, banking and litigation counsel.  By Orders entered on February 17, 2010, the Bankruptcy Court approved the employment of LGB (Docket No. 25) and Manatt (Docket No. 26).

On March 2, 2010, the Debtor filed its application to employ Hutchinson & Bloodgood LLP ("H&B") to review, consolidate and electronically file (but not to prepare) the Debtor's federal tax returns for the tax year ended December 31, 2009, for a flat fee of $23,000.00.  (Docket No. 30).  The Court approved the employment of H&B by Order entered on July 22, 2010.  (Docket No. 55).

### 2.     Change in Debtor's Management and Application to Employ Don Pelgrim as Chief Administrative Officer.

As of the Petition Date, the Debtor had two officers who continued to serve as officers of the Debtor as Debtor-in-Possession: Babette Heimbuch, who served as the Debtor's Chief Executive Officer and Chief Financial Officer, and Vikas Arora, who served as the Debtor's General Counsel.  Subsequent to the commencement of the case, the OTS notified the Debtor's Board of Directors ("Board") that it intended to take regulatory action against the Board and its members in connection with Ms. Heimbuch's appointment because the Board allegedly had failed to give the OTS 30 day's prior notice of Ms. Heimbuch's appointment.  Although Ms. Heimbuch, FirstFed and its Board believed that the appointment was in accordance with the OTS's regulations because the commencement of the Bankruptcy Case was an exigent circumstance that obviated the need for compliance with the 30-day notice requirement, Ms Heimbuch nonetheless, after discussions between the Board and the OTS, acceded to the OTS's pressure and voluntarily resigned from her position as CEO and CFO of the Debtor, effective mid-May.  Shortly thereafter,

1    Mr. Arora resigned to take up a post elsewhere. Accordingly, FirstFed was left with no officer to

2    act on its behalf in the bankruptcy case.

3         To fill this vacuum, FirstFed's Board acted quickly to identify possible candidates to serve

4    as Chief Administrative Officer for FirstFed, including Mr. Donald H. Pelgrim, who had first-hand

5    experience of the bank holding company bankruptcy process, having served as Chief

6    Administrative Officer ("CAO") of Vineyard National Bancorp. ("VNB") during VNB's Chapter

7    11 Bankruptcy Case. Based on this experience and Mr. Pelgrim's extensive background in banking

8    the Board selected Mr. Pelgrim, and entered into an agreement ("Pelgrim Employment

9    Agreement") with Delta Corps, Inc. ("Delta Corps") to provide the Debtor with Mr. Pelgrim's

10   services as CAO of the Debtor. The Board also appointed Brian Argrett to serve as FirstFed's

11   Chief Executive Officer and Secretary. Mr. Argrett is a member of FirstFed's Board. The

12   combined compensation of Mr. Pelgrim and Mr. Argrett represented a 20% savings to the Debtor's

13   estate, when compared with the salaries that were paid to Ms. Heimbuch and Mr. Arora.

14        On June 25, 2010, the Debtor filed its application to employ Delta Corps for the services of

15   Mr. Pelgrim as CAO. (Docket No. 46). On July 12, 2010, the FDIC filed its written objection to

16   Mr. Pelgrim's employment. (Docket No. 53) ("FDIC Delta Corps Objection"). The Debtor's

17   counsel contacted counsel for the FDIC to attempt to resolve the FDIC's Delta Corps Objection.

18   However, although the Debtor was able to provide the FDIC with additional information relating to

19   the employment application, the FDIC ultimately was reluctant to withdraw the FDIC Delta Corps

20   Objection, and Mr. Pelgrim elected to withdraw from his position with the Debtor.

21        **3.    Application to Employ Carl W. McKinzie as Debtor's Chief**

22              **Executive Officer.**

23        Following the withdrawal of Mr. Pelgrim, the Debtor again mounted a search for a suitable

24   candidate to fill the role of Chief Executive Officer of the Debtor. The Debtor's Board ultimately

25   selected Mr. Carl McKinzie, an experienced lawyer and respected member of the legal community in

26   Los Angeles, to fill that post. The Debtor filed its Application to Employ Mr. McKinzie with the

27   Court on September 20, 2010 (Docket No. 88)("McKinzie Employment Application"). On October

28   20, 2010, the Court entered its Order granting the McKinzie Employment Application and

LANDAU
GOTTFRIED
& BERGER LLP

1    authorizing the Debtor's employment of Mr. McKinzie as Chief Executive Officer of the Debtor

2    (Docket No. 99).  Mr. Argrett continues to serve as the Debtor's Secretary and is a member of the

3    Debtor's Board of Directors.

4              **4.    Application to Employ Crowe Horwath, LLP as Accountants.**

5              As noted, one of the principal assets of the Debtor is its right to receive a refund of its

6    federal taxes estimated to be in an amount of more than $100 million ("Refund") as a result of the

7    enactment, in November of 2009, of the WHBAA and the promulgation of Revenue Procedure

8    2009-52, which permit companies to carry back Net Operating Losses ("NOL") and Alternative

9    Minimum Tax Net Operating Losses ("ATNOL") incurred in either the 2008 or 2009 tax years for a

10   period of 5 years versus the 2 year period under the old rule.

11             However, the amount of the Refund is not certain, and some or all of it may be claimed by

12   the FDIC as receiver for the Bank, thus raising complex legal and accountancy issues.  Having

13   previously obtained an extension of time through September 15, 2010 in which to file its 2009

14   return, the Debtor, on May 18, 2010, filed its application to employ Crowe Horwath, LLP ("Crowe

15   Horwath") as its accountants to prepare the Debtor's 2009 tax returns and its application for the

16   Refund, as well in connection with any other tax matters.  (Docket No. 39).  Crowe Horwath was

17   retained on account of its experience in the banking sector and its direct experience, gleaned in

18   other bank holding company bankruptcy cases, of the legal and accountancy issues arising in

19   connection with the Refund.  On July 22, 2010, the Court entered its Order approving the

20   employment of Crowe Horwath (Docket No. 57).

21             **5.    Application to Employ Rus Miliband & Smith as Attorneys to**

22                  **Investigate the Debtor's Potential Claims Against the Debtor's**

23                  **Prepetition Accountants.**

24             On July 6, 2010, the Debtor filed its application to employ Rus, Miliband & Smith

25   ("RMS") as special litigation counsel to investigate and evaluate potential claims that the Debtor

26   may have against GT, subject to payment of a post-petition retainer in the amount of $50,000.00 to

27   RMS, the amount of which would also serve as the maximum amount to be paid to RMS for such

28   investigation and analysis.  (Docket No. 49).  On July 30, 2010, the Court entered its Order

LANDAU
GOTTFRIED
& BERGER LLP

23

1    approving the Debtor's employment of RMS upon the terms set forth in the RMS engagement letter

2    and employment application. (Docket No. 59).

### 6.    Bar Date Motion.

4    On February 22, 2010, the Debtor filed its *Notice of Motion and Motion for Entry of an*

5    *Order (I) Establishing Bar Dates for Filing Proofs of Claim or Interest; and (II) Approving the*

6    *Form and Manner of Notice Thereof* (Docket No. 28) ("Bar Date Motion"). Pursuant to an Order

7    of the Bankruptcy Court entered on April 15, 2010 (Docket No. 34), the Bar Date Motion was

8    approved and the Bar Date for filing proofs of claim was fixed as May 20, 2010 (the "Bar Date").

9    The last date for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file

10    proofs of claim was set for July 5, 2010. On April 16, 2010, the Debtor served on all creditors,

11    equity holders and other parties-in-interest and filed with the Bankruptcy Court its *Notice of Bar*

12    *Date for Filing Proofs of Claim or Interest against Debtor and Debtor-in-Possession FirstFed*

13    *Financial Corp.* (Docket No. 35).

### 7.    Schedules and Statement of Financial Affairs.

15    On the Petition Date, the Debtor filed its Schedules and Statement of Financial Affairs with

16    the Bankruptcy Court.

### 8.    Tax Audit and Refunds.

18    As noted previously, the Debtor may be eligible to claim a Refund of its federal taxes in an

19    amount of estimated to be more than $100 million due to a change in the tax law promulgated under

20    Revenue Procedure 2009-52 permitting companies to carry back NOLs and ATNOLs incurred in

21    either the 2008 or 2009 tax years for a period of 5 years versus the 2 year period under the old rule.

22    However, the amount of such Refund is not certain and some or all of the Refund may be

23    claimed by the FDIC as Receiver for the Bank. Further, there can be no guaranty that the Refund

24    will be allowed by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver

25    for the Bank, will receive any, or any material portion of, any such Refund.

### 9.    FDIC Proof of Claim.

27    On June 29, 2010, the FDIC filed the FDIC POC in the Debtor's Bankruptcy Case. As filed,

28    the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims pursuant

LANDAU
GOTTFRIED
& BERGER LLP

1  to 11 U.S.C. § 507(a)(9) and/or other applicable authority.  A copy of the FDIC POC is attached

2  hereto as Exhibit "G."

3       TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM, IT WILL

4  BE CLASSIFIED AS A CLASS 1 PRIORITY CLAIM.  DISTRIBUTIONS MADE ON ACCOUNT

5  OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH

6  THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER

7  APPLICABLE LAW.  ANY SUCH ALLOWED CLASS 1 FDIC CLAIM WILL REDUCE AND

8  MAY COMPLETELY ELIMINATE THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO

9  OTHER UNSECURED CREDITORS OF THE DEBTOR.  THE DEBTOR DISPUTES THE FDIC'S

10  CLAIM.  THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE WITH

11  RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY,

12  EXPRESSLY RESERVED.

13      **E.**    **The FDIC's Motion for Relief From Stay, the Debtor's 2004**

14          **Motion and the Filing of the Debtor's Federal Tax Return for the**

15          **Year Ended December 31, 2009.**

16       On August 13, 2010, the FDIC filed its *Notice of Motion and Motion for Relief From the*

17  *Automatic Stay Under 11 U.S.C. §362* (the "FDIC RFS Motion"), seeking, *inter alia*, an order of the

18  Bankruptcy Court granting the FDIC relief from the automatic stay under Section 362 of the

19  Bankruptcy Code to exercise certain rights (referred to in the FDIC RFS Motion as the "Tax Rights")

20  under Section 6402(k) of Title 26 of the United States Code (the "Internal Revenue Code" or "IRC")

21  and related regulations set forth at 26 C.F.R. § 301.6402-7 (the "Treasury Regs") relating to the filing

22  of federal tax returns for the Debtor and the Bank for the tax year ended December 31, 2009.  The

23  FDIC based the FDIC RFS Motion in part on the FDIC's stated concern that the Debtor would not

24  timely complete the return before the extended September 15, 2010 deadline by which it had to be

25  filed in order to preserve certain NOLs essential to the Refund.  A hearing before the Bankruptcy

26  Court to consider the FDIC RFS Motion was set for September 7, 2010 at 10:00 a.m. (the "FDIC RFS

27  Hearing")

28  ///

LANDAU
GOTTFRIED
& BERGER LLP

By its *Debtor's Opposition to FDIC Motion for Relief from Stay* and related Declarations (together, "Debtor's Opposition") filed with the Bankruptcy Court and served on August 24, 2010 (Docket No. 67), the Debtor opposed the FDIC RFS Motion, on various grounds, including that any delay in completing the 2009 return was caused by the FDIC because information required to complete the return lay within the control of the FDIC, which had not provided such information to the Debtor despite requests therefor; that the Debtor intended to, could, and would, file a return in a timely fashion in order to protect the Debtor's NOLs against loss to the fullest extent possible, even if the FDIC failed to provide the Debtor with the information necessary to complete the return; and that the scope of the relief sought by the FDIC was overly broad and vague.

Also on August 24, 2010, Wilmington Trust filed its *Statement of Joinder of Wilmington Trust Company as Indenture Trustee to Debtor's Opposition to FDIC Motion for Relief from Stay* (Docket No. 68) ("Joinder").

On August 23, 2010, the Debtor filed its *Notice of Motion and Motion Pursuant to Fed. R. Bankr. P. 2004 for an Order Requiring the Production of Documents by and Examination of FDIC* and related Declaration (Docket No. 66) ("Debtor's 2004 Motion") seeking production by the FDIC of documents and information necessary to complete the 2009 tax return. An order of the Bankruptcy Court granting the Debtor's 2004 Motion was entered on August 28, 2010 (Docket No. 69) ("2004 Order").

On August 31, 2010, the FDIC filed its *Reply of the Federal Deposit Insurance Corporation to the Debtor's Opposition* (Docket No. 71) and related Declarations (together, the "FDIC Reply").

Although the FDIC had, prior to the FDIC RFS Hearing, produced certain documents to the Debtor in response to the 2004 Order, the Debtor and its accountants determined that the information so provided was inadequate to allow the Debtor to file a complete federal return for the tax year ended December 31, 2009. On September 7, 2010, in order to preserve the Debtor's NOLs and rights to the Refund to the greatest extent possible, the Debtor filed as complete a return as possible without complete information from the FDIC. ("Debtor's 2009 Return"). The Debtor reserves the right to amend and/or supplement the Debtor's 2009 Return to the extent appropriate in light of any relevant information that the Debtor may obtain from the FDIC.

LANDAU
GOTTFRIED
& BERGER LLP

Following the FDIC RFS Hearing, the Bankruptcy Court entered its Order granting the FDIC

RFS Motion to the extent set forth in the Court's tentative ruling on the Motion and as reflected in the

record of the FDIC RFS Hearing.

### F.    Motion to Abandon Certain Claims.

Upon the instructions of the Debtor, the Debtor's counsel, commencing in the first week of

September, 2010, conducted an investigation of the Debtor's books, records and certain publicly

available documents, including the Debtor's pre-petition public filings with the Securities and

Exchange Commission, to determine whether the Debtor had, and could reasonably pursue, claims

against the Debtor's pre-petition directors and officers, including under the relevant directors and

officers insurance policies of the Debtor ("D&O Claims").  Based on that investigation and, in part,

on consideration of the impact of the decision in *Biltmore Associates, LLC v. Twin City Fire*

*Insurance Company,* 572 F.3d 663 (9th Cir. 2009) that the so-called "insured versus insured"

exclusion to coverage in a directors and officers liability policy ("D&O Policy") would operate to bar

a trustee of a liquidating trust under a confirmed plan of liquidation under Chapter 11 of the

Bankruptcy Code from asserting a claim under the D&O Policy, the Debtor determined that there

were no viable D&O Claims that should be pursued on behalf of the Debtor's estate.

Accordingly, on October 6, 2010, the Debtor filed with the Bankruptcy Court and served its

*Notice of Intent to Abandon* (Docket No. 94) ("Abandonment Notice").  No objection was timely

filed to the Abandonment Notice.

### G.    Prosecution of Estate Causes of Action.

#### 1.    Estate Causes of Action Against Third Parties.

The Debtor and its professionals have made a diligent effort to identify in Exhibit "D" to

this Disclosure Statement, all Estate Causes of Action against third parties other than

preference/fraudulent transfer actions and objections to Claims.  No reliance should be placed on

the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D" and "F"

because the lists are non-exclusive and may be amended prior to the Confirmation Date to provide

for additional disclosures.  The Liquidating Trustee may seek to investigate, file and prosecute

Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of

Action are identified in the Disclosure Statement. As reflected in Section IV.B.3 of the Plan, on the
Effective Date, any and all Estate Causes of Action the Estate may have against any third parties
shall be vested in the Liquidating Trust and Section IV.B.4 of the Plan provides that the Liquidating
Trustee has the authority to prosecute these Estate Causes of Action.

### 2.    Recovery of Preferential or Fraudulent Transfers.

The Liquidating Trustee will investigate whether certain prepetition payments to creditors
may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or applicable
State law. Exhibit "F" to the Disclosure Statement lists and/or identifies (i) all payments to
creditors made within ninety days of the Petition Date, (ii) all payments to insiders made within one
year of the Petition Date, and (iii) all distributions given to an insider of the Debtor, including
compensation in any form, bonuses, loans, stock, redemptions, and options exercised, also within
one year of the Petition Date. Each transfer listed therein and all other prepetition transfers and
obligations of the Debtor will be evaluated to determine whether the transfer or obligation is
avoidable on any grounds. Any creditor or party in interest that received a transfer from the Debtor
within four years prior to the Petition Date or in whose favor the Debtor incurred an obligation may
be the subject of an Estate Causes of Action on account of such transfer or obligation if grounds
exist to avoid the transfer or obligation. The Liquidating Trustee has the authority to prosecute
preferential and fraudulent transfers. See Section IV.B.3 of the Plan.

### 3.    Objections to Claims.

To date, the Debtor has not filed any objections to Claims. As set forth in Section IV.B.3
of the Plan, after the Effective Date, the Liquidating Trustee has the authority to object, prosecute,
and settle Claims.

## IV.    THE PLAN OF REORGANIZATION

A DETAILED CHART SETTING FORTH EACH CLASS DESIGNATED UNDER THE
PLAN, THE PROPOSED TREATMENT UNDER THE PLAN OF EACH CLASS, THE
PROJECTED RECOVERY UNDER THE PLAN FOR EACH CLASS, AND WHETHER A
CLASS IS ENTITLED TO VOTE, IS SET FORTH AT THE OUTSET OF THIS DISCLOSURE
STATEMENT. See **Plan Summary**.

LANDAU
GOTTFRIED
& BERGER LLP

The Plan envisions a liquidation of all remaining assets of the Debtor's Estate by the Liquidating Trustee. The assets of the Estate will vest in the Liquidating Trust upon the Effective Date and will be distributed consistent with the Bankruptcy Code priority scheme and in accordance with the terms of the Plan and the Liquidating Trust Agreement.

The Debtor believes that through the Plan: (x) holders of impaired unsecured Claims will obtain a greater recovery than would be available if the Debtor's assets were liquidated in any other manner under the Bankruptcy Code or if any other feasible alternatives were pursued; and (y) the value of the assets of the Estate will be maximized by converting the assets of the Estate into Cash in the most efficient and economical manner.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS ACCEPT THE PLAN.

In accordance with the Bankruptcy Code, the Plan classifies Claims and Equity Interests separately and provides, separately for each Class, that Holders of Claims or Equity Interests in the Class will receive various types of consideration, thereby giving effect to the different rights of the holders in each Class.

In general, under the Plan, on the Effective Date, all of the Estate's assets will vest in the Liquidating Trust and the Allowed Administrative Expenses, Allowed Priority Tax Claims, and the Allowed Class 1 Claims and Allowed Class 2 Claims will receive payment from the Liquidating Trustee in full in Cash or as otherwise noted in the Plan.

Each Holder of an Allowed Class 3 Claim will receive, as soon as practicable in the discretion of the Liquidating Trustee a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution"). In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata interim distributions (the "Interim Distributions") of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions. Pro Rata distributions relating to Disputed Claims will be placed in the

LANDAU
GOTTFRIED
& BERGER LLP

Disputed Claims Reserve. Based upon the Debtor's estimate of the total General Unsecured Claims in Class 3 of approximately $159,652,188 and the Debtor's estimate of the Available Cash, the Debtor estimates that holders of Allowed Claims in Class 3 will receive a percentage recovery of approximately 1.3% of the face amount of their Allowed Claims.[2]  The actual percentage recovery will vary depending upon, among other things, the actual amount of Allowed Claims and the actual amount of Available Cash realized, such that the actual recovery may be different than the Debtor's estimate. Based upon the Debtor's estimates, the Available Cash are not sufficient to pay the Allowed Class 3 Claims in full. See Exhibit "B" to this Disclosure Statement.

Holders of Allowed FirstFed Common Stock Interests in Class 4 are junior in priority to Allowed Class 3 Claims and will not receive a distribution under the Plan unless and until the Holders of Allowed Class 3 Claims are paid in full.  Since no distribution is expected to be made on account of Allowed Class 4 Claims, Allowed FirstFed Common Stock Interests in Class 4 will be deemed to receive nothing on account of their interests under the Plan, and such FirstFed Common Stock Interests will be deemed cancelled upon confirmation of the Plan.

THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  THE PLAN IS ATTACHED HERETO AS EXHIBIT "A," AND FORMS A PART OF THIS DISCLOSURE STATEMENT.

**A.      Summary of Certain Other Provisions of the Plan.**

**1.      Deadline for Filing Certain Administrative Tax Claims.**

Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, all requests for payment of Claims by a governmental unit (as defined under section 101(27) of the Bankruptcy Code) for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be Filed on or before the later of: (a) sixty (60) days following the

---

[2] This estimate does not take into account any proceeds of, or costs of recovery of, the Debtor's Tax Refund Claims, Estate Causes of Action or avoidance claims arising under Chapter 5 of the bankruptcy Code or costs of distribution, all of which remain unknown at this time.

LANDAU
GOTTFRIED
& BERGER LLP

Effective Date; or (b) ninety (90) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes is required to File a request for a payment of the post-petition taxes and other monies due related to such taxes. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes which does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against any of the Estate, the Liquidating Agent or their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date, and shall receive no distribution under the Plan or otherwise on account of such Claim.

### 2.    Executory Contracts and Unexpired Leases.

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers the Debtor to assume, assume and assign, or reject executory contracts and unexpired leases. As a general matter, an "executory contract" is a contract under which material performance remains due by each party. If an executory contract or unexpired lease is rejected by the Debtor, the other party to the agreement may file a Claim for any damages incurred by reason of the rejection. In the case of rejection of employment agreements and leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the debtor generally has the obligation to perform its obligations thereunder in accordance with the terms of such agreement. If an executory contract is assumed and assigned, the assignee generally has the obligation to perform the obligations of the debtor thereunder in accordance with the terms of such agreement.

Section VII of the Plan discusses the assumption and rejection of executory contracts in further detail. Executory contracts and unexpired leases to be assumed pursuant to the Plan and the projected Cure Payments, if any, are listed in Exhibit "1" to the Plan. The procedures for disputing a Cure Payment or objecting to the assumption of such executory contracts or unexpired leases are discussed in further detail in Section VII.B of the Plan. The Debtor reserves the right to delete any contract or lease from Exhibit "1" to the Plan, thereby rejecting the contract or lease, up to and

including the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended

Exhibit "1" to the Plan and by giving notice to counsel for the Indenture Trustee and counsel for the

non-debtor party to the contract or lease.

All executory contracts and unexpired leases which have not previously been rejected,

which are not specifically assumed, either pursuant to the Plan or by separate order in the Chapter

11 Case, or which are not the subject of a motion to assume pending on the Effective Date, are

deemed rejected pursuant to the Plan as of the Effective Date (or as of such earlier date as

announced by the Debtor at the Confirmation Hearing).  Exhibit "2" to the Plan contains a

nonexclusive list of executory contracts and unexpired leases to be rejected under the Plan.  Section

VII.D sets forth the procedures for filing a Claim arising from the rejection of an executory contract

or unexpired lease.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases,

whether under the Plan or by separate proceeding, will be treated as Allowed Class 3 Claims under

the Plan.

### 3.    Means of Implementation.

### (a)    From the Confirmation Date to the Effective Date.

Although the Plan will become effective only on the Effective Date, on and after the

Confirmation Date and until the Effective Date, the Debtor shall take or cause to be taken all

actions which are necessary or appropriate to enable the Plan to become effective on the Effective

Date and to implement and perform the Plan on and after the Effective Date.

### (b)    Vesting of Assets.

Unless otherwise expressly provided under the Plan, on the Effective Date, the Debtor's

Assets, including all of the Estate Causes of Action, will vest in the Liquidating Trust free and clear

of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan.

On and after the Effective Date, the transfer of the Debtor's Assets from the Estate to the

Liquidating Trust will be deemed final and irrevocable and distributions may be made from the

Liquidating Trust.

///

In connection with the foregoing:

(i)     On the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property of the Liquidating Trusts free of any restrictions imposed under the Bankruptcy Code;

(ii)     The Confirmation Order will provide the Liquidating Trustee with express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of Action; and

(iii)     As of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

**(c)     Establishment of the Liquidating Trust.**

On the Effective Date the Liquidating Trust Agreement will become effective, establishing the Liquidating Trust. The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). As of the Effective Date, the Liquidating Trustee will be responsible for liquidating the assets of the Liquidating Trust. The Liquidating Trustee shall commence his duties as Liquidating Trustee on the Effective Date for the purpose of carrying out all responsibilities and making distributions provided for under the Plan and Liquidating Trust Agreement.

**(i)     Beneficiaries.**

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries ("Beneficiaries") of the Liquidating Trust will be the Holders of all Allowed Claims against and, to the extent Allowed Claims are paid in full with interest, Allowed Interests in the Debtor. The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement. The Beneficiaries of the Liquidating Trust

LANDAU
GOTTFRIED
& BERGER LLP

1    shall be treated as the grantors and owners of such Beneficiaries' respective portion of the

2    Liquidating Trust.

3                    **(ii)      Implementation of the Liquidating Trust.**

4            On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will

5    be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the

6    form attached as Exhibit "3" to the Plan, take all such actions as required to transfer from the

7    Debtor and the Estate the Debtor's Assets (except as specifically set forth herein).  From and after

8    the Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as

9    required to implement the Liquidating Trust Agreement and the provisions of the Plan as are

10   contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing

11   Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or otherwise

12   resolving Estate Causes of Action and causing Distributions from the Liquidating Trust to be made

13   to the Beneficiaries.

14                   **(iii)     Transfer of Debtor's Assets.**

15           On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the

16   Bankruptcy Code, the Debtor is authorized and directed to transfer, grant, assign, convey, set over,

17   and deliver to the Liquidating Trustee all of that Debtor's and its Estate's right, title and interest in

18   and to its Assets, including all Estate Causes of Action, free and clear of all liens, Claims,

19   encumbrances or interests of any kind in such property, except as otherwise expressly provided in

20   the Plan.  To the extent required to implement the transfer of the Debtor's Assets from the Debtor

21   and its Estate to the Liquidating Trust, all Persons will cooperate with the Debtor and the Estate to

22   assist the Debtor and the Estate to implement said transfers.

23                   **(iv)     Representative of the Estate.**

24           The Liquidating Trustee will be appointed as the representative of the Estate pursuant to

25   sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with

26   the authority and power (subject to the Liquidating Trust Agreement) to inter alia: (i) object to

27   Claims against and Equity Interests in the Debtor; (ii) administer, investigate, prosecute, settle and

28   abandon all Estate Causes of Action assigned to the Liquidating Trust; (iii) make Distributions

provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (iv) take

such action as required to administer, wind-down, and close the Chapter 11 Case. As the

representative of the Estate, the Liquidating Trustee will be vested with all of the rights and powers

of the Debtor and the Estate with respect to all Estate Causes of Action assigned and transferred to

the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtor and/or

the Estate, as applicable, as the party in interest in all such litigation pending as of the Effective

Date.

### 4.    No Liability of Liquidating Trustee.

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers,

directors, agents, members, or representatives, or professionals employed or retained by the

Liquidating Trustee (the "Liquidating Trustee's Agents"), and their employees, officers, directors,

agents, members, or representatives, or professionals employed or retained, will not have or incur

liability to any Person for an act taken or omission made in good faith in connection with or related

to the administration of the Liquidating Trust Assets, the implementation of the Plan and the

Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. The

Liquidating Trustee, the Liquidating Trustee's Agents and their employees, officers, directors,

agents, members, or representatives, or professionals employed or retained will in all respects be

entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities

under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a

judicial determination that the exculpation provision contained in Section X.A of the Plan is

necessary to, *inter alia*, facilitate Confirmation and feasibility and to minimize potential claims

arising after the Effective Date for indemnity, reimbursement or contribution from the Estate or the

Liquidating Trust. The Confirmation Order's approval of the Plan will also constitutes a *res

judicata* determination of the matters included in the exculpation provisions of the Plan.

Notwithstanding the foregoing, nothing herein or in Section X.A of the Plan will alter any provision

in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating

Trustee to any Person.

///

### 5. Prosecution of Estate Causes of Action by the Liquidating Trustee.

Pursuant to the Confirmation Order, on the Effective Date, the Debtor irrevocably assigns, transfers and conveys to the Liquidating Trust all property of the Estate, including, but not limited to, all Estate Causes of Action. Subject to the provisions of Section IV.B.1 of the Plan, the Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all such Estate Causes of Action, with all recoveries derived therefrom to be included within Available Cash.

Therefore, the Estate Causes of Action described in Exhibit "F" (potential preference payments), Exhibit "E" (litigation against third parties) and the pending litigation claims described on Exhibit "D", if any, will be investigated and may be prosecuted by the Liquidating Trustee thereafter. Additionally, the Liquidating Trustee will investigate and may object to Claims after the Effective Date. The Debtor and its Professional Persons have made a diligent effort to identify in Exhibits "D," "E" and "F" to this Disclosure Statement, all potential Estate Causes of Action (other than objections to Claims). However, no reliance should be placed on the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D," "E", or "F". The Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the Disclosure Statement.

With the sole exception of the potential D&O Claims abandoned pursuant to the Abandonment Notice described in Section III.F, above, neither the Debtor nor the Liquidating Trustee waives, relinquishes, or abandons any right or cause of action which constitutes property of the Debtor's Estate, whether or not such right or cause of action is an Estate Cause of Action has been listed or referred to in the Schedules or in this Disclosure Statement and whether or not such right or cause of action is currently known to the Debtor or the Liquidating Trustee. The Debtor submits that the reservation of Estate Causes of Action herein is sufficient to preserve such Estate Causes of Action and shall not give rise to any release, waiver, extinguishment, forfeiture or other impairment of any Estate Cause of Action against any party, nor shall same subject the Estate or

the Liquidating Trustee to any claims or defenses of *res judicata*, equitable estoppel or any other

similar doctrines or theories in connection with any of the Estate Causes of Action.

### (a)    Issuance and Execution of Plan Related Documents and Corporate Action.

Pursuant to Section IV.B of the Plan, as of the Effective Date, the Liquidating Trustee will be

authorized to execute such amendments, modifications, supplements, and other documents as

provided for in the Plan.  From and after the Effective Date, the Debtor shall be dissolved and the

Liquidating Trustee shall be authorized to take all action necessary to dissolve the Debtor.  On the

Effective Date, the employment, retention, appointment and authority of all Officers, Directors,

Employees and Professionals of the Debtor shall be deemed to terminate.

### (b)    Cancellation/Surrender of Debentures and Related Agreements.

As of the Effective Date, (a) the Indentures and the Debentures shall immediately and

automatically terminate and have no further force or effect, and (b) neither the Debtor nor the other

parties thereto shall have any further rights, obligations or duties thereunder, except that each of the

Indentures and the Debentures shall continue to remain in effect for the following:

(i)    allowing a holder of an Allowed Class 3 Claim (including the

Indenture Trustee, and holders of Debentures) to receive a distribution provided for under this Plan in

accordance with the distribution provisions contained in the Indentures;

(ii)    the right of the Indenture Trustee to exercise its charging lien

rights under Sections 5.4 and 6.6 of the Indentures against any recoveries which are or may be due

and payable to any holders of the Debentures as Allowed Class 3 Claims; and

(iii)    the right of the Indenture Trustee to be indemnified pursuant to

the provisions of Section 6.6 of each of the Indentures.

Following the Effective Date, holders of Allowed Class 3 Claims will receive from the

Indenture Trustee or its designee specific instructions regarding the time and manner in which the

Debentures are to be surrendered.  Pending such surrender, such Debentures will be deemed cancelled

and shall represent only the right to receive the distributions to which the holder is entitled under this

LANDAU
GOTTFRIED
& BERGER LLP

1   Plan. Any such holder who fails to surrender or cause to be surrendered such Debenture or fails to

2   execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent

3   or the respective indenture trustee (including the Indenture Trustee), agent or servicer, as the case

4   may be, within six (6) months after the Effective Date, shall be deemed to have forfeited all rights and

5   claims in respect of such Debenture and shall not participate in any distribution hereunder, and all

6   cash in respect of such forfeited distribution, including interest accrued thereon, shall revert to

7   distributions to be made to other holders of Debentures.

8         **6.**    **Provision for Allowance of the Claims Asserted by the Indenture**

9              **Trustee On Behalf of the Holders of the Debentures (the**

10              **"Debenture Claims").**

11      As set forth in further detail in Section IV.A. of the Plan, a beneficial owner of the

12   Debentures of record as of the seventh (7th) Business Day following entry of the Confirmation

13   Order (the "Record Date") shall, for purposes of distributions under the Plan, be deemed to have an

14   Allowed Class 3 Claim for the outstanding principal amount of the Debentures owned by such

15   beneficial owner plus accrued and unpaid interest as of the Petition Date, and need not file a proof

16   of claim with respect thereto.

17      With respect to distributions to be made to holders of the Debentures classified in Class 3,

18   the Indenture Trustee shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to

19   holders of the Debentures which are classified as Allowed Class 3 Claims; (iii) be solely

20   responsible for making distributions to holders of Allowed Class 3 Claims arising from such

21   Debentures; and (iv) be authorized to deduct the Indenture Trustee's Fees and Expenses from the

22   consideration provided to holders of Allowed Class 3 Claims to the extent so provided for in the

23   Indentures.

24         **7.**    **Resolution of Disputed Claims.**

25      As set forth in Section IV of the Plan, after the Effective Date and subject to the provisions

26   of the Plan and Liquidating Trust Agreement, the Liquidating Trustee will review all Claims and

27   determine if any grounds exist to object to such Claims. Only Allowed Claims will be paid.

28   Distributions relating to Disputed Claims will be placed into the Disputed Claims Reserve until

such time as such Disputed Claim is adjudicated or otherwise settled. Any Disputed Claim that becomes an Allowed Claim after the Effective Date will be paid from the Disputed Claims Reserve. If such Disputed Claim fails to become an Allowed Claim, money placed in the Disputed Claims Reserve on behalf of such Disputed Claim shall be deemed to be Available Cash and shall be distributed to holders of Allowed Class 3 Claims. All objections to claims shall be filed prior to the Liquidating Trustee Claim Objection Deadline, as defined in IV.B of the Plan, and served upon the Holder of the Claim to which the objection is made.

Additionally, any Claims filed by the Debtor's officers and directors seeking indemnification from the Debtor pursuant to employment agreements, by-laws or otherwise, shall be channeled, subject to any defenses thereto and 11 U.S.C. 510(b) and (c), to the Debtor's applicable directors' and officers' insurance policies including but not limited to:  U.S. Specialty Insurance Company, Policy # 14-MGU-09-A20123; National Union Fire Insurance Company of Pittsburgh, Pa. Policy # 00-245-05-68.

### 8. Distributions Under the Plan.

#### (a) General Provisions.

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court, distributions to be made on the Effective Date on account of Allowed Claims, other than Allowed Class 3 Claims, shall be made on the Effective Date or as soon as practicable thereafter. Each Holder of an Allowed Class 3 Claim shall receive an Initial Class 3 Distribution, as soon as practicable in the discretion of the Liquidating Trustee, comprising a Pro Rata Share of the Available Cash. Notwithstanding the foregoing, no distributions will be made on a Claim unless it is an Allowed Claim or, in the case of a Disputed Claim, an order of the Bankruptcy Court has been entered estimating the Claim for purposes of distribution; and, provided further, however, distributions on Allowed Claims may be delayed as a result of, or the allowance or estimation of, Disputed Claims, or the expiration of time for filing a proof of claim.

#### (b) Delivery of Distributions, Address of Holder.

For purposes of all notices and distributions under the Plan, and except as provided in Section 5 above, the Liquidating Trustee shall be entitled to rely on the name and address of the

1   Holder of each Claim as shown on, and distributions to Holders of Allowed Claims shall be made

2   by regular U.S. first class mail to, the following addresses: (a) at the addresses set forth in the

3   proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notices of

4   address change delivered to the Debtor or to the Liquidating Trustee after the date on which any

5   related proof of Claim was Filed; or (c) the address reflected on the Schedules if no proof of Claim

6   or proof of Equity Interest is Filed and the Debtor or the Liquidating Trustee has not received a

7   written notice of a change of address.  The Liquidating Trustee shall be under no duty to attempt to

8   locate Holders of Allowed Claims who are entitled to unclaimed distributions.

9                                    **(c)      Record Date.**

10          Pursuant to Bankruptcy Rule 3021 and effective as of 5:00 p.m. (Pacific time) on the

11   Record Date, the transfer ledgers for the Indentures and the Equity Interests shall be closed, and

12   there shall be no further changes in the record holders of such Debentures and Equity Interests.  The

13   Liquidating Trustee shall have no obligation to recognize any transfer of any such Debentures

14   and/or Equity Interests occurring after the Record Date, but shall instead be entitled to recognize

15   and deal for all purposes with only those holders of record stated on the applicable transfer ledgers

16   as of the Record Date and shall be entitled instead to recognize and deal for all purposes hereunder

17   with only those record holders stated on the transfer ledgers as of the close of business on the

18   Record Date.

19                             **9.      Conditions Precedent.**

20          The Plan provides that it will not become effective until the Confirmation Order has been

21   entered on the docket of the Bankruptcy Court and no stay of the Confirmation Order is in effect,

22   unless this condition has been waived in writing by the Debtor.

23                          **10.      Retention of Jurisdiction.**

24          The Plan provides for the retention by the Bankruptcy Court of jurisdiction over the

25   Chapter 11 Case as specified in the Plan.

26                              **11.      Effective Date.**

27          The Effective Date is the first date that the Plan becomes effective under Section VIII.A. of

28   the Plan.

### 12.    Amendment, Modification or Revocation of the Plan.

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Debtor. After the Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or its Estate or any other person or to prejudice in any manner the rights of the Debtor, the Debtor or its Estate or any person in any further proceedings involving the Debtor.

### 13.    Post Confirmation Notice.

From and after the Effective Date, any person who desires notice of any pleading or document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as to which the Bankruptcy Code requires notice to be provided, shall file a request for post-confirmation notice and shall serve the request on the Liquidating Trustee; provided, however, the Office of the United States Trustee in this district ("OUST"), counsel to the Debtor and counsel to the Indenture Trustee shall be deemed to have requested post-confirmation notice.

### V.    EFFECT OF PLAN CONFIRMATION

### A.    Preservation of Rights of Action.

Except to the extent any rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case: (i) any and all Estate Causes of Action vesting with the Liquidating Trust under the Plan shall remain Liquidating Trust Assets, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Estate Causes of Action have been listed or referred to in this Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtor nor the Estate waives, releases, relinquishes, forfeits, or abandons (nor shall either be estopped or otherwise precluded or impaired

LANDAU
GOTTFRIED
& BERGER LLP

from asserting) any Estate Cause of Action that constitutes property of the Debtor's Estate: (a) whether or not such Estate Cause of Action has been listed or referred to in the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such Estate Cause of Action is currently known to the Debtor or the Liquidating Trustee, and (c) whether or not a defendant in any litigation relating to such Estate Cause of Action filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan.

**B.    No Liability for Solicitation or Participation.**

In accordance with section 1125(e) of the Bankruptcy Code and as more fully set forth in Section X.A of the Plan, on the Effective Date, the Debtor, the Indenture Trustee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case (including, for example, proposal and solicitation of acceptances for the Plan), except for acts or omissions which constitute willful misconduct or gross negligence.

**VI.    CONFIRMATION PROCEDURE**

HOLDERS OF IMPAIRED CLAIMS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN (INCLUDING THE EXHIBITS THERETO) IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met. These include, among others, the requirements that the Plan: (i) is accepted by all impaired classes of Claims; (ii) is feasible; and (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Bankruptcy Court and, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement. The Plan, the Disclosure Statement, Ballots, and other solicitation materials approved by the Bankruptcy Court

LANDAU
GOTTFRIED
& BERGER LLP

were distributed to all known holders of impaired Claims in the Voting Classes. A Confirmation

Hearing with respect to the Plan is scheduled to commence as set forth in the Confirmation Notice

included in the solicitation materials and served on all creditors and parties in interest. At the

confirmation hearing, the Debtor will request the Bankruptcy Court to confirm the Plan on the basis

that all confirmation requirements have been satisfied.

### A.    Voting; Acceptance.

Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's

Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court

(provided that such Claim has not been scheduled as disputed, contingent, unknown, or

unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously

fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the

Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been

disallowed for voting purposes by the Bankruptcy Court, or is disallowed under the Plan. The

Record Date for determining which Holders of the Debentures is a "Record Holder" for voting

purposes will be January 5, 2010. A vote may be disregarded if the Bankruptcy Court determines,

after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in

good faith or in accordance with the provisions of the Bankruptcy Code.

The Voting Class of Claims (*i.e* Class 3) will be deemed to have accepted the Plan if the

Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in

number of the Claims of such Class (excluding certain Claims designated under section 1126(e) of

the Bankruptcy Code) that will have voted to accept or reject the Plan.

THE INDENTURE TRUSTEE IS NOT PERMITTED TO VOTE ON BEHALF OF THE

HOLDERS OF THE DEBENTURES. FOR PURPOSES OF VOTING, THE BENEFICIAL

HOLDER OF A DEBENTURE SHALL BE TREATED AS THE HOLDER OF ITS RESPECTIVE

SHARE OF DEBENTURE CLAIMS AND SHALL BE ENTITLED TO VOTE WITH RESPECT

TO THE PLAN. CONSEQUENTLY, THE DEBTOR WILL SEND A BALLOT DIRECTLY TO

SUCH BENEFICIAL HOLDER IN ACCORDANCE WITH THE DIRECTION OF THE

INDENTURE TRUSTEE AND SUCH BENEFICIAL HOLDER MUST SUBMIT ITS OWN

1  BALLOT IN ACCORDANCE WITH THE TERMS OF THE INDENTURE IN ORDER FOR ITS

2  VOTE TO COUNT.

3         Class 3 is the only Voting Class because Classes 1 and 2 are not impaired and therefore are

4  deemed to accept the Plan and Class 4 is impaired but deemed to reject the Plan because it will not

5  receive a distribution under the Plan.

6                    **B.     Confirmation Hearing.**

7         Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

8  hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Confirmation

9  Hearing may be postponed from time to time by the Bankruptcy Court without further notice except

10 for an announcement of the postponement made at the Confirmation Hearing. Section 1128(b) of

11 the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

12 Objections must be made in writing, specifying in detail the name and address of the person or

13 entity objecting, the grounds for the objection, and the nature and amount of the Claim or Equity

14 Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy

15 Rules and Local Bankruptcy Rules. Objections must be filed and served pursuant to the

16 Confirmation Notice in the manner set forth therein, on or before the time and date designated in

17 the Confirmation Notice as being the last date for serving and filing objections to confirmation of

18 the Plan.

19        UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED

20 IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED

21 BY THE BANKRUPTCY COURT. AS SET FORTH IN THE CONFIRMATION NOTICE, THE

22 BANKRUPTCY COURT MAY NOT CONSIDER ANY OBJECTIONS THAT ARE NOT

23 TIMELY RAISED.

24        At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

25 whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code

26 have been satisfied:

27              1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

28

LANDAU
GOTTFRIED
& BERGER LLP

2.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor and the nature of any compensation for such insider.

6.      Each Holder of an impaired Claim and each Holder of Equity Interests either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claims or Equity Interests, as the case may be, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor's Estate were liquidated on such date under chapter 7 of the Bankruptcy Code.

7.      Unless the Debtor proposes a nonconsensual plan of liquidation, each class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and such Other Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full on the Effective Date and that holders of Priority Tax Claims will receive on account of such Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

LANDAU
GOTTFRIED
& BERGER LLP

9.    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

10.    The Plan contemplates the disposition of all of the assets of the Estate and the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity Interests in order of priority and as provided for in the Plan.

The Debtor believes that, upon acceptance of the Plan by the Voting Class, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

### C.    Feasibility.

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless a liquidation is contemplated by the Plan. Here, the Plan contemplates the orderly sale or disposition of all of the assets of the Debtor and the distribution of the proceeds therefrom in accordance with the Plan. The Debtor has prepared a Projection of the Available Cash (see Exhibit "B" hereto). Exhibit "B" includes a detailed schedule of the sources and uses of Cash and property at the assumed Effective Date. The sources of funds for such cash payments will be cash on hand at the Effective Date. The Debtor believes that, based upon the assumptions made, such available funds will be adequate to fund the Plan.

### D.    Best Interests Test.

As referred to in subparagraph 6 of Section VI.B. above, confirmation of the Plan requires that each Holder of an impaired Claim either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor's Estate were liquidated under chapter 7 of the Bankruptcy Code.

The Debtor has determined that confirmation of the Plan will provide each Holder of a Claim with a recovery that is not less than that which it would receive pursuant to a liquidation of

the Debtor under chapter 7 of the Bankruptcy Code. This determination is based upon a consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders.

Conversion of this case to one under chapter 7 at this stage would simply add another layer of administrative expenses which would only serve to diminish the distributions to all creditors in this case. In a chapter 7 case, the chapter 7 trustee will incur fees and expenses of professionals that will be paid prior to any chapter 11 Claims. Accordingly, the distributions to creditors will likely be larger under the Plan. Moreover, initial distributions to creditors contemplated by the terms of the Debtor's Plan will be made quicker than any likely distribution that would be made by a Chapter 7 Trustee because a Chapter 7 Trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Debtor's Estate.

Based on the foregoing, the Debtor believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a chapter 7 case and the appointment of a chapter 7 trustee therein.

### E.    Risks.

Because the final amount of monies that will be collected and the final amount of Allowed Administrative, Priority, Secured, General Unsecured Claims, and Debenture Claims have not yet been determined, the amounts for distribution to holders of Allowed Class 3 Claims and the percentage that each holder of an Allowed Class 3 Claim may receive on account of its Allowed Claim could be less than the percentage estimated herein.

### VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

The Debtor believes that the Plan affords Holders of Claims the potential for the greatest feasible realization out of the Debtor's assets, and, therefore, is in the best interest of such holders. The Debtor has considered alternatives to the Plan, such as a liquidation in the context of a chapter 7 case. In the opinion of the Debtor, such alternatives would not afford Holders of Claims a return greater than that achieved under the Plan.

///

### A.    Liquidation Under Chapter 7.

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recovery by holders of Claims is set forth above in the section entitled "Best Interests Test."

### B.    Alternative Plan of Liquidation.

If the Plan is not confirmed, the Debtor could attempt to formulate a different plan. With respect to an alternative plan, the Debtor has explored various other alternatives in connection with the negotiation process involved in the formulation and development of the Plan, but concluded that the Plan provides the best feasible recoveries attainable under the circumstances. The Plan provides for an orderly disposition of the assets of the Estate on a timetable, and on terms, which maximizes the value of the Estate. Any alternative liquidation under chapter 11 or under chapter 7, is likely to result in a lower recovery.

THE DEBTOR BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.

### VIII.    VOTING PROCEDURES

The Debtor is providing, or causing to be provided, copies of the Confirmation Notice, this Disclosure Statement, the Plan, and/or Ballots or master ballots ("Master Ballots"), as applicable, to all known Holders of impaired Claims in the Voting Class, including registered holders as of the Record Date of the Debentures (or, if applicable, to those holders who are listed as participants in a clearing agency's position). Registered holders may include brokerage firms, commercial banks, trust companies, or other nominees (the "Nominees"). If such Nominees do not hold for their own account, they should follow the procedures described in Section VIII.B below. Any beneficial owner who has not received a Ballot should contact such owner's Nominees, or write to the

Debtor's Ballot Tabulator. Ballots must be returned to the Ballot Tabulator by no later than the

Voting Deadline set forth in the Ballot.

###    A.    Procedures for Tabulation of Votes on the Plan.

Solely for purposes of voting to accept or reject the Plan, and not for the purpose of the

allowance of, or distribution on account of, a Claim and without prejudice to the rights of the

Debtor in any other context, the Debtor proposes that each Claim within the Voting Class that is

entitled to vote to accept or reject the Plan be temporarily allowed in accordance with the

following rules (collectively, the "Tabulation Rules"):

1.    Ballots and Master Ballots that fail to indicate an acceptance or rejection on

the Ballot will not be accepted or counted by the Debtor in connection with the Debtor's request for

confirmation of the Plan.  Ballots that indicate both an acceptance and a rejection of the Plan will be

treated as an acceptance of the Plan and will be counted as such;

2.    Creditors shall not split their vote within a Claim; thus, each creditor shall

be deemed to have voted the full amount of its Claim either to accept or reject the Plan;

3.    Original executed Ballot or Master Ballot is required.  Delivery of a Ballot

or Master Ballot by facsimile, email or any other electronic means will not be accepted;

4.    If multiple Ballots or Master Ballots are received from or on behalf of an

individual holder of a claim with respect to the same Claims prior to the Voting Deadline, the last

Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any

prior Ballot;

5.    If a Claim for which a proof of claim has been timely filed is marked as

contingent, unliquidated or disputed on the face of the proof of Claim, such Claim will be

temporarily allowed for voting purposes in the amount of $1.00, unless otherwise ordered by the

Court, after notice and a hearing;

6.    If a proof of Claim has been filed but such Claim is considered by the

Debtor to be a Disputed Claim, such Disputed Claim will not be counted for purposes of voting on

the Plan if the Debtor files an objection to such Disputed Claim no later than fourteen (14) days

prior to the Voting Deadline, unless an order of the Bankruptcy Court is entered after notice and a

hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule
3018(a);

       7.     If a Claim holder identifies a Claim amount on its Ballot that is less than the
amount otherwise calculated in accordance with the Tabulation Rules, the Claim will be
temporarily allowed for voting purposes in the lesser amount identified on such Ballot; and

       8.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-
in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such
person should indicate such capacity when signing.

### B.    Special Provisions With Respect to Voting by Beneficial Owners of the Debentures

As stated above, the Indenture Trustee is not permitted to vote on behalf of the beneficial
holders of the Debentures.  Accordingly, the Debtor shall retain an appropriate noticing agent to (a)
provide such beneficial holders (or their Nominees, if held in "street name") with copies of the
Disclosure Statement, the Plan, Confirmation Notice and the Ballot (collectively, the "Solicitation
Package") as directed by the Indenture Trustee, and (b) request that such Nominees (if held in
"street name") distribute to such beneficial holders the Solicitation Package , and (c) such holders
shall vote on the Plan in accordance with the terms of the relevant Indentures.

## IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction.

The following discussion summarizes certain federal income tax consequences of the
implementation of the Plan to the Holders of Class 3 Claims.  The following summary does not
address the federal income tax consequences to Holders of any other Claims and Claims that are not
Impaired by the Plan, or to Holders of Equity Interest.  The following summary is based on the
IRC, Treasury regulations promulgated and proposed thereunder, judicial decisions and published
administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the
date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and
could significantly affect the federal income tax consequences described below.  Further, any
discussion of the Liquidating Trust and the powers, obligations and/or actions of the Litigating

1   Trustee that may be set forth below is subject to the applicable provisions of the Plan and the

2   Liquidating Trust Agreement; if and to the extent that there is any inconsistency between such

3   discussion on one hand and the Plan and the Liquidating Trust Agreement on the other hand, the

4   terms of the latter documents shall control.  Holders of Claims and Equity Interests should read the

5   Plan and the Liquidating Trust Agreement in their entirety.

6          The federal income tax consequences of the Plan are complex and are subject to significant

7   uncertainties.  The Debtor has not requested a ruling from the IRS or an opinion of counsel with

8   respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the

9   interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not

10  address foreign, state or local tax consequences of the Plan, nor does it purport to address the

11  federal income tax consequences of the Plan to special classes of taxpayers (such as foreign

12  taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small

13  business investment companies, regulated investment companies, tax-exempt organizations,

14  investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or

15  conversion transaction, Holders who acquired their Claims as compensation, and Holders who do

16  not hold their Claims as capital assets).

17          ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME

18  TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A

19  SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE

20  INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR

21  INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT

22  THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX

23  CONSEQUENCES APPLICABLE UNDER THE PLAN.

24          TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE

25  INFORM YOU THAT (A) ANY WRITTEN UNITED STATES FEDERAL TAX ADVICE

26  CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENT) IS

27  NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, FOR

28  THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY

SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF

THE TRANSACTION OR MATTER ADDRESSED HEREIN AND (C) ALL HOLDERS OF

CLAIMS AND/OR EQUITY INTEREST SHOULD SEEK ADVICE BASED ON THEIR

PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### B.      Consequences to the Debtor

Under the Plan, the Liquidating Trust will be treated for U.S. federal income tax purposes

as "grantor" trust (i.e., a pass-through tax entity), rather than a separate taxable entity. The transfer

of the Debtor's Assets to the Liquidating Trust may result in the Debtor recognizing gain or

income, depending in part on the value of such assets on the Effective Date and the adjusted basis

of such assets on the Effective Date.

### C.      Consequences to Holders of Allowed Class 3 General Unsecured Claims

#### 1.      Recognition of Gain or Loss Generally

Pursuant to the Plan, on the Effective Date, each Holder of an Allowed Class 3 Claim will

receive an interest in the Liquidating Trust, which is a beneficial interest in the Liquidating Trust,

entitling the holder thereof to distributions from the Liquidating Trust as provided for in the Plan

and in the Liquidating Trust Agreement.  Except to the extent that the holder of a Class 3 Claim or

beneficial interest therein agrees to a different treatment, said Persons will receive on account of

their Allowed Class 3, in full and complete satisfaction thereof, from the Liquidating Trust, one or

more Pro Rata Distributions of the Available Cash based upon the amount of the respective

Holder's Allowed Claim.  In general, each holder of an Allowed Claim will recognize gain or loss

in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair

market value of any other property (including, as discussed below, its undivided interest in the

Liquidating Trust Assets) that such holder receives in satisfaction of its Claim (other than in respect

of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as

imputed interest due to the post-Effective Date Distribution of such consideration upon the

resolution of Disputed Claims), and (ii) such Holder's adjusted tax basis in its Claim (other than

any Claim for accrued but unpaid interest).  For a discussion of the U.S. federal income tax

consequences of any Claim for accrued interest, see Section 2 below.

LANDAU
GOTTFRIED
& BERGER LLP

As discussed below, the Liquidating Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, each holder of an Allowed Claim receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating Trust Assets (see section 3 below). As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all parties, including the Holders of Class 3 Claims, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidating Trust may receive more than one Distribution subsequent to the Effective Date (due to the subsequent disallowance of certain Disputed Claims or unclaimed Distributions), the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

After the Effective Date, any amount that a Holder receives as a Distribution from the Liquidating Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) should not be included for federal income tax purposes in the Holder's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the Liquidating Trust.

Where a Holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a

1    capital asset in the hands of the Holder and how long it has been so held, whether the Holder had

2    acquired the Claim at a market discount, and whether and to what extent the Holder had previously

3    claimed a bad debt deduction.  A Holder that purchased its Claim from a prior Holder at a market

4    discount may be subject to the market discount rules of the IRC.  Under those rules, assuming that

5    the Holder has made no election to amortize the market discount into income on a current basis

6    with respect to any market discount instrument, any gain recognized on the exchange of such Claim

7    (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of

8    the accrued market discount on such Claim as of the date of the exchange.

9          In general, a Holder's tax basis in any beneficial interest received (and undivided interest in

10   the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate

11   share of the Liquidating Trust Assets on the Effective Date.  The holding period for such assets

12   generally will begin the day following the Effective Date.

13                   **2.          Distributions in Payment of Accrued but Unpaid Interest**

14         Distributions to any Holder of an Allowed Claim will be allocated first to the original

15   principal portion of such Claim as determined for federal income tax purposes, and then, to the

16   extent the consideration exceeds such amount, to the portion of such Claim representing accrued

17   but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for

18   federal income tax purposes.

19         To the extent a Holder of debt receives an amount of Cash or property in satisfaction of

20   interest accrued during its holding period, such Holder generally recognizes taxable interest income in

21   such amount (if not previously included in the Holder's gross income).  Conversely, a Holder

22   generally recognizes a deductible loss to the extent any accrued interest claimed was previously

23   included in its gross income and is not paid in full.  Each Holder is urged to consult its tax advisor

24   regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal

25   income tax purposes.

26

27

28

### 3. Tax Treatment of the Liquidating Trust and Holders of Interests Therein

On the Effective Date, the Liquidating Trust will be established for the benefit of Holders of all Allowed Claims. The Liquidating Trust is intended to qualify and be treated as a "grantor" (*i.e.*, a pass-through tax entity), rather than as a separate taxable entity. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries of the Liquidating Trust) are required for federal income tax purposes to treat the Liquidating Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as a transfer of such Liquidating Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust. Consistent therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax purposes. Each such Person will have a tax basis in its proportionate share of the Liquidating Trust

Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim receiving a beneficial interest in the Liquidating Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidating Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a Holder are not dependent upon the Liquidating Trust distributing any Cash or other proceeds. Therefore, a Holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidating Trust regardless of the fact that the Holder has not received any prior or concurrent Distribution. Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidating Trust Assets.

The assets set aside or reserved to fund the payment of the Disputed Claims Reserve will be treated and taxed for federal income tax purposes similar to the other assets transferred and held by the Liquidating Trust (i.e. the reserved assets will be treated as transferred to the grantor Liquidating Trust owned by the Beneficiaries) *unless* the Liquidating Trustee files a tax election to treat the Disputed Claim Reserve as a Disputed Ownership Fund. Under the Plan, the Liquidating Trustee is allowed, for federal income tax purposes, to treat the Disputed Claims Reserve as either (a) a part of the assets of the grantor Liquidating Trust owned by the Beneficiaries (i.e.,   the

Beneficiaries, rather than the Liquidating Trust, will pay tax on their share of Tax Items, as that term is defined in the Liquidating Trust, attributable to the Disputed Claims) or (b) a Disputed Ownership Fund ("DOF"), taxable under IRC Section 468B and Treasury Income Tax Regulation Section 1.468B-9 (separate taxable entity).    If the Liquidating Trustee fails to file a DOF tax election, the tax consequences with respect to the transfer of assets used to fund the Disputed Claims reserve will be the same as described above for the other assets transferred by the Debtor to the Liquidating Trustee.

If the Liquidating Trustee files a tax election to treat the Disputed Claims reserve accounts as a DOF, then the DOF will be treated as a separate taxable entity for federal income tax purposes (rather than a pass-through tax entity) that is required to file federal income tax returns and pay any federal income tax due with respect to Tax Items that are attributable to the Disputed Claims.  All of the federal income tax liability of the DOF will reduce the distributions of all of the Beneficiaries, including the Disputed Claimants.  The DOF will be taxed for federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the fund by or on behalf of transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of IRC Section 468B and the Treasury Income Tax Regulations thereunder (a "QSF"), if all the assets transferred to the fund are passive investment assets.  For purposes of determining the DOF's federal income tax liability, a DOF is not required to report as income transfers of assets to the DOF, but is required to include in income all income received or accrued from the assets transferred to the DOF.  The DOF is not allowed a tax deduction for a distribution of disputed assets or the net after tax income earned by the DOF made to a Beneficiary.  The initial tax basis of assets transferred to a DOF is the fair market value of the asset determined on the date of transfer to the DOF, and the DOF's holding period begins on the date of the transfer.

### 4.    Tax Reporting.

Only to the extent that the Liquidating Agent does not make the DOF tax election, all parties (including the Debtors, the Liquidating Trustee and the Beneficiaries) shall, for all federal income tax purposes, treat the transfer of assets to the Liquidating Trust in accordance with the terms of the Plan as a transfer of such assets directly to the Beneficiaries, followed by the transfer

thereof by such Beneficiaries to the Liquidating Trust. Consistent therewith, for federal income tax purposes, all parties shall treat the Liquidating Trust as a grantor trust of which such Beneficiaries are the owners and grantors. Thus, such Beneficiaries (and any subsequent Beneficiaries) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidating Trust for all federal income tax purposes. The Debtors and Liquidating Trustee will jointly determine the fair market value of the assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

The Liquidating Trustee will file with the Internal Revenue Service tax returns as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidating Trustee will also send to each Beneficiary a separate statement setting forth the Beneficiary's share of the Liquidating Trustee's Tax Items of income, gain, loss, deduction or credit and will instruct the Beneficiary to report such items on its federal income tax return.

Each of the Beneficiaries will be required to report on his/her federal income tax return(s) the Beneficiary's allocable share of any Tax Items such as income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust and that is set forth on the tax statement provided to the Beneficiary. The character of items of income, deduction and credit to any Beneficiary and the ability of such Beneficiary to benefit from any deduction or losses may depend on the particular situation of the Beneficiary.

The federal income tax reporting obligation of the Beneficiaries is not dependent upon the Liquidating Trustee's distribution of cash or other proceeds. Therefore, Beneficiaries may receive Tax Items in a taxable year regardless of the fact that the Liquidating Trustee has not made, or will not make, any concurrent or subsequent distributions to the Beneficiaries. If a Beneficiary does not receive distributions from the Liquidating Trustee commensurate with the Tax Items allocated to it, the Beneficiary may be entitled to a subsequent loss or deduction.

If the Liquidating Trustee files a DOF tax election with respect to the Disputed Claims Reserve then, for federal income tax purposes, the Liquidating Trustee will file a tax return for the DOF and pay any federal income tax due.

LANDAU
GOTTFRIED
& BERGER LLP

For federal income tax purposes, Disputed Claimants are not treated as transferring assets to the DOF. The taxability of distributions to Disputed Claimants is determined by reference to the Disputed Claim in which the distribution is made.

### 5.    Withholding

All Distributions to Holders of Allowed Class 3 Claims are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### X.    FEES AND EXPENSES

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings have been and will be borne by the Debtor's Estate. The solicitation has been and is being made principally by mail. Arrangements also have been or will be made with brokerage houses and other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and other pertinent materials to the beneficial holders of the Debentures. The Debtor has reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses incurred by them, but no compensation has been or will be paid for their services.

LANDAU
GOTTFRIED
& BERGER LLP

In addition to the foregoing, the estate is obligated to pay fees and reimburse expenses for the various professionals employed in connection with the Chapter 11 Case to the extent such fees and expenses are allowed by the Bankruptcy Court.

## XI.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION

Additional sources of information regarding the Debtor's Estate and documents relating to the Plan are available to holders of Claims and Equity Interests.  The following is a summary of certain documents and the places they can be reviewed or obtained:

A.    Both prior to and after the Petition Date, the Debtor filed documents with the SEC in accordance with the informational requirements of the 1934 Act.  Copies of such material can be obtained from the Public Reference Section of the Commission at 450 Fifth Street, NW, Washington, D.C. 20549, at prescribed rates.  Certain of such material may be accessible via online computer.

B.    Orders of the Bankruptcy Court and related papers pertaining to transactions outside of the Debtor's ordinary course of business may be inspected at the office of the Clerk of the Bankruptcy Court located at the Edward A. Roybal Federal Building and Courthouse, 225 East Temple Street, Room 940, Los Angeles, California 90012.

C.    The Debtor's Schedules of Assets and Liabilities, Statement of Affairs, List of Old Equity Security Holders, and Schedules of Executory Contracts and Unexpired Leases, as amended, may be inspected at the office of the Clerk of the Bankruptcy Court located at the Edward A. Roybal Federal Building and Courthouse, 225 East Temple Street, Room 940, Los Angeles, California 90012.

D.    Periodic post-petition financial reports as filed with the OUST may be inspected at the Office of the OUST located at 725 South Figueroa Street, Suite 2600, Los Angeles, California 90017.

///

///

///

///

LANDAU
GOTTFRIED
& BERGER LLP

## XII.    RECOMMENDATION AND CONCLUSION

The Debtor believes that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for holders of Claims.  Accordingly, the Debtor urges holders of Claims in the Voting Class to accept the Plan.

DATED: January 5, 2011            DEBTOR AND DEBTOR-IN-POSSESSION
FIRSTFED FINANCIAL CORP.


By: _____
         Carl W. McKinzie
         Chief Executive Officer


**SUBMITTED BY:**

LANDAU GOTTFRIED & BERGER LLP


By:    /s/ Jon L. R. Dalberg
      JON L.R. DALBERG
      Attorneys for Debtor FirstFed Financial Corp.

LANDAU
GOTTFRIED
& BERGER LLP

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit "A" -  PLAN

Exhibit "B" -  PROJECTED AVAILABLE CASH ANALYSIS

Exhibit "C" -  HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSIS

Exhibit "D" -  LIST OF PENDING LITIGATION CLAIMS

Exhibit "E"-   POTENTIAL PREFERENCE PAYMENTS

Exhibit "F" -  POTENTIAL THIRD PARTY ESTATE CAUSES OF ACTION

Exhibit "G" -  FDIC POC

**EXHIBIT "A"**

**PLAN**


(See attached)

1  LANDAU GOTTFRIED & BERGER LLP
   JON L. R. DALBERG (State Bar No. 128259)
2  RODGER M. LANDAU (State Bar No. 151456)
   1801 Century Park East, Suite 1460
3  Los Angeles, California 90067
   Telephone: (310) 557-0050
4  Facsimile: (310) 557-0056
   jdalberg@lgbfirm.com
5  rlandau@lgbfirm.com

6  Counsel for FirstFed Financial Corp.

7
                    UNITED STATES BANKRUPTCY COURT
8
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
                        LOS ANGELES DIVISION
10

11  In re                              Case No.  2:10-bk-12927-ER

12  FIRSTFED FINANCIAL CORP.,          Chapter 11

13        Debtor and                   **PLAN OF LIQUIDATION**
          Debtor-in-Possession         **DATED AS OF JANUARY 5, 2011**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. DEFINITIONS AND RULES OF CONSTRUCTION ........................................................1

   A. Defined Terms. ....................................................................................................1

   B. Other Terms. ........................................................................................................9

   C. Computation of Time. ..........................................................................................9

   D. Exhibits. ...............................................................................................................9

II. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................................................................................................9

   A. Summary. ..............................................................................................................9

   B. Unclassified Claims. ..........................................................................................10

      1. Administrative Expense Claims. .............................................................10

         (a) General. .......................................................................................10

         (b) Deadlines For Filing Claims For Administrative Expenses. ..........10

            (i) Pre-Effective Date Claims and Expenses............................10

            (ii) Indenture Trustee Fees and Expenses. ...............................11

            (iii) Tax Claims. .......................................................................12

      2. Priority Tax Claims. ...............................................................................12

   C. Classification and Treatment ...............................................................................13

      1. Class 1: Other Priority Claims. ..............................................................13

      2. Class 2: Secured Claims. ........................................................................13

      3. Class 3: General Unsecured Claims.........................................................13

      4. Class 4: FirstFed Common Stock Interests..............................................14

III. ACCEPTANCE OR REJECTION OF THE PLAN ........................................................14

   A. Voting Classes. ...................................................................................................14

   B. Voting Rights Of Holders Of Disputed Claims. ...................................................14

# TABLE OF CONTENTS (CONT'D)

|  |  | Page |
|---|---|---|
| C. | Acceptance By Impaired Classes. | 14 |
| D. | Presumed Acceptance Of The Plan. | 15 |
| IV. | PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES | 15 |
| A. | Allowance Of Claims Of Holders Of Record Of Debentures. | 15 |
| B. | Resolution Of Disputed Claims. | 16 |
| C. | Reserve for Disputed Claims. | 16 |
| V. | IMPLEMENTATION OF THE PLAN | 17 |
| A. | Vesting Of Assets. | 17 |
| B. | Establishment of the Liquidating Trust. | 18 |
|  | 1. Beneficiaries. | 18 |
|  | 2. Implementation of the Liquidating Trust. | 18 |
|  | 3. Transfer of Debtor's Assets. | 18 |
|  | 4. Representative of the Estate. | 19 |
|  | 5. No Liability of Liquidating Trustee. | 19 |
|  | 6. Provisions Relating to Federal Income Tax Compliance. | 20 |
| C. | Prosecution Of Estate Causes Of Action By The Liquidating Trustee. | 20 |
| D. | Issuance And Execution Of Plan Related Documents. | 20 |
| E. | Cancellation/Surrender of the Debentures And Related Agreements. | 21 |
| F. | Dissolution of the Debtor and Termination of Current Officers, Directors, Employees and Counsel. | 22 |
| VI. | DISTRIBUTIONS UNDER THE PLAN. | 22 |
| A. | In General. | 22 |
| B. | Manner Of Payment Under The Plan. | 22 |
| C. | Manner Of Distribution Of Other Property. | 22 |
| D. | Setoffs. | 22 |

# TABLE OF CONTENTS (CONT'D)

|  |  | Page |
|---|---|---|
| E. | Distribution Of Unclaimed Property. | 23 |
| F. | De Minimis Distributions. | 23 |
| G. | Record Date. | 23 |
| H. | Saturday, Sunday, Or Legal Holiday. | 23 |
| 1. | Delivery Of Distributions, Address Of Holder. | 23 |
| **VII.** | **EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | 24 |
| A. | Assumption. | 24 |
| B. | Assumption And Cure Payment Objection. | 24 |
| C. | Rejection. | 25 |
| D. | General. | 25 |
| E. | Insurance Policies | 26 |
| **VIII.** | **EFFECTIVENESS OF THE PLAN** | 26 |
| A. | Conditions Precedent. | 26 |
| B. | Notice Of Effective Date. | 27 |
| **IX.** | **RETENTION OF JURISDICTION** | 27 |
| **X.** | **LIMITATION OF LIABILITY, RELEASES AND INJUNCTION** | 28 |
| A. | Exculpation. | 28 |
| B. | Injunction Enjoining Holders of Claims against Debtor | 29 |
| C. | Nondischarge of the Debtor. | 30 |
| **XI.** | **MISCELLANEOUS PROVISIONS** | 30 |
| A. | Payment Of Statutory Fees. | 30 |
| B. | Preservation Of Rights Of Action. | 30 |
| C. | Headings. | 31 |
| D. | Binding Effect. | 31 |
| E. | Revocation Or Withdrawal. | 31 |
| 1. | Right To Revoke. | 31 |

# TABLE OF CONTENTS (CONT'D)

|  |  |  | Page |
|---|---|---|---|
|  | 2. | Effect Of Revocation. | 31 |
| F. |  | Governing Law. | 31 |
| G. |  | Withholding, Reporting, And Payment Of Taxes. | 32 |
| H. |  | Other Documents And Actions. | 32 |
| I. |  | Modification Of The Plan. | 32 |
| J. |  | Notices. | 32 |
| K. |  | Severability of Plan Provisions. | 34 |
| L. |  | Successors And Assigns. | 34 |
| M. |  | Post-Confirmation Notice. | 35 |

1       Debtor and Debtor-in-Possession FirstFed Financial Corp. ("Debtor") proposes the following

2 Plan of Liquidation (along with any amendments, supplements or exhibits hereto, collectively, the

3 "Plan") pursuant to section 1121(a) of the Bankruptcy Code for resolution of all Claims against and

4 interests in the Debtor and its Estate.  The Disclosure Statement In Support of the Debtor's Plan of

5 Liquidation (the "Disclosure Statement"), which accompanies the Plan, discusses the Debtor's

6 history, business, contracts, leases, results of operations, resolution of material disputes, significant

7 potential litigation, financial projections for the liquidation and distribution of Debtor's remaining

8 assets, and contains a summary and discussion of the Plan.  Holders of Claims are encouraged to

9 read the Disclosure Statement before voting to accept or reject the Plan.

10       Following solicitation of acceptances for the Plan, the Debtor, as Plan proponent, will seek

11 the Bankruptcy Court's confirmation of the Plan.  No solicitation materials other than the Disclosure

12 Statement and any schedules, exhibits or letters attached thereto or referenced therein have been

13 authorized by the Debtor or the Bankruptcy Court for use in soliciting acceptances or rejections of

14 the Plan.

15 **I.    DEFINITIONS AND RULES OF CONSTRUCTION**

16       **A.    Defined Terms.**

17       As used herein, the following terms have the respective meanings specified below (such

18 meanings to be equally applicable to both the singular and plural, and masculine and feminine forms

19 of the terms defined):

20       1.    "Administrative Expense" means any cost or expense of administration of the

21 Chapter 11 Case under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without

22 limitation, any actual and necessary post-petition expenses of preserving the Estate, any actual and

23 necessary post-petition expenses of administering and liquidating the Estate, all compensation or

24 reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330, 331,

25 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate under section

26 1930 of title 28 of the United States Code.

27       2.    "Allowed Claim" means, except as otherwise allowed or otherwise provided herein, a

28 Claim, proof of which was timely and properly filed or, if no proof of claim was filed, which has