Daniel R. Brown (Admitted *Pro Hac Vice*)
BROWN LEGAL ADVISORS, LLC
 4851 N. Winchester Ave. #3
Chicago, IL  60640
Telephone:  (773) 527-0585
E-mail:  daniel@brownlegal.net

Counsel for Holdco Advisors, L.P.

Jon L.R. Dalberg (State Bar No. 128259)
Rodger M. Landau (State Bar No. 151456)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 700
Los Angeles, California  90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com

Counsel for FirstFed Financial Corp.

Philip E. Strok
Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, CA  92626
Tel: (714) 966-1000
Fax: (714) 966-1002
Email: pstrok@wgllp.com

Local Counsel for Holdco Advisors, L.P.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>FIRSTFED FINANCIAL CORP.,<br><br><br>                      Debtor. | CASE NO. 2:10-bk-12927-ER<br><br>CHAPTER 11<br><br>Judge:  Honorable Ernest M. Robles<br><br>**SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012**<br><br>**Disclosure Statement Hearing**<br><br>Date:  July 3, 2012<br>Time:  10:00 a.m.<br>Place: 255 E. Temple<br>Ctrm:  1560<br>        Los Angeles, CA 90012 |

## I. STATEMENT RE ELECTION TO RECEIVE CASH DISTRIBUTION

PLEASE TAKE NOTICE THAT YOU MUST AFFIRMATIVELY CHOOSE TO ELECT THE NEW SERIES B COMMON STOCK ELECTION DESCRIBED HEREIN IN ORDER TO RECEIVE THE RIGHT TO RECEIVE FUTURE NET FREE CASH (AS DEFINED IN THE PLAN) IF AND WHEN SUCH CASH MAY BE DISTRIBUTABLE . IF YOU DO NOT MAKE THIS ELECTION, YOU WILL BE DEEMED TO HAVE CHOSEN TO RECEIVE CLASS A COMMON STOCK (AS DEFINED IN THE PLAN) IN THE REORGANIZED DEBTOR ON ACCOUNT OF YOUR CLAIM.  PLEASE SEE SECTION VI OF THIS DISCLOSURE STATEMENT FOR A DESCRIPTION OF THE REORGANIZED DEBTOR'S BUSINESS PLAN.

IN ADDITION, PLEASE NOTE THAT YOU MUST AFFIRMATIVELY CHOOSE TO ELECT THE HOLDCO CASH-OUT ELECTION DESCRIBED HEREIN IN ORDER TO QUALIFY FOR A POTENTIAL CASH RECEIPT (EQUAL TO 5% OF YOUR ALLOWED CLAIM) ON THE EFFECTIVE DATE TO THE EXTENT HOLDCO ELECTS (IN A MANNER DESCRIBED HEREIN) TO GO FORWARD WITH SUCH OFFER.

PLEASE TAKE FURTHER NOTICE THAT TO THE EXTENT YOU ARE A BENEFICIAL HOLDER OF A COLLATERALIZED DEBT OBLIGATION (a "CDO") WHOSE ASSETS INCLUDE DEBENTURE UNSECURED CLAIMS (AS THAT TERM IS DEFINED IN III. A. 39 OF THE PLAN, EXHIBIT "A" HERETO), THE DEBTOR WILL NOT BE ACCEPTING YOUR BALLOTS DIRECTLY. RATHER, THE DEBTOR WILL ONLY TABULATE VOTES CAST BY THE BENEFICIAL HOLDERS OF DEBENTURE UNSECURED CLAIMS.  AS SUCH, IF YOU HOLD ONLY INTERESTS IN A CDO, YOUR AFFIRMATIVE ELECTION OF THE NEW SERIES B COMMON STOCK ELECTION OR THE HOLDCO CASH OUT ELECTION, MAY NOT ENTITLE YOU TO YOUR ELECTED TREATMENT UNLESS THE AGENT OF YOUR CDO (WHICH MAY BE THE INDENTURE TRUSTEE OF YOUR CDO) MAKES SUCH ELECTION ON BEHALF OF THE CDO AS A WHOLE, WHICH MAY BE DETERMINED BY THE CDO'S GOVERNING DOCUMENTS, AND MAY BE DICTATED (OR

/ / /

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

II

1  MAY NOT BE DICTATED) BY THE ELECTIONS OF OTHER HOLDERS OF DEBENTURE

2  UNSECURED CLAIMS WITHIN THE SAME CDO.

3  FURTHERMORE, PLEASE NOTE THAT HOLDCO IS NOT MAKING THE NEW

4  SERIES B COMMON STOCK ELECTION.

5  **II. STATEMENT RE DISCLOSURE STATEMENT**

6  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO

7  SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS

8  NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES

9  LAWS OR SIMILAR LAWS.  THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES

10  OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS.  THE

11  INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE

12  PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED

13  UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO

14  VOTE ON THE PLAN.  THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES

15  ARE FAIR AND ACCURATE.

16  THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE

17  STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT

18  UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS

19  REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF

20  SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN

21  THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

22  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY

23  REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN

24  THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES

25  NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY ENTITIES

26  DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH

27  THEIR OWN ADVISORS.

28

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

III

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, OR THE PLAN SUPPLEMENT SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE PLAN PROPONENTS CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

/ / /

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

IV

1    PLEASE REFER TO ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED

2    "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A

3    DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A

4    HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

5    NOTHING IN THIS DISCLOSURE STATEMENT OR THE PLAN SHALL PREJUDICE

6    THE RIGHTS OF ANY PARTY TO BRING ANY CLAIM OR CAUSE OF ACTION TO THE

7    EXTENT THE PLAN IS NOT CONFIRMED.

8    ### III. PLAN CONFIRMATION & BALLOTING

9    THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO

10    COMMENCE ON JULY 3, 2012, AT 10 A.M. PREVAILING PACIFIC TIME BEFORE THE

11    HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, IN THE

12    UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF

13    CALIFORNIA, LOCATED AT 255 E. TEMPLE STREET, COURTROOM 1560.  THE

14    CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE

15    BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN

16    ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION

17    HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING

18    FILED BY THE PLAN PROPONENTS.

19    TO BE COUNTED, THE BALLOTS UPON WHICH HOLDERS OF IMPAIRED CLAIMS

20    ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN

21    INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN

22    ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT.  SUCH BALLOTS

23    SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES

24    DESCRIBED IN FURTHER DETAIL BELOW AND THE DISCLOSURE STATEMENT ORDER

25    AND NOTICE.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE

26    COUNTED IN THE SOLE DISCRETION OF THE PLAN PROPONENTS.

27    / / /

28

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

v

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE _____, 2012 AT 11:59 P.M. PREVAILING PACIFIC STANDARD TIME, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES AND DISCLOSURE STATEMENT ORDER, WHICH ARE DESCRIBED IN FURTHER DETAIL BELOW.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES AND DISCLOSURE STATEMENT ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## IV. FORWARD LOOKING STATEMENTS

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED.  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE PLAN PROPONENTS' EXPECTATIONS REGARDING FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, PARTICULARLY IN LIGHT OF THE CURRENT WORLDWIDE FINANCIAL AND CREDIT CRISIS, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS.  WHILE THE PLAN PROPONENTS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

VI

1   ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR THE PLAN

2   PROPONENTS' ASSUMPTIONS REGARDING DISTRIBUTIONS UNDER THE PLAN.  THE

3   PLAN PROPONENTS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE

4   RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

5          AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER

6   MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE ARE THE

7   FOLLOWING:  (1) THE PLAN PROPONENTS' ABILITY TO PROSECUTE, CONFIRM, AND

8   CONSUMMATE A PLAN WITH RESPECT TO THIS CASE; AND (2) LITIGATION

9   OUTCOMES OF, AMONG OTHER THINGS, LITIGATION WITH THE FDIC, AS RECEIVER

10  OF THE BANK.

11         THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF

12  THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE PLAN PROPONENT IS

13  UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIMS ANY OBLIGATION, TO

14  PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT

15  OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

16                                   # # #

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

VII

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     Defined Terms ......................................................................................................2

III.    Summary ..............................................................................................................5

      A.      Rules of Interpretation, Computation of Time, and References to Monetary
            Figures..............................................................................................................6

             1.      Rules of Interpretation ..............................................................6
             2.      Reference to Monetary Figures.................................................7

      B.      Overview of Chapter 11 ...................................................................................7

      C.      The Purpose and Effect of the Plan...................................................................8

      D.      Treatment of Claims and Equity Interests .........................................................9

             1.      Classification..............................................................................9
             2.      Unclassified Claims ...................................................................9
             3.      Summary of Classification, Treatment, and Projected Recoveries of
                 Classified Claims and Equity Interests .........................................10
             4.      Claims Estimates.........................................................................12

      E.      Consummation .................................................................................................14

      F.      Certain Factors to Be Considered Prior to Voting ...................................................14

      G.      Voting and Confirmation ..................................................................................14

IV.     Background To The Chapter 11 Case .........................................................................16

      A.      The Debtor's Business .....................................................................................16

             1.      Summary of the Debtor's Business.............................................16
             2.      Debentures and Indentures.........................................................17
             3.      Other Indebtedness.....................................................................18
             4.      Interests.......................................................................................18

      B.      Management of the Debtor ...............................................................................18

             1.      Directors, Executive Officers, and Corporate Governance ..........................18

V.      The Chapter 11 Case ...........................................................................................18

      A.      Events Leading to the Chapter 11 Case and Related Postpetition Events ...............19

      B.      Initiation of the Chapter 11 Case ....................................................................23

      C.      Initial Stages of the Chapter 11 Case ..............................................................23

DM3\2133230.1

i

DISCLOSURE STATEMENT RE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY
HOLDCO ADVISORS L.P. DATED MARCH 23, 2012

1.      Employment Applications ................................................23
2.      Bar Date Motion ..............................................................24
3.      Schedules and Statement of Financial Affairs ................24
4.      FDIC Proof of Claim .......................................................24
5.      Motion to Abandon Certain Claims .................................25
6.      Prosecution of Causes of Action .....................................26

        a.      Causes of Action Against Third Parties...............26
        b.      Recovery of Preferential or Fraudulent Transfers. ...........26

7.      IRS Adversary Proceeding and Objections to Claims .................26
8.      The Liquidating Plan .......................................................27
9.      Exclusivity ......................................................................27
10.     Additional Tax Refunds ...................................................27

VI.     The Reorganized Debtor's Business Plan and Valuation ....................................29

        A.      The Reorganized Debtor's Business Plan ....................................29

        B.      Business Projections ............................................................31

        C.      Note Regarding Forward-Looking Statements ........................33

        D.      Valuation of the Reorganized Debtor ....................................33

        E.      Feasibility of the Plan ........................................................36

VII.    Summary Of The Plan ................................................................37

        A.      Administrative and Priority Claims ....................................37

                1.      Administrative Claims ................................................37
                2.      Priority Tax Claims. ..................................................38

        B.      Classification and Treatment of Claims and Interests ....................38

                1.      Class 1 (Secured Claims) ..........................................39

                        Classification....................................................39
                        Impairment and Voting ......................................39
                        Treatment ..........................................................39

                2.      Class 2—Non-FDIC Priority Claims ........................39

                        Classification....................................................39
                        Impairment and Voting ......................................40
                        Treatment ..........................................................40

                3.      Class 3—FDIC Priority Claims ................................40

                        Classification....................................................40
                        Impairment and Voting ......................................40
                        Treatment ..........................................................40

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

II

4.    Class 4—Debenture Unsecured Claims ......................................................40

            Classification ..............................................................................40
            Impairment and Voting ...............................................................40
            Treatment .....................................................................................40

5.    Class 5—FDIC Non-Priority Claims ........................................................41

            Classification ..............................................................................41
            Impairment and Voting ...............................................................41
            Treatment .....................................................................................41

6.    Class 6—Other Unsecured Claims ...........................................................42

            Classification ..............................................................................42
            Impairment and Voting ...............................................................42
            Treatment .....................................................................................42

7.    Class 7 (Convenience Claims) .................................................................43
8.    Class 8 (Holders Of Interests) .................................................................43

C.    Means for Implementation of the Plan ...............................................................43

1.    Corporate Existence ................................................................................43
2.    Directors/Officers of the Debtor on the Effective Date; Plan
      Committee ................................................................................................44

            a.    Release and Discharge of Duties and Obligations of Current
                  Directors and Officers .................................................................44
            b.    Plan Committee ...........................................................................44

D.    Removal or Resignation of Plan Committee Members ..........................................46

E.    Cancellation of Debentures, Indenture and Interests ...............................................47

1.    Cancellation of Debentures ......................................................................47
2.    Limited Survival of Senior Debt Documents ............................................47
3.    Limited Preservation of Indenture Trustee Rights to Charging Liens .........47
4.    Payment of Holdco Fees ..........................................................................48
5.    Payment of Indenture Trustee Fees ...........................................................48

F.    Reorganized Debtor Securities ...........................................................................51

1.    New Series A Common Stock ...................................................................51
2.    Issuance of New Series B Common Stock (Separate Series or Classes
      of Common Stock) ....................................................................................51

            a.    General Provisions .......................................................................51

3.    Alternative Treatment ..............................................................................53

G.    FDIC Priority Claims ........................................................................................54

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

III

1.    Dividends ........................................................................................54
2.    Other Attributes of New Series A and B Common Stock ............................55
3.    Redemption of Common Stock.....................................................55

H.    Exemption from the Registration Requirements of the Securities Act;
Investment Company Act ...............................................................................56

I.    Restructuring Transactions ...........................................................................58

J.    Corporate Action...........................................................................................58

K.    Effectuating Documents; Further Transactions .........................................58

L.    Exemption from Certain Transfer Taxes and Recording Fees..................59

M.    Board Representation....................................................................................59

N.    Senior Management .......................................................................................60

O.    Vesting of Assets in the Reorganized Debtor .............................................60

P.    Prohibition Against Pledging Assets ...........................................................61

Q.    Deregistration................................................................................................61

R.    Allowance of Debenture Unsecured Claims ...............................................61

S.    New Series B Common Stock Election Trust...............................................61

1.    General........................................................................................61
2.    Purpose of New Series B Common Stock Election Trust..............................62
3.    Costs and Expenses of New Series B Common Stock Election Trust...........63
4.    New Series B Common Stock Election Trust Assets ...................................63
5.    Conveyance of Trust Tax Refund Assets...................................................64
6.    Appointment of a New Series B Common Stock Election Trustee ...............66
7.    Transferability and Form of New Series B Common Stock Election
Trust Interests.............................................................................66
8.    Federal Income Tax Treatment of New Series B Common Stock
Election Trust..............................................................................67
9.    New Series B Common Stock Election Trust a "Liquidating Trust" ...........67

T.    Holdco Cash Out Election ............................................................................68

1.    How Made....................................................................................68
2.    When Payment Made....................................................................69
3.    Effect of Payment .......................................................................69
4.    Holdco to Elect to Proceed with Holdco Cash Out Election ......................69

U.    Provisions Governing Distributions.............................................................69

1.    Initial Distribution Date ..............................................................69
2.    Disputed Reserve ........................................................................70

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

IV

|  |  |  | a. | Establishment of Disputed Reserve ................................................. | 70 |
|  |  |  | b. | Maintenance of Disputed Reserve ................................................... | 70 |
|  |  | 3. | Quarterly Distributions ...................................................................... | | 71 |
|  |  | 4. | No Distribution in Excess of Allowed Amount of Claim..................... | | 72 |
|  |  | 5. | Setoff and Recoupment........................................................................ | | 72 |
|  |  | 6. | No Distribution to General Unsecured Creditors.................................. | | 72 |

V.    Treatment of Executory Contracts and Unexpired Leases ....................................... 73

|  |  | 1. | Rejection of Executory Contracts and Unexpired Leases..................... | | 73 |
|  |  | 2. | Procedural Issues ................................................................................ | | 73 |
|  |  | 3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases..................................................................................................... | | 74 |
|  |  | 4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................................................................................................... | | 74 |

|  |  |  | a. | Cure of Defaults.................................................................... | 74 |
|  |  |  | b. | Objections to Cure................................................................. | 75 |
|  |  |  | c. | Release and Satisfaction of Debtor upon Assumption........... | 75 |

|  |  | 5. | Reservation of Rights............................................................................ | | 76 |
|  |  | 6. | Idemnification Obligations ................................................................... | | 76 |
|  |  | 7. | Insurance Policies ................................................................................ | | 77 |

W.    Conditions Precedent to Confirmation and the Effective Date................................ 77

|  |  | 1. | Conditions to Confirmation .................................................................. | | 77 |
|  |  | 2. | Conditions to the Effective Date.......................................................... | | 77 |

X.    Discharge, Release, Injunction and Related Provisions............................................ 78

|  |  | 1. | Satisfaction of Claims .......................................................................... | | 78 |
|  |  | 2. | Discharge of Claims and Termination of Interests ............................... | | 79 |
|  |  | 3. | Compromise and Settlement ................................................................. | | 79 |
|  |  | 4. | Releases................................................................................................ | | 80 |

|  |  |  | a. | Releases of Third Parties by the Debtor .............................. | 80 |
|  |  |  | b. | Releases of Third Parties by Others..................................... | 82 |
|  |  |  | c. | Waiver of Statutory Limitations on Releases ...................... | 83 |
|  |  |  | d. | Exculpation .......................................................................... | 83 |
|  |  |  | e. | Releases of the D&Os; D&Os Insurance Coverage .......... | 84 |
|  |  |  | f. | Good Faith Solicitation ....................................................... | 86 |
|  |  |  | g. | Release Provisions Relating to the FDIC............................ | 89 |

|  |  | 5. | Preservation of Rights of Action.......................................................... | | 90 |

|  |  |  | a. | Vesting of Causes of Action ................................................ | 90 |
|  |  |  | b. | Reservation of Causes of Action.......................................... | 91 |
|  |  |  | c. | Reservation of Rights Regarding Claims............................. | 92 |
|  |  |  | d. | Idemnification Obligations .................................................. | 92 |
|  |  |  | e. | Insurance Obligations .......................................................... | 93 |

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

v

6.       Injunction .......................................................................................93

Y.       Retention of Jurisdiction ...........................................................................95

Z.       Miscellaneous Provisions..........................................................................97

VIII.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...................97

A.       The Confirmation Hearing .......................................................................97

B.       Confirmation Standards ...........................................................................97

C.       Financial Feasibility.................................................................................99

D.       Best Interests of Creditors Test................................................................99

E.       Acceptance by Impaired Classes ...........................................................102

F.       Confirmation Without Acceptance by All Impaired Classes..................102

1.       No Unfair Discrimination ...........................................................103
2.       Fair and Equitable Test ...............................................................103

IX.      Certain Risk Factors To Be Considered Prior To Voting ...................................104

A.       Certain Bankruptcy Law Considerations ................................................105

1.       Parties in Interest May Object to the Plan's Classification of Claims
and Equity Interests......................................................................105
2.       Failure to Satisfy Vote Requirements..........................................105
3.       The Debtor May Not Be Able to Secure Confirmation of the Plan............105
4.       Modifications to the Plan...............................................................106
5.       Nonconsensual Confirmation.......................................................107
6.       The Plan Proponent May Object to the Amount or Classification of a
Claim............................................................................................107
7.       Risk of Non-Occurrence of the Effective Date.............................107
8.       Contingencies Could Affect Votes of Impaired Classes to Accept or
Reject the Plan .............................................................................108
9.       Holdco May Decide in its Sole Discretion Not to Proceed With the
Holdco Cash Out Election ...........................................................108

B.       Risk Factors that May Affect the Recovery Available to Holders of Allowed
Claims ......................................................................................................108

1.       The Plan Proponent Cannot State with any Degree of Certainty What
Recovery Will Be Available to Holders of Allowed Claims in Voting
Classes.........................................................................................109
2.       The Debtor is Subject to Litigation Which, if Adversely Determined,
Could Result in Substantial Losses..............................................109
3.       Risk Factors Could Negatively Impact the Reorganized Debtor's
Business .......................................................................................109

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

VI

C.    Additional Risk Factors ........................................................................111

    1.    Unidentified Investments ...........................................................111
    2.    Highly Competitive Market for Investment Opportunities.......111
    3.    Passive Investment ....................................................................111
    4.    Legal, Tax, and Regulatory Risks..............................................111
    5.    Risk of Limited Number of Investments ....................................111
    6.    The Reorganized Debtor is Subject to Credit Risk ....................112
    7.    The Reorganized Debtor may be Further Adversely Affected by
        Current Economic and Market Conditions.................................112
    8.    The Reorganized Debtor Will Be Exposed to Risk of Environmental
        Liability When It Takes Title to Real Property .........................113
    9.    The Reorganized Debtor's Investment Results Are Subject to General
        and Regional Economic Conditions, Which Are Beyond Its Control ........113
    10.    If The Reorganized Debtor Fails to Effectively Manage Credit Risk,
        Its Business and Financial Condition Will Suffer......................114
    11.    The Reorganized Debtor Is Subject To Losses Due to the Errors or
        Fraudulent Behavior of Employees or Third Parties .................114
    12.    The Reorganized Debtor Will Depend on Its Senior Management
        Team, and the Unexpected Loss of One or More of Its Senior
        Executives Could Adversely Affect Its Business and Financial Results....115
    13.    If Borrowers and Guarantors Fail to Perform as Required by the Terms
        of Their Loans, the Reorganized Debtor Will Sustain Losses...................115
    14.    The Reorganized Debtor Is Exposed to Operational Risks that Can
        Negatively Affect Its Financial Condition..................................115
    15.    The Reorganized Debtor's Potential Concentration of Real Estate
        Loans Subjects It to Increased Risks in the Event Real Estate Values
        Continue to Decline Due to the Economic Recession, a Further
        Deterioration in the Real Estate Markets or Other Causes .......116
    16.    Economic and Market Developments, Including the Potential for
        Inflation, May Have an Adverse Effect on the Business of the
        Reorganized Debtor, Possibly in Ways That Are Not Predictable or
        That the Reorganized Debtor May Fail to Anticipate.................116
        The Reorganized Debtor Has a Deferred Tax Asset That May Not Be
        Fullly Realized in the Future...................................................117

X.    Disclosure Statement Disclaimer ..................................................................117

    A.    This Disclosure Statement Was Not Approved by the United States Securities
        and Exchange Commission ..............................................................118

    B.    Reliance on Exemptions from Registration Under the Securities Act and
        Investment Company Act ..................................................................118

    C.    No Legal or tax Advice Is Provided to You by this Disclosure Statement.
        This Disclosure Statement is not legal advice to you ...............................118

    D.    No Admissions Made.........................................................................119

    E.    Failure to Identify Litigation Claims or Projected Objections................119

    F.    No Waiver of Right to Object or Right to Recover Transfers and Assets.............119

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND  AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

VII

G.    Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Professionals ..................................................................................119

H.    Potential Exists for Inaccuracies, and the Plan Proponent Has No Duty to Update ..................................................................................................120

I.    No Representations Outside this Disclosure Statement Are Authorized ..............120

J.    Liquidation Under Chapter 7 ..................................................................120

XI.    Certain United States Federal Income Tax Consequences ..................................................120

A.    Certain United States Federal Income Tax Consequences to the Debtor .............122

1.    Cancellation of Debt and Reduction of Tax Attribute ................................122
2.    Limitation of NOL Carryforwards and Other Tax Attributes....................123

a.    General Section 382 Annual Limitation .........................................124
b.    Special Bankruptcy Exceptions .....................................................125
c.    Alternative Minimum Tax .............................................................126

B.    Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims ..................................................................................127

1.    Consequences to Holders of Class 3 FDIC Priority Claims .......................127
2.    Consequences to Holders of Class 4 Debenture Unsecured Claims...........127
3.    Consequences to Holders of Class 5 FDIC Non-Priority Claims and Class 6 Other Unsecured Claims ..................................................131
4.    Accrued Interest ..................................................................................133
5.    Market Discount..................................................................................134
6.    Consequences to Holders of New Series A Common Stock or Other Series or New Series B Common ..................................................135

a.    Dividends on New Series A Common Stock or New Series B Common Stock..................................................................................135
b.    Sale, Redemption or Repurchase of New Series A Common Stock or New Series B Common Stock ........................................136
c.    Medicare Tax ..............................................................................136

7.    Information Reporting and Backup Withholding ......................................136

XII.    Plan Supplement ..................................................................................137

XIII.    Conclusion And Recommendation ..................................................................137

EXHIBIT A – THE PLAN ..................................................................................139

EXHIBIT B – PROJECTIONS..................................................................................232

EXHIBIT C – BIOGRAPHIES ..................................................................................233

EXHIBIT D – HYPOTHETICAL LIQUIDATION ANALYSIS ....................................237

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

VIII

# I.      INTRODUCTION

This Disclosure Statement (the "Disclosure Statement") has been prepared jointly by FirstFed Financial Corp. (the "Debtor") and Holdco Advisors, L.P. ("HoldCo", and together with the Debtor, the "Plan Proponents").  Holdco is the managing entity of a creditor holding approximately $20 million of Debenture Unsecured Claims (as defined in the Plan). HoldCo is an asset management and advisory firm that specializes in distressed and event-driven credit and equity investing. HoldCo's principals have significant experience in the distressed investment arena as senior-level investment professionals. Currently, the principals of HoldCo, Vik Ghei and Misha Zaitzeff, run three distressed investment funds, which are the largest creditors in dozens of bankrupt or otherwise distressed companies. In addition, prior to founding HoldCo, Mssrs. Ghei and Zaitzeff both worked in senior investment professional capacities at certain pre-eminent funds in the U.S. One or both principals have held senior roles at Tricadia Capital Management and Owl Creek Asset Management, as well positions at as HIG Capital and Goldman Sachs.

The purpose of this Disclosure Statement is to provide the holders of claims against the Debtor with adequate information to make an informed judgment about the Second Amended Chapter 11 Plan Of Reorganization Proposed By the Debtor and Holdco Advisors L.P., Dated June 1, 2012 (the "Plan"), before determining whether to object to the Plan and before exercising their right to vote for acceptance or rejection of the Plan.

An acceptance or rejection of the Plan must be in writing and may only be made by completing the Ballot that accompanies the Plan and mailing it to:

**[BALLOTING AGENT TO COME]**

In order for your vote to be counted, it must be *received* no later than 5:00 p.m. on **[Date]**, unless extended by Holdco (the "Voting Deadline").

This Disclosure Statement includes (among other things) a brief history of the Debtor, a summary of its Chapter 11 case, a description of the claims against and equity interests in the Debtor, a summary of the Plan, a discussion of the Plan's feasibility and a liquidation analysis setting forth what the holders of a claim against or equity interest in the Debtor would recover if the Debtors were liquidated immediately under Chapter 7 of the Bankruptcy Code.  The Disclosure

Statement also describes the treatment of the Debtor's principal outstanding liabilities and the anticipated sources, amounts and timing of compensation on account of such liabilities.

The Plan Proponents request that you vote promptly for the Plan upon reviewing the accompanying materials.  The Plan Proponents believe that the restructuring contemplated by the Plan will yield a recovery to creditors greater than the return that could be achieved through other restructuring alternatives or a liquidation under Chapter 7 of the Bankruptcy Code.

If you have any questions concerning the procedures for voting, or any questions concerning your treatment under the Plan, please contact:

> Jon L. R. Dalberg
> Landau Gottfried & Berger LLP
> 1801 Century Park East, Suite 700
> Los Angeles, CA 90067
> Telephone: 310-557-0050
> -or-
>
> Misha Zaitzeff
> Holdco Advisors, L.P.
> 32 Broadway, Suite 1112
> New York NY 10004
> Telephone:  (212) 785-5567

The Plan Proponents reserve the right to amend, modify, or supplement the Plan at any time before the confirmation of the Plan, provided that, such amendments or modifications do not materially alter the treatment of, or distributions to, creditors and holders of equity interests under the Plan.  Any such modification shall require the consent of both Plan Proponents.

## II.    DEFINED TERMS

Unless the context requires otherwise, the following terms shall have the following meanings when used in capitalized form herein:[1]

1.    "*382(1)(5) Exception*" means an exception to the Section 182 Limitation that generally applies when so-called "qualified creditors" of a debtor in chapter 11 receive, in respect of

---

[1]    All capitalized terms not defined herein have the meaning ascribed to them in the Plan. All terms used and not otherwise defined herein that are defined in the Bankruptcy Code shall have the meanings ascribed to them in the Bankruptcy Code.

their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan.

2.    "*382(1)(6) Exception*" means an exception to the Section 182 Limitation where the 382(l)(5) Exception is not applicable, either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception.

3.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses including, without limitation, **fees** or expenses Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered prior to the Effective Date, or thereafter in connection with, and only with, (x) applications Filed pursuant to section 330 and 331 of the Bankruptcy Code and (y) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, incurred by all Professionals in the Case that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

4.    "*AMT*" means alternative minimum tax.

5.    "*AMTI*" means a corporation's alternative minimum taxable income.

6.    "*Bank*" means First Federal Bank of California.

7.    "*Capital Maintenance Claim*" means the portion of the proof of Claim filed by the FDIC that asserts a claim in an unliquidated amount based on a claim that the Debtor agreed to maintain the capital of the Bank, as described in section "D" of the Attachment to the FDIC's Proof of Claim filed on December 29, 2010.

8.    "*FDIC*" means the Federal Deposit Insurance Corporation, solely in its capacity as receiver of the Bank.

/ / /

9.      "*FDIC-Corporate*" means the Federal Deposit Insurance Corporation, in its corporate capacity.

10.       "*IRS*" means the Internal Revenue Service.

11.      "*Net Tax Refund Recovery*" means tax refunds recovered by the estate as a result of the FDIC Causes of Action.  It is assumed that this number is $30 million which is net of expenses for litigation including, but not limited to, financial advisors, attorneys and any other professionals which may be paid in cash, on a contingency basis or with some alternate form of financing.  It is further assumed that in connection with a settlement the FDIC is not asserting any claim.  These are simply assumptions made for purposes of establishing a base case analysis for valuation purposes.

12.      "*NYSE*" means the New York Stock Exchange.

13.      "*Pre-Change Losses*" means the amount of net operating losses ("NOLs") and built-in losses of a corporation prior to an "ownership change" within the meaning of Section 382 of the Internal Revenue Code.

14.       "*Representatives*" means, with regard to an Entity, its officers, directors, members, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals).

15.      "*Resolution Event*" means, with respect to a Disputed Claim, any one of the following events:  (a) an order by the Bankruptcy Court is entered allowing such Disputed Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order by the Bankruptcy Court is entered temporarily allowing such Disputed Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of the Disputed Claim and the Debtor or Reorganized Debtor, as applicable, resolving the objection to the Disputed Claim and allowing the Disputed Claim in an agreed upon amount; or (d) the pending objection to the Disputed Claim voluntarily is withdrawn by the Debtor or Reorganized Debtor, as applicable.

16.      "*Section 382 Limitation*" means the limitation of Pre-Change Losses determined under Section 382 of the Internal Revenue Code in the case of an "ownership change."

17.    "*Solicitation Agent*" means Garden City Group, Inc., or such other Entity appointed by the Court, which shall oversee the Plan voting process and tabulate the votes accepting or rejecting the Plan.

18.    "*Solicitation Package*" means those certain documents, as described in Article III.G herein, to be sent to Holders of Claims in Voting Classes.

19.    "*Solicitation Procedures*" means the Debtor's solicitation and voting procedures, attached as Exhibit 1 to and/or included in the Disclosure Statement Order.

20.    "*Treasury Regulations*" means the United States Department of Treasury regulations promulgated under the Internal Revenue Code.

21.    "*Voting Classes*" means Classes of Claims, the Holders of which are entitled to vote to accept or reject the Plan.

## III.    SUMMARY

The following summary of this Disclosure Statement is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.

The Debtor is a bank holding company that was registered under the Bank Holding Company Act of 1956 and incorporated in Delaware on February 3, 1987.  It is a public reporting company under the Securities Exchange Act of 1934.  The Bank, he Debtor's wholly-owned California-chartered banking subsidiary, had 39 full-service banking branches located in Southern California and engaged in single family, multi-family and commercial lending throughout California.

On January 6, 2010, the Debtor commenced its Case.  The Debtor is operating its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed in this Case.

On October 1, 2010, the Debtor filed the *Plan of Liquidation* (the "Liquidating Plan") [Docket No. 91], which proposed an orderly liquidation of the Debtor's estate.  On November 12, 2010, the Debtor filed a *Disclosure Statement in Support of the Debtor's Plan of Liquidation* [Docket No. 106].  On December 29, 2010, the Debtor filed an amended version of this liquidating plan [Docket No. 137] and disclosure statement [Docket No. 138].  On February 9, 2011, the Bankruptcy Court approved the disclosure statement for the Liquidating Plan [Docket No. 156].  The

1    Debtor's creditors, however, rejected the Liquidating Plan, and the Debtor has since abandoned the

2    Liquidating Plan.  At this time, the Debtor supports the Plan as a Plan Proponent.

3         The central component of the Plan filed by the Plan Proponents is the conversion of General

4    Unsecured Claims into equity in the Reorganized Debtor, with the option for each holder of General

5    Unsecured Claims to elect to receive a "cash out" right of payment and/or a security that results in

6    cash from certain of the Debtor's assets, including Cash held by the Debtor as of the Effective Date

7    and the Net Tax Refund Recovery, if any.

8         The Plan Proponents now submit this Disclosure Statement, pursuant to section 1125 of the

9    Bankruptcy Code, to holders of Claims against the Debtor in connection with the solicitation of

10   votes to accept or reject the Plan and the Confirmation Hearing, which is scheduled for [], 2012 at []

11   p.m., prevailing Pacific Standard time.  A copy of the Plan is attached hereto as Exhibit A and

12   incorporated herein by reference.

13   **A.    Rules of Interpretation, Computation of Time, and References to Monetary**
     **Figures**.

14

15        **1.    Rules of Interpretation**.

16        For purposes of this Disclosure Statement: (a) whenever from the context it is appropriate,

17   each term, whether stated in the singular or the plural, shall include both the singular and the plural,

18   and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine,

19   feminine, and the neuter gender; (b) unless otherwise specified, any reference in this Disclosure

20   Statement to a contract, instrument, release, indenture, or other agreement or document being in a

21   particular form or on particular terms and conditions means that such document shall be substantially

22   in such form or substantially on such terms and conditions; (c) unless otherwise specified, any

23   reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not

24   filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended,

25   modified, or supplemented; (d) any reference to an Entity as a holder of a Claim or Interest includes

26   that Entity's successors and assigns; (e) unless otherwise specified, all references in this Disclosure

27   Statement to Articles are references to Articles of this Disclosure Statement; (f) unless otherwise

28   specified, all references in this Disclosure Statement to exhibits are references to exhibits in the Plan

Supplement; (g) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (j) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Disclosure Statement that is not otherwise defined herein in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Case, unless otherwise stated.

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### 2.    Reference to Monetary Figures.

All references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### B.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

As a result of various factors described more fully herein, the Plan Proponents have determined that the Plan is in the best interests of the Debtor's creditors.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

**C.    The Purpose and Effect of the Plan**.

The Plan provides for the reorganization of the Debtor and for Holders of certain Allowed Claims to receive equity in the Reorganized Debtor, unless a  Holder of General Unsecured Claims affirmatively elects to receive, instead, a "cash out" right of payment and/or a security that will result in cash distribution being made on account of such Holder's Allowed Claim from certain of the Debtor's assets, including Cash held by the Debtor as of the Effective Date and the Net Tax Refund Recovery, if any.  In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtor's Estate (including Causes of Action not expressly released under the Plan and any proceeds thereof) shall vest in the Reorganized Debtor[2] and then, where applicable, be distributed pursuant to the Plan.  As described in more detail below, the Reorganized Debtor shall continue to operate the Debtor's business as a going concern in the investment and financial services sector, and will pursue litigation, including litigation with the FDIC, and make Distributions under the Plan.

The Plan Proponents believe that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommend that you vote to accept the Plan (if you are entitled to vote).  The

---

[2]    As described further in the Plan, this Disclosure Statement shall refer to FirstFed Financial Corp. as the Debtor for time periods prior to the Effective Date and as the Reorganized Debtor for any time period on or after the Effective Date.

Plan Proponents believe that any alternative to confirmation of the Plan, such as a conversion of the Case to a case under chapter 7 of the Bankruptcy Code, would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

**D.    Treatment of Claims and Equity Interests**.

**1.    Classification**.

The Plan divides all Claims, other than Administrative Claims, and Priority Tax Claims, and all Interests into various Classes.  Listed below is a summary of the Classes of Claims and Interests under the Plan.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 3 | FDIC Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 4 | Debenture Unsecured Claims | Impaired | Yes |
| 5 | FDIC Non-Priority Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |
| 7 | Convenience Claims | Unimpaired | No (conclusively presumed to accept) |
| 8 | Equity Interests | Impaired | No (conclusively presumed to reject) |

The following tables summarize the Classes of Claims and Interests under the Plan, as well as the treatment of such Classes.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern.  The ranges of recoveries listed below are based on various assumptions, including assumptions regarding asset realization, the total amount of the Allowed General Unsecured Claims, FDIC Priority Claims, Administrative Claims, Non-FDIC Priority Claims, Priority Tax Claims and assumptions concerning the costs to operate the Reorganized Debtor's business and pursue certain litigation.

**2.    Unclassified Claims**.

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| Administrative Claims | Paid in full in Cash | 100.0% |
| Priority Tax Claims | Paid in full in Cash | 100.0% |

3.    **Summary of Classification, Treatment, and Projected Recoveries of Classified Claims and Equity Interests**.

The classification, treatment, and the projected recoveries of classified Claims and Interests under the Plan are described in summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article III of the Plan.

| Class | Claim/ Equity Interest | Plan Treatment of Class | Estimated Claims/ Equity Interests | Projected Recovery Under the Plan[3] | |
|---|---|---|---|---|---|
| 1 | Secured Claims | At the sole option of the Plan Proponents, (i) paid in full in Cash, (ii) receive the collateral securing its Allowed Secured Claim, plus post-petition interest, or (iii) receive other treatment rendering such Secured Claim Unimpaired. | $0 | 100% | |
| 2 | Non-FDIC Priority Claims | Each Holder shall receive cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment. | $0 | N/A | |
| 3 | FDIC Priority Claims | Each Holder of an Allowed FDIC Priority Claim shall receive all Net Free Cash as such Net Free Cash is available until such Allowed FDIC Priority Claim is paid in full. | $0[4] | N/A | |
| 4 | Debenture Unsecured Claims | In full satisfaction, settlement, release, and compromise of and in exchange for each Debenture Unsecured Claim, each Holder of a Debenture Unsecured Claim shall receive on the Initial Distribution Date the New Series A Common Stock or, only if it so elects, such Holder shall instead receive the Class B Common Stock Election Trust Interests, which, *inter alia*, shall entitle such Holder to receive its Pro Rata Share of Net Free Cash from the Class B Common Stock | $157.8 million | Series A Common Stock 24.0% | Class B Common Stock Election 16.7% |

---

[3]    Estimated gross proceeds available from the monetization of assets include Cash ($0.2 million) and the Net Tax Refund Recovery ($30.0 million). Should there be an FDIC Cause of Action, the ultimate outcome of the FDIC Causes of Action is highly uncertain and the Debtor's recovery may be materially different than the amount set forth in this chart.  The FDIC Causes of Action litigation are discussed in additional detail in Article V.C.4.

Assumes future annual operating expenses of 2% of the assets invested and 10% of realized value of investments in excess of the original invested amount.

[4]    The Plan Proponents do not believe that a FDIC Priority Claim will ultimately be allowed in any amount. The FDIC's Proof of Claim does not include an amount for any alleged FDIC Priority Claim and therefore it is listed here as zero.

| Class | Claim/ Equity Interest | Plan Treatment of Class | Estimated Claims/ Equity Interests | Projected Recovery Under the Plan[3] | |
|---|---|---|---|---|---|
| | | Election Trust Assets in accordance with the Plan and the Class B Common Stock Election Trust Agreement.  Notwithstanding anything to the contrary in the Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 4 Claim who may not be a holder of New Class A Common Stock consistently with any exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election. | | | |
| 5 | FDIC Non-Priority Claims[5] | In full satisfaction, settlement, release, and compromise of and in exchange for each FDIC Non-Priority Claim, each Holder of an FDIC Non-Priority Claim shall receive on the Initial Distribution Date the New Series A Common Stock or, only if it so elects, such Holder shall instead receive the Class B Common Stock Election Trust Interests, which *inter alia*, shall entitle such Holder to receive its Pro Rata Share of Net Free Cash from the Class B Common Stock Election Trust Assets in accordance with the Plan and the Class B Common Stock Election Trust Agreement Notwithstanding anything to the contrary in the Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 5 Claim who may not be a holder of New Class A Common Stock consistently with any exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election. | $0 million | Series A Common Stock 24.0% | Class B Common Stock Election 16.7% |
| 6 | Other Unsecured Claims | In full satisfaction, settlement, release, and compromise of and in exchange for each Other Unsecured Claim, each Holder of an Allowed Other Unsecured Claim shall | $0 million | Series A Common Stock 24.0% | Class B Common Stock Election 16.7% |

---

[5]    It is assumed the debtor has ownership of $30.0 mm of Net Tax Refund Recovery, and has $22mm of NOLs after cancellation of debt income and other necessary adjustments.

| Class | Claim/ Equity Interest | Plan Treatment of Class | Estimated Claims/ Equity Interests | Projected Recovery Under the Plan[3] |
|---|---|---|---|---|
| | | receive on the Initial Distribution Date the New Series A Common Stock or, only if it so elects, such Holder shall instead receive the Class B Common Stock Election Trust Interests, which *inter alia*, shall entitle such Holder to receive its Pro Rata Share of Net Free Cash from the Class B Common Stock Election Trust Assets in accordance with the Plan and the Class B Common Stock Election Trust. Notwithstanding anything to the contrary in the Plan, at Holdco's election, in its sole and absolute discretion, any holder of any Allowed Class 6 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.. | | |
| 7 | Convenience Claims | Each Holder of an Allowed Convenience Claim shall receive cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment. | N/A | 100% |
| 8 | Interests | Deemed canceled | N/A | N/A |

## 4.    Claims Estimates

As of November 7, 2011, it appears that approximately 28 Proofs of Claim had been filed against the Debtor.  The total amount of Unsecured Claims asserted against the Debtor, not including the FDIC Claims, appears to be $163,028,146.59, which consists primarily of Claims asserted by Wilmington Trust Company acting solely in its capacity as indenture trustee (when acting in such capacity, hereinafter referred to the "Indenture Trustee") under the Indentures (as defined below). The Indenture Trustee timely filed, for and on behalf of the holders of the Debentures and itself, in this Case, six (6) proofs of claim in the aggregate pre-petition, liquidated amount of $157,779,697.89.

/ / /

On June 29, 2010, the FDIC filed its proof of Claim (the "FDIC Proof of Claim").   The FDIC believes that is entitled to certain tax refunds received by the Debtor because the refunds were generated by the financial operations of the Bank and would have, in the FDIC's opinion, unquestionably been recognized as the Bank's property had the Bank filed its tax returns on a stand-alone basis. The FDIC asserts that the existence of the tax sharing agreement does not change the foregoing.  The FDIC Proof of Claim also references the Intercompany Tax Sharing Agreement dated as of October 19, 2006 between the Debtor and the Bank, which is attached to the FDIC Proof of Claim as Exhibit "1".  The FDIC asserts that under that agreement, all of the tax refunds received by the Debtor are to be held in trust for the Bank and are not property of the Debtor's estate.  The FDIC also believes that the Debtor's interpretation of that agreement would render it illegal and unenforceable.

On August 13, 2010, the FDIC filed a notice of motion and motion for relief from the automatic stay. [Docket No. 64].  The FDIC asked the Bankruptcy Court to allow the FDIC to exercise certain tax rights relating to the filing of federal tax returns for the Debtor and the Bank for the 2009 tax year.  On August 24, 2010, the Debtor opposed the FDIC's motion.  [Docket No. 67]. On September 10, 2010, the Bankruptcy Court granted the FDIC's motion and ordered that, in the event that the Debtor or the FDIC receive any tax refunds, such monies be placed in to a joint bank account and/or escrow account, with all rights of the FDIC and the Debtor fully preserved pending a resolution of the ownership of such tax refunds.  [Docket No. 82].  The Debtor filed an adversary proceeding (No. 2:11-ap-02893) against the United States of America on behalf of its agency the Internal Revenue Service (the "IRS") on October 14, 2011.  [Docket No. 210].  The Complaint objects to the IRS's Proof of Claim, seeks a determination of tax liability pursuant to U.S.C. Section 505, and seeks a declaratory judgment.  The Debtor also filed an adversary proceeding against the FDIC (No. LA11 -03218-ER), on December 21, 2012 seeking, *inter alia*, a declaration that the tax refunds are property of the Debtor's Estate, and entry of an order disallowing the FDIC's proof of claim.

The California Franchise Tax Board (the "FTB") filed on March 24, 2010, a $12.3 million proof of claim in the Debtor's case.  On September 9, 2011, the FTB filed an amended proof of

claim in the amount of $0.  On June 29, 2011, the IRS amended its proof of Claim to assert that the

Debtors owes it $5,183,366.79

**E.    Consummation**. Following Confirmation, the Plan will be consummated on the

Effective Date, as defined in the Plan.  Distributions to be made under the Plan will be made on or as

soon as reasonably practicable after the Effective Date in accordance with the Plan.

**F.    Certain Factors to Be Considered Prior to Voting**. Prior to voting to accept or

reject the Plan, each Holder in a voting Class should carefully consider all of the information in this

Disclosure Statement, especially the risk factors described in Article IX.

**G.    Voting and Confirmation**.

Holders of Claims in Classes 1, 2, 3 and 7 are Unimpaired and are conclusively presumed to

accept the Plan.  Holders of Interests in Class 8 will receive nothing on account of their Interests and

are conclusively presumed to reject the Plan.  Accordingly, Holders of Claims or Interests in Classes

1, 2, 3, 7 and 8 are not entitled to vote on the Plan, and the vote of such Holders of Claims and

Interests shall not be solicited.  Only Holders of Claims in Classes 4, 5 and 6 are entitled to vote to

either accept or reject the Plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise

provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the

Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the

Allowed Claims in such Class actually voting have voted to accept the Plan.

Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek

confirmation at the Confirmation Hearing scheduled to commence on [], at [] p.m., prevailing Pacific

Standard Time, before the Bankruptcy Court.  Section 1129(a)(10) of the Bankruptcy Code shall be

satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims.

The Plan Proponents shall seek confirmation of the Plan pursuant to section 1129(b) of the

Bankruptcy Code because Class 8, Interests of the Debtor, is deemed to reject the Plan.  The Plan

Proponents also reserve the right to modify the Plan and seek confirmation consistent with the

Bankruptcy Code.

The Bankruptcy Court has established _____, 2012 as the Voting Record Date for determining which Holders of Claims are eligible to vote to accept or reject the Plan.  Ballots, along with this Disclosure Statement, the Plan, and the Disclosure Statement Order, will be mailed to all registered Holders of Claims as of the Voting Record Date that are entitled to vote to accept or reject the Plan.  An appropriate return envelope, postage prepaid, will be included with each Ballot, if appropriate.

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY.  THE BALLOTS AND THE PRE-ADDRESSED, POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL INDICATE WHETHER THE BALLOT MUST BE RETURNED TO THE SOLICITATION AGENT.  THE ADDRESS FOR BALLOTS RETURNABLE AS INDICATED IN THE ENCLOSED INSTRUCTIONS.**

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE SOLICITATION AGENT AT THE PHONE NUMBER IN THE ATTACHED INSTRUCTIONS.**

**TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN THE VOTING DEADLINE.  SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND THE DISCLOSURE STATEMENT ORDER.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE PLAN PROPONENTS.**

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please refer to the docket for this Case, available at the Court's website, http://www.casb.uscourts.gov/.

/ / /

1    THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST

2    OF ALL HOLDERS OF CLAIMS AND RECOMMENDS THAT ALL SUCH HOLDERS WHOSE

3    VOTES ARE BEING SOLICITED VOTE TO ACCEPT THE PLAN.

4    **IV.    BACKGROUND TO THE CHAPTER 11 CASE**

5        The following is a general summary of the Debtor's business and history prior to filing this

6    Case.

7        **A.    The Debtor's Business**.

8            **1.    Summary of the Debtor's Business**.

9        The Debtor is a savings and loan holding company that was incorporated in Delaware on

10   February 3, 1987, and commenced operations on September 22, 1987.  The Debtor's principal

11   business was to serve as the holding company for the Bank, the Debtor's principal asset.  As of

12   December 2009, the Bank had 39 full-service banking branches located in Southern California and

13   engaged in single family, multi-family and commercial lending throughout California.

14       As a savings and loan holding company, the Debtor was subject to regulation by the Office

15   of Thrift Supervision ("OTS").  The Bank's deposits were insured through the Deposit Insurance

16   Fund ("DIF'') of the FDIC-Corporate, and the Bank was subject to regulation by the FDIC-

17   Corporate.

18       The Bank was closed by its regulators on December 18, 2009 and the FDIC was appointed as

19   the Bank's receiver.

20       As a legal entity separate and distinct from its subsidiary Bank, the Debtor's principal source

21   of funds was dividends that were paid by the Bank. Upon its appointment as receiver for the Bank,

22   the FDIC entered into a purchase and assumption agreement with OneWest Bank, FSB ("OneWest")

23   to assume all of the Bank's deposits and certain other of its assets and liabilities.  As a result of the

24   loss of its primary financial asset, the Debtor commenced this case under Chapter 11 of the

25   Bankruptcy Code by filing its voluntary petition for relief on the Petition Date.  The Plan preserves

26   any and all claims that the Debtor may have against OneWest in connection with its acquisition of

27   the Bank.

28   / / /

### 2.    **Debentures and Indentures**.

The Debtor has issued the following debentures (collectively, the "Debentures") on the various dates noted below:

(a)    certain Fixed/Floating Rate Senior Debt Securities Due 2015 (the "2015 Debentures") which the Debtor issued on or about June 15, 2005 in the original principal aggregate amount principal of Fifty Million and 00/100 Dollars ($50,000,000.00), all pursuant to the provisions of that certain Indenture, dated as of June 15, 2005 (the "2015 Indenture"), by and between the Debtor and the Indenture Trustee;

(b)    certain Fixed/Floating Rate Senior Debt Securities Due 2016 (the "2016 Debentures") which the Debtor issued on or about December 29, 2005 in the original principal aggregate amount principal of Fifty Million and 00/100 Dollars ($50,000,000.00), all pursuant to the provisions of certain Indenture, dated as of December 29, 2005 (the "2016 Indenture"), by and between the Debtor and the Indenture Trustee; and

(c)    certain Fixed/Floating Rate Senior Debt Securities Due 2017 (the "2017 Debentures") which the Debtor issued on or about April 26, 2007 by the Debtor in the original principal aggregate amount principal of Fifty Million and 00/100 Dollars ($50,000,000.00), pursuant to the provisions of that certain Indenture, dated as of April 26, 2007 (the "2017 Indenture"), by and between the Debtor and the Indenture Trustee.

The 2015 Indenture, the 2016 Indenture and the 2017 Indenture are hereinafter sometimes referred to collectively as the "Indentures". The Debentures were structured as both fixed and floating rate senior debt securities on the Debtor's balance sheets. The holders of the Debentures are entitled to receive (i) quarterly payments of interest when and as provided therein and (ii) lump sum payments of principal at the applicable maturity dates provided therein.

The filing of the Case by the Debtor constituted an event of default under each of the Indentures. In accordance with the provisions of Section 5.3 of each of the Indentures, the Indenture Trustee has timely filed, for and on behalf of the holders of the Debentures and itself, with the Bankruptcy Court, proofs of claim before the deadline for filing such claims.

Upon the occurrence and during the continuance of any event of default under the Indenture, and in accordance with the provisions of Sections 5.8, 6.1 and 6.2(d) of each of the Indentures, those holders of a majority of the aggregate principal amount outstanding under the Debentures have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee or exercise any trust or power conferred on the Indenture Trustee with respect to the Debentures (including any rights and remedies which the Indenture Trustee has, or may have, in the bankruptcy proceeding); *provided*, *however*, that, among other things, the Indenture Trustee

shall have been provided with indemnity satisfactory to it, and the Indenture Trustee retains all of its rights and other protections available under the Indentures and applicable law.  To date, the Indenture Trustee has not received any such direction from such holders of a majority of the aggregate principal amount outstanding under the Debentures.

### 3.    Other Indebtedness.

In addition to the Indentures, the Debtor's other indebtedness includes unliquidated intercompany claims that may be held by the Bank, unliquidated claims for pre-petition professional services rendered and other vendor claims.  As of the filing of this Disclosure Statement, Debtor does not believe that it has any secured indebtedness.

### 4.    Interests.

The Debtor was formed as a savings and loan holding company to provide additional flexibility to the organization through the ability to serve a broader geographic area, expand its product offerings, access capital markets through the ability to issue debt and other financial instruments, and to gain certain tax benefits.  Upon its formation in 1987, the Debtor acquired all of the issued and outstanding securities of the Bank.  The Common Stock of the Debtor was traded in the over-the-counter market on the Pink Sheets under the symbol "FFEDQ.PK."

### B.    Management of the Debtor.

#### 1.    Directors, Executive Officers, and Corporate Governance.

As of the filing of this Disclosure Statement, the Debtor's Board of Directors consists of Bill Ouchi, Bill Rutledge and Chris Harding. Mr. Carl McKinzie is currently Debtor's Chief Executive Officer, and Brian Argrett served as Secretary for the Debtor until December 31, 2011.

## V.    THE CHAPTER 11 CASE

The following is a general summary of the Case, including the events leading up to the chapter 11 filing, the stabilization of the Debtor's operations following the Petition Date, certain administrative matters addressed during the Case, and the Debtor's restructuring initiatives since the Petition Date.

**A.      Events Leading to the Chapter 11 Case and Related Postpetition Events**.

As set forth above, prior to 2009, the principal business of the Bank was attracting checking and savings deposits from the general public and using those deposits, together with borrowings and other funds, to make real estate, business and consumer loans.  In the past several years prior to the Petition Date, the Bank invested in a portfolio of single-family residential loans on properties located throughout California.  These residential loans, the majority of which originated between 2004 and 2008, were obtained primarily from wholesale loan brokers, although residential loans were also offered in the Bank's branches.

Beginning in late 2007, the single family housing market in California began to decline, a decline that continued precipitously throughout 2008 and most of 2009.  The combination of a declining real estate market and increasing unemployment resulted in rising delinquencies and foreclosures in the Bank's loan portfolio during 2008 and 2009.  That portfolio included a significant number of adjustable rate loans that were reaching their maximum allowed negative amortization, which exacerbated the effects of the recession on the loan portfolio.  At the beginning of 2008, the Bank had a nonperforming asset ratio of 2.79%.  By the end of that year, the ratio had risen to 7.00%, later climbing to 8.20% as of June 30, 2009.

In the fall and winter of 2008, the Debtor engaged investment banking services to assist it in raising capital or to pursue a merger with or acquisition by another federally insured institution.  The Debtor concluded that effort was unsuccessful and was quickly abandoned due to deteriorating conditions in the wider economy which generally dampened the appetite for strategic transactions.  Concurrently with these capital raising efforts, the Debtor timely submitted an application to the OTS for a TARP investment of $125,000,000 on October 24, 2008.  That request was never acted on by the OTS.

NYSE Regulation, Inc. announced on February 26, 2009 that it had determined that the Common Stock of the Debtor would be suspended from trading prior to market opening on Wednesday, March 4, 2009 due to the Debtor's failure to satisfy one of the continued listing standards of the NYSE.  Since March 4, 2009, the stock has been quoted on the over-the-counter market under the symbol "FFEDQ.PK."

On January 26, 2009, the OTS issued an Order to Cease and Desist to each of the Debtor and the Bank (the "Debtor Order" and the "Bank Order," respectively, and together, the "Orders").  The Debtor Order required the Debtor to notify, or in certain cases receive the permission of, the OTS prior to, *inter alia*, (i) declaring or paying any dividends or other capital distributions on its capital stock; (ii) incurring, issuing, renewing, repurchasing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; or (iii) making payments (including without limitation, principal, interest or fees of any kind) on any existing debt.

In an effort to comply with asset growth limitations contained in the Orders, the Bank immediately suspended lending for its own portfolio, resulting in the layoff of approximately 10% of the Bank's then-current workforce and significant continued downsizing throughout 2009.  The Debtor did not receive the necessary consent from the OTS to make the aggregate $2,300,000 in interest payments due on the Indentures on March 16, 2009, and therefore could not and did not make those payments (for the same reason, Debtor failed to make the aggregate $2,300,000 in interest payments due on each of June 15, September 15 and December 15, 2009).  On May 28, 2009, the OTS issued an Amended Order to Cease and Desist to each of the Debtor and the Bank (the "Amended Cease and Desist Orders") that implemented more stringent restrictions on the Debtor and the Bank.

As the Debtor took actions to improve the opportunity for the investment by outside capital, the Bank began an aggressive loan modification outreach to further blunt the adverse effect of recasting adjustable rate mortgages on delinquencies in its loan portfolio, which it had begun modifying based on borrower payment difficulty beginning in late 2007.  As a result of this outreach effort, the Bank was able to modify over $1 billion in such mortgages by July 2009, substantially reducing the future financial uncertainty that otherwise would have existed.  In addition, the Bank's modified loan portfolio was performing substantially better than published data of industry-average modified portfolio performance. Nevertheless, in early July 2009, the Debtor was informed by FDIC-Corporate that potential bidders for the Bank's assets would be arriving that month, implying that the regulators intended imminently to seize the Bank.

/ / /

1    Members of the Debtor's executive management and Board went to Washington, DC to

2    present to representatives of the OTS and FDIC-Corporate the Debtor's progress with respect to the

3    debt tender offer and loan modifications, and data demonstrating that the Debtor's financial

4    condition was beginning to improve. This meeting resulted in regulatory interest in the Bank's

5    modification program, with the FDIC sending examiners to the Bank on July 27, 2009 to undertake a

6    review of it.

7    On September 3, 2009, the FDIC issued a visitation report related to its recent review of the

8    Bank's loan modification program.  After reviewing the report, the Bank's management noted that it

9    contained numerous significant factual and process errors which together led to a conclusion

10   unsupported by the actual and projected condition of the Bank. FDIC-Corporate, acknowledging that

11   its report was not in accordance with GAAP, finally issued an amended visitation report.  While

12   several of the more egregious errors had been remedied, many which had been discussed and

13   conceded by FDIC-Corporate were not reflected in the amended report, which also contained new

14   errors.

15   The Debtor held a special stockholder meeting on September 30, 2009, at which stockholders

16   agreed to increase the number of authorized shares of the Debtor's common stock from 100 million

17   to 5 billion and authorized a subsequent reverse stock split, which actions would have enabled the

18   Debtor to proceed to raise capital in the public markets pursuant to a registration statement the

19   Debtor had been preparing to file with the Securities and Exchange Commission ("SEC") in order

20   formally to initiate its public offering.

21   The Bank, at the same time, did not meet certain capital ratios contained in the Amended

22   Cease and Desist Orders on September 30, 2009.  The Bank submitted to the OTS a contingency

23   plan to accomplish either a merger of the Bank with, or an acquisition of the Bank by, another

24   federally insured institution or holding company thereof, or a voluntary liquidation of the Bank.

25   On October 29, 2009, FDIC-Corporate began its on-site marketing of the Bank. OneWest

26   was indeed the successful bidder.  During the marketing, several parties who had been interested in

27   making a capital investment in the Debtor refocused their efforts on participating in the bidding

28   process.

1    The November 6, 2009 enactment of Worker, Homeownership, and Business Assistance Act

2    of 2009 (the "WHBAA"), which allows businesses to carry back net operating losses from 2008 and

3    2009 for up to five years, significantly improved the Debtor's capital position.  Based on the

4    WHBAA, the Debtor expected to book a tax benefit estimated to be more than $100 million in the

5    fourth quarter of 2009 and anticipated receiving a federal income tax cash refund during the first

6    quarter of 2010.

7    The Debtor's financial condition was showing signs of improvement independent of the tax

8    benefit, with loan delinquency levels continuing to trend downward.  Unaudited, unconsolidated

9    monthly results as of October 31, 2009 showed a decline in delinquent loans of 16%, from the

10   previous month. October 2009 was the eighth consecutive month in which the Bank's loan

11   delinquencies decreased, resulting in total delinquencies less than half of historic peak levels

12   reported by Debtor in early 2009.

13   Throughout November, it made several telephone calls and wrote many letters to the OTS

14   and FDIC-Corporate, urging them to restrain from seizing the Bank given the Debtor's improving

15   overall financial condition.  On December 2, 2009, the Debtor's management and Board met with

16   FDIC-Corporate and OTS representatives in Washington, DC.  In that meeting, the Debtor's

17   financial advisor informed the agencies of its belief that a successful capital raise would be all but

18   inevitable if the Debtor were given the latitude to complete it, despite the passage of the December

19   2nd planned completion date.

20   On December 4, 2009, at the request of the OTS, the Debtor's Board provided the FDIC with

21   a consent to a receivership of the Bank.  The following week, on December 9, 2009, the OTS stated

22   that it would forestall FDIC takeover of the Bank and allow the Debtor further time in which to raise

23   capital if the Debtor's Chief Executive Officer and Chairman of the Board was to relinquish her

24   positions.  The Debtor's CEO/Chairman accepted the proposal.  Despite the Debtor's cooperation

25   with the regulatory agencies the Bank was placed on December 18, 2009 into receivership with the

26   FDIC and certain assets and liabilities of the Bank were thereafter sold to OneWest.

27   / / /

28   / / /

1    As a result thereof, the Debtor filed the Petition. The Plan preserves any and all claims the

2    Debtor may have against the OTS and FDIC-Corporate in connection with its seizure of the Bank,

3    including claims for improper seizure.

4        **B.**    **Initiation of the Chapter 11 Case**.

5    On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the

6    Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to

7    sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in

8    the Case.

9        **C.**    **Initial Stages of the Chapter 11 Case**.

10    The Debtor commenced its Chapter 11 Case on the Petition Date and intended to implement

11    the liquidation of the Debtor's assets and operations.  As explained below, the Debtor's creditors

12    rejected the Liquidation Plan that the Debtor proposed.  The Plan Proponents have filed their Plan as

13    the alternative to the Liquidation Plan, and indeed, the only method proposed in this case  to provide

14    creditors with the opportunity to realize a recovery greater than liquidation value.  Since the Petition

15    Date, the following has occurred:

16        **1.**    **Employment Applications**.

17    On January 20, 2010, the Debtor filed applications to employ Landau Gottfried & Berger,

18    LLP ("LGB") as its bankruptcy counsel and Manatt, Phelps & Phillips, LLP ("Manatt") as its special

19    corporate, banking and litigation counsel.  By Orders entered on February 17, 2010, the Bankruptcy

20    Court approved the employment of LGB (Docket No. 25) and Manatt (Docket No. 26).  On March 2,

21    2010, the Debtor filed its application to employ Hutchinson & Bloodgood LLP ("H&B") to review,

22    consolidate and electronically file (but not to prepare) the Debtor's federal tax returns for the tax

23    year ended December 31, 2009.  The Court approved the employment of H&B by Order entered on

24    July 22, 2010.  (Docket No. 55).

25    As one of the principal assets of the Debtor is its right to receive a refund of its federal taxes

26    estimated ("Refund") as a result of the enactment, in November of 2009, of the WHBAA and the

27    promulgation of Revenue Procedure 2009-52, which permit companies to carry back Net Operating

28    Losses ("NOL") and Alternative Minimum Tax Net Operating Losses ("ATNOL"), the Debtor, on

May 18, 2010, filed its application to employ Crowe Horwath, LLP ("Crowe Horwath") as its accountants to prepare the Debtor's 2009 tax returns and its application for the Refund, as well in connection with any other tax matters. (Docket No. 39).  On July 22, 2010, the Court entered its Order approving the employment of Crowe Horwath (Docket No. 57).

In addition, on July 6, 2010, the Debtor filed its application to employ Rus, Miliband & Smith ("RMS") as special litigation counsel to investigate and evaluate potential claims that the Debtor may have against its prepetition accountants.  (Docket No. 49).  On July 30, 2010, the Court entered its Order approving the Debtor's employment of RMS.  (Docket No. 59).

### 2.    Bar Date Motion.

On February 22, 2010, the Debtor filed its *Notice of Motion and Motion for Entry of an Order (I) Establishing Bar Dates for Filing Proofs of Claim or Interest; and (II) Approving the Form and Manner of Notice Thereof* (Docket No. 28) ("Bar Date Motion").  Pursuant to an Order of the Bankruptcy Court entered on April 15, 2010 (Docket No. 34), the Bar Date Motion was approved and the Bar Date for filing proofs of claim was fixed as May 20, 2010 (the "Bar Date").  The last date for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim was set for July 5, 2010.  On April 16, 2010, the Debtor served on all creditors, equity holders and other parties-in-interest and filed with the Bankruptcy Court its *Notice of Bar Date for Filing Proofs of Claim or Interest against Debtor and Debtor-in-Possession First Fed Financial Corp.*  (Docket No. 35).

### 3.    Schedules and Statement of Financial Affairs.

On the Petition Date, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court.

### 4.    FDIC Proof of Claim.

On June 29, 2010, the FDIC filed the FDIC Proof of Claim in the Debtor's Bankruptcy Case.  The Proof of Claim alleges both a unsecured and priority claim pursuant to 11 U.S.C. § 507(a) (9) and/or other applicable authority. The FDIC Proof of Claim is contingent, disputed and unliquidated.

On August 13, 2010, the FDIC filed its *Notice of Motion and Motion for Relief From the Automatic Stay Under 11 U.S.C. §362* (the "FDIC RFS Motion"), seeking, *inter alia*, to allow the

FDIC to exercise certain tax rights relating to the filing of federal tax returns for the Debtor and the Bank for the 2009 tax year. By its *Debtor's Opposition to FDIC Motion for Relief from Stay* and related Declarations (together, "Debtor's Opposition") filed with the Bankruptcy Court on August 24, 2010 (Docket No. 67), the Debtor opposed the FDIC RFS Motion, on various grounds, including that any delay in completing the 2009 return was caused by the FDIC because information required to complete the return lay within the control of the FDIC.

Following a hearing on the FDIC RFS Motion on September 10, 2010, the Bankruptcy Court granted the FDIC RFS Motion and ordered that, in the event that the Debtor or the FDIC receive any tax refunds, such monies be placed in to a joint bank account and/or escrow account, with all rights of the FDIC and the Debtor fully preserved pending a resolution of the ownership of such tax refunds.

Thereafter, as described below, in December, 2011, the Debtor filed an adversary proceeding the ("FDIC Adversary Proceeding"), in which it has asserted the FDIC Causes of Action, seeking a declaration that the Refund is property of the Debtor's Estate and entry of an order disallowing the FDIC's claim.

### 5.    Motion to Abandon Certain Claims.

Commencing in the first week of September, 2010, the Debtor's counsel conducted an investigation of the Debtor's books, records and certain publicly available documents, including the Debtor's pre-petition public filings with the SEC, to determine whether the Debtor had, and could reasonably pursue, claims against the Debtor's pre-petition directors and officers, including under the relevant directors and officers insurance policies of the Debtor ("Former Officer and Director Causes of Action").  Based on that investigation and, in part, in consideration of the impact of the decision in *Biltmore Associates, LLC v. Twin City Fire Insurance Company*, 572 F.3d 663 (9th Cir. 2009) that the so-called "insured versus insured" exclusion to coverage in a directors and officers liability policy ("D&O Policy") would operate to bar a trustee of a liquidating trust under a confirmed plan of liquidation under Chapter 11 of the Bankruptcy Code from asserting a claim under the D&O Policy, the Debtor determined that there were no viable Former Officer and Director Causes of Action that should be pursued on behalf of the Debtor's estate.  Accordingly, on October

6, 2010, the Debtor filed with the Bankruptcy Court and served its *Notice of Intent to Abandon* (Docket No. 94) ("Abandonment Notice").  No objection was timely filed to the Abandonment Notice.  The Plan, if confirmed, affirms that the Former Officer and Director Causes of Action have been abandoned and shall not be revived for the benefit of the Estate or any other Entity.

### 6.    Prosecution of Causes of Action.

#### a.    Causes of Action Against Third Parties.

The Reorganized Debtor may seek to investigate, file and prosecute Causes of Action after the Effective Date of the Plan, whether or not the Causes of Action are identified in the Disclosure Statement.  As reflected in the Plan (but subject to the releases described in the Plan), on the Effective Date, any and all Causes of Action of the Debtor and/or the Estate may have against any third parties shall be vested in the Reorganized Debtor and the Plan provides that the Reorganized Debtor has the authority to prosecute these Estate Causes of Action.

In particular, the Debtor asserts that one of the principal assets of the Debtor is its right to receive the Refund.  In December, 2011, the Debtor filed the FDIC Adversary Proceeding.  Under the Plan, the Reorganized Debtor will retain and will continue to pursue the FDIC Adversary Proceeding and the FDIC Causes of Action if not resolved before the Effective Date.

#### b.    Recovery of Preferential or Fraudulent Transfers.

The Reorganized Debtor will investigate whether certain prepetition payments to creditors may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or applicable State law.  The Reorganized Debtor will have the authority to prosecute preferential and fraudulent transfers under the Plan.

### 7.    IRS Adversary Proceeding and Objections to Claims.

Other than the FDIC Adversary Proceeding, to date, the Debtor has not filed any objections to Claims, except that the Debtor, on October 14, 2011, commenced Adv. Proc. No. 11-02893 (the "IRS Adversary") seeking to disallow Claim no. 3, filed by the IRS and for a determination of tax liability.  Under the Plan, after the Effective Date, the IRS Adversary shall vest in the Reorganized Debtor, which shall have standing and authority to prosecute the IRS Adversary.  Moreover, the Reorganized Debtor has the authority to object, prosecute, and settle Claims.

### 8.    The Liquidating Plan.

As set forth briefly above, the original Liquidating Plan was amended by a *Plan of Liquidation Dated as of January 5, 2011* [Docket No. 137] (the "Amended Liquidating Plan") and related *Disclosure Statement in Support of the Debtor's Plan of Liquidation Dated as of January 5, 2011.* The Amended Liquidating Plan was supported by the Indenture Trustee, and was not opposed by the FDIC. *See Response and Statement of Position of the FDIC as Receiver of First Federal Bank of California to Confirmation of Debtor's Plan of Liquidation Dated as of January 5, 2011* [Docket No. 165].

Nevertheless, at the end of the Debtor's solicitation process, conducted in accordance with this Court's *Order Authorizing and Approving (A) the Adequacy of the Disclosure Statement in Support of the Debtor's Plan of Liquidation Dated as of January 5, 2011; (B) the Form, Scope, and Nature of Solicitation, Balloting, Tabulation and Notices with Respect Thereto; (C) Related Confirmation Procedures, Deadlines and Notices and (D) Extending the Plan Exclusivity Period* [Docket No. 156] (the "Disclosure Statement Order"), only three ballots were submitted, two of which voted against the Amended Liquidating Plan. As a result, no class of claims could be deemed to have accepted the Amended Liquidating Plan and, confirmation of the Plan, based on the ballots cast, was not legally possible, due to the Debtor's inability to comply with the requirements of 11 U.S.C §§ 1129(a)(8) and 1129(b)(1).

At the hearing to consider confirmation of the Amended Liquidating Plan on June 7, 2011, the Debtor requested that the hearing be continued. The Court took the confirmation hearing off calendar, and set a status conference for September 1, 2011. At the status conference, the Court again continued the hearing on confirmation of the Amended Liquidating Plan to December 21, 2011. That hearing again has been continued. The Plan Proponents believe that confirmation of the Amended Liquidating Plan will not and cannot occur, as no class of impaired creditors has voted to accept the Amended Liquidating Plan.

### 9.    Exclusivity.

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for

voluntary relief.  If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the date on which the debtor filed for voluntary relief to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan.  However, a court may extend these periods upon request of a party in interest and "for cause."  On April 30, 2010, the Debtor filed the *Notice of Motion and Second Motion for Entry of an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Periods in Which the Debtor Exclusively May File a Chapter 11 Plan and Solicit Acceptances Thereto; Memorandum of Points and Authorities; Declaration of Jon L.R. Dalberg in Support Thereof* [Docket No. 36].  On June 3, 2010, the Bankruptcy Court extended the Debtor's exclusive plan proposal period through and including August 4, 2010, and the Debtor's exclusive plan solicitation period through and including October 4, 2010.

On August 2, 2010, the Debtor filed the *Notice of Motion and Second Motion for Entry of an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Periods in Which the Debtor Exclusively May File a Chapter 11 Plan and Solicit Acceptances Thereto; Memorandum of Points and Authorities; Declaration of Jon L.R. Dalberg in Support Thereof* [Docket No. 60].  On August 23, 2010, the Bankruptcy Court extended the Debtor's exclusive plan proposal period through and including October 4, 2010, and the Debtor's exclusive plan solicitation period through and including December 3, 2010.

On October 1, 2010, the Debtor filed the Liquidating Plan and subsequently on November 12, 2010 filed *Notice of Motion and Motion for Order Authorizing and Approving (A) The Adequacy of the Disclosure Statement in Support of the Debtor's Plan of Liquidation, (B) the Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notices with Respect Thereto; (C) Related Confirmation Procedures, Deadlines and Notices; and (D) Extending the Period in Which the Debtor Exclusively May Solicit Acceptances of the Plan; Memorandum of Points and Authorities* to extend the Debtor's exclusive plan solicitation to March 2, 2011.  On January 5, 2011, the Court granted an extension of the Debtor's plan solicitation and increased all deadlines by two weeks at the parties request.  No further extensions to the Debtor's exclusive plan proposal period or the Debtor's exclusive plan solicitation period have been requested.

### 10. Additional Tax Refunds

On or about March 26, 2012, the Plan Proponents learned from the Debtor's accountants, Crowe Horwath, that, in addition to the approximately $130 million of tax refunds that is the subject of an ownership dispute with the FDIC, the Debtor or the Bank may have received an additional tax refund of approximately $97 million on or about March 2009 on account of 2008 net operating losses and related carrybacks (the "Additional Tax Refund").

Upon learning of the Additional Tax Refund, the Plan Proponents immediately began investigating (i) where the funds received on account of the Additional Tax Refund were held, (ii) why this information was not previously available to the Debtor or its professionals, and (iii) the strategies that the Debtor could employ to preserve the Debtor's right to seek a return of this payment in the event that such payment was down-streamed from the Debtor to the Bank and recoverable as an avoidable preference or fraudulent transfer, or was otherwise recoverable as property of the Debtor's estate. The Plan Proponents continue to investigate whether the Additional Tax Refund is recoverable as property of the Debtor's estate and what legal strategies the Debtor can employ to ensure that, to the extent it is properly recoverable as property the Debtor's estate, it is recovered and made available to creditors.

## VI. THE REORGANIZED DEBTOR'S BUSINESS PLAN AND VALUATION

### A. The Reorganized Debtor's Business Plan.

The Debtor was a bank holding company for the Bank. The Debtor, primarily through the Bank, engaged in (i) originating and purchasing real estate loans secured by income producing properties for retention in its loan portfolio, (ii) accepting customer deposits through certificates of deposits, money market, passbook, and demand deposit accounts, (iii) generally engaging in financial services, (iv) making investments; and (v) pursuing causes of action against borrowers and other counterparties. Following the Debtor's bankruptcy, the Reorganized Debtor and Holdco intend to continue in one or more of its previous business activities, solely to the extent allowable under applicable law. The Reorganized Debtor will utilize Cash on hand, understanding that the Refund will not be available to invest until resolution of the FDIC Adversary Proceeding and FDIC Causes of Action.

Within 10 days after distributing this Disclosure Statement, the Plan Proponents will identify the New Board, all of whom will have experience in the financial services industry. The New Board will have the broad mandate of deciding how to implement the go-forward business of the Reorganized Debtor and may decide, at their discretion, to execute the business plan by hiring internal management, external management, or pursuing the business plan via any other method they deem appropriate. Until such time that the Reorganized Debtor receives proceeds, if any, from the pending Causes of Action, it is expected that the Reorganized Debtor will have to reserve significant Cash in order to pursue the Cause of Action, thereby limiting investable assets. From time to time, including after the resolution of the FDIC Cause of Action, the New Board will evaluate its business plan, which is subject to change at any time, and may decide to continue in its current direction, change directions, or give money back to shareholders.

Holdco believes that in the aftermath of the financial crisis that has seen hundreds of bank failures and implosions of real estate trusts and financial asset vehicles, there is a substantial opportunity to opportunistically source and make investments in these entities as they unwind, litigate, and liquidate. As an added benefit, the Reorganized Debtor may be able to utilize go-forward tax attributes in the form of net operating loss ("NOL") carry-forwards, although this is subject to some uncertainty. The principals of Holdco have extensive experience as distressed debt investors in the financial services sector; currently, Holdco manages distressed debt issued by more than 70 bank holding companies whose banks have failed and is the largest such creditor in many of the largest bank failures of the last cycle.

It is difficult, if not impossible, to project with any meaningful certainty what the results of the Reorganized Debtor's business operations will be. Furthermore, although the Plan Proponents presently believe that the aforementioned opportunity is attractive, the New Board will determine with greater precision what types of assets the Reorganized Debtor will invest in and what business lines to pursue, if at all. Taking into consideration the above, the Reorganized Debtor's business plan will likely include, but not necessarily be limited to, the following investments in highly speculative, illiquid assets including, without limitation:

/ / /

(i)    Tax refund or other insolvency-related litigation claims or causes of action that are unliquidated, contingent or disputed.

(ii)    Distressed debt and event-driven equity securities purchased in the secondary market whose recovery may be partially or wholly dependent upon pursuing, implementing and maximizing the value of litigation claims or asset liquidations.

(iii)    Bankruptcy trade claims sourced directly from third parties.

(iv)    Non-performing real estate assets.

(v)    Loans issued by under-served companies.

(vi)    Other "special situation" investments.

**B.      Business Projections**.

Holdco, as a Plan Proponent, retained Kinetic Advisors LLC ("Kinetic") to prepare certain business projections, liquidation analysis and valuations. All of these documents, including the Projections, should be read in conjunction with the assumptions, qualifications and explanations set forth herein.

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or the Rules and Regulations of the SEC regarding projections. Furthermore, the Projections have not been audited or reviewed by a registered independent public accounting firm.

The Projections are based on assumptions that are inherently uncertain and unpredictable. The operating and financial information contained in the projected financial data have been prepared by Kinetic, with the assistance of Holdco's retained professionals, and reflects Kinetic's current estimates of the Reorganized Debtors' future performance. It is difficult, if not impossible, to project with any meaningful certainty what the results of the Reorganized Debtor's business operations will be. Furthermore, although the Plan Proponents presently believe that the aforementioned opportunity set is attractive, the New Board will determine with greater precision what types of assets the Reorganized Debtor will invest in and what business lines to pursue, if at all. The projections and assumptions have not been reviewed or independently verified by any third party.

The projected results are based on assumptions and events over which, in many cases, the Reorganized Debtor will have only partial or no control. The selection of assumptions underlying

such projected information require the exercise of judgment, and the Projections are subject to uncertainty due to the effects that economic, business, competitive, legislative, political or other changes may have on future events. Changes in the facts or circumstances underlying such assumptions could affect the Projections, perhaps materially and/or adversely. The assumptions underlying the Projections may be incomplete and inaccurate, and unanticipated events and circumstances are likely to occur. To the extent that assumed events do not materialize, actual results may vary substantially from the projected results.

The projected financial statements were developed using the following major assumptions:

(i)  The Plan of Reorganization goes effective on July 31, 2012.

(ii)  The FDIC Adversary Proceeding is resolved in eighteen months from the Effective Date

(iii)  The Reorganized Debtor will invest its existing and future Cash (net of Net Cash Free Reserves and payments to creditors established pursuant to the Plan)

(iv)  Investments made by the Reorganized Debtor yield a return on investment ("ROI") ranging from 9% - 15% annually

(vi)  Future annual operating expenses of 2% of the assets invested and 10% of realized value of investments in excess of the original invested amount.

(vii)  The Reorganized Debtor is able to utilize $22 million of Net Operating Losses.

(viii)  Blended effective tax rate of 27%.

(ix)  The result of the FDIC Causes of Action is a Net Tax Refund Recovery of $30 million and in conection with any settlement the FDIC is not asserting any claim.[6]

(x)  Initial Investments will primarily be in:

  1.  Distressed debt and litigation claims investment leveraged at 20% loan to value

  2.  Real estate leveraged at 65% loan to value

---

[6] This assumed Net Tax Refund is for illustrative purposes only and shall not be deemed an admission or evidence in any proceeding involving the Debtor, the Reorganized Debtor or any FDIC Causes of Action.

Please see Exhibit B for the full projections

**C.    Note Regarding Forward-Looking Statements**.

Certain matters discussed herein contain forward-looking statements that are subject to certain risks, uncertainties or assumptions and may be affected by certain other factors which may impact future results and financial condition. In certain cases, you can identify forward looking statements by terminology such as "may", "should", "could", "expects", "plans", "projected", "anticipates", "believes", "estimates", "predicts" and "potential", or the negative of these terms or other comparable terminology. Should one or more of these risks, uncertainties or other factors materialize, or should underlying assumptions prove incorrect, actual results, performance or achievements of the Reorganized Debtor may vary materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

Forward-looking statements are based on beliefs and assumptions of the Plan Proponents and on information currently available to the Plan Proponents. Forward-looking statements speak only as of the date they are made, and the Plan Proponents undertake no obligation to update them in light of any new information or future events. Undue reliance should not be placed on such forward-looking statements, which are based on current expectations. Forward-looking statements are not guarantees of performance.

The Debtor does not, as a matter of course, publish its business plans, budgets or strategies or make public/external projections or forecasts of their anticipated financial positions or results of operations. Accordingly, neither the Reorganized Debtor nor the Plan Proponents anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets or projections to holders of claims, interests or stock in the Reorganized Debtor prior to or after the Effective Date or to include such information in documents required to be filed with the Securities Exchange Commission or any stock exchange or otherwise make such information publicly available.

**D.    Valuation of the Reorganized Debtor**.

THE VALUATIONS SET FORTH REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE

IN THE PUBLIC OR PRIVATE MARKETS. THE NEW EQUITY VALUE DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE NEW EQUITY VALUE.

In connection with certain matters relating to the Plan, Kinetic has prepared a valuation analysis of Reorganized Debtor's businesses and assets. Kinetic has employed generally accepted valuation techniques in estimating the reorganization value of the Reorganized Debtor. In preparing its valuation, each of the generally accepted valuation techniques described below were considered:

(1) **Discounted Cash Flow Analysis**: A discounted cash flow analysis estimates the total enterprise value of a business or asset based upon the present value of the projection of unlevered after-tax cash flows available to all providers of capital using estimated discount rates. The projection of unlevered free cash flows is discounted using an estimated weighted average cost of capital determined by, among other things, reference to observed costs of capital for comparable companies (i.e., companies with reasonably similar characteristics, including, among other things, lines of business, geography, size and profitability to the underlying businesses of the Reorganized Debtor). Added to the present value of the unlevered free cash flows is an estimate of the present value of the terminal value of the underlying businesses of the Reorganized Debtor.

(2) **Comparable Public Company Analysis**: In a comparable public company analysis, a subject company is valued by reference to the trading multiples of comparable companies. Specifically, market multiples of EBITDA (or in certain circumstances, net book value of assets) were applied to the Financial Projections (or net book value of assets) to determine the ranges of total enterprise value.

(3) **Precedent Transactions Analysis**: The precedent transactions analysis is based on the enterprise values of comparable companies involved in merger and acquisition transactions. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the liabilities assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of EBITDA (or in certain circumstances, net book value of assets). The derived multiples were then applied to the EBITDA of the Reorganized Debtor's underlying business or assets (or net book value of assets) to determine the ranges of total enterprise value.

Kinetic considered each of the valuation techniques described above, but determined that the valuation process for the Reorganized Debtor did not call for a comparable public company analysis or a precedent transaction analysis because there are no similarly situated companies whose assets consist almost entirely of cash and contingent assets. Accordingly, Kinetic relied primarily on the discounted cash flow analysis in conducting its valuation analysis.

/ / /

Based upon the methodology described above and assuming (for illustrative purposes only) that 20% of the Unsecured Claims make the Class B Common Stock Election, it is estimated the equity value for the Reorganized Debtor will be $30.3 million where the Reorganized Debtor receives $30.0 million in Net Tax Refund Recovery and has $22 million of Net Operating Losses after adjustments for Cancellation of Debt Income and other adjustments. It further assumes a 35% ordinary income tax rate and a 15% long-term capital gains rate. It is assumed that 60% of the reorganized debtor's funds are invested in distressed and middle market lending while 40% of the funds are invested in real-estate. Of the returns generated from the distressed and middle market portfolio, 50% is assumed to be taxed at ordinary rates and 50% taxed at long-term capital gains rates. In the real estate portfolio, 75% of the returns are assumed to be taxed at ordinary rates while 25% are taxed at long-term capital gains rates. The blended rate for these investments is assumed to be 27%. Assuming that 100% of the FDIC Non-Priority Claims and 20% of all other Unsecured Claims make the Class B Common Stock Election, it is estimated that total cash payments to these Holders is $12.8 million.

The Class B Common Stock Election assumes that any Holders that elect this option will bear their pro-rata cost of administering the Plan. This includes any and all costs related to the implementation of the Plan, including, but not limited to, all costs related to pursuing any and all Causes of Action, including, but not limited to the FDIC Causes of Action. A portion of those costs will include compensation of the members of the Plan Committee, which could cost the Reorganized Debtor $35,000 per person per year.

In the Chapter 7 liquidation, it is assumed that the cost associated with converting the Plan to a Chapter 7, paying the Chapter 7 trustee's fees, fees associated with any professionals excluding the costs of pursuing the tax litigation (accountants, attorneys etc.) and any other costs associated with liquidating the assets amount to approximately $1.5 million. With all other assumptions between the Class B Common Stock Election and the Chapter 7 Liquidation being equal, the Class B Common Stock Election provides Holders with a superior recovery.

The equity values calculated in the valuation analysis do not purport to be an estimate of a post-reorganization trading value. Trading values may be materially different from the implied

equity value associated with the valuation analysis.  Moreover, the Plan Proponents anticipate that the Reorganized Debtor will be held by fewer than 20 shareholders, and will have uncertain liquidity in its shares. The value estimates are based on economic, market, financial, and other conditions as they exist, and on the information available.  It should be understood that, although subsequent developments may affect the conclusions, the Plan Proponents do not have any obligation to update, revise, or reaffirm the estimate.

### E.    Feasibility of the Plan.

The Plan Proponents believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Plan Proponents believe it will have the resources available from Cash on hand as of the Effective Date and from the resolution of the FDIC Causes of Action to make payment to all Creditors who make the New Series B Common Stock Election.  Thus, Creditors who do not make the New Series B Common Stock Election should be limited to those fully prepared to accept the risk of loss resulting from the potential failure of the Reorganized Debtor to earn sufficient profits to allow shareholders to recover at least what they would have recovered had they made the New Series B Common Stock Election.  Assuming the FDIC Priority Claim is not Allowed, the Plan Proponents estimate the Reorganized Debtor will have sufficient cash to fund all Plan Distributions required on the Effective Date.  Further, upon emergence from bankruptcy on the Effective Date, the Reorganized Debtor will be debt-free and does not require any exit financing.  Therefore the Reorganized Debtor will have no debt service requirements on the Effective Date.  The management and New Board of the Reorganized Debtor, who will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, will be comprised of individuals with experience in the real estate and financial services industries. Accordingly, the Plan Proponents believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Reorganized Debtor will not have Cash available to pay the FDIC Priority Claim if it is Allowed.  Prior to the Confirmation Hearing, the Court may be requested to enter one or more orders

estimating the FDIC Priority Claim at zero.  The Plan Committee will determine, after the Effective

Date, how best to finance litigation against the FDIC and shall be responsible to pursue all FDIC

Causes of Action pursuant to the Plan.

**VII.     SUMMARY OF THE PLAN**

    **A.     Administrative and Priority Claims**.

        **1.     Administrative Claims**.

Holders of Allowed Administrative Claims shall be paid the full unpaid amount of their

Allowed Administrative Claims in Cash upon the later of: (a) on the Effective Date or as soon as

reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is

due); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as

soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative

Claim is due); (c) at such other time as may be agreed upon by such Holder and the Debtor or the

Reorganized Debtor, as applicable; or (d) at such time and upon such terms as set forth in an order of

the Bankruptcy Court.  The Reorganized Debtor shall establish appropriate reserves on the Effective

Date for all Allowed Administrative Claims, if any, that are not paid in full on the Effective Date.

        a.     **Tax Claims Entitled to Administrative Priority**

The L.A. County Treasurer and Tax Collection has asserted approximately $2,452.74 in

Claims for taxes and related interest and penalties that it believes are subject to administrative

priority under section 503(b)(1)(B) and (C) of the Bankruptcy Code.  To the extent such Claims

become Allowed Administrative Claims, this amount may increase during the pendency of this

chapter 11 case as a result of accrued interest and penalties.  All interest and penalties for Allowed

Administrative Claims for taxes will accrue in accordance with applicable law, including sections

511 and 506(b) 0f the Bankruptcy Code.

        b.     **Accrued Professional Compensation**

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtor

or the Reorganized Debtor, as applicable, shall pay the Accrued Professional Compensation of each

Professional.

/ / /

## 2.    Priority Tax Claims.

The Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Allowed Priority Tax Claim becomes Allowed; and (c) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. The L.A. County Treasurer and Tax Collector has asserted approximately $41,676.31 in Priority Tax Claims.  The L.A. County Treasurer and Tax Collector has also asserted that such Priority Tax Claims are secured by liens against property of the Estate.  Such Priority Tax Claims will be treated as Secured Claims to the extent they are secured.  To the extent that Priority Tax Claims become Allowed, the amount asserted by the L.A. County Treasurer may increase during the pendency of this chapter 11 case as a result of accrued interest and penalties. All interest and penalties for Allowed Priority Tax Claims will accrue in accordance with applicable law, including sections 511 and 506(b) 0f the Bankruptcy Code.

### B.    Classification and Treatment of Claims and Interests.

The Plan constitutes a chapter 11 plan of reorganization for the Debtor.  Except for Administrative Claims and Priority Tax Claims, all Claims against and Interests in the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article III of the Plan.

The table in Article III.B of the Plan classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 3 | FDIC Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 4 | Debenture Unsecured Claims | Impaired | Yes |
| 5 | FDIC Non-Priority Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |
| 7 | Convenience Claims | Unimpaired | No (conclusively presumed to accept) |
| 8 | Interests | Impaired | No (conclusively presumed to reject) |

### 1.    Class 1 (Secured Claims). Classification.

Class 1 consists of all Secured Claims.

### Impairment and Voting.

Class 1 is Unimpaired under the Plan and the Holders of Class 1 Allowed Secured Claims, if any, are deemed to accept the Plan.

### Treatment.

The legal, equitable and contractual rights of the Holders of Allowed Secured Claims are unaltered by the Plan.  Unless otherwise agreed to by the Holder of an Allowed Secured Claim and the Debtor, each Holder of an Allowed Secured Claim shall receive on the later of (x) the Effective Date, and (y) the date an order of the Bankruptcy Court allowing the Secured Claim becomes a Final Order, on account of and in full satisfaction of its Allowed Secured Claim, either of the following treatments at the election of (A) the Debtor or (B) if after the Effective Date, the Reorganized Debtor: (i) Cash equal to the amount of the Allowed Secured Claim or (ii) possession of the property in which the Holder of the Allowed Secured Claim has a perfected, unavoidable and enforceable lien, security interest or other charge and relief from the automatic stay provided by section 362 of the Code to foreclose, collect upon or set-off the property in accordance with applicable non-bankruptcy law; *provided*, *however*, that any time after the Confirmation Date but before the Effective Date, Holdco, in its sole discretion, can elect to give to the Holder of an Allowed Secured Claim the treatment provided in subparagraph (ii) above.

### 2.    Class 2—Non-FDIC Priority Claims. Classification.

Class 2 consists of all Non-FDIC Priority Claims.

/ / /

**Impairment and Voting**.

Class 2 is Unimpaired by the Plan.  Each Holder of a Non-FDIC Priority Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

**Treatment**.

On or as soon as practicable after the Effective Date, the Reorganized Debtor shall pay each Holder of an Allowed Non-FDIC Priority Claim, in full and final satisfaction of such Allowed Non-FDIC Priority Claim, Cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such Allowed Non-FDIC Priority Claim becomes Allowed; and (iii) the date such Allowed Non-FDIC Priority Claim is payable under applicable non-bankruptcy law.

**3.** **Class 3—FDIC Priority Claims Classification**.

Class 3 consists of all FDIC Priority Claims.

**Impairment and Voting**.

Class 3 is Unimpaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute an FDIC Priority Claim, is conclusively presumed to accept the Plan pursuant to section 1126(f) of the Code, and is not entitled to vote to accept or reject the Plan.

**Treatment**.

The legal, equitable and contractual rights of the Holders of Allowed FDIC Priority Claims are unaltered by the Plan.

**4.** **Class 4—Debenture Unsecured Claims Classification**.

Class 4 consists of all Debenture Unsecured Claims.

**Impairment and Voting**.

Class 4 is Impaired by the Plan.  Each Holder of a Debenture Unsecured Claim is entitled to vote to accept or reject the Plan.

**Treatment**.

In full satisfaction, settlement, release, and compromise of and in exchange for each Allowed Debenture Unsecured Claim, each Holder of an Allowed Debenture Unsecured Claim shall receive on the Initial Distribution Date its Stock Pro Rata Distribution of the New Series A Common Stock.

Alternatively, and only if such Holder so elects, instead of any of the foregoing, such Holder shall receive the New Series B Common Stock Election consisting of such Holder's Election Pro Rata share of the New Series B Common Stock Election Trust Interests, which, *inter alia*, shall entitle such Holder to receive its Election Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with this Plan and the New Series B Common Stock Election Trust Agreement.  The Reorganized Debtor reserves the right, in addition, to issue shares of New Series B Common Stock to Holders of Allowed Class 4 Claims making the New Series B Common Stock Election as is necessary to preserve certain tax attributes of the Debtor. Notwithstanding anything to the contrary in this Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 4 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use below, may be deemed to have elected the New Series B Common Stock Election.

>    **5.**    **Class 5—FDIC Non-Priority Claims Classification**.

Class 5 consists of all FDIC Non-Priority Claims.

>    **Impairment and Voting**.

Class 5 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute an FDIC Non-Priority Claim in Class 5 is entitled to vote to accept or reject the Plan.

>    **Treatment**.

In full satisfaction, settlement, release, and compromise of and in exchange for each FDIC Non-Priority Claim, each Holder of an Allowed FDIC Non-Priority Claim shall receive on the Initial Distribution Date its Pro Rata Distribution of the New Series A Common Stock.  Alternatively, and only if such Holder so elects, instead of any of the foregoing, such Holder shall receive the New Series B Common Stock Election consisting of such Holder's Pro Rata share of the New Series B Common Stock Election Trust Interests, which, *inter alia*, shall entitle such Holder to receive its Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with the Plan and the New Series B Common Stock Election Trust Agreement.  The Reorganized Debtor reserves the right to convert, on a Pro

Rata basis, all New Series B Common Stock Elections to New Series B Common Stock as is necessary to preserve certain tax attributes of the Debtor.   Notwithstanding anything to the contrary in the Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 5 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.

### 6.    Class 6—Other Unsecured Claims Classification.

Class 6 consists of all Other Unsecured Claims.

### Impairment and Voting.

Class 6 is Impaired by the Plan.  Each Holder of an Other Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

### Treatment.

In full satisfaction, settlement, release, and compromise of and in exchange for each Other Unsecured Claim, each Holder of an Allowed Other Unsecured Claim shall receive on the Initial Distribution Date its Pro Rata Distribution of the New Series A Common Stock.  Alternatively, and only if such Holder so elects, such Holder shall instead receive the New Series B Common Stock Election, consisting of such Holder's Pro Rata share of the New Series B Common Stock Election Trust Interests, which, *inter alia*, shall entitle such Holder to receive its Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with the Plan and the New Series B Common Stock Election Trust Agreement.  The Reorganized Debtor reserves the right to convert, on a Pro Rata basis, all New Series B Common Stock Elections to New Series B Common Stock as is necessary to preserve certain tax attributes of the Debtor.  Notwithstanding anything to the contrary in the Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 6 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.

/ / /

**7.    Class 7 (Convenience Claims)**.

Class 7 consists of Convenience Claims.  Each Holder of an Allowed Convenience Claim shall receive, on account of and in full satisfaction of its Allowed Convenience Claim, Cash equal to 100% of the amount of the Allowed Convenience Claim on the later of (x) the Effective Date, and (y) the date an order of the Bankruptcy Court  allowing the Convenience Claim becomes a Final Order.  Class 7 is Unimpaired under the Plan and the Holders of Class 7 Allowed Convenience Claims are deemed to accept the Plan pursuant to section 1126(f) of the Code.

**8.    Class 8 (Holders of Interests)**.

Class 8 is comprised of Holders of Interests.  Holders of Class 8 Interests shall neither receive nor retain any property under the Plan and all Interests of the Debtor shall be cancelled as of the Effective Date.  Class 8 is impaired under the Plan and the Holders of Class 8 Interests are deemed to reject the Plan.

**C.    Means for Implementation of the Plan**.

**1.    Corporate Existence**.

Except as otherwise provided in the Plan or Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a separate corporate Entity with all the powers of a corporation pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the certificate of incorporation, charter and bylaws in effect prior to the Effective Date, except to the extent the Reorganized Debtor elects to reincorporate in another state or territory, or make any other amendments to such certificate of incorporation, charter or bylaws, pursuant to documents contained in the Plan Supplement, in which case such documents in effect prior to the Effective Date are deemed to be amended pursuant to the Plan and require no further action or approval.  For the avoidance of doubt, the Reorganized Debtor may reincorporate from and after the Effective Date in a state territory or other political subdivision of the United States of America other than Delaware as the Reorganized in its sole discretion may select.

/ / /

/ / /

/ / /

**2.      Directors/Officers of the Debtor on the Effective Date; Plan Committee**.

a.      **Release and Discharge of Duties and Obligations of Current Directors and Officers**.

On the Effective Date, the persons then acting as directors and officers of the Debtor shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtor or the Case.

b.      **Plan Committee**.

As of the Effective Date, the Plan Committee shall be created and shall consist of three members of the New Board: Kenneth Tepper, Birge Watkins, and Michael Piracci.  Although the Plan Committee will be a subset of the New Board, for all matters other than New Board Interested Transactions and Financing Arrangements (each as defined below), the Plan Committee will have substantially reduced voting power as compared to the other members of the New Board.  During such time as the Plan Committee may be in existence, each member of the Plan Committee shall be compensated in an amount not to exceed $35,000 per year from the Reorganized Debtor, and shall receive no other form of compensation from the Reorganized Debtor in any other capacity.  Each Plan Committee member shall serve for a term of five years, unless the Plan Committee has completed its duties hereunder and has been dissolved.  In that case, each Plan Committee member's term shall expire on the next business day following the next meeting of the New Board that occurs after the dissolution of the Plan Committee.  The New Board shall have absolutely no right, power or authority to remove any member of the Plan Committee or alter their compensation in any manner whatsoever.  The Plan Committee shall oversee and have decision-making authority regarding any litigation and/or settlement of Causes of Action, including the FDIC Causes of Action, and the administration of Distributions.  Without limiting the generality of the immediately preceding sentence, the Plan Committee shall have the power, right, authority and obligation to seek and implement the appropriate arrangement to compensate professionals and "Financing Arrangements" (as defined below) (including financial advisors, employees, and attorneys, which may include any Entity or Person, including firms or individuals currently or prospectively affiliated or employed by the Debtor and/or the Reorganized Debtor, Persons who are Insiders, or Persons who may have conflicts of interest with the Reorganized Debtor, and may include, without limitation, Holdco, its

affiliates, attorneys or other professional advisors, but shall exclude members of the Plan Committee) with respect to Causes of Action, which may include but shall not be limited to one or a combination of contingency arrangements and/or dilutive capital raising initiatives that may include contingent liens on future proceeds of the Causes of Action and may dilute and impact the recoveries of all holders of New Common Stock and New Series B Common Stock Election Trust Interests, including any holders who made the New Series B Common Stock Election.

Notwithstanding any other provision in the Plan or Disclosure Statement, the Plan Committee shall have the sole discretion to determine whether the Reorganized Debtor shall enter into transactions in which any members of the New Board, other than the members of the Plan Committee, have an interest (such transactions, "New Board Interested Transactions").  The members of the New Board that are not Plan Committee members, in turn, shall have sole discretion to determine whether the Reorganized Debtor shall enter into transactions in which any member of the Plan Committee has an interest.

In addition, notwithstanding any other provision in the Plan or Disclosure Statement, the Plan Committee shall have the unequivocal and sole authority to determine the appropriate financing arrangement (the "Financing Arrangement") with respect to all Causes of Action and may execute such documents relating to such Financing Arrangement which will be borne by and shall be binding on holders of New Common Stock and holders of New Series B Common Stock Election Trust Interests (including, for the avoidance of doubt, holders who made the New Series B Common Stock Election). For the avoidance of doubt, the costs associated with the Financing Arrangement shall be shared by all of the holders of interests described in the immediately preceding sentence.

The fiduciary duties of the members of the Plan Committee (in their capacity as Plan Committee members) shall run to all parties entitled to Distributions under the Plan, whether or not such beneficiaries have elected the New Series B Common Stock Election.  The Reorganized Debtor shall seek approval of any settlement of a Material Cause of Action from the Bankruptcy Court by the filing of an appropriate motion, and such approval shall be governed by Fed.R.Bankr.P. 9019, shall only come after a hearing, upon notice to all parties requesting service pursuant to Bankruptcy Rule 2002 or to such Entities as the Court may order.

### D.    Removal or Resignation of Plan Committee Members

1.  In the event one or more members of the Plan Committee resign or are removed *for cause* (as defined below), the remaining members of the Plan Committee (collectively, the "Remaining Members") shall fill the vacancy with a replacement member having equivalent or greater experience, knowledge and independence as the member being replaced.

2.  If the Remaining Members are unable to agree on a replacement member within 60 days after the date on which the member being replaced gives notice of his or her resignation or is notified of his or her removal, then any Remaining Member of the Plan Committee may petition the Bankruptcy Court for the appointment of a replacement member.

3.  No member may resign without giving at least 90 calendar days' prior written notice thereof to the Remaining Members of the Plan Committee.

4.  If by the 60th calendar after the date on which the member being replaced gives notice of his or her resignation or is notified of his or her removal, a duly qualified replacement member has not been selected, agreed upon and appointed by the Remaining Members of the Plan Committee, then the Remaining Members of the Plan Committee shall promptly deliver to all of the beneficial holders of the Class A Stock and Class B Stock a written notice thereof.

5.  No member of the Plan Committee may be removed, except *for cause,* as determined by any of the following:

    (a)    So long as the Plan Committee consists of three (3) members, the unanimous action of the two (2) other members of the Plan Committee; or

    (b)    the Bankruptcy Court upon the petition of any member of the Plan Committee.

As used in this section, the term "cause" shall mean (i) the commission of an act of fraud, (ii) the willful and persistent neglect of his or her duties as a member of the Plan Committee, or (iii) the inability to perform his or her duties due to his or her mental or physical condition.

/ / /

/ / /

### E.    Cancellation of Debentures, Indenture and Interests.

#### 1.    Cancellation of Debentures.

On the Effective Date, except to the extent otherwise provided herein (including for avoidance of doubt, Sections 2 and 3 of Article V.C. of the Plan), all notes, stock, instruments, certificates and other documents evidencing the Debenture Unsecured Claims and Interests, including the Senior Debt Documents, shall be deemed automatically canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged.

#### 2.    Limited Survival of Senior Debt Documents.

Notwithstanding anything to the contrary contained in the Plan, (a) the Senior Debt Documents will continue in effect solely for purposes of (i) allowing the Indenture Trustee to receive and make the Distributions to be made pursuant to the Plan on account of Debenture Unsecured Claims, from Distributions received from the Reorganized Debtor in accordance with the Indentures and the Plan, and (ii) permitting the Indenture Trustee to maintain any rights or Charging Liens that it may have under the applicable Senior Debt Documents to receive Indenture Trustee Fees and indemnification, provided that the Reorganized Debtor will not have any obligation to the Indenture Trustee for payment of any Indenture Trustee Fees or indemnifications except as otherwise provided in the Plan, and (b) the Debentures will continue in effect solely for the purposes of permitting Holders thereof to receive Distributions from the Indenture Trustee in accordance with the applicable provisions of the Indentures and the Plan.

#### 3.    Limited Preservation of Indenture Trustee Rights to Charging Liens.

To the extent that, under the Senior Debt Documents, the Indenture Trustee is entitled to Charging Liens on account of unpaid Indenture Trustee Fees, recoveries under the Plan will be adjusted so that sufficient Cash Distributions are available to allow the Indenture Trustees to exercise such Charging Liens against Cash distributed under the Plan.  Payment of fees, if any, to the Indenture Trustees will reduce recoveries to all Holders of Allowed Debenture Unsecured Claims regardless if whether they make the New Series B Common Stock Election or receive the New Series A Common Stock.

4.    **Payment of Holdco Fees**.

The Reorganized Debtor shall pay the Holdco Fees as soon as reasonably practicable after the Effective Date.  As a precondition to payment of any Holdco Fees, Holdco shall, after the Effective Date, submit to the Bankruptcy Court its invoices and an application for payment of such Holdco Fees. The Bankruptcy Court shall review each application for payment of Holdco Fees for reasonableness, as required under section 1129(a)(4) of the Bankruptcy Code. After the Bankruptcy Court has approved an application for payment of Holdco Fees as reasonable, the Reorganized Debtor shall, as soon as practicable thereafter, reimburse Holdco in Cash for such Holdco Fees.  The Holdco Fees shall not reduce the recovery, if any, of the FDIC in connection with any Allowed FDIC Non-Priority Claims, and the FDIC will be entitled to receive the same Distributions it would otherwise be entitled to receive absent payment of the Holdco Fees.  If and only if Holdco elects in its sole discretion, payment of the Holdco Fees shall not reduce the recovery, if any, of the Holders of Allowed Other Unsecured Claims, and such Holders will be entitled to receive the same Distributions they would otherwise be entitled to receive absent payment of the Holdco Fees.

5.    **Payment of Indenture Trustee Fees**.

a.    Subject to the provisions of paragraph (b) below, the Reorganized Debtor shall pay all of the Indenture Trustee Fees in full in Cash; provided, however, so long as the Reorganized Debtor has not received any Net Recovery Proceeds, such Indenture Trustee Fees shall only be due and payable from the Debtor and/or the Reorganized Debtor, to the extent and only to the extent, that there is any Cash remaining after the payment on or about the Effective Date of the following (the total amount of said remaining Cash is hereinafter referred to as the "Indenture Trustee Fee Initial Payment"):

(i)    all Allowed Administrative Claims as of the Effective Date;

(ii)    all of the Holdco Fees; and

(iii)    $300,000 in Cash to fund the operations of the Reorganized Debtor and the New Series B Common Stock Election Trust.

For avoidance of doubt, so long as the Reorganized Debtor has not received any Net Recovery Proceeds, neither the Debtor nor the Reorganized Debtor shall have any obligation whatsoever to pay any Indenture Trustee Fees pursuant to this paragraph (a) that are in excess of the Indenture Trustee Fee Initial Payment.

b.    As a precondition to the payment by the Reorganized Debtor of the Indenture Trustee Fees incurred prior to the Effective Date, the Indenture Trustee shall submit to the Bankruptcy Court (i) its invoices for such Indenture Trustee Fees (which invoices shall be in reasonable detail but maybe redacted in order to preserve any privileges, work-products or legitimate confidentialities of the Indenture Trustee and (ii) one or more applications for payment of such Indenture Trustee Fees. The Bankruptcy Court shall review each application for payment of Indenture Trustee Fees for reasonableness, as and to the extent required under section 1129(a)(4) of the Bankruptcy Code. After the Bankruptcy Court has approved an application for payment of Indenture Trustee Fees as reasonable, the Reorganized Debtor shall, as soon as practicable thereafter (but in any event, within ten (10) calendar days after the Bankruptcy Court has entered an order so approving the payment of such Indenture Trustee Fees) pay the Indenture Trustee in Cash for such Indenture Trustee Fees.

c.    Payment of the Indenture Trustee Fees shall not reduce the recovery, if any, of the Holders of Allowed FDIC Non-Priority Claims or Allowed Other Unsecured Claims, such Holders will be entitled to receive the same distributions that they would otherwise be entitled to receive absent payment of such Indenture Trustee Fees, and the Reorganized Debtor is authorized to make future cash payments to such Holders, if necessary, in order to ensure that their recoveries are not reduced in connection with any future payment of the Indenture Trustee Fees.

d.    For any Indenture Trustee Fees that are not otherwise paid by the Indenture Trustee Fee Initial Payment for whatever reason whatsoever, as provided in paragraphs (a) and (b) above, upon receipt by the Reorganized Debtor of any Net Recovery Proceeds, the Reorganized Debtor shall promptly (but in any event within ten (10) calendar days of its receipt of any such Net Recovery Proceeds) pay using such Net Recovery Proceeds any then remaining unpaid Indenture Trustee Fees until all such remaining unpaid Indenture Trustee Fees have been paid in full in Cash (all such payments by the Reorganized Debtor to the Indenture Trustee pursuant to this paragraph (d)

are hereinafter sometimes referred to collectively as the "Indenture Trustee Fee Final Payment")(the Indenture Trustee Fee Initial Payment and the Indenture Trustee Final Payment are hereinafter sometimes referred to collectively as the "Indenture Trustee Payments").   For the avoidance of doubt, the Indenture Trustee Fee Final Payment shall be payable only from Net Recovery Proceeds.

e.        Upon its receipt of all of the Indenture Trustee Payments, the Indenture Trustee shall promptly (but in any event, within one (1) Business Day thereafter) confirm in writing to the Reorganized Debtor its receipt of the Indenture Trustee Payments (the date on which the Indenture Trustee so delivers such written confirmation to the Reorganized Debtor is hereinafter referred to as the "Charging Lien Termination Date").   Effective as of the Charging Lien Termination Date, all Charging Liens in favor of the Indenture Trustee shall immediately and automatically terminate and shall have no further force and effect.

f.        For avoidance of doubt, at all times prior to the Charging Lien Termination Date, (i) nothing contained in this Plan (including, without limitation, the provisions of paragraphs (a), (b), (c), (d) and (e) above) shall prohibit, prevent, restrict, limit or prejudice, in any way, the right of the Indenture Trustee to exercise its Charging Liens against any Distributions (whether in the form of Cash (including any Cash consisting of Net Recovery Proceeds), Common Stock or other property) to be made to the Holders of the Allowed Debenture Unsecured Claims in order to pay any unpaid Indenture Trustee Fees that may be due and owing to the Indenture Trustee; and (ii) any portion of the Indenture Trustee Fees which is not otherwise paid in full in Cash pursuant to the provisions of paragraphs (a) and (b) above shall be recoverable by the Indenture Trustee through the exercise of its Charging Liens before any Distributions are made to the Holders of the Allowed Debenture Unsecured Claims.

g.        Until the Charging Lien Termination Date, (i) the Indenture Trustee or its agent and representative shall receive and hold in its actual possession all shares of New Common Stock that are to be distributed under this Plan to the Holders of the Allowed Debenture Unsecured Claims, solely for the purpose of perfecting its Charging Liens in such shares; and (ii) the Reorganized Debtor will consciously mark its stock register to acknowledge and reflect that such shares are encumbered by the Indenture Trustee's Charging Liens and may not be sold, transferred, assigned,

pledged or otherwise conveyed to any Person, without the prior written consent of the Indenture
Trustee, which consent may be withheld by the Indenture Trustee in its sole and absolute discretion.
If, however, the Plan Proponents determine in their sole but reasonable discretion the provisions of
this paragraph (g) may result in material adverse tax consequences for the Reorganized Debtor
arising under Section 382(l)(5) of the Internal Revenue Code, the Plan Proponents and the Indenture
Trustee will determine and implement, a different solution to preserve, and maintain the perfection
and priority of, the Indenture Trustee's Charging Liens on such shares that do not result in material
adverse tax consequences to the Reorganized Debtor.  Such renegotiated resolution shall not be
considered a material or adverse modification to the Plan.

### B.    Reorganized Debtor Securities. New Series A Common Stock.

The Reorganized Debtor's equity interests shall consist of New Series A Common Stock,
and, the New Series B Common Stock.  On the Effective Date, or as soon as reasonably practicable
thereafter, the Reorganized Debtor shall issue or reserve for issuance all securities to be issued
pursuant to the terms of the Plan, without need for any further corporate or shareholder action.
Shares of the New Series B Common Stock on account of the New Series B Common Stock
Election, depending on the election of the applicable Holder of a particular General Unsecured
Claim, shall be issued Pro Rata to (a) Holders of Allowed Debenture Unsecured Claims, (b) Holders
of Allowed FDIC Non-Priority Claims, and (c) Holders of Allowed Other Unsecured Claims.

### 2.    Issuance of New Series B Common Stock (Separate Series or Classes of Common Stock).

#### a.    General Provisions.

Unless Holdco determines in its sole discretion that issuance of New Common Series B
Common Stock is unnecessary to preserve the Reorganized Debtor's tax attributes, on the Effective
Date each Holder that has made a New Series B Common Stock Election with respect to which the
Reorganized Debtor chooses to issue New Series B Common Stock shall be issued, in lieu of or in
exchange for New Series B Common Stock Election Trust Interests, New Series B Common Stock.

/ / /

/ / /

In such case, the New Series B Common Stock Election Trust Interests that would have been issued to such Holders will be issued to a wholly owned, special purpose bankruptcy remote vehicle of the Reorganized Debtor and the New Series B Common Stock Election Trust Agreement and the Reorganized Debtor's certificate of incorporation shall provide that (i) any Distributions on account of such New Series B Common Stock Election Trust Interests held by such special purpose vehicle shall be used exclusively for funding dividend, distribution, or redemption payments on the New Series B Common Stock and (ii) each holder of New Series B Common Stock shall be entitled to its Pro Rata share of Net Free Cash as if such Holder had received New Series B Common Stock Election Trust Interests in accordance with the Plan and the New Series B Common Stock Election Trust Agreement.  If New Series B Common Stock is issued to the Holders making a New Series B Common Stock Election as provided above, then (x) the certificate of incorporation, charter and bylaws of the special purpose vehicle referred to above shall be subject to the approval of Holdco and the Indenture Trustee, (y) the rights, preferences and privileges of the New Series B Common Stock contained in the certificate of incorporation, charter and bylaws of Reorganized Debtor shall be subject to the approval of Holdco and the Indenture Trustee; and (z) the certificate of incorporation of Reorganized Debtor shall provide that (I) the holder of each share of New Series B Common Stock, if any, shall be entitled to receive a dividend, distribution, redemption, or similar payment corresponding to and from Distributions that  are made from the New Series B Common Stock Election Trust representing such Holder's pro rata share of the amount of such New Series B Common Stock Election Trust Cash in accordance with the Plan and the New Series B Common Stock Election Trust Agreement, (II) the holder of each share of New Series B Common Stock shall be entitled to a liquidation preference in an aggregate amount equal to the their respective pro rata share of the fair market value of the New Series B Common Stock Election Trust Property, as of the date of the liquidation or dissolution of the Reorganized Debtor, which may be satisfied by the distribution of the New Series B Common Stock Election Trust Interests held by the special purpose vehicle created pursuant to the Plan to the holders of the New Series B Common Stock pursuant to such liquidation or dissolution and (III) Reorganized Debtor may not be merged or consolidated with any other Entity or liquidated or dissolved at any time that the New Series B Common Stock is

outstanding unless adequate provision is made to secure the right of the holders of the New Series B Common Stock to receive Distributions of Net Free Cash as provided for in the Plan. As defined in the Plan, "Net Free Cash" means the amount of the Reorganized Debtor's Free Cash available after full payment or satisfaction of, or Net Free Cash Reserves for: all Allowed Secured Claims, Allowed Administrative Claims, Allowed FDIC Priority Claims, Allowed Non-FDIC Priority Claims and Indenture Trustee Fees; and costs of administering and implementing the Plan; but not including any costs and expenses solely attributable to the business operations of the Reorganized Debtor.

Alternatively, the New Series B Common Stock Election Trust Agreement, the Reorganized Debtor's certificate of incorporation, and certificate of incorporation, charter and bylaws of the special purpose vehicle referred to above shall provide that at any time on or after the Effective Date, the New Board shall in its discretion distribute the New Series B Common Stock Election Trust Interests held by such special purpose vehicle to holders of New Series B Common Stock in the form of a dividend, distribution, redemption, or any other type of payment, after which the Reorganized Debtor shall have no further obligations to make distributions to holders of New Series B Common Stock. Moreover, at the election of Holdco, in lieu of the creating a special purpose vehicle, the Debtor may distribute New Series B Common Stock Election Trust Interests directly to holders of New Series B Common Stock on the Effective Date, which such distribution shall be in addition to, and not in lieu of the shares of New Series B Common Stock to be distributed on such date.

### 3.    Alternative Treatment.

Alternatively, to the extent the Reorganized Debtor issues the New Series B Common Stock as one or more separate series or classes of common stock on account of part of the New Series B Common Stock Election, which shall be in addition to, and not in lieu of, the other Distributions to which a Holder making the New Series B Common Stock Election is entitled to receive under the Plan), each Holder who elects to receive the New Series B Common Stock Election:

> (a)    shall be entitled on account of such New Series B Common Stock to a pro rata share (such share to be calculated based on such Holder's number of shares of such New Series B Common Stock divided by the total outstanding shares as of the Effective Date of New Series B Common Stock issued to Holders who elect to receive the New Series

B Common Stock Election) of any Net Free Cash that constitutes net proceeds of the Causes of Action, pursuant to redemption upon the terms set forth in the Reorganized Debtor's charter upon entry of a Final Order resolving the Causes of Action; and

(b)    shall also be entitled to a right of payment equal to such holder's Pro Rata share of Net Free Cash that does not constitute the proceeds of the Causes of Action.

Each share of New Series B Common Stock shall entitle the Holder of such share to exercise voting rights equal to 1/20 of the voting rights exercisable by each of Holder of New Series A Common Stock.

### G.    FDIC Priority Claims Determination.

If the Effective Date occurs prior to the entry of a n order of the Bankruptcy Court resolving the FDIC Priority Claims, the Reorganized Debtor shall not make any Cash Distributions to Holders of New Series A Common Stock or the New Series B Common Stock Election Trust, and the New Series B Common Stock Election Trustee shall not make any Cash distributions to the Holders of New Series B Common Stock Election Trust Interests until the entry of an order of the Bankruptcy Court resolving the FDIC Priority Claim.  Following the Effective Date, if (a) there is a Final Order that makes FDIC Priority Claims Allowed Claims and (b) the Plan Committee determines, in its sole discretion, that the Allowed FDIC Priority Claims exceeds the aggregate total of Estate assets available for distribution, the Plan Committee shall administer the orderly liquidation of the Reorganized Debtor's assets (and consistent with its fiduciary duties shall continue to maximize the value of such assets) and make distributions to Holders of Allowed Claims in accordance with all applicable laws and payment priorities (statutory or contractual).  Notwithstanding anything to the contrary, the Plan Committee shall only be obligated to make payments to any party in accordance with the foregoing when it has Net Free Cash available to do so.

### 1.    Dividends.

Except as otherwise provided by applicable law or in the corporate documents that will be included in the Plan Supplement, the holders of New Series A Common Stock and the New Series B Common Stock, if any, shall share ratably in all dividends and other distributions, whether in respect of liquidation or dissolution (voluntary or involuntary) or otherwise.  Without limiting the generality of the immediately preceding sentence, Holders of Allowed Claims who properly and timely make

the New Series B Common Stock Election shall not receive an amount greater than the Pro Rata

portion of Net Free Cash that such Holders would have received if all Net Free Cash was Distributed

Pro Rata to all Holders of Allowed General Unsecured Claims, and all Cash received by such

Holders, whether on account of New Series B Common Stock Election Trust Interests or New Series

B Common Stock, shall be applied in reduction of such amount.

### 2.    Other Attributes of New Series A and B Common Stock.

Shares of New Series A Common Stock and the New Series B Common Stock, if any, shall

have conversion rights, redemption rights, preemptive rights, transfer restrictions and other rights,

responsibilities and restrictions typically associated with common stock, all as set forth in the Plan

Supplement, in order to preserve and maximize the value of all tax attributes that are or will be held

by the Reorganized Debtor from and after the Effective Date.

### 3.    Redemption of Common Stock.

The New Board may elect to redeem all shares of New Common Stock held by a particular

stockholder as set forth in the Plan, so long as the New Common Stock is redeemed for Fair Market

Value Price.  For purposes of the redemption of the New Common Stock, to determine whether the

New Common Stock is redeemed for a Fair Market Value Price, the New Board shall rely on a

nationally recognized accounting or valuation firm selected by the Plan Committee to determine the

Fair Market Value Price for the New Common Stock.  Prior to making a final determination to

exercise the Reorganized Debtor's redemption right under this paragraph, the Reorganized Debtor

shall send a written notice to such stockholder (at the notice address appearing in the Reorganized

Debtor's records) advising the stockholder of the Reorganized Debtor's intention to exercise its

redemption right.  In the event that the stockholder notifies the Reorganized Debtor in writing

(within 60 days after the date of the Reorganized Debtor's notice) that such stockholder objects to

the redemption of its shares, then the Reorganized Debtor shall not exercise the redemption right.  In

the event that the stockholder does not respond to the Reorganized Debtor's notice within 60 days

the stockholder is deemed to have consented to the proposed redemption.  In the event that the

stockholder does not respond to the Reorganized Debtor's notice within 60 days after the date of the

Reorganized Debtor's notice (or the stockholder notifies the Reorganized Debtor that it approves or

does not object to such redemption), then the New Board shall be entitled to make a final

determination to exercise the redemption right.  In the event that the New Board makes such a final

determination, then the redemption shall take place on a date determined by the New Board (but

such redemption date shall be no later than 30 days after the New Board's final determination) and

shall be at a price equal to the Fair Market Value Price.  The purchase price payable in any such

redemption shall be paid in cash or by check on the closing date.  Such redemption shall be effective

on the closing date of the redemption regardless of whether or not the stockholder participates in the

closing or delivers his or its stock certificate to the Reorganized Debtor for cancellation.  No New

Common Stock shall be redeemed pursuant to this section until the conclusion of determination of

the FDIC Causes of Action.

     **H.**     **Exemption from the Registration Requirements of the Securities Act;**

          **Investment Company Act**.

     The offering, issuance, and distribution of securities pursuant to the Plan shall be exempt

from the registration requirements of section 5 of the Securities Act as one or more private

placements pursuant to any and all applicable exemptions, including, as applicable, exemptions

provided by Section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and/or Rule

506 of Regulation D under the Securities Act, based on the number of creditors receiving securities

under the Plan, the Reorganized Debtor's belief as to their status as accredited investors, and other

factors.  As a result, the securities issued under the Plan likely will be "restricted securities" for

purposes of the federal securities laws.  The Reorganized Debtor also reserves all rights to rely, if

necessary in its sole discretion, on other exemptions to the registration requirements of section 5 of

the Securities Act.

     In addition, the Reorganized Debtor expects to rely on one or more of the exemptions

contained in the Investment Company Act, which exemptions may include, without limitation,

exemptions under Sections 3(c)1 and 3(c)7.  Companies that are investment companies within the

meaning of the Investment Company Act, and that do not qualify for an exemption from the

provisions of such Act, are required to register with the Securities and Exchange Commission and

are subject to substantial regulations with respect to capital structure, operations, transactions with

affiliates and other matters. In the event such companies do not register under the Investment Company Act, they may not, among other things, conduct public offerings of their securities in the United States or engage in interstate commerce in the United States.

# INTENTIONALLY LEFT BLANK

**I.    Restructuring Transactions**. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, charter, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtor determines are necessary or appropriate.

**J.    Corporate Action**. Each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate, financing or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Equity Interests, the directors of the Debtor or any other Entity.  Without limiting the foregoing, such actions will include:  the adoption and (as applicable) filing of amended and restated certificate of incorporation, charter, bylaws and other governance documents; the appointment of officers and (as applicable) directors for the Reorganized Debtor; the issuance of the New Series A Common Stock and any security or instrument issued by the Reorganized Debtor on account of part of the New Series B Common Stock Election, and all related documents and instruments (as applicable).  The Reorganized Debtor shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

**K.    Effectuating Documents; Further Transactions**. On and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and

1   other agreements or documents and take such actions as may be necessary or appropriate to

2   effectuate, implement, and further evidence the terms and conditions of the Plan and the securities

3   issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, and the

4   Reorganized Debtor may make non-material modifications to the documents set forth in the Plan

5   Supplement, without the need for any approvals, authorizations, or consents except for those

6   expressly required pursuant to the Plan.

7        **L.**    **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section

8   1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any

9   Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the

10   issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or

11   the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage,

12   deed of trust or other security interest, or the securing of additional indebtedness by such or other

13   means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making,

14   delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in

15   connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of

16   transfer executed in connection with any transaction arising out of, contemplated by, or in any way

17   related to the Plan, shall not be subject to any document recording tax, sales tax, stamp tax,

18   conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording

19   tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other

20   similar tax or governmental assessment, and the appropriate state or local governmental officials or

21   agents shall forego the collection of any such tax or governmental assessment and to accept for filing

22   and recordation any of the foregoing instruments or other documents without the payment of any

23   such tax or governmental assessment.

24        **M.**    **Board Representation**. The New Board shall be disclosed by the Plan Proponents in

25   the Plan Supplement, which will be filed and served within 10 days after distribution of this

26   Disclosure Statement in accordance with section 1129(a)(5) of the Bankruptcy Code. Holdco will

27   select the members of the New Board.   The initial members of the New Board, other than the Plan

28   Committee, shall serve staggered terms of one and two years, as designated.  The members of the

New Board shall be up for election on a staggered three-year basis by the holders of New Series A Common Stock and (as applicable and as may be in accordance with the Reorganized Debtor's articles of incorporation) holders of New Series B Common Stock.  The New Board shall have all authority to make business decisions under applicable law with respect to all matters affecting the Reorganized Debtor, including with investment activity and the Causes of Action in accordance with the terms of the Plan.

N.    **Senior Management**. Senior management of the Reorganized Debtor shall also be selected by Holdco and disclosed by the Plan Proponent in the Plan Supplement, and the New Board will select members of the senior management as needed after the Effective Date.  The Reorganized Debtor may, but shall not be required, to enter into one or more contracts with one or more Entities to outsource or subcontract certain management functions, and the identity or identities of such Entities with whom the Reorganized Debtor may contract as of the Effective Date shall be disclosed in the Plan Supplement, and thereafter the New Board may enter into such contracts with one or more such Entities.  These members of senior management or Entities as described in this section may include, without limitation, firms or individuals currently or prospectively affiliated or employed by the Debtor and/or the Reorganized Debtor, Persons who are Insiders, or Persons who may have conflicts of interest with the Reorganized Debtor, and may include, without limitation, Holdco, its affiliates, principals, members, attorneys or other professional advisors.  To the extent permitted by the law of the state or territory in which the Reorganized Debtor is incorporated, the Reorganized Debtor's charter, by-laws or other governing documents may provide that the members of the Plan Committee shall serve as special directors solely for purposes of voting whether to approve any such contract with respect to which existing members of the New Board may have an interest.

O.    **Vesting of Assets in the Reorganized Debtor**. Except as otherwise provided in the Plan (including for avoidance of doubt, Sections 2 and 3 of Part C of Article V of the Plan) or in any agreement, instrument or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Debtor and its Estate (including, without limitation, any and all assets acquired by the Debtor after the Petition Date and any property that

may have been abandoned to the Debtor pursuant to 11 U.S.C. § 554 and Fed.R.Bankr.P. 6007) shall

vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.

Except as may be provided in the Plan or the Confirmation Order, including the New Series B

Common Stock Election Trust, on and after the Effective Date, the Reorganized Debtor may use,

acquire or dispose of its property and compromise or settle any Claims without supervision or

approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy

Rules.

**P.    Prohibition Against Pledging Assets**. The Reorganized Debtor shall be precluded

from, and the Confirmation Order shall expressly prohibit the Reorganized Debtor from, pledging

any interest in (a) the Disputed Reserve or the assets therein or (b) the New Series B Common Stock

Election Trust.  The Confirmation Order shall also provide that any such pledge in violation of this

section of the Plan is null and void.

**Q.    Deregistration**. As soon after the Effective Date as is practicable, the Reorganized

Debtor shall terminate its registration under the Securities and Exchange Act of 1934 by filing a

Form 15 "Certification and Notice of Termination of Registration Under Section 12(g) of the

Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 12 and 15(d)

of the Securities and Exchange Act of 1934" with the United States Securities and Exchange

Commission and shall otherwise comply with the statutory or regulatory requirements of a publicly

traded company, including, but not limited to, seeking to deregister the Equity Interests.

**R.    Allowance of Debenture Unsecured Claims**

The Debenture Unsecured Claims will be deemed to be Allowed Claims in the amount set

forth in the proofs of claim filed by the Indenture Trustee.

**S.    New Series B Common Stock Election Trust**

**1.    General**.

On or before the Effective Date, the New Series B Common Stock Election Trust Agreement,

in form and substance satisfactory to the Plan Proponent and substantially as set forth in the Plan

Supplement, will be executed and all other necessary steps will be taken to establish the New Series

B Common Stock Election Trust and the beneficial interests therein, which will be for the benefit of

the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, that elect the New Series B Common Stock Election.  In the event of any conflict or inconsistency between the terms of the Plan and the terms of the New Series B Common Stock Election Trust Agreement, then the terms of the New Series B Common Stock Election Trust Agreement will govern.  The New Series B Common Stock Election Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that (i) such powers, duties, and authorities do not affect the status of the New Series B Common Stock Election Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims, (ii) such powers, duties and authorities do not operate to confer standing upon the New Series B Common Stock Election Trustee to be a party to, or to participate in, the Reorganized Debtor's activities including litigation and/or settlement of Causes of Action, including the FDIC Causes of Action, and (iii) such powers, duties, and authorities are limited to the administration of distributions on account of the New Series B Common Stock Election Trust Interests.  The New Series B Common Stock Election Trust Agreement shall expressly provide that, prior to the Charging Lien Termination Date, (a) all distributions made to beneficiaries of the New Series B Common Stock Election Trust that are Holders of Allowed Debenture Unsecured Claims are subject to, and encumbered by, the Charging Liens of the Indenture Trustee, and (b) no such distributions shall be made to the beneficiaries of the New Series B Common Stock Election Trust that are Holders of Allowed Debenture Unsecured Claims.  This summary is qualified in its entirety by the terms of and is subject to the terms of the New Series B Common Stock Election Trust Agreement.

> **2.**    **Purpose of New Series B Common Stock Election Trust**.

The New Series B Common Stock Election Trust will be established for the sole purpose of liquidating New Series B Common Stock Election Trust Property and distributing the New Series B Common Stock Election Trust Cash, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to achieve, and consistent with, the liquidating purpose of the New Series B Common Stock Election Trust.

**3.      Costs and Expenses of New Series B Common Stock Election Trust**.

The costs and expenses of the New Series B Common Stock Election Trust, including the fees and expenses of the New Series B Common Stock Election Trustee and its retained professionals, will be paid out of the New Series B Common Stock Election Trust Property, and the Reorganized Debtor will not be responsible for any fees, expenses or costs of the New Series B Common Stock Election Trust.

**4.      New Series B Common Stock Election Trust Property**.

Subject to and in accordance with the Plan and the New Series B Common Stock Election Trust Agreement, on the Effective Date or as soon as reasonably practical thereafter, the Debtor will assign and transfer to the New Series B Common Stock Election Trust all of its rights, title and interests in and to the portion of the following assets to which Holders making the New Series B Common Stock Election are entitled under the Plan (collectively, the "New Series B Stock Election Trust Property"):

       (x)    the interest in the Trust Refund Assets as provided below;

       (y)    the portion of Net Free Cash existing as of the Effective Date (which, for the avoidance of doubt, shall be net of any Net Free Cash Reserves) allocable to the Holders that elected the New Series B Common Stock Election; and

       (z)    an undivided beneficial interest in and to the other New Series B Common Stock Election Trust Cash existing as of the Effective Date (including the Net Free Cash Reserves, which for clarification purposes may be fully overseen, spent, reduced and otherwise controlled, in the sole and absolute discretion of the Plan Committee, by the Reorganized Debtor as provided in the Plan).

Notwithstanding the foregoing, the New Series B Common Stock Election Trustee shall not be entitled to receive Cash, which, in the aggregate (when added to all Cash received previously), exceeds what it otherwise would have been entitled to receive in the aggregate had all aggregate Cash proceeds generated from New Series B Common Stock Election Trust Property been received by the Debtor by such date and then subsequently conveyed to the New Series B Common Stock Election Trust pursuant to the "Turnover Obligation" as defined below ("Cash Limitation Provision).

In the event that Reorganized Debtor receives on account or in respect of any New Series B Common Stock Election Trust Property any distribution or payment of Net Free Cash (after taking into account Net Free Cash Reserves and full payment or satisfaction of all Allowed Secured Claims, Allowed Administrative Claims, Allowed FDIC Priority Claims, and Allowed Non-FDIC Priority Claims; and costs of administering and implementing the Plan; but not including any costs and expenses solely attributable to the business operations of the Reorganized Debtor) the Reorganized Debtor shall segregate and hold in trust (as property of the New Series B Common Stock Election Trustee on behalf of the beneficiaries of the trust) for the benefit of, and immediately upon receipt thereof, shall pay over or deliver to, the New Series B Common Stock Election Trustee such distribution or payment for application in accordance with the terms of the Plan (the "Turnover Obligation").  Such transfers will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax and, except as otherwise may be set forth specifically herein, will be free and clear of any liens, claims and encumbrances and no other entity (other than the New Series B Common Stock Election Trustee and General Unsecured Creditors receiving rights under the Plan), including the Debtor or the Reorganized Debtor, will have any interest, legal, beneficial, or otherwise, in the New Series B Common Stock Election Trust or the New Series B Common Stock Election Trust Property upon their assignment and transfer to the New Series B Common Stock Election Trust (other than as provided herein or in the New Series B Common Stock Election Trust Agreement).  Upon delivery of the New Series B Common Stock Election Trust Property to the New Series B Common Stock Election Trust, the Reorganized Debtor will be deemed released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims with respect to the New Series B Common Stock Election Trust Property, and will have no further obligations to the New Series B Common Stock Election Trust or the New Series B Common Stock Election Trustee except the Turnover Obligation referred to above and the Net Free Cash Reserve Obligation referred below.

### 5. Conveyance of Trust Tax Refund Assets.

The tax refunds that are the subject of the FDIC Causes of Action are held in the Tax

Refund Escrow Account pending determination of the FDIC Causes of Action, and are subject to the *Stipulation to Establish Escrow Account Relating to Income Tax Refunds* [Docket No. 143] (the "Escrow Account Stipulation") and the *Order Approving Stipulation to Establish Escrow Account Relation to Income Tax Refunds* [Docket No. 150] (the "Escrow Account Order").  The Reorganized Debtor shall be deemed a party to the Escrow Account Stipulation, the Escrow Account Order, and the Tax Refund Escrow Account, and the parties to such documents shall execute any further documents as may be necessary to ensure that the Reorganized Debtor shall succeed to the Debtor and be bound by the provisions thereunder.

Subject to the Cash Limitation Provision (as defined above), promptly after the Charging Lien Termination Date the Reorganized Debtor will convey, transfer and assign, without recourse or warranty, to the New Series B Common Stock Election Trustee, for the benefit of the Holders making the New Series B Common Stock Election, all of Debtor's right, title and interest in the Cash in the Tax Refund Escrow Account ultimately determined to be distributable to the Reorganized Debtor ("Determined Tax Refund Assets"), equal to the portion of Net Free Cash that all of the Holders who make the New Series B Common Stock Election are entitled under the terms of this Plan solely on account of Determined Tax Refund Assets in accordance with the New Series B Common Stock Election Trust Agreement (the "Trust Tax Refund Assets"). In addition, the New Series B Common Stock Election Trustee, for the benefit of the Holders electing the New Series B Common Stock Election, shall be entitled to an additional amount payable out of Reorganized Debtor's interest in the Tax Refund Escrow Account (after the transfer referred to above) equal to the portion of Net Free Cash Reserves that all of the Holders who make the New Series B Common Stock Election are entitled under the terms of this Plan attributable to the FDIC Causes of Action (and such allocation determined in the discretion of the Plan Committee)  ("Reserve Escrow Payment") remaining upon the conclusion of the FDIC Causes of Action (the "Net Free Cash Reserve Obligation") but such amount shall only be payable solely to the extent that the New Series B Common Stock Election Trustee has not at such time received Cash from the Reorganized Debtor on account of its undivided beneficial interest in Net Free Cash Reserves attributable to the FDIC Causes of Action ("Unpaid Reserve Interest"); and further, to the extent that such Reserve Escrow

1    Payment is made, it shall be deemed to be made on account of the New Series B Common Stock

2    Election Trustee's undivided beneficial interest in Net Free Cash Reserves attributable to the FDIC

3    Causes of Action and the Reorganized Debtor shall no longer have Turnover Obligations with

4    respect to such asset.

5          **6.**      **Appointment of a New Series B Common Stock Election Trustee**.

6          Prior to the Effective Date, the Plan Proponent will identify the New Series B Common

7    Stock Election Trustee.  The salient terms of the New Series B Common Stock Election Trustee's

8    employment, including the New Series B Common Stock Election Trustee's duties and

9    compensation, will be set forth in the New Series B Common Stock Election Trust Agreement.  The

10   New Series B Common Stock Election Trust Agreement will specify the procedures for replacing

11   the New Series B Common Stock Election Trustee.

12         **7.**      **Transferability and Form of New Series B Common Stock Election Trust**

13               **Interests**.

14         The New Series B Common Stock Election Trust Interests shall not be transferable, unless

15   otherwise provided for in the New Series B Common Stock Election Trust Agreement.  To the

16   extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then

17   such securities shall be exempt from the requirements of applicable non-bankruptcy law to the

18   maximum extent permitted by 11 U.S.C. §1145.  The New Series B Common Stock Election Trust

19   Interests shall not be certificated.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**8.    Federal Income Tax Treatment of New Series B Common Stock Election Trust.**

For all federal income tax purposes, all parties (including, without limitation, the Debtor, Reorganized Debtor, the New Series B Common Stock Election Trustee, and the holders of Allowed General Unsecured Claims) will treat the transfer of the New Series B Common Stock Election Trust Property to the New Series B Common Stock Election Trust, including any amounts or other assets subsequently transferred to the New Series B Common Stock Election Trust (but only at such time as actually transferred) for the benefit of the holders of Claims entitled to receive New Series B Common Stock Election Trust Interests, whether Allowed on or after the Effective Date, as (A) a transfer of the New Series B Common Stock Election Trust Property directly to the holders of such Allowed Claims, followed by (B) the transfer by such Persons to the New Series B Common Stock Election Trust of such New Series B Common Stock Election Trust Property in exchange for beneficial interests in the New Series B Common Stock Election Trust.  Accordingly, the holders of such Allowed Claims will be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable New Series B Common Stock Election Trust Property.

**9.    New Series B Common Stock Election Trust a "Liquidating Trust".**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the New Series B Common Stock Election Trustee of a private letter ruling if the New Series B Common Stock Election Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the New Series B Common Stock Election Trustee), all parties will treat the New Series B Common Stock Election Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed Claims described above, whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the New Series B Common Stock Election Trust is required for federal income tax purposes, the New Series B Common Stock Election Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the New Series B Common Stock Election Trust, and (if applicable) anyone who subsequently becomes a holder, of such alternative treatment.

The New Series B Common Stock Election Trustee will file returns for the New Series B Common Stock Election Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The New Series B Common Stock Election Trustee also may send annually to each record holder of a beneficial interest in the New Series B Common Stock Election Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The New Series B Common Stock Election Trustee will also file (or cause to be filed) any other statements, returns, or disclosures relating to the New Series B Common Stock Election Trust that are required by any governmental unit. Except as may otherwise be provided, the New Series B Common Stock Election Trust's taxable income, gain, loss, deduction or credit will be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the New Series B Common Stock Election Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the New Series B Common Stock Election Trust Agreement, up to the tax book value of the New Series B Common Stock Election Trust Property treated as contributed by the holders of Allowed Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the New Series B Common Stock Election Trust. Similarly, taxable loss of the New Series B Common Stock Election Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

### T.    Holdco Cash Out Election.

#### 1.    How Made.

Each Holder of an Allowed Class 4, 5 and 6 Claim shall be entitled to make the Holdco Cash Out Election by checking the appropriate box on the Ballot provided to each such Holder. Further documentation governing the Holdco Cash Out Election may be included in the Plan Supplement.

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

**2.    When Payment Made**.

Holdco shall make payment to each Holder properly and timely making the Holdco Cash Out Election on the later of the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

**3.    Effect of Payment**.

For all purposes of the Plan, Holdco or its designee shall be deemed to be the Holder of all Claims for which payment is made pursuant to the Holdco Cash Out Election as of the Effective Date, and any and all Distributions (of New Common Stock or otherwise) the original Holder of such Claim received prior to receipt of payment by Holdco, if any, shall be deemed transferred, assigned and conveyed to Holdco *nunc pro tunc* as of the Effective Date, and Holdco shall have and enjoy such rights, benefits and privileges accorded to Holders of Allowed Class 4, 5 and 6 Claims, as applicable, as if Holdco had been the Holder of such Claims as of and on the Effective Date.

**4.    Holdco to Elect to Proceed with Holdco Cash Out Election**.

Notwithstanding anything in the Plan or any other document, no Holder shall have the right to receive the benefits of the Holdco Cash Out Election unless, within 10 days prior to the Effective Date, Holdco has filed with the Bankruptcy Court a notice in its sole and absolute discretion indicating that it intends to proceed with the Holdco Cash Out Election.  Absent the timely filing of such notice by Holdco in its sole and absolute discretion, the Holdco Cash Out Election shall be deemed null, void and of no effect, and Holders shall have no rights related to the Holdco Cash Out Election notwithstanding such Holder's checking of the appropriate box on the Ballot electing the Holdco Cash Out Election, and in such event such Holder shall receive New Series A Common Stock as if such Holder had not made the Holdco Cash Out Election.

**U.    Provisions Governing Distributions**.

**1.    Initial Distribution Date**.

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

///

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

**2.**    **Disputed Reserve**.

**a.**    **Establishment of Disputed Reserve**

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Reserve for Disputed Claims, which Disputed Reserve shall be administered by the Reorganized Debtor, provided, however, to the extent an Administrative Claim is disputed, Cash reserved for such Administrative Claim shall be maintained in the Net Cash Free Reserve established for Administrative Claims until such dispute is resolved either consensually or by Bankruptcy Court order.  The Reorganized Debtor shall reserve in the Disputed Reserve a number of shares of New Series A Common Stock, an amount of Cash, or any other security or equity interest issued under the Plan, depending on the election of the Holder of such Disputed Claims and whether the Debtor elects to issue a security on account of part of the New Series B Common Stock Election, sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).**Maintenance of Disputed Reserve**.

The Reorganized Debtor shall hold unissued New Series A Common Stock and Cash in the Disputed Reserve in trust, segregated from and not to be commingled with any other assets of the Reorganized Debtor, for the benefit of the Holders of Claims ultimately determined to be Allowed. The Reorganized Debtor shall, in its sole discretion, distribute such amounts (net of any expenses, including taxes, relating thereto), as provided herein, as such Disputed Claims are resolved by a Final Order, and such New Series A Common Stock and Cash (or other security) will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

///

The tax refunds that are the subject of the FDIC Causes of Action shall be held in the Tax Refund Escrow Account pending determination of the FDIC Causes of Action, and shall not be disbursed or released from the Tax Refund Escrow Account except upon further order of the Bankruptcy Court.

3.    **Quarterly Distributions**.

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Reserve and distributed on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date. Distributions from the New Series B Common Stock Trust Account shall be supervised by the Plan Committee. For avoidance of doubt, this does not apply to payment of Allowed Administrative Claims and Allowed Priority Tax Claims, which shall be paid in accordance with sections A.1 and A.2 of Article III of the Plan.

.

Except as otherwise provided in a Final Order of the Bankruptcy Court or as otherwise stipulated by the Plan Proponents or Reorganized Debtor, as applicable, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Reorganized Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Reorganized Debtor shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that are known to the Reorganized Debtor as applicable, as of the Distribution Record Date.

///

.

Except with respect to property not distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of such one-year period, the Claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim. Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

////

Please see the Plan and Plan Supplement for further mechanical details regarding the Plan.

### 4. No Distribution in Excess of Allowed Amount of Claim.

No Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### 5. Setoff and Recoupment.

The Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

### 6. No Distribution to General Unsecured Creditors.

No Net Free Cash may be distributed to Holders of General Unsecured Claims until any FDIC Priority Claim is paid in full.

////

1    In connection with making Distributions under the Plan, to the extent applicable, the

2    Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it

3    by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such

4    withholding and reporting requirements.  Notwithstanding the above, each Holder that is to receive a

5    Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and

6    payment of any taxes imposed on such Holder by a governmental unit, including income,

7    withholding and other tax obligations, on account of such Distribution.  The Reorganized Debtor

9    may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such

10   Holder provides the necessary information to comply with any withholding requirements of any

11   governmental unit.  Any property so withheld will then be paid by the Reorganized Debtor to the

12   appropriate authority, including, without limitation, a signed and completed Internal Revenue

13   Service Form W-8 or W-9, as applicable.  If the Holder of an Allowed Claim fails to provide the

14   information necessary to comply with any withholding requirements of any governmental unit

15   within 90 days from the Reorganized Debtor's request for such information, then such Holder's

16   Distribution shall be treated as an undeliverable Distribution and such Holder's Claims shall not be

17   Allowed Disputed Claims

18   ///

19   The Plan contains detailed provisions regarding the treatment of and method of resolving

20   Disputed Claims.  Parties in interest are respectfully invited to review the Plan for further details.

21   **W.    Treatment of Executory Contracts and Unexpired Leases**.

22   **1.    Rejection of Executory Contracts and Unexpired Leases**.

23   All executory contracts or unexpired leases of the Debtor, except (a) those previously

24   assumed and assigned by Final Order and (b) those which are assumed under the Plan, are rejected.

25   The Plan Proponents shall file a schedule of executory contracts to be assumed, if any, in the Plan

26   Supplement.

27   ///

28   **2.    Procedural Issues**.

The Plan shall constitute a motion to reject any executory contracts and unexpired leases not identified in the Plan Supplement as executory contracts or unexpired leases to be assumed, and the Debtor and Reorganized Debtor shall have no further liability thereunder.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, its Estate and all parties in interest in the Case.

3.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article IV. A. of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article IV.A.  for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan.

4.     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

a.     **Cure of Defaults**.

Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by a waiver of Cure agreed upon between the Plan Proponent and applicable non-debtor counterparty.  Except with respect to executory contracts or unexpired leases in which the Plan Proponent and the applicable non-debtor counterparties have stipulated in writing to payment of a Cure, all requests for payment of a Cure must be Filed on or before the Cure Bar Date.  Any request

for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred

from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any

objection by the Reorganized Debtor or further notice to or action, order, or approval of the

Bankruptcy Court, and any such Claim for Cure shall be deemed fully satisfied, released, and

discharged, notwithstanding anything included in the Schedules or in any proof of Claim to the

contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any

Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.

The Reorganized Debtor also may settle any Cure without further notice to or action, order, or

approval of the Bankruptcy Court.

### b.    Objections to Cure.

If the Plan Proponents or Reorganized Debtor, as applicable, object to any request for Cure

or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount

of such Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the

Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within

the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption,

then such Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving

such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon

by the Reorganized Debtor and the counterparty to the executory contract or unexpired lease.  Any

counterparty to an executory contract or unexpired lease that fails to object timely to the proposed

assumption of any executory contract or unexpired lease will be deemed to have consented to such

assumption.  The Plan Proponents and Reorganized Debtor, as applicable, reserve the right, either to

reject or nullify the assumption of any executory contract or unexpired lease no later than thirty (30)

days after a Final Order determining the Cure or any request for adequate assurance of future

performance required to assume such executory contract or unexpired lease.

### c.    Release and Satisfaction of Debtor upon Assumption.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise

and after satisfaction of any Cure, shall result in the full release and satisfaction of any Claims or

defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change

in control or ownership interest composition or other bankruptcy-related defaults, arising under any

assumed executory contract or unexpired lease at any time prior to the effective date of assumption.

### 5.    Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor

anything contained in the Plan, shall constitute an admission by the Plan Proponents that any such

contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor

has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was

executory or unexpired at the time of assumption or rejection, the Plan Proponents or Reorganized

Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such

dispute to alter their treatment of such contract or lease.

### 6.    Indemnification Obligations

Notwithstanding anything in the Plan to the contrary, except with respect to any D&O that

waives its releases form the Debtor, whether expressly or impliedly, as of the Effective Date, any

and all proofs of claim against the Debtor by the D&Os regarding any purported Indemnification

Obligations shall be deemed withdrawn without prejudice, and the D&Os shall be deemed to have

released the Debtor and the Reorganized Debtor from any purported Indemnification Obligations;

provided, however, that solely to the extent necessary to ensure that the D & Os Insurance Coverage

for all D & Os is fully preserved, the D&Os shall be permitted to file proofs of claim against the

Debtor or Reorganized Debtor (notwithstanding any applicable bar dates) regarding purported

Indemnification Obligations and the release of such Indemnification Obligations by the D&O shall

then be deemed null and void; provided further, however, that nothing herein shall prevent or

prohibit the Debtor or Reorganized Debtor from objecting to or otherwise contesting the validity of

or the amounts claimed under any purported Indemnification Obligations. Nothing in the foregoing

paragraph is intended to give any D&O the right to assert an Indemnification Obligation if such

D&O did not already possess such right, including claims for Indemnification Obligations that were

time-barred prior to the Effective Date, except to the extent the only reasons such claims are time-

barred is due to the failure of a D&O to file a claim by an applicable deadline in the Case.

### 7.    Insurance Policies

Each insurance policy owned by the Debtor that provides D&O Insurance Coverage shall be assumed by the Reorganized Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order; provided, however, that any such assumption by the Debtor and the Reorganized Debtor shall not result in the Debtor or the Reorganized Debtor being required to make any cash disbursements on account of such insurance policy.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtor's insurers, if any, in any respect or the rights of the Debtors or any other party against the Debtor's insurers or in respect of any insurance of the Debtors or in connection with the provision of any insurance with respect to any claim or cause of action asserted against any of the D & Os.  The rights of the Debtor's and the Debtor's insurers vis-à-vis one another shall be determined under their respective insurance policies and any related agreements with the Debtor, if any, subject to the rights of the Debtor to assume any such policy or agreement in accordance with this provision.

### X.    Conditions Precedent to Confirmation and the Effective Date.

#### 1.    Conditions to Confirmation.

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have Entered the Confirmation Order in form and substance acceptable to the Plan Proponent.

#### 2.    Conditions to the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

> (i)     the Confirmation Order shall be a Final Order;

> (ii)    all other actions and all agreements, instruments or other documents

necessary to implement the terms and provisions of the Plan shall have

been effected, and in each case, shall have been duly and validly

executed and delivered by the parties thereto and all conditions to their

effectiveness shall have been satisfied or waived in accordance

therewith;

(iii)    the Plan Proponents shall have received all authorizations, consents,

rulings, opinions, or other documents that are determined by the Plan

Proponents,  to be necessary to implement the Plan and that are

required by law, regulation, or order, and

(iv)    Holdco shall not have exercised the Effective Date Deferral Election.

The conditions set forth in Article IX, Sections A and B of the Plan may be waived, in whole

or in part, by the Plan Proponents, without any notice to any other parties in interest or the

Bankruptcy Court and without a hearing.  The failure of the Plan Proponents to exercise any of the

foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be

deemed an ongoing right, which may be asserted at any time.

If the Effective Date does not occur, the Plan shall be null and void in all respects and

nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of

any claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor,

any holder of a Claim or Interest, or any other Person; or (iii) constitute an admission,

acknowledgement, offer, or undertaking by the Debtor, any Creditors, or holders of Interests, or any

other Person in any respect.

**Y.    Discharge, Release, Injunction and Related Provisions.**

**1.    Satisfaction of Claims.**

Except to the extent otherwise provided in the Plan, the treatment of all Claims or Interests in

the Debtor under the Plan shall be in exchange for and in complete satisfaction and release of, all

Claims or Interests in the Debtor of any nature whatsoever, known or unknown, including any

interest accrued or expenses incurred thereon from and after the Petition Date, or against the Estate.

Except as otherwise provided in the Plan, upon the Effective Date, all Claims and Interests in the Debtor and the Estate shall be satisfied and released in full in exchange for the consideration provided under the Plan.  Except as otherwise provided in the Plan, all Persons shall be precluded and enjoined from asserting against the Debtor, the Estate or the Reorganized Debtor any Claims or Interests or other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

### 2.    Discharge of Claims and Termination of Interests.

Except as otherwise specifically provided in the Plan or in the Confirmation Order, pursuant to section 1141(d) of the Code, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of all Claims, including any interest or penalties accrued on such Claims from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against and Interests in the Debtor, or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights and Interests, including but not limited to, Claims and Interests that arose before the Confirmation Date, including all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of Claim or interest based upon such Claim, debt, right or Interest is Filed or deemed Filed under section 501 of the Code; (b) a Claim or Interest based upon such Claim, debt, right or Interest is allowed under section 502 of the Code, or (c) the Holder of such a Claim, debt, right, or Interest accepted the Plan.  The Confirmation Order shall constitute a determination of the discharge of all of the Claims against and Interests in the Debtor, subject to the occurrence of the Effective Date.

### 3.    Compromise and Settlement.

Pursuant to section 363 of the Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Interests on the terms set forth in the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise

or settlement of all Claims and Interests, as well as a finding by the Bankruptcy Court that such

compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the

Estate and Holders of Claims and Equity Interests.  Entry of the Confirmation Order also shall

constitute the Bankruptcy Court's approval of the releases set forth in the Plan pursuant to

Bankruptcy Rule 9019 and its finding that the releases are: (i) in exchange for good and valuable

consideration ; (ii) a good faith settlement and compromise of the Claims released by releases set

forth in the Plan; (iii) in the best interests of the Debtor and all Holders of Claims; (iv) fair, equitable

and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to

any of the Debtor or the Reorganized Debtor (or anyone claiming through or derivatively on behalf

of the Debtor or Reorganized Debtor), or the Holders of Claims against the Debtor asserting any

Claim released by the Releasing Parties set forth in the Plan against any of the Releasees or the

D&Os.

        **4.**      **Releases**.

           **a.**      **Releases by the Debtor, the Debtor's Estate and the Reorganized Debtor**

Notwithstanding anything contained herein to the contrary, pursuant to section 1123(b) of the

Bankruptcy Code, on the Confirmation Date and effective as of the Confirmation Date, for good,

valuable and adequate consideration, including: (1) the settlement, release, and compromise of debt

and all other good and valuable consideration paid pursuant hereto; and (2) the services of the D &

Os and advisors in facilitating the expedient implementation of the restructuring transactions

contemplated hereby, the Debtor, the Reorganized Debtor and the Debtor's Estate (including all

parties claiming derivatively or through the Debtor or the Reorganized Debtor or the Estate) or their

affiliates (excluding the D&Os, subject to the terms of the Plan) discharge and release and shall be

deemed to have provided a full discharge and release to each of the Released Parties and their

respective property (the "Debtor Release") from any and all claims, obligations, debts, rights, suits,

damages, remedies, rights of setoff, causes of action, and liabilities whatsoever (including any

derivative claims asserted on behalf of the Debtor) whether known or unknown, matured or

unmatured, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing

as of the effective date in law, equity or otherwise, whether for tort, contract violations of federal or

state securities laws or otherwise, arising from or related in any way to the Debtor, the Case, the

issuance of any security of the Debtor, the subject matter of, or the transactions or events giving rise

to, any claim or interest that is treated in the Plan, the business or contractual arrangements between

the Debtor, any Released Parties, the restructuring of Claims and Interests prior to or in the case, the

negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement,

or related agreements, instruments, or other documents, upon any other act or omission, transaction,

agreement, event, or other occurrence taking place on or before the Effective Date, including those

that the Debtor would have been legally entitled to assert in its own right or that any Holder of a

Claim or an Interest or other Entity would have been legally entitled to assert on behalf of the Debtor

or its Estate; provided, however, that the foregoing Debtor Release shall not operate to waive or

release any claims or liabilities of the Debtor: (1) arising under any contractual obligation owed to

the Debtor that are preserved by the Plan, the Plan Supplement, or related documents; (2) expressly

set forth in and preserved by the Plan, the Plan Supplement, or related documents; or (3) against the

Bank or the FDIC (in any capacity, whether in its corporate capacity or as receiver of the Bank);

further provided, however, that notwithstanding the foregoing proviso (including clause (1)

contained therein) to the contrary, the foregoing Debtor Release is, and shall operate as, a release of,

among other things, any and all claims or liabilities of the Debtor arising under the Senior Debt

Documents.

  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant

to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related

provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's

finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided

by the Releasing Parties; (2) a good faith settlement and compromise of the claims released by the

Debtor Release; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4)

fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and

(6) a bar to any of the Debtor or the Reorganized Debtor asserting any claim or cause of action

released pursuant to the Debtor Release.

### b.    Releases of Third Parties By Others

Unless otherwise expressly provided in the Plan, on the Confirmation Date and effective as

of the Confirmation Date, the Releasing Parties shall be deemed to provide a full release to the

Releasees and their respective property from any and all Causes of Action, whether known or

unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, and all

direct claims, based in whole or in part upon any act or omission, transaction, or other occurrence or

circumstances existing or taking place prior to or on the Effective Date arising from or related in any

way to the Debtor, including those in any way related to the Case or the Plan; provided, however,

that the foregoing provisions shall have no effect on the liability of any Releasee that results from

any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross

negligence or intentional or willful misconduct or fraud; provided, further, however, that other than

as set forth in the Plan, nothing in the Plan or the Confirmation Order shall affect, release, enjoin or

impact in any way the prosecution of any claims by the FDIC against any non-Debtor, including the

Releasees; provided further, however, that the foregoing third-party release shall not operate to

release claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of

any Releasing Party: (1) against a releasing party or a party releasing under this third-party release

arising from any contractual obligations owed to the Releasing Party if (a) expressly set forth in and

preserved by the Plan, the Plan Supplement, or related documents or (b) such release would

negatively impair any insurance covering any act or omission of any of the D&Os (and solely to the

extent that such release would negatively impair any insurance covering any act or omission by any

of the D&Os; or (2) against the Bank or the FDIC (in any capacity, whether in its corporate capactiy

or as receiver of the Bank).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant

to Bankruptcy Rule 9019, of the third-party release described herein, which includes by reference

each of the related provisions contained herein, and further, shall constitute the Bankruptcy Court's

82

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

finding that the third-party release is (1) in exchange for the good and valuable consideration

provided by the Releasing Parties; (2) good-faith settlement and compromise of the claims released

by the third-party release; (3) in the best interests of the Debtor and all Holders of Claims and

Interest; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for

hearing; and (6) a bar to any Releasing Parties asserting any claim or cause of action released

pursuant to such third-party release.

### c.    Waiver of Statutory Limitations on Releases.

Each of the Releasing Parties in each of the releases contained in the Plan expressly

acknowledges that although ordinarily a general release may not extend to claims which the

Releasing Party does not know or suspect to exist in his favor, which if known by it may have

materially affected its settlement with the party released, they have carefully considered and taken

into account in determining to enter into the above releases the possible existence of such unknown

losses or claims. without limiting the generality of the foregoing, each Releasing Party, pursuant to

the Plan, expressly waives any and all rights conferred upon it by any statute or rule of law which

provides that a release does not extend to claims which the claimant does not know or suspect to

exist in its favor at the time of executing the release, which if known by it may have materially

affected its settlement with the released party, including, without limitation, California Civil Code

Section 1542, which provides:

> **A general release does not extend to claims which the creditor does not**
>
> **know or suspect to exist in his or her favor at the time of executing the**
>
> **release, which if known by him or her must have materially affected his or**
>
> **her settlement with the debtor.**

The releases contained in the Plan are effective regardless of whether those released matters

are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### d.    Exculpation.

Under the Plan, the Exculpated Parties shall neither have, nor incur any liability to any entity

for any act taken or omitted to be taken in connection with, or related to formulating, negotiating,

preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement, the restructuring transactions, the issuance and/or distribution of any security under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Plan or the restructuring of the Debtor (collectively, "Exculpated Claims"); provided, that the foregoing provisions of this exculpation shall have no effect on any post-effective date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; *provided, further*, that each exculpated party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided further*, that the foregoing "exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

**e.    Releases of the D&Os; D&Os Insurance Coverage.**

For the avoidance of doubt, the provisions in the Plan shall not prevent any of the D&Os or any insurance carrier or other insurer providing D&O Insurance Coverage from bringing a claim against the Debtor or Reorganized Debtor, as applicable, to the extent that (i) such claim is necessary to preserve coverage under any directors' and officers' liability insurance provided to such D&O (such coverage, "D&O Insurance Coverage"), (ii) such claim is a direct result of litigation or claims initiated or prosecuted  by the Debtor, the Reorganized Debtor or Holdco against any entity other than FDIC, (iii) such claim constitutes costs of representation or defense as a witness in any litigation or claim by or against the Debtor or the Reorganized Debtor; or (iv) any of the  D&Os determines to waive the release provided by the Debtor to such person (the "Waiving D&O"), in which case the waiving D&O, and only the Waiving D&O, shall be entitled to bring claims against the Debtor notwithstanding any of the foregoing.

Nothing herein shall constitute an admission by the Debtor or the Reorganized Debtor as to the validity, priority, or amount of any such claims, and the Debtor and the Reorganized Debtor

1    reserve all rights to object to or otherwise dispute the validity, priority, or amount of any such

2    claims.  In addition, nothing contained in the Plan shall constitute a release of any claims, rights, or

3    defenses by an insurance carrier or other insurer providing D&O Insurance Coverage against any of

4    the D&Os, or by the D&Os against any such carrier or insurer.

5         Further, to the extent that any D&O (or any insurance carrier or other insurer providing D&O

6    Insurance Coverage, as the case may be) brings any claims or commences any litigation against the

7    Debtor or the Reorganized Debtor on account of pre-Effective Date acts, omissions, or anything

9    related to pre-Effective Date issues other than pursuant to (i), (ii), or (iii) in the preceding paragraph,

10   the Debtor or the Reorganized Debtor shall be entitled to assert any and all claims it holds against

11   such D&O (or the insurance carrier or other insurer providing D&O Insurance Coverage) that

12   brought such claims or commenced such litigation, and such action on the part of the D&O (or the

13   insurance carrier or other insurer providing D&O Insurance Coverage) shall operate to nullify and

14   avoid any and all releases, exculpation, or injunctions in the Plan that may otherwise prohibit the

15   Debtor or Reorganized Debtor from bringing such claims against such D&O (or the insurance carrier

16   or other insurer providing D&O Insurance Coverage).  Moreover, in the event that the Debtor or the

17   Reorganized Debtor is entitled to bring such claims, they shall vest exclusively in a trust established

18   for the purpose of holding and bringing such claims (the D&O Litigation Trust), which trust shall be

19   deemed to have been created *nunc pro tunc* to the Effective Date.

20        Consistent with the foregoing, the Plan Proponents and the D&Os shall cooperate to ensure

21   that the releases provided by the D&Os pursuant to the Plan do not adversely impact any D&O

22   Insurance Coverage or access to proceeds of any D&O insurance for any of the D&Os, and shall

23   take such steps as are necessary and reasonably practicable and not unduly burdensome to the

24   Reorganized Debtor to ensure that the D&O Insurance Coverage for all D & Os is fully preserved.

25        In the event any of the releases, exculpation, or injunction provisions in the Plan with respect

26   to the D & Os are not in full force and effect on and after the Effective Date, any surviving claims or

27   causes of action held by the Debtor or the Estate (or any Entity claiming by or derivatively through

28   the Debtor or the Estate) (the "Surviving D&Os Claims") shall vest exclusively in the D&O

Litigation Trust; provided, however, that, subject to the terms of the Plan, immediately following the Effective Date, D&O Litigation Trust shall release any Surviving D&Os Claims.

### f.    Good Faith Solicitation.

Upon entry of the Confirmation Order, pursuant to section 1125(e) of the Code, the Debtor and Holdco, and their respective present and former members, officers, and directors (including the D & Os), employees, agents, advisors, representatives, successors or assigns, and any Professionals (acting in such capacity) employed by any of the foregoing Persons will be deemed to have solicited votes on the Plan in good faith and in compliance with the Code and any applicable non-bankruptcy law, and, therefore, shall have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

The Plan is deemed to be a motion under sections 105, 363, and 1123 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for approval of the releases described in the Plan. The confirmation of the Plan shall constitute approval of such motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

As indicated above, pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules, the Plan incorporates the proposed Substantive Consolidation Settlement. In order to approve a compromise or settlement, a court must find that the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997). In the context of evaluating a settlement, the court may approve a settlement so long as the settlement does not "fall below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). In considering a settlement, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct an extended full independent investigation. *In re Drexel Burnham*, 134 B.R. at 496.

1   Courts in this Circuit consider the following factors when determining whether to approve a

2   settlement under Rule 9019: (a) the probability of success in the litigation; (b) the difficulties, if any,

3   to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the

4   expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of the

5   creditors and a proper deference to their reasonable views in the premises." *In re A & C Properties*,

6   784 F.2d 1377 (9th Cir. Cal. 1986).

7   The decision to approve a settlement lies within the sound discretion of the bankruptcy court.

9   *Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).  The court may give weight to the

10   informed judgment of the debtor that a compromise is fair and equitable.  *In re Purofied Down*

11   *Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).  Additionally, a court may exercise its discretion

12   "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217

13   B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

14   The Debtor believes that the proposed releases are in the best interests of the Debtor's Estate

15   because the claims released by the Estate against the D & Os are hypothetical at best.  For example,

16   pursuant to the Notice of Abandonment, the Debtor no longer holds any pre-petition claims against

17   the D & Os.  As stated in the Notice of Abandonment, the Debtor concluded that the claims are of

18   inconsequential value to the Estate based upon the Debtor's counsel's review of the Debtor's

19   corporate documents, records, and information, as well as publicly available information, including

20   SEC filings, and that pursuing claims would be burdensome to the Estate.

21   In addition, even if claims could be successfully pursued, the Debtor believes that there

22   would be little possibility of recovery.  The Debtor's directors' and officers' liability insurance

23   policies include "insured v. insured" exceptions that, under Ninth Circuit law, likely would preclude

24   the Debtor from obtaining proceeds based on any claims against the directors and officers.  *Biltmore*

25   *Assoc. LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663 (9th Cir. 2009) (holding that Insured v. insured

26   coverage exclusion in directors a directors and officers insurance policy applies to claims by debtors

27   in possession).

28   Further, the Debtor believes that it would face competition for recovery from the limited

87

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

insurance and personal resources of the directors and officers.  This is because the FDIC, acting as receiver for the Bank, has asserted that the directors and officers may have liability to the Bank, and notified the carriers of the directors' and officers' insurance policies of a demand in the magnitude of tens of millions in excess of any potentially available insurance coverage.

In addition, the Debtor believes that no post-petition claims exist against the D & Os who served during the Case because all actions outside the ordinary course of business were subject to approval of this Court, and any claim for negligence asserted against a director would be barred by the standard exculpatory provisions of the Debtor's certificate of incorporation.

Moreover, the Debtor believes that even if viable post-petition litigation against D & Os could be successful on the merits, the cost of collection – or inability to collect – supports the releases.  The Debtor believes that directors are entitled to indemnity under the Debtor's certificate of incorporation for any costs, fees or judgments related to any action they took in good faith – will such indemnity constituting an administrative claim of the Estate.  In consideration for the release by the Debtor, it is the Debtor's view that the directors have agreed to provide valuable releases of their claims for indemnity to the extent provided in the Plan.

Further, the Debtor believes that the D & Os are not people of means, and the Debtor did not procure any post-petition insurance that could fund a judgment.  In addition, it is the Debtor's view that any litigation would be lengthy and expensive would likely require a detailed, fact-intensive inquiry that would require substantial time, energy and expense to discover and adjudicate.  Such lengthy litigation could significantly delay confirmation of the Plan and could significantly impair the Debtor's restructuring efforts.

Finally, the Debtor believed that the threat of litigation could lead the remaining D & Os to resign from their respective positions.  The Debtor believed that this was true even if litigation was targeted at former D & Os, who could have cross-claimed against the existing D & Os or sought expensive third party discovery against them.  In addition, as noted above, the Debtor believes that it would be obligated to indemnify all of its directors with respect to any costs and expenses related to that litigation or discovery.  Accordingly, it is the Debtor's view that the corporate chaos that could

1   have ensued from these mass resignations could have in turn lead to material additional costs and

2   delay in the Case, including the appointment of a trustee or examiner.

3        Therefore, after taking into account the aforementioned facts, the Debtor concludes that the

4   releases and the related features embodied in the Plan are equitable and in the best interests of the

5   Debtor's Estate.

6        Nothing herein shall constitute an admission by the Debtor or the Reorganized Debtor as to

7   the validity, priority, or amount of any indemnity or reimbursement claim of any kind that may be

9   asserted by any of the D&Os against the Debtor or the Reorganized Debtor, and the Debtor and the

10  Reorganized Debtor reserve all rights to object to or otherwise dispute the validity, priority, or

11  amount of any such claims.

12                    **g.      Release Provisions Relating to the FDIC**.

13       Nothing in the Plan or the Confirmation Order shall affect, release, enjoin or impact in any

14  way the prosecution of any claims by the FDIC against any non-Debtor, including the Releasees.

15  Neither this Plan, nor Confirmation thereof shall be deemed to waive, diminish, impair, release or

16  otherwise affect the FDIC's right as receiver of the Bank to assert, pursue, resolve, prosecute, litigate

17  or defend the FDIC's claims that it is the owner of and entitled to possess to the exclusion of all

18  others proceeds arising from (a) any and all tax refunds now owed or payable or hereafter owed or

19  payable or paid by any federal or state taxing authority as a result of tax returns filed by First Federal

20  Bank of California, its subsidiaries or affiliates, or the consolidated tax group of which First Federal

21  Bank of California is a member; (b) any claims or causes of action against any persons or entities

22  arising from or related to the malfeasance, breaches of duties, errors and omissions of any such

23  persons or entities with respect to the Bank; (c) interests in financial institutions, banker bonds or

24  insurance policies; (d) claims for refunds, reimbursement or loss under any bonds or insurance

25  policies; and (e) any other claims asserted in the Proof of Claim that it filed in this Bankruptcy Case.

26       In addition, nothing contained herein or in the Confirmation Order shall impair the right of

27  any Entity, including the Debtor, the Reorganized Debtor, or the D & Os, to pursue and prosecute

28  any claims, or to defend against, assert affirmative defenses, counterclaims or cross claims, against

the FDIC or the Bank, including against the FDIC as receiver of the Bank.

### 5.    Preservation of Rights of Action.

#### a.    Vesting of Causes of Action.

Except as expressly released or otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Code, the Reorganized Debtor exclusively shall be vested with and shall retain and may enforce any and all Causes of Action that the Debtor or the Estate may hold or have against any Person or Entity (including, without limitation, the FDIC Causes of Action), all of which are hereby preserved, including all Causes of Action, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect to claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate or the Reorganized Debtor.  Except as otherwise provided in the Plan, such claims, rights and causes of action shall remain assets of and vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such claims, rights and causes of action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court.  Except as otherwise provided in the Plan or the Confirmation Order, neither the Debtor, the Estate nor the Reorganized Debtor waives, releases, relinquishes, forfeits, or abandons (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action or defenses that constitute property of the Debtor or its Estate: (a) whether or not such claims, rights, causes of action, or defenses have been listed or referred to the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such claims, rights and causes of action, or defenses are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such claims, rights or causes of action filed a proof of Claim in the Case, filed a notice of appearance or any other pleading or notice in the Case, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, (x) the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and

causes of action, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the right of the Reorganized Debtor, to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action, that the Debtor, its Estate, may have as of the Petition Date and the Effective Date, and (y) from and after the Effective Date, the Reorganized Debtor shall have exclusive standing and authority to prosecute any Causes of Action, including, without limitation, any FDIC Causes of Action.

### b.    Reservation of Causes of Action.

The Debtor expressly reserves all its Causes of Action, including, without limitation, all claims, rights, Causes of Action, including the FDIC Causes of Action, and defenses for later adjudication by the Reorganized Debtor, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action, and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Reorganized Debtor expressly reserves the right to pursue or adopt claims, rights and causes of action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any entity, including the plaintiffs or co-defendants in such lawsuits.  Any entity to whom the Debtor has incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtor, or who has received money or property from the Debtor, or who has transacted business with the Debtor, or who has leased equipment or property from or to the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may be the subject of an action after the Effective Date, whether or not: (a) such entity has filed a proof of Claim against the Debtor in this Case; (b) such entity's proof of Claim has been objected to by the Debtor; (c) such entity's Claim was included in the Debtor's Schedules; or (d) such entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or disputed.

91

c.      **Reservation of Rights Regarding Claims**.

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the Debtor or any other Person to object to any Claim for purpose of voting, the failure of the Debtor or any other Person to object to a Claim or Administrative Claim before confirmation or consummation of the Plan or the Effective Date, the failure of any Person to assert a Claim or cause of action before confirmation or consummation of the Plan or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim nor any action or inaction of the Debtor or any other Person with respect to a Claim or Administrative Claim, other than a legally effective express waiver or release, shall be deemed a waiver or release of the right of the Debtor or the Reorganized Debtor before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim or Administrative Claim in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against the holder of any such Claim.

d.      **Indemnification Obligations**

Notwithstanding anything herein to the contrary, except with respect to any D&O that waives its releases form the Debtor, whether expressly or impliedly, as of the Effective Date, any and all proofs of claim against the Debtor by the D&Os regarding any purported Indemnification Obligations shall be deemed withdrawn without prejudice, and the D&Os shall be deemed to have released the Debtor and the Reorganized Debtor from any purported Indemnification Obligations; provided, however, that solely to the extent necessary to ensure that the D & Os Insurance Coverage for all D & Os is fully preserved, the D&Os shall be permitted to file proofs of claim against the Debtor or Reorganized Debtor (notwithstanding any applicable bar dates) regarding purported Indemnification Obligations and the release of such Indemnification Obligations by the D&O shall then be deemed null and void; provided further, however, that nothing herein shall prevent or prohibit the Debtor or Reorganized Debtor from objecting to or otherwise contesting the validity of or the amounts claims under any purported Indemnification Obligations. Nothing in the foregoing paragraph is intended to give any D&O the right to assert an Indemnification Obligation if such

D&O did not already possess such right, including claims for Indemnification Obligations that were time-barred prior to the Effective Date.

### e.    Insurance Policies

Each insurance policy that provides D&O Insurance Coverage owned by the Debtor shall be assumed by the Reorganized Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order; provided, however, that any such assumption by the Debtor and the Reorganized Debtor shall not result in the Debtor or the Reorganized Debtor being required to make any cash disbursements on account of such insurance policy.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtor's insurers, if any, in any respect or the rights of the Debtors or any other party against the Debtor's insurers or in respect of any insurance of the Debtors or in connection with the provision of any insurance with respect to any claim or cause of action asserted against any of the D & Os.  The rights of the Debtor's and the Debtor's insurers vis-à-vis one another shall be determined under their respective insurance policies and any related agreements with the Debtor, if any, subject to the rights of the Debtor to assume any such policy or agreement in accordance with this provision.

### 6.    Injunction.

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Interests, causes of action or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) are subject to exculpation pursuant to the Plan, including Exculpated Claims (but only to the extent of the exculpation provided in the Plan); or (4) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the effective date, from: (a) commencing or continuing in any manner any action or other proceeding of

any kind, including on account of any claims, interests, causes of actions or liabilities that have been compromised or settled against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or estate of any entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated claims, interests, causes of action or liabilities; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or estate of the Debtor, the Reorganized Debtor, or any entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, causes of action, or liabilities; (c) creating, perfecting or enforcing any lien, claim, or encumbrance of any kind against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or Estate of the Debtor, the Reorganized Debtor, or any entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, equity interests, causes of action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or Estate of the Debtor, the Reorganized Debtor, or any entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, causes of action or liabilities unless such holder has filed a timely Proof of Claim with the Bankruptcy Court preserving such right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or Estate of the Debtor, the Reorganized Debtor, or any entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, causes of action, or liabilities released, settled or compromised pursuant to the Plan; *provided that* nothing contained herein shall preclude an Entity from obtaining benefits directly and expressly provided to such Entity pursuant to the terms of the Plan; *provided, further*, that  nothing contained herein shall

be construed to prevent any Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.  In addition, nothing contained in the foregoing injunction provisions or in the Plan's release provisions shall apply to any defense, offset, counterclaim, or similar right that a Releasing Party may hold against an entity that pursues, asserts, or litigates a claim against that Releasing Party.

Neither the Plan, nor confirmation thereof shall be deemed to waive, diminish, impair, release or otherwise affect the FDIC's right to assert, pursue, resolve, prosecute, litigate or defend claims that it is the owner of and entitled to possess to the exclusion of all others proceeds arising from (a) any and all tax refunds now owed or payable or hereafter owed or payable or paid by any federal or state taxing authority as a result of tax returns filed by First Federal Bank of California, its subsidiaries or affiliates, or the consolidated tax group of which First Federal Bank of California is a member; (b) any claims or causes of action against any persons or entities arising from or related to the malfeasance, breaches of duties, errors and omissions of any such persons or entities; (c) interests in financial institutions, banker bonds or insurance policies; (d) claims for refunds, reimbursement or loss under any bonds or insurance policies; and (e) any other claims asserted in the Proof of Claim that it filed in this Case.

**Z.    Retention of Jurisdiction**.

Following the Effective Date, the Bankruptcy Court shall retain such jurisdiction to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

a.    To determine the allowability, amount, classification, or priority of Claims upon objection by the Reorganized Debtor;

b.    To construe and to take any action to execute and enforce the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date;

c.    To rule on any and all applications for allowance of compensation and

expense reimbursement of Professionals for periods on or before the Effective Date;

d.    To rule on any request for payment of any Administrative Claim;

e.    To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan;

f.    To resolve all applications, adversary proceedings, contested matters, and other litigated matters instituted on or before the Effective Date;

g.    To hear and determine any actions related to the Causes of Action, whether or not such actions are pending on or commenced after the Effective Date and to recover any assets of the Debtor's Estate;

h.    To determine such other matters and to perform other functions as may be provided in the Plan and the Confirmation Order;

i.    To modify the Plan under section 1127 of the Code, to remedy any apparent nonmaterial defect or omission in the Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes;

j.    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any entity;

k.    To issue such orders in aid of execution of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any entity, to the full extent authorized by the Code;

l.    To hear and determine any tax disputes concerning, and to determine and declare any tax effects under the Plan; and

m.    To enter a final decree closing the Case.

Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or any of the exhibits thereto, nothing herein is intended to, nor shall anything herein be construed in any manner to, modify, limit or otherwise affect the FDIC's, right, if any, to seek or to oppose (a) the entry of any and all final orders in any and all non-core matters entered only after *de novo* review by

96

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

the United States District Court; (b) trial by jury in any proceedings as to any and all matters so triable therein, whether or not the same be designated legal or private rights, or in any case, controversy or proceeding related thereto, whether or not such jury trial right is pursuant to statute or the United States Constitution; (c) withdrawal of the reference of any matter by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal; or (d) the enforcement or exercise in any manner of any other rights, claims, actions defenses, setoffs, recoupments or other matters to which the FDIC is entitled under any agreements or at law or in equity or under the United States Constitution; nor shall anything therein be construed in any manner to, modify, limit or otherwise affect the FDIC's right, if any, to object to the jurisdiction or authority of any court (including, without limitation, the Bankruptcy Court) to resolve any dispute between the FDIC on one hand, and the Debtor, the Reorganized Debtor or the New Series B Common stock Election Trustee, on the other hand, all of which rights are expressly reserved.

**AA.    Miscellaneous Provisions**.

The Plan also contains numerous miscellaneous provisions.  Parties in interest are respectfully invited to review the Plan for further details.

**VIII.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the confirmation process.  Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

**A.    The Confirmation Hearing**.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation.

**B.    Confirmation Standards**.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Plan Proponents believe that:  (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code;

(2) it has complied or will have complied with all of the requirements of chapter 11 of the

Bankruptcy Code; and (3) the Plan has been proposed in good faith.  Specifically, the Plan

Proponents believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of

section 1129 of the Bankruptcy Code, including those set forth below.

a.      The Plan complies with all applicable provisions of the Bankruptcy Code.

b.      The Plan Proponents will have complied with the applicable provisions of the

Bankruptcy Code.

c.      The Plan has been proposed in good faith and not by any means forbidden by

law.

d.      Any payment made or to be made under the Plan for services or for costs and

expenses in, or in connection with, the Case, or in connection with the Plan and incident to the Case,

has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the

Confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy

Court as reasonable, if it is to be fixed after Confirmation of the Plan.

e.      Each Holder of an Impaired Claim has accepted the Plan or will receive or

retain under the Plan on account of such Claim property of a value as of the Effective Date of the

Plan that is not less than the amount that such Holder would receive or retain if the Debtor were

liquidated on that date under chapter 7 of the Bankruptcy Code.

f.      Each Class of Claims that is entitled to vote on the Plan has either accepted

the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such

voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

g.      Except to the extent that the Holder of a particular Claim will agree to a

different treatment of its Claim, the Plan provides that Holders of Administrative Claims, Holders of

Priority Tax Claims,  and Holders of Non-FDIC Priority Claims shall receive payment in Cash, in

full on the Effective Date unless otherwise agreed to by the Creditor and the Debtor or the

Reorganized Debtor.  Holders of FDIC Priority Claims, to the extent Allowed, shall receive periodic

payments of Net Free Cash until such Allowed Claim is paid in full.

h.      At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

i.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

j.      The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

k.      In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Debtor's Case for each quarter (including any fraction thereof), to the United States Trustee, until the Case is closed.

**C.      Financial Feasibility**.

The Bankruptcy Code permits a chapter 11 plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization, other than as provided in such plan. For purposes of determining whether the Plan meets this requirement, Holdco has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan.  Holdco believes the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor. The discussion regarding feasibility is set forth above and is incorporated here by reference.

**D.      Best Interests of Creditors Test**.

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors.  Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated under chapter 7 of the

Bankruptcy Code.

Holdco's hypothetical Liquidation Analysis is attached as Exhibit D to this Disclosure Statement.  The Plan Proponents believe that the Plan will produce a greater recovery for Holders of Allowed Claims against and Equity Interests in the Estate than would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code.  The reason for this largely is a function of the Plan structure and the protections built in to the Plan structure that shield Holders of Unsecured Claims making the New Series B Common Stock Election from the risks of the Reorganized Debtor's post-confirmation business activities.  Essentially, the Plan provides Holders of Unsecured Claims with an option – they can either elect to "cash out" and thereby receive a Distribution based upon Cash on hand and the proceeds, if any, recovered by the Reorganized Debtor in the FDIC Causes of Action and any other potential Causes of Action or assets, or they can do nothing, and if confirmed, then the Plan by default converts their Allowed Claims into New Series A Common Stock.  The Cash that will be available for Distribution to those who make the New Series B Common Stock Election – the Cash on hand on the Effective Date and the proceeds, if any, of the FDIC Causes of Action and other assets – will be segregated (to the extent and in the amount necessary to make Distributions to those Creditors who properly make the New Series B Common Stock Election) and not consumed by the Reorganized Debtor in its operations post-confirmation.  Thus, there are no circumstances under which Holders of Allowed Unsecured Claims will recover less than would be available in a chapter 7 liquidation, unless they specifically assume that risk by refraining from making the New Series B Common Stock Election and instead receive New Series A Common Stock on account of their Allowed Claims.

Furthermore, the holders of Allowed General Unsecured Claims that elect the New Series B Common Stock Election will receive their recoveries with no dilution for chapter 7 trustee fees and costs, including the costs of administering the chapter 7 case. If this Case was converted to a chapter 7 liquidation, a trustee would be appointed by the Bankruptcy Court.  That trustee would liquidate the remaining assets of the Debtor's Estate and distribute the proceeds in accordance with the priorities established under the Code.

1    All administrative expenses of the chapter 7 case, including the chapter 7 trustee's fees

2 (which can be as high as 3% of the total amount collected and disbursed pursuant to the formula in

3 section 326 of the Code) would have to be paid in full before payment of the unpaid administrative

4 expenses from the Case.  Unpaid chapter 11 Administrative Claims would, in turn, be paid in full

5 before any Distribution could be made to unsecured Creditors.  It is unusual for Distributions to be

6 made within one year of the appointment of a chapter 7 trustee in a case involving substantial assets

7 or Claims.  In addition, the chapter 7 trustee would not have the expertise or familiarity with the

9 FDIC Causes of Action, or any other potential Claim objections, which will likely result in

10 substantial delay and increased costs in the prosecution and recovery on these critical lawsuits.

11    Thus, in a chapter 7 liquidation, it is likely the total proceeds would be approximately the

12 same, or possibly less, for those creditors that elect the New Series B Common Stock Election.

13 However, the administrative expenses associated with the chapter 7 case would very likely exceed

14 the expenses that the Reorganized Debtor will incur in the implementation of the Plan, and the

15 Distributions likely would be delayed longer than the Distributions that will be made under the Plan.

16 Therefore, the Plan Proponents believe that the Plan satisfies the requirements of the "best interests"

17 test and provides Creditors at least as much present value as they would receive in a chapter 7

18 liquidation.

19    The Liquidation Analysis does not compare the ultimate recoveries to Holders of Unsecured

20 Claims who become shareholders of the Reorganized Debtor with the recoveries to Holders of

21 Unsecured Claims who make the New Series B Common Stock Election.  Such a comparison is

22 difficult to illustrate, in light of uncertainties about the Reorganized Debtor's prospects.  The

23 Reorganized Debtor's future business plan is discussed in Article V, above.

24    Based upon the conclusions set forth herein the Plan Proponents believe that the value of

25 Distributions, if any, in a hypothetical chapter 7 liquidation to Holders of Allowed General

26 Unsecured Claims would be less than or equal to the value of distributions to such Holders under the

27 Plan and Plan Proponents believe that the Plan satisfies the "best interests" test of section

28 1129(a)(7) of the Bankruptcy Code.

**E.**      **Acceptance by Impaired Classes**.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii) provides that, on the Effective Date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

The Claims in Classes 1, 2, 3, and 7 are not Impaired under the Plan, and, as a result, the Holders of such Claims are conclusively presumed to have accepted the Plan.

The Voting Classes – Classes 4, 5 and 6 -- are Impaired under the Plan, and the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

**F.**      **Confirmation Without Acceptance by All Impaired Classes**.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if all other impaired classes entitled to vote on the plan have not accepted it, *provided* that the plan has

been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code,

notwithstanding an impaired class's rejection or conclusively presumed rejection of the plan, such

plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram

down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect

to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.      No Unfair Discrimination.

This test applies to classes of claims or equity interests that are of equal priority and are

receiving different treatment under the Plan.  The test does not require that the treatment be the same

or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a

plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the

same legal character).  Bankruptcy courts will take into account a number of factors in determining

whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured

creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test.

This test applies to classes of different priority and status (*e.g.,* secured versus unsecured)

and includes the general requirement that no class of claims receive more than 100% of the amount

of the allowed claims in such class.  As to the non-accepting class, the test sets different standards

depending on the type of claims or equity interests in such class.

Secured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of

secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens

securing such claims to the extent of the allowed amount of the claims, whether the property subject

to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each

holder of a secured claim in the class receives deferred cash payments totaling at least the allowed

amount of such claim with a present value, as of the effective date of the plan, at least equivalent to

the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class

of unsecured claims includes the following requirement that either:  (a) the plan provides that each

---

103

holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Interests:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Plan Proponents will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the conclusively presumed rejection by Class 8.  To the extent that any of the Voting Classes vote to reject the Plan, the Debtor further reserves the right to (a) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XI.C of the Plan.

The votes of Holders of Interests in Class 8 are not being solicited because, as set forth in Article III of the Plan, there will be no distribution to any of these Classes, and such Holders are thus conclusively deemed to have rejected the Plan.

Notwithstanding the conclusively presumed rejection by Class 8 or any Class that votes to reject the Plan, the Plan Proponents do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and  Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

///

# IX.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

104

### A.    Certain Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Plan Proponent believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponent created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponent intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Plan Proponent may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    The Plan Proponents May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting

classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for

further financial restructuring unless such liquidation or reorganization is contemplated by the plan;

and (c) the value of distributions to non-accepting holders of claims and equity interests within a

particular class under such plan will not be less than the value of distributions such holders would

receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.


Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy

Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either

the adequacy of this Disclosure Statement or whether the balloting procedures and voting results

satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court

determines that this Disclosure Statement, the balloting procedures, and the voting results are

appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the

statutory requirements for Confirmation have not been met, including the requirement that the terms

of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If

the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will

receive with respect to their Allowed Claims.

### 4.    Modifications to the Plan.

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to

section 1127 of the Bankruptcy Code solely upon the mutual written agreement between the Debtor

and Holdco, unless the other party has withdrawn as a proponent of the Plan.  After the Effective

Date, the Reorganized Debtor shall have the sole authority and power to alter, amend, or modify the

Plan pursuant to section 1127 of the Bankruptcy Code.  Holdco shall have the sole and exclusive

right to determine the contents of the Plan Supplement, provided that nothing in the Plan Supplement

shall conflict with the terms of the Plan.  Notwithstanding the foregoing, the definitions of

Confirmation Order, Exculpated Party, Released Parties, Releasees, Releasing Parties, and Articles

IV.F, IV.G, VIII.D, XI.C, and XI.D of the Plan shall not be amended or modified at any time

without the express written consent of the D & Os, which consent may be granted or withheld in the

D & Os' sole discretion.  The D & Os are express third party beneficiaries of, and shall have the right to enforce, this provision.

In addition, subject to any express or implied waiver by the D&Os of the releases provided under the Plan, the releases provided under the Plan shall be irrevocable.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Plan Proponent believes that the Plan satisfies these requirements and the Plan Proponent may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation of the Plan may result in, among other things, increased expenses relating to Professionals.

### 6. The Plan Proponents May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Plan Proponents and the Reorganized Debtor reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement and may not be entitled to vote on the Plan.

### 7. Risk of Non-Occurrence of the Effective Date.

Although the Plan Proponents believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date

will, in fact, occur.  As noted above, the occurrence of the Effective Date could be delayed for months or years after the Confirmation Date.

> **8.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, the outcome and financing of litigation with the FDIC and the outcome of the FDIC Priority Claims Determination.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

> **9.     Holdco May Decide in its Sole Discretion Not to Proceed With the Holdco Cash Out Election**.

If Holdco in its sole discretion determines not to proceed with the Holdco Cash Out Election, then Holders of Allowed Class 4, 5 and 6 Claims who timely and properly make the Holdco Cash Out Election (i) will not receive anything on account of the Holdco Cash Out Election, (ii) will receive New Series A Common Stock on account of such Holder's Allowed Claim and (iii) will be bound to such Holder's vote to accept the Plan.

> **B.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims**.

**HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION**

**WITH THE PLAN AND ITS IMPLEMENTATION.**

>    **1.    The Plan Proponents Cannot State with any Degree of Certainty What**
>
>    **Recovery Will Be Available to Holders of Allowed Claims in Voting**
>
>    **Classes**.

Many unknown factors make certainty of creditor recoveries under the Plan impossible. Among them are the following:  First, the Plan Proponents cannot know with any certainty, at this time, the exact value of the New Series A Common Stock or New Series B Common Stock in the Reorganized Debtor that may be issued in connection with the New Series B Common Stock Election, or what the results will be of the Reorganized Debtor's post-confirmation business activities.  Second, the Plan Proponents cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed.  Third, the Plan Proponent cannot know with any certainty, at this time, the number or size of Claims senior to voting Classes of 4, 5 and 6 or unclassified Claims that will ultimately be Allowed

>    **2.    The Debtor is Subject to Litigation That, if Adversely Determined,**
>
>    **Could Result in Substantial Losses**.

As further discussed in Article IV, the Debtor is, from time to time, subject to various litigation claims and legal disputes, including, among other things, the FDIC Cause of Action.  If the FDIC Cause of Action is determined adversely to the Debtor, substantially less funds may be available to be distributed under the Plan.  Moreover, if the Court does not estimate the FDIC Priority Claim at zero, or at an amount that is immaterial, then the Plan may not be feasible.

>    **3.    Risk Factors Could Negatively Impact the Reorganized Debtor's**
>
>    **Business**.

The risks enumerated above could have a materially adverse effect on the business, financial condition, or results of operations of the Reorganized Debtor.  Moreover, the Reorganized Debtor's business may be adversely affected by the major recession currently being experienced in the United States.  Investment returns could be less than projected and the Reorganized Debtor might be forced to liquidate investments to raise Cash.  Additional risks and uncertainties not currently known to the

Plan Proponents or that the Plan Proponents currently deem immaterial may also materially adversely affect the Reorganized Debtor's business, financial condition, or results of operations. Moreover, the Reorganized Debtor will be engaged in inherently risky business, and there is substantial risk that the Reorganized Debtor's business plan will not perform as well as intended.   There is no assurance that management will select investments that produce results that meet expectations.   There is no assurance that New Series A Common Stock will avoid becoming worthless and losing all of its value.

In addition to the possibility of a loss in the value of the New Series A Common Stock due to risks associated with the Reorganized Debtor's business, a liquid trading market for the New Series A Common Stock might never develop.  As of the Effective Date, neither the New Series A Common Stock nor the New Series B Common Stock will be listed for trading on any stock exchange or trading system, and no such listing is anticipated in the future.  Consequently, the trading liquidity of the New Series A Common Stock and the New Series B Common Stock is expected to be very limited.  In addition, it is expected that from and after the Effective Date, the certificate of incorporation of the Reorganized Debtor will contain certain restrictions in relation to the transfer of New Series A Common Stock and New Series B Common Stock.  In particular, without the prior approval of the New Board, no person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of related transactions, shares of the Reorganized Debtor to the extent that, after giving effect to the proposed acquisition, (i) the purported transferee or, as a result of the proposed acquisition, any other person, would hold more than 4.9% of the total equity value of the Reorganized Debtor, or (ii) a person who already holds at least 4.9% of the total equity value of the Reorganized Debtor shares would hold shares representing a higher percentage of that value.

Further, any creditor making the decision to elect not to take the New Series B Common Stock  and to receive instead the New Series A Common Stock should understand that liabilities of the Reorganized Debtor and its business will be satisfied before there is any distribution to holders of the New Series A Common Stock.

As a result of the above risk factors, the ultimate value of each share of the Reorganized Debtor's New Series A and B Common Stock is uncertain and holders thereof may incur a complete loss.

### C.    Additional Risk Factors.

#### 1.    Unidentified Investments.

The Reorganized Debtor has not identified any particular investments to make with Cash available now or in the future other than to make investments on the basis of opportunities as they may arise.  Therefore, holders of New Series A Common Stock of the Reorganized Debtor must rely on the ability of the Reorganized Debtor's management in making investments consistent with the objectives of the Reorganized Debtor.  Holders of New Series A Common Stock of the Reorganized Debtor will not have the opportunity to evaluate the relevant economic, financial, and other information which will be utilized by the Reorganized Debtor's management in deciding whether or not to make a particular investment.

#### 2.    Highly Competitive Market for Investment Opportunities. The activity of identifying, completing, and realizing on attractive investments is highly competitive and involves a high degree of uncertainty.  There can be no assurance that the Reorganized Debtor's management will be able to identify and complete investments which satisfy its investment objective, or realize the value of such investments, or that it will be able to invest fully its available cash at any time. The Reorganized Debtor will be competing for investment opportunities against various other groups, including industry participants, investment firms, and commercial banks.

#### 3.    Passive Investment. In order to safeguard their limited liability for and in respect of the Reorganized Debtor's liabilities, holders of New Series A Common Stock of the Reorganized Debtor must rely entirely on the management of the Reorganized Debtor to conduct and manage the affairs of the Reorganized Debtor.

#### 4.    Legal, Tax, and Regulatory Risks. Legal, tax, and regulatory changes could occur that may adversely affect the Reorganized Debtor.

#### 5.    Risk of Limited Number of Investments. As the Reorganized Debtor may

111

make only a limited number of investments and because the Reorganized Debtor's investments may

will involve a high degree of risk, poor performance by a few of the investments could severely

affect the total returns to the holders of New Series A Common Stock.  If an investment fails to

achieve desired returns, the Reorganized Debtor may suffer a partial or total loss of such investment.

**6.        The Reorganized Debtor is Subject to Credit Risk.**The Reorganized

Debtor is exposed to the risk that third parties that owe the Reorganized Debtor money, securities, or

other assets will not repay their obligations.  Credit risk arises anytime the Reorganized Debtor

commits, invests, or otherwise extends funds through contractual agreements, whether reflected on

or off the balance sheet.  These parties may default on their obligations due to bankruptcy, lack of

liquidity, operational failure, or other reasons.

**7.        The Reorganized Debtor may be Further Adversely Affected by Current**

**Economic and Market Conditions**.The national and global economic

downturn has resulted in significant financial market disruptions which may depress overall the

market value of financial institutions, limit access to capital, or have a material adverse effect on the

financial condition or results of operations of investment companies in general, including the

Reorganized Debtor. In addition, the possible duration and severity of the adverse economic cycle is

unknown and may exacerbate the Reorganized Debtor's exposure to credit risk.  The Reorganized

Debtor may be particularly exposed to downturns in the U.S. commercial real estate markets.

Reflecting concern about the stability of the financial markets generally and the strength of

counterparties, many lenders and institutional investors have reduced or ceased providing funding to

borrowers, including to other financial institutions.  This market turmoil and tightening of credit

have led to an increased level of delinquencies, lack of consumer confidence, increased market

volatility, and widespread reduction of business activity and employment generally.  The resulting

economic pressure on consumers and lack of confidence in the financial markets has adversely

affected the Debtor's business, financial condition, and results of operations.  The Reorganized

Debtor cannot be certain that the difficult conditions in the financial markets are likely to experience

sustainable improvement in the near future.  A worsening or prolonging of these conditions would

---

112

likely exacerbate the adverse effects of these difficult market conditions on the Reorganized Debtor

and others in the financial services industry.  Financial markets have experienced, and may continue

to experience, periods of high volatility accompanied by reduced liquidity.  These markets are

susceptible to severe events evidenced by rapid depreciation in asset values accompanied by a

reduction in asset liquidity. Under these extreme conditions, hedging and other risk management

strategies may not be as effective at mitigating trading losses as they would be under more normal

market conditions.  The Reorganized Debtor's risk management and monitoring processes seek to

quantify and mitigate risk to more extreme market moves.  Severe market events have historically

been difficult to predict, however, and the Reorganized Debtor could realize significant losses if

unprecedented extreme market events were to occur.

8. **The Reorganized Debtor Will Be Exposed to Risk of Environmental Liability When It Takes Title to Real Property**.In the course of its

business, the Reorganized Debtor may foreclose on and take title to real estate.  As a result, the

Reorganized Debtor may be subject to environmental liabilities with respect to these properties.  The

Reorganized Debtor may be held liable to a governmental entity or to third parties for property

damage, personal injury, investigation, and clean-up costs incurred by these parties in connection

with environmental contamination or may be required to investigate or clean-up hazardous or toxic

substances or chemical releases at properties.  The costs associated with investigation or remediation

activities could be substantial.  If the Reorganized Debtor becomes subject to significant

environmental liabilities, its financial condition and results of operations could be adversely affected.

9. **The Reorganized Debtor's Investment Results Are Subject to General and Regional Economic Conditions, Which Are Beyond Its Control**.The

Reorganized Debtor's success depends to a large degree on the general economic conditions of the

diverse geographic markets it serves.  Local economic conditions have a significant impact on the

generation of commercial, commercial real estate, and real estate loans; the ability of borrowers to

repay these loans; and the value of the collateral securing these loans.  Adverse changes in the

economic conditions of the markets in which the Reorganized Debtor invests could also negatively

1  impact the financial results of the Reorganized Debtor. For example, adverse changes in these

2  factors could lead to reduced interest income and an increase in the provision for loan losses.  This is

3  consistent with what has occurred during the current economic downturn with the Debtor incurring

4  significant operating losses and a corresponding reduction in shareholders' equity during the past

5  years.

6      **10.    If The Reorganized Debtor Fails to Effectively Manage Credit Risk, Its**

7          **Business and Financial Condition Will Suffer**.The Reorganized Debtor

8  must effectively manage credit risk.  There are risks inherent in making any loan, including risks

9  with respect to the period of time over which the loan may be repaid, risks relating to proper loan

10  underwriting and guidelines, risks resulting from changes in economic and industry conditions, risks

11  inherent in dealing with individual borrowers and risks resulting from uncertainties as to the future

12  value of collateral.  There is no assurance that credit risk monitoring and loan approval procedures of

13  the Reorganized Debtor are or will be adequate or will reduce the inherent risks associated with

14  lending.  The credit administration personnel, policies, and procedures of the Reorganized Debtor

15  may not adequately adapt to changes in economic or any other conditions affecting customers and

16  the quality of its loan portfolio.  Any failure to manage such credit risks may materially adversely

17  affect the business and our consolidated results of operations and financial condition of the

18  Reorganized Debtor.

19      **11.    The Reorganized Debtor Is Subject To Losses Due to the Errors or**

20          **Fraudulent Behavior of Employees or Third Parties**.The Reorganized

21  Debtor will be exposed to many types of operational risk, including the risk of fraud by employees

22  and outsiders, clerical recordkeeping errors, and transactional errors.  The business of the

23  Reorganized Debtor is dependent on its employees as well as third-party service providers to process

24  a large number of increasingly complex transactions.  The Reorganized Debtor could be materially

25  adversely affected if one of its employees causes a significant operational breakdown or failure,

26  either as a result of human error or where an individual purposefully sabotages or fraudulently

27  manipulates operations or systems.  When the Reorganized Debtor originates loans, it relies upon

28  

114

information supplied by loan applicants and third parties, including the information contained in the loan application, property appraisal and title information, if applicable, and income documentation provided by third parties.  If any of this information is misrepresented and such misrepresentation is not detected prior to loan funding, the Reorganized Debtor will generally bear the risk of loss associated with the misrepresentation.  Any of these occurrences could result in a diminished ability of the Reorganized Debtor to operate its business, potential liability to customers, reputational damage and regulatory intervention, which could negatively impact the business, financial condition, and results of operations of the Reorganized Debtor.

> **12.     The Reorganized Debtor Will Depend on Its Senior Management Team, and the Unexpected Loss of One or More of Its Senior Executives Could Adversely Affect Its Business and Financial Results.** The future success of

the Reorganized Debtor significantly depends on the continued services and performance of its key management personnel and its future performance will depend on its ability to motivate and retain these and other key personnel.  The loss of the services of members of senior management, or other key employees, or the inability to attract additional qualified personnel as needed, could materially and adversely affect the businesses and the consolidated results of operations and financial condition of the Reorganized Debtor.

> **13.     If Borrowers and Guarantors Fail to Perform as Required by the Terms of Their Loans, the Reorganized Debtor Will Sustain Losses.** A significant

source of risk arises from the possibility that losses will be sustained if the Reorganized Debtor's borrowers and guarantors fail to perform in accordance with the terms of their loans and guaranties. This risk increases when the economy is weak.  The Reorganized Debtor intends to implement underwriting and credit monitoring procedures and credit policies that it believes are appropriate to reduce this risk by assessing the likelihood of nonperformance.  These policies and procedures, however, may not prevent unexpected losses that could materially adversely affect the Reorganized Debtor's results of operations.

> **14.     The Reorganized Debtor Is Exposed to Operational Risks that Can**

---

115

**Negatively Affect Its Financial Condition.** The Reorganized Debtor will be exposed to operational risk.  In its daily operations, the Reorganized Debtor will rely on the continued efficacy of its technical and telecommunication systems, operational infrastructure, relationships with third parties, and the vast array of associates and key executives.  Failure by any or all of these resources subjects us to risks that may vary in size, scale, and scope. These risks include, among other things, operational, technical, and computer system failures, ineffectiveness or exposure due to interruption in third party support, the risk of fraud or theft by employees or outsiders and unauthorized transactions by employees or operational errors (including clerical or recordkeeping errors), as well as the loss of key individuals or failure on the part of the key individuals to perform properly.

15. **The Reorganized Debtor's Potential Concentration of Real Estate Loans Subjects It to Increased Risks in the Event Real Estate Values Continue to Decline Due to the Economic Recession, a Further Deterioration in the Real Estate Markets or Other Causes.** The current economic recession, deterioration in the real estate markets, increasing delinquencies and foreclosures, and unemployment may have an adverse effect on loans held or invested in by the Reorganized Debtor. The continuation or further deterioration of these factors, including increasing foreclosures and unemployment, will continue to have the same or similar adverse effects on loans held or invested in by the Reorganized Debtor.  A continued decline in real estate values could also lead to higher charge-offs in the event of defaults in real estate loans held or invested in by the Reorganized Debtor.  Similarly, the occurrence of a natural or manmade disaster in its market areas could impair the value of such loans and investments.  Any one or a combination of the factors identified above could negatively impact the business, financial condition, results of operations and prospects of the Reorganized Debtor.

16. **Economic and Market Developments, Including the Potential for Inflation, May Have an Adverse Effect on the Business of the Reorganized Debtor, Possibly in Ways That Are Not Predictable or That**

116

**the Reorganized Debtor May Fail to Anticipate**.

Recent economic and market developments and the potential for continued economic disruptions and inflation present considerable risks and challenges to the Reorganized Debtor. Dramatic declines in the housing market, with decreasing home prices and increasing delinquencies and foreclosures throughout most of the nation, have negatively impacted the credit performance of mortgage and construction loans and resulted in significant write downs of assets by many financial institutions. General downward economic trends, reduced availability of commercial credit, and increasing unemployment have also negatively impacted the credit performance of commercial and consumer credit, resulting in additional write downs. These risks and challenges have significantly diminished overall confidence in the national economy, the financial markets, and many financial institutions and financial services companies. This reduced confidence could further compound the overall market disruptions and risks to financial services companies, including the Reorganized Debtor. In addition to economic conditions, the business of the Reorganized Debtor also is affected by political uncertainties, volatility, illiquidity, interest rates, inflation, and other developments impacting the financial markets. Such factors have affected, and may further adversely affect, both credit and financial markets and future economic growth, resulting in adverse effects on the Reorganized Debtor and other financial services companies in ways that are not predictable or that the Reorganized Debtor may fail to anticipate.

**17.    The Reorganized Debtor Has a Deferred Tax Asset That May Not Be Fully Realized in the Future**.

The ultimate realization of a deferred tax asset is dependent upon the generation of future taxable income during the periods prior to the expiration of the related NOLs. If the Reorganized Debtor's estimates and assumptions about future taxable income are not accurate, the value of its deferred tax asset may not be recoverable and may result in a valuation allowance that would impact the earnings of the Reorganized Debtor.

**X.    DISCLOSURE STATEMENT DISCLAIMER**

.

117

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

**A.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission**.

Neither the Securities Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**B.    Reliance on Exemptions from Registration Under the Securities Act and Investment Company Act**.

The Plan provides that the Debtor and the Reorganized Debtor may rely on section 1145 of the Bankruptcy Code as well as exemptions from registration under the Securities Act and the Investment Company Act. Parties in interest are invited to review the Plan for further details.

**C.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement**.
**This Disclosure Statement is not legal advice to you.**

The contents of this Disclosure Statement should not be construed as legal, business, or tax

advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to confirmation of the Plan.

**D.     No Admissions Made**.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Plan Proponents) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

**E.     Failure to Identify Litigation Claims or Projected Objections**.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents or the Reorganized Debtor, may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

**F.     No Waiver of Right to Object or Right to Recover Transfers and Assets**.

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action of the Debtor, its Estate or the Reorganized Debtor are specifically or generally identified herein.

//

**G.     Information Was Provided by the Debtor and Holdco and Was Relied Upon by the Plan Proponents' Professionals**.

The Plan Proponents' professionals have relied upon information provided by the Debtor and Holdco in connection with the preparation of this Disclosure Statement. Although such

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P. DATED JUNE 1, 2012

professionals have performed certain limited due diligence in connection with the preparation of this

Disclosure Statement, they have not verified independently the information contained herein.

### H.    Potential Exists for Inaccuracies, and the Plan Proponents Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Plan Proponents as of

the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after

that date does not imply that there has not been a change in the information set forth herein since that

date.  While the Plan Proponents have used their reasonable business judgment to ensure the

accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan

Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing

in this Disclosure Statement.  Further, although the Plan Proponents may subsequently update the

information in this Disclosure Statement, they have no affirmative duty to do so unless ordered to do

so by the Bankruptcy Court.

### I.    No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtor, this Case, or the Plan are authorized

by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure

Statement.  Any representations or inducements made to secure your acceptance or rejection of the

Plan that are other than as contained in, or included with, this Disclosure Statement, should not be

relied upon by you in arriving at your decision.  You should promptly report unauthorized

representations or inducements to the counsel to the Plan Proponents and the United States Trustee.

### J.    Liquidation Under Chapter 7.

The Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to

which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in

accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a

chapter 7 liquidation would have on the recoveries of Holders of Claims and the Holdco Liquidation

Analysis is set forth in Article VII herein, "Statutory Requirements for Confirmation of the Plan."

### XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtor and certain Holders of Claims and Interests and is based upon information provided by the Debtor and gathered by the Plan Proponent.  This summary does not address the United States federal income tax consequences to Holders (i) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.  This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Plan Proponent does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  This summary is not binding on the IRS or the courts. There can be no assurance that the IRS will not assert, or that a court will not sustain, a different position than any position discussed below.

This summary does not address all aspects of United States federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances, nor does it discuss tax issues applicable to Holders of Claims or Interests that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, brokers, dealers and traders in securities, financial institutions, governmental authorities or agencies, insurance companies, mutual funds, pass-through entities, regulated investment companies, small business investment companies, tax-exempt organizations, and trusts and those holding, or who will hold, Claims, Interests, New Series A Common Stock or New Series B Common Stock as part of a hedge, straddle, conversion or constructive sale transaction).  This summary assumes (i) each Holder of a Claim or Interest holds its Claim, Interests, New Series A Common Stock or other Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election as "capital assets" (generally, property held for investment) within the meaning of Section

1221 of the Internal Revenue Code and (ii) the debt obligations(s) underlying each Allowed Claim is

properly treated as debt (rather than equity) of the Debtor.  Moreover, this summary does not purport

to cover all aspects of United States federal income taxation that may apply to the Debtor and

Holders of Claims and Equity Interests based upon their particular circumstances.  Additionally, this

summary does not discuss any tax consequences that may arise under any laws other than United

States federal income tax law, including under state, local, estate, gift, foreign or other tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES

FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY

AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON

THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR

EQUITY INTEREST.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO

CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, ESTATE,

GIFT, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH

REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE

PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE

CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING

ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF

THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.

EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR

CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.**    **Certain United States Federal Income Tax Consequences to the Debtor**.

**1.**    **Cancellation of Debt and Reduction of Tax Attribute**.

In general, absent an exception, a debtor will realize and recognize CODI upon satisfaction

of its outstanding indebtedness for total consideration less than the amount of such indebtedness.

The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Series A Common Stock or Cash or New Series B Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

Pursuant to Section 108 of the Internal Revenue Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes are reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.

Because the Plan provides that Holders of certain Claims will receive New Series A Common Stock or and New Series B Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election, the amount of CODI, and accordingly the amount of tax attributes of the Debtor required to be reduced, will depend on the fair market value of the New Series A Common Stock or New Series B Common Stock. The amount of such CODI is therefore uncertain. It is expected, however, that the Debtor will recognize a substantial amount of CODI as a result of consummation of the Plan, and that this CODI will result in a reduction in, and perhaps elimination of, their NOL carryforwards of the Reorganized Debtor.

### 2. Limitation of NOL Carryforwards and Other Tax Attributes.

Even after taking into account a reduction in its NOLs as a result of CODI, the Plan Proponents anticipate the Reorganized Debtor may have significant tax attributes (in particular, NOLs) at emergence. The amount of such tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of

tax losses incurred by the Debtor in 2011; (b) the fair market value of the New Series A Common Stock or New Series B Common Stock; (c) the amount of CODI that has not been included in gross income by the Debtor as a result of the above-described rules in connection with consummation of the Plan; and (d) the remaining Bank assets.

Under Section 382 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Plan Proponents anticipate that the issuance of the New Series A Common Stock and/or New Series B Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtor for these purposes, and that the Debtor's use of its Pre-Change Losses (which are anticipated to include substantial built-in losses) will be subject to limitation unless an exception to the general rules of Section 382 of the Internal Revenue Code applies.

### a.    General Section 382 Annual Limitation.

In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.3% for the month of July 2011).  The Section 382 Limitation may be increased to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Series A Common Stock and/or New Series B Common Stock, along with the cancellation of existing Debtor Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtor on the Effective Date.  As a result,

unless an exception applies, Section 382 of the Internal Revenue Code will apply to limit the

Debtor's use of any remaining Pre-Change Losses after the Effective Date.  This limitation is

independent of, and in addition to, the reduction of tax attributes described in the preceding section

resulting from the exclusion of CODI.

### b.    Special Bankruptcy Exceptions.

The 382(1)(5) Exception to the foregoing annual limitation rules generally applies when so-

called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at

least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if

also in chapter 11) pursuant to a confirmed chapter 11 plan.  Under the 382(l)(5) Exception, a

debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are

required to be reduced by the amount of any interest deductions claimed during any taxable year

ending during the three-year period preceding the taxable year that includes the effective date of the

plan of reorganization, and during the part of the taxable year prior to and including the effective

date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If

the 382(l)(5) Exception applies but the debtor undergoes another ownership change within two years

after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their

entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify

for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule, the

382(1)(6) Exception, will generally apply.  When the 382(l)(6) Exception applies, a debtor

corporation that undergoes an ownership change generally is permitted to determine the fair market

value of its stock after taking into account the increase in value resulting from any surrender or

cancellation of creditors' Claims in the bankruptcy.  This differs from the ordinary rule that requires

the fair market value of a debtor corporation that undergoes an ownership change to be determined

before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5)

Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in

the manner described above, and the debtor may undergo a change of ownership within two years

125

without triggering the elimination of its Pre-Change Losses.

Holdco believes it will be beneficial for it to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtor does utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtor's Pre-Change Losses would effectively be eliminated.  In order to prevent such a subsequent ownership change, it is expected that the Reorganized Debtor's certificate of incorporation will contain restrictions on transfers of the Reorganized Debtor's stock that are intended to prevent such a change.

Whether the Reorganized Debtor will qualify for the 382(l)(5) Exception is uncertain. Qualification under Section 382(l)(5) is a complex determination that depends on a number of different facts and legal conclusions, many of which cannot be known at this time, including the identity of those persons who will own claims against the Debtor that will be exchanged for stock on the Effective Date. If the Reorganized Debtor does not qualify for the 382(l)(5) Exception, the Debtor expects that its use of its NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtor takes advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtor's use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the Internal Revenue Code were to occur after the Effective Date.

### c.   Alternative Minimum Tax.

In general, an AMT is imposed on a corporation's AMTI at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, generally only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  The effect of this rule could cause the Reorganized Debtor to owe a modest amount of federal income tax on taxable income in future years even though NOL carryforwards may be available to offset that

126

taxable income.

**B.**     **Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims**.

**1.**     **Consequences to Holders of Class 3 FDIC Priority Claims**.

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 3 Claim will receive Cash.  A Holder of an Allowed Class 3 Claim who receives Cash in exchange for its Allowed Claim generally should recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim not allocable to accrued but unpaid interest and (b) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain (subject to the "market discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, the extent that a portion of the Cash received in exchange for the Claim is allocable to accrued but unpaid interest (see "Accrued Interest" below), whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.

**2.**     **Consequences to Holders of Class 4 Debenture Unsecured Claims**.

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 4 Claim will receive New Series A Common Stock or, where the Holder affirmatively elects the New Series B Common Stock Election, a Pro Rata Distribution of Net Free Cash, which may be evidenced in part (at the Plan Proponent's option) by New Series B Common Stock or New Series B Election Trust Interests.

While not free from doubt, where a Holder elects the New Series B Common Stock Election, and the Debtor does not issue New Series B Common Stock to evidence such right, the Holder should recognize capital gain or loss on the exchange, except to the extent that a portion of the Cash received is treated as interest that accrued between the Effective Date and the distribution dates (see "Accrued Interest" below). Any such capital gain or loss would equal the difference between (a) the

127

amount of Cash received (other than Cash treated as interest) and (b) the Holder's tax basis in the surrendered Allowed Class 4 Claim. Such gain or loss should be long-term capital gain (subject to the "market discount" rules described below) or loss if the Holder had a holding period in the Class 4 Claim of more than one year.

Additionally, certain Holders so electing may be eligible to use the installment method to defer recognition of any gain until the distribution dates. It is also plausible that a Holder not eligible for the installment method could defer recognition of any gain or loss by treating the transaction as an "open" transaction for United States federal income tax purposes.  The United States federal income tax consequences of an open transaction are uncertain and highly complex. A Holder electing the New Series B Common Stock Election should consult with its tax advisor to determine if it is eligible to use the installment method and/or whether open transaction treatment might be appropriate.

The discussion that follows describes the tax treatment that applies where a Holder either (a) receives New Series A Common Stock or (b) elects the New Series B Common Stock Election and the Debtor issues New Series B Common Stock to evidence such right, as understood by Holdco.

Whether a Holder of an Allowed Class 4 Claim recognizes gain or loss as a result of the exchange of its Claim for New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the Debentures constituting the Allowed Class 4 Claim surrendered are treated as a "security" for the reorganization provisions of the Internal Revenue Code; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class 4 Claim; (c) such Holder has claimed a bad debt deduction with respect to such Allowed Class 4 Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.

Whether a debt instrument constitutes a "security" for United States federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether

such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Plan Proponents anticipate the Reorganized Debtor will be taking the position that the Debentures underlying the Allowed Class 4 Claims will be treated as "securities" for United States federal income tax purposes.

If the Debentures constituting a Holder's surrendered Allowed Class 4 Claim are treated as "securities" for United States federal income tax purposes, the exchange of such Holder's Allowed Class 4 Claim for New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election should be treated as a recapitalization, and therefore a reorganization, under the Internal Revenue Code.  In general, this means such a Holder will recognize gain, but not loss, on the exchange. Specifically, such a Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the fair market value of the New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election received, and (b) ordinary interest income to the extent that the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election are treated as received in satisfaction of accrued but untaxed interest on the Debentures underlying the Allowed Class 4 Claim (see discussion of "Accrued Interest" below).  In such case, such a Holder's tax basis in the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received should be equal to the tax basis of the Debentures constituting the

Allowed Class 4 Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of the New Series A Common Stock or the New Series B Common Stock Election received), and such a Holder's holding period for its New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received should include the holding period for the Debentures constituting the surrendered Allowed Class 4 Claim; *provided* that the tax basis of any portion of New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election that is treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such portion of the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election should not include the holding period of the Debentures constituting the surrendered Allowed Class 4 Claim.

If the Debentures constituting a Holder's surrendered Allowed Class 4 Claim are not treated as "securities" for U. S. federal income tax purposes, such a Holder should be treated as exchanging its Allowed Class 4 Claim for New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election in a fully taxable exchange. A Holder of an Allowed Class 4 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the Holder's tax basis in the Allowed Class 4 Claim surrendered by the Holder in such exchange, and (ii) the fair market value of the New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election received. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the Debentures constituting the surrendered Allowed Class 4 Claim were held for more than one year by the Holder. To the extent that a portion of the New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election received is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued

Interest" below). Such a Holder's tax basis in the New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election received should equal its fair market value.  Such a Holder's holding period for the New Series A Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the New Series B Common Stock Election received on the Effective Date should begin on the day following the Effective Date.

### 3.    Consequences to Holders of Class 5 FDIC Non-Priority Claims and Class 6 Other Unsecured Claims.

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 5 or 6 Claim will receive New Series A Common Stock or, where the Holder affirmatively elects the New Series B Common Stock Election, a Pro Rata Distribution of Residual Net Free Cash, which may be evidenced in part (at the Debtor's option) by other Common Stock in the Reorganized Debtor.

While not free from doubt, where a Holder elects the New Series B Common Stock Election, and the Debtor does not issue other Common Stock in the Reorganized Debtor to evidence such right, the Holder should recognize capital gain or loss on the exchange, except to the extent that a portion of the Cash received is treated as interest that accrued between the Effective Date and the distribution dates (see "Accrued Interest" below).  Any such capital gain or loss would equal the difference between (a) the amount of Cash received (other than Cash treated as interest) and (b) the Holder's tax basis in the surrendered Allowed Class 5 or 6 Claim.  Such gain or loss should be long-term capital gain (subject to the "market discount" rules described below) or loss if the Holder had a holding period in the Class 5 or 6 Claim of more than one year.

Additionally, certain Holders so electing may be eligible to use the installment method to defer recognition of any gain until the distribution dates. It is also plausible that a Holder not eligible for the installment method could defer recognition of any gain or loss by treating the transaction as an "open" transaction for United States federal income tax purposes.  The United States federal income tax consequences of an open transaction are uncertain and highly complex.  A Holder electing the New Series B Common Stock Election should consult with its tax advisor to determine

if it is eligible to use the installment method and/or whether open transaction treatment might be appropriate.

The discussion that follows describes the tax treatment that applies where a Holder either (a) receives New Series A Common stock or (b) elects the New Series B Common Stock Election and the Debtor issues New Series B Common Stock to evidence such right as understood by Holdco.

Whether a Holder of an Allowed Class 5 or 6 Claim recognizes gain or loss as a result of the exchange of its Claim for New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt instrument(s) constituting the Allowed Class 5 or 6 Claim surrendered is treated as a "security" for the reorganization provisions of the Internal Revenue Code; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class 5 or 6 Claim; (c) such Holder has claimed a bad debt deduction with respect to such Allowed Class 5 or 6 Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.

Whether a debt instrument constitutes a "security" for United States federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. Holdco anticipates the Reorganized Debtor taking the position that the debt instruments underlying the Class 5 and 6 Claims will not be treated as "securities."

If the debt instrument(s) constituting a Holder's surrendered Allowed Class 5 or 6 Claim is not treated as a "security" for U. S. federal income tax purposes, such a Holder should be treated as exchanging its Allowed Class 5 or 6 Claim for New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election in a fully taxable exchange.  A Holder of an Allowed Class 5 or 6 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the Holder's tax basis in the Allowed Class 5 or 6 Claim surrendered by the Holder in such exchange, and (ii) the fair market value of the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received.  Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the debt instrument(s) constituting the surrendered Allowed Class 5 or 6 Claim was held for more than one year by the Holder.  To the extent that a portion of the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below).  Such a Holder's tax basis in the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received should equal its fair market value.  Such a Holder's holding period for the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election received on the Effective Date should begin on the day following the Effective Date.

### 4. Accrued Interest.

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instrument(s) constituting such Claim was previously included in the

Holder's gross income but was not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt instrument(s) constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

**5.      Market Discount**.

Under the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code, some or all of the gain realized by a Holder who exchanges the debt instrument(s) constituting its Allowed Claim for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instrument(s) constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining  payments to be made on the debt

instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of the debt instrument(s) constituting its Allowed Claim that had been acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include "market discount" in income as it accrued).

6.    **Consequences to Holders of New Series A Common Stock or Other Series or New Series B Common**.

a.    **Dividends on New Series A Common Stock or New Series B Common Stock**.

Any distributions made on account of the New Series A Common Stock or New Series B Common Stock issued in connection with the New Series B Common Stock Election will constitute dividends for United States federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Debtor as determined under United States federal income tax principles.  To the extent that a Holder receives distributions that would otherwise constitute dividends for United States federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares.  Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to certain exceptions, dividends received by noncorporate Holders prior to 2013 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met.

Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options,

contracts to sell, short sales or similar transactions.  In addition, to the extent that a corporation

incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is

paid, all or a portion of the dividends received deduction may be disallowed.

### b.    Sale, Redemption or Repurchase of New Series A Common Stock or New Series B Common Stock.

Unless a non-recognition provision applies, subject to the "market discount" rules discussed

above, Holders generally will recognize capital gain or loss upon the sale, redemption or other

taxable disposition of New Series A Common Stock or New Series B Common Stock issued in

connection with the New Series B Common Stock Election.

### c.    Medicare Tax.

Certain Holders that are individuals, estates or trusts are required to pay an additional 3.8%

tax on, among other things, gains from the sale or other disposition of capital assets for taxable years

beginning after December 31, 2012.  Holders that are individuals, estates or trusts should consult

their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition

of New Series A Common Stock or New Series B Common Stock issued in connection with the

New Series B Common Stock Election.

### 7.    Information Reporting and Backup Withholding.

The Debtor and Reorganized Debtor, as applicable, will withhold all amounts required by

law to be withheld from payments of interest and dividends.  The Debtor will comply with all

applicable reporting requirements of the Internal Revenue Code.  In general, information reporting

requirements may apply to distributions or payments under the Plan.  Additionally, under the backup

withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of

28%) with respect to distributions or payments made pursuant to the Plan unless that Holder

complies with the applicable requirements of the backup withholding rules and:  (a) comes within

certain exempt categories (which generally include corporations) and, when required, demonstrates

that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of

perjury that the taxpayer identification number is correct and that the Holder is not subject to backup

withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided, however*, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF EQUITY INTERESTS IN OR CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, ESTATE, GIFT, FOREIGN OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.   PLAN SUPPLEMENT

The Plan Supplement will be filed with the Bankruptcy Court within 10 days after distribution of this Disclosure Statement.  The Plan Proponents reserve the right to modify and supplement the Plan Supplement through and including the Effective Date.

## XIII.   CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that the Plan is in the best interests of all Holders of Claims.

1   The Plan Proponents urge all Holders of Claims entitled to vote to accept the Plan and to evidence

2   such acceptance by returning their Ballots, as applicable, so they will be received by the Voting

3   Deadline.

4

5   Dated: June 29, 2012      Respectfully submitted,

6

7                          LANDAU GOTTFRIED & BERGER LLP

9

10

11                    By:

12                          Jon L.R. Dalberg

13

14                          Counsel to FirstFed Financial Corp.

15

16

17                        BROWN LEGAL ADVISORS, LLC

18

19                    By:

20

21                          Daniel R Brown

22

23                        Counsel for Holdco Advisors, L.P.

24

25

26

27

28

SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P, DATED JUNE 1, 2012

## EXHIBIT A

### The Plan

Daniel R. Brown (Admitted Pro Hac Vice)
BROWN LEGAL ADVISORS, LLC
4851 N. Winchester Ave. #3
Chicago, IL  60640
Telephone:  (773) 527-0585
E-mail:  daniel@brownlegal.net

Counsel for Holdco Advisors, L.P.

Philip E. Strok
Weiland, Golden,
Smiley Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, CA  92626
Tel: (714) 966-1000
Fax: (714) 966-1002
Email: pstrok@wgllp.com

Local Counsel for Holdco Advisors, L.P.

Jon L.R. Dalberg (State Bar No. 128259)
Rodger M. Landau (State Bar No. 151456)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 700
Los Angeles, California  90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com

Counsel for FirstFed Financial Corp. as Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| **In re:** | ) **CASE NO. 2:10-bk-12927-ER** |
| | ) |
| **FIRSTFED FINANCIAL CORP.,** | ) **CHAPTER 11** |
| | ) |
| | ) **Judge:  Honorable Ernest M. Robles** |
| | ) |
| **Debtor and Debtor in Possession.** | ) **SECOND AMENDED CHAPTER 11** |
| | ) **PLAN OF REORGANIZATION** |
| | ) **PROPOSED BY THE DEBTOR AND** |
| | ) **HOLDCO ADVISORS L.P., DATED** |
| | ) **JUNE 1, 2012** |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION ................................................................................................. 1

ARTICLE II. DEFINITIONS AND RULES OF CONSTRUCTION ..................................... 1

    Specific Definitions ............................................................................................................ 1

B.       Interpretation, Rules of Construction and Computation of Time ............................ 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......... 18

    Unclassified Claims ......................................................................................................... 18

        1.       Administrative Claims ........................................................................... 19

                   Treatment ................................................................................................. 19
                   Bar Date For Administrative Claims ................................................. 19

        2.       Priority Tax Claims ................................................................................ 19

    Classified Claims And Interests .................................................................................... 20

        1.       Class 1 (Secured Claims) ...................................................................... 20

                   Classification ........................................................................................... 20
                   Impairment and Voting .......................................................................... 20
                   Treatment ................................................................................................. 20

        2.       Class 2—Non-FDIC Priority Claims ................................................. 21

                   Classification ........................................................................................... 21
                   Impairment and Voting .......................................................................... 21
                   Treatment ................................................................................................. 21

        3.       Class 3—FDIC Priority Claims ........................................................... 21

                   Classification ........................................................................................... 21
                   Impairment and Voting .......................................................................... 21
                   Treatment ................................................................................................. 22

        4.       Class 4—Debenture Unsecured Claims ............................................. 22

                   Classification ........................................................................................... 22
                   Impairment and Voting .......................................................................... 22
                   Treatment ................................................................................................. 22

        5.       Class 5—FDIC Non-Priority Claims .................................................. 22

                   Classification ........................................................................................... 22
                   Impairment and Voting .......................................................................... 23
                   Treatment ................................................................................................. 23

6.    Class 6—Other Unsecured Claims ................................................................. 23

Classification................................................................................ 23
Impairment and Voting ................................................................ 23
Treatment ..................................................................................... 23

7.    Class 7 (Convenience Claims)....................................................................... 24
8.    Class 8 (Holders Of Interests)....................................................................... 24

ARTICLE IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES................................................................................................................... 24

Default Rejection of Executory Contracts and Unexpired Leases............................ 24

Procedural Issues ..................................................................................................... 25

Claims Based on Rejection of Executory Contracts or Unexpired Leases................ 25

Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ............ 25

1.    Cure of Defaults............................................................................................ 25
2.    Objections to Cure ........................................................................................ 26
3.    Release and Satisfaction of Debtor upon Assumption.................................. 26

Reservation of Rights................................................................................................ 27

ARTICLE V. MEANS OF IMPLEMENTATION OF THE PLAN.................................... 28

Corporate Existence ................................................................................................. 28

Directors/Officers of the Debtor on the Effective Date; Plan Committee ................ 28

1.    Release and Discharge of Duties and Obligations of Current Directors
and Officers.................................................................................................. 28
2.    Plan Committee............................................................................................. 28
3.    Removal or Resignation of Plan Committee Members ................................. 30

Cancellation of Debentures, Indentures and Equity Interests ................................... 31

1.    Cancellation of Debentures........................................................................... 31
2.    Limited Survival of Senior Debt Documents................................................ 31
3.    Limited Preservation of Indenture Trustee Rights to Charging Liens........... 32
4.    Payment of Holdco Fees ............................................................................... 32
5.    Payment of Indenture Trustee Fees............................................................... 33

Reorganized Debtor Securities ................................................................................. 34

1.    New Series A Common Stock ....................................................................... 34
2.    Issuance of New Series B Common Stock (Separate Series or Classes
of Common Stock)........................................................................................ 34

General Provisions ........................................................................ 34
Alternative Treatment .................................................................. 36

3.    Limitation on Management and Control over the Reorganized Debtor ........ 37

4.      Dividends, Other Attributes .................................................................. 37

                Dividends ........................................................................................... 37
                Other Attributes of New Series A and B Common Stock ................. 37
                Redemption of Common Stock ........................................................... 38

Exemption from the Registration Requirements of the Securities Act;
Investment Company Act ....................................................................................... 39

        1.      Exemption from Securities Act ......................................................... 39
        2.      Investment Company Act ................................................................. 39

Restructuring Transactions ..................................................................................... 39

Corporate Action .................................................................................................... 40

Effectuating Documents; Further Transactions ..................................................... 40

Exemption from Certain Transfer Taxes and Recording Fees ............................... 41

Board Representation .............................................................................................. 41

Senior Management ................................................................................................ 42

Vesting of Assets in the Reorganized Debtor ........................................................ 42

Prohibition Against Pledging Assets ...................................................................... 43

Deregistration ......................................................................................................... 43

Allowance of Debenture Unsecured Claims .......................................................... 43


New Series B Common Stock Election Trust .......................................................... 43

        1.      General ............................................................................................. 44
        2.      Purpose of New Series B Common Stock Election Trust .................. 44
        3.      Costs and Expenses of New Series B Common Stock Election Trust ... 44
        4.      New Series B Common Stock Election Trust Property ..................... 45
        5.      Current Conveyance of Interest in Tax Refund Escrow Account ....... 46
        6.      Appointment of a New Series B Common Stock Election Trustee ...... 47
        7.      Transferability and Form of New Series B Common Stock Election
                Trust Interests .................................................................................. 48
        8.      Federal Income Tax Treatment of New Series B Common Stock
                Election Trust ................................................................................... 48
        9.      Tax Withholding by New Series B Common Stock Election Trustee .. 50

Holdco Cash Out Election ...................................................................................... 51

        1.      How Made ......................................................................................... 51
        2.      When Payment Made ........................................................................ 51
        3.      Effect of Payment ............................................................................. 51
        4.      Holdco to Elect to Proceed with Holdco Cash Out Election ............ 51

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...................................................52

    Initial Distribution Date ..............................................................................52

    Disputed Reserve ........................................................................................52

        1.    Establishment of Disputed Reserve ..............................................52
        2.    Maintenance of Disputed Reserve ................................................52

    Tax Refund Litigation Escrow.....................................................................53

    Quarterly Distributions ...............................................................................53

    Record Date for Distributions......................................................................53

    Delivery of Distributions.............................................................................54

        1.    General Provisions; Undeliverable Distributions .........................54
        2.    Unclaimed Property ......................................................................55

    Surrender of Canceled Instruments and Securities ......................................56

        1.    Generally......................................................................................56
        2.    Failure to Surrender Canceled Instruments...................................57

    Lost, Stolen, Mutilated or Destroyed Instrument or Security.....................57

    Manner of Cash Payments Under the Plan ..................................................58

    Time Bar to Cash Payments by Check ........................................................58

    Limitations on Funding of Disputed Reserve .............................................58

    Compliance with Tax Requirements............................................................58

    No Payments of Fractional Dollars..............................................................59

    Interest on Claims .......................................................................................59

    No Distribution in Excess of Allowed Amount of Claim............................59

    Setoff and Recoupment...............................................................................59

    No Distribution to General Unsecured Creditors.........................................60

    Cap and Limitation on Total Cash Payments to Creditors Who Make the New
    Series B Common Stock Election................................................................60

ARTICLE VII. DISPUTED CLAIMS.............................................................................60

    No Distribution Pending Allowance ...........................................................60

        1.    Distributions on Disputed Claims.................................................60
        2.    No Partial Payments.....................................................................61

Resolution of Disputed Claims ................................................................. 61

Objection Deadline ................................................................................... 61

Estimation of Claims ............................................................................... 62

Disallowance of Claims ........................................................................... 62

ARTICLE VIII. EFFECT OF PLAN CONFIRMATION .................................... 62

Satisfaction of Claims .............................................................................. 62

Discharge ................................................................................................. 63

Compromise and Settlement ................................................................... 63

Releases ................................................................................................... 64

    1.    Releases of Third Parties by the Debtor. ........................... 65
    2.    Releases of Third Parties by Others .................................. 66
    3.    Injunction .......................................................................... 66

Preservation of Causes of Action ............................................................ 68

    1.    Vesting of Causes of Action ............................................. 68
    2.    Reservation of Causes of Action ....................................... 69
    3.    Reservation of Rights Regarding Claims .......................... 70

Exculpation and Limitation of Liability .................................................. 70

    1.    Exculpation of Releasees .................................................. 70
    2.    Good Faith Solicitation .................................................... 70

Cramdown ............................................................................................... 71

ARTICLE IX. CONDITIONS PRECEDENT ..................................................... 71

Conditions to Confirmation .................................................................... 71

Conditions to the Effective Date ............................................................. 71

Effective Date Deferral Election .............................................................. 71

Waiver of Conditions to Confirmation ................................................... 72

Effect of Failure of Conditions ............................................................... 72

ARTICLE X. RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY
COURT ......................................................................................................... 72

Retention and Scope of Jurisdiction of the Bankruptcy Court ................ 72

ARTICLE XI. MISCELLANEOUS ................................................................... 74

Governing Law ........................................................................................ 74

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR HOLDCO ADVISORS L.P., DATED JUNE 1, 2012

v

Successors And Assigns ............................................................................................ 75

Modification of the Plan ........................................................................................... 75

Provisions Severable ................................................................................................ 75

Headings Do Not Control ......................................................................................... 75

Post-Confirmation Notices or Requests .................................................................... 75

Successors/Representatives of the Debtor ................................................................. 75

ARTICLE XII. CONFIRMATION REQUEST ................................................................. 76

# ARTICLE I.

## INTRODUCTION

This Plan of Reorganization is the Plan that the Debtor and Holdco Advisors L.P. seek to confirm pursuant to 11 U.S.C. § 1129.  Reference is made to the Disclosure Statement (as defined herein), distributed contemporaneously herewith, and all exhibits to the Disclosure Statement.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, will govern.

**NOTE TO CREDITORS RE COMMON STOCK ELECTION AND HOLDCO CASH-OUT ELECTION:**

PLEASE TAKE NOTICE THAT YOU MUST AFFIRMATIVELY CHOOSE TO ELECT THE NEW SERIES B COMMON STOCK ELECTION DESCRIBED HEREIN IN ORDER TO RECEIVE THE RIGHT TO RECEIVE FUTURE NET FREE CASH IF AND WHEN SUCH CASH MAY BE DISTRIBUTABLE.  IF YOU DO NOT MAKE THIS ELECTION, YOU WILL BE DEEMED TO HAVE CHOSEN TO RECEIVE CLASS A COMMON STOCK IN THE REORGANIZED DEBTOR ON ACCOUNT OF YOUR CLAIM.  PLEASE SEE SECTION VI OF THIS DISCLOSURE STATEMENT FOR A DESCRIPTION OF THE REORGANIZED DEBTOR'S BUSINESS PLAN.

IN ADDITION, PLEASE NOTE THAT YOU MUST AFFIRMATIVELY CHOOSE TO ELECT THE HOLDCO CASH-OUT ELECTION DESCRIBED HEREIN IN ORDER TO QUALIFY FOR A POTENTIAL CASH RECEIPT (EQUAL TO 5% OF YOUR ALLOWED CLAIM) ON THE EFFECTIVE DATE TO THE EXTENT HOLDCO ELECTS (IN A MANNER DESCRIBED HEREIN) TO GO FORWARD WITH SUCH OFFER.

PLEASE TAKE FURTHER NOTICE THAT TO THE EXTENT YOU ARE A BENEFICIAL HOLDER OF A COLLATERALIZED DEBT OBLIGATION (a "CDO") WHOSE ASSETS INCLUDE DEBENTURE UNSECURED CLAIMS, THE DEBTOR WILL NOT BE ACCEPTING YOUR BALLOTS DIRECTLY. RATHER, THE DEBTOR WILL ONLY TABULATE VOTES CAST BY THE BENEFICIAL HOLDERS OF DEBENTURE UNSECURED CLAIMS.  AS SUCH, IF YOU HOLD ONLY INTERESTS IN A CDO , YOUR

AFFIRMATIVE ELECTION OF THE NEW SERIES B COMMON STOCK ELECTION OR THE HOLDCO CASH OUT ELECTION MAY NOT ENTITLE YOU TO YOUR ELECTED TREATMENT UNLESS THE AGENT OF YOUR CDO (WHICH MAY BE THE INDENTURE TRUSTEE OF YOUR CDO) MAKES SUCH ELECTION ON BEHALF OF THE CDO AS A WHOLE, WHICH MAY BE DETERMINED BY THE CDO'S GOVERNING DOCUMENTS, AND MAY BE DICTATED (OR MAY NOT BE DICTATED) BY THE ELECTIONS OF OTHER HOLDERS OF DEBENTURE UNSECURED CLAIMS WITHIN THE SAME CDO.

FURTHERMORE, PLEASE NOTE THAT HOLDCO IS NOT MAKING THE NEW SERIES B COMMON STOCK ELECTION.

## ARTICLE II.

DEFINITIONS AND RULES OF CONSTRUCTION

**A.** Specific Definitions.

In addition to such other terms as are defined in other Sections hereof, the following terms shall have the following meanings:

1.    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Code and entitled to priority pursuant to sections 507 of the Code, including compensation of and reimbursement of costs to Professionals, and all fees and charges assessed against the Debtor and the Estate under 28 U.S.C. section 1930.

2.    "Administrative Claim Objection Bar Date" means the deadline for the Reorganized Debtor to object to Administrative Claims Filed in the Case which deadline shall be the later of:  (a) ninety (90) days after the Effective Date, or (b) ninety (90) days after the particular request for an administrative expense payment has been filed, except as extended by an agreement by and among the Creditor that filed the Administrative Claim objected to, the objecting Creditor and/or the Reorganized Debtor (as the case may be), or by order of the Bankruptcy Court.

3.    "Affiliate" means the term "affiliate" as defined in section 101(2) of the Bankruptcy Code.

4.    "Allowed Administrative Claim" means all or that portion of an Administrative Claim which is an Allowed Claim.

5.      "Allowed Claim" means that portion of a Claim which:  (a) was scheduled by the Debtor pursuant to section 521 of the Code, other than a Claim scheduled as disputed, contingent or unliquidated; (b) is set forth in a proof of Claim which was timely filed with the Bankruptcy Court, and as to which no objection has been filed within the time provided by the Plan; or (c) if a proof of Claim was timely filed and an objection to the proof of Claim was filed, has been allowed by a Final Order.

6.      "Allowed Convenience Claim" means all or that portion of a Convenience Claim which is an Allowed Claim.

7.      "Allowed Priority Claim" means all or that portion of a Priority Claim which is an Allowed Claim.

8.      "Allowed Priority Tax Claim" means all or that portion of a Priority Tax Claim which is an Allowed Claim.

9.      "Allowed Secured Claim" means an Allowed Claim secured by a lien on any property of the Estate, but only to the extent of the value of the interest of the holder of such Allowed Claim in such property, the calculation of which shall not include any demand for default interest, penalty interest or other similar demands.

10.      "Allowed Unsecured Claim" means all or that portion of an Unsecured Claim which is an Allowed Claim.

11.      "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its Estate or the Reorganized Debtor under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

12.      "Ballot" means a ballot sent to Holders of Claims to be counted as a vote to accept or reject the Plan.

13.      "Bank" means First Federal Bank of California, a wholly owned subsidiary of the Debtor.

/ / /

14.    "Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

15.    "Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California, having jurisdiction over the Case and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court pursuant to section 151 of title 28 of the United States Code; or, in the event such court ceases to exercise jurisdiction over the Case, such court or unit thereof that exercises jurisdiction over the Case in lieu thereof.

16.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court, to the extent applicable to the Case, including all amendments thereto to the extent such amendments are applicable to the Case.

17.    "Bar Date Order" means the Order (I) Establishing Bar Dates for Filing Proofs of Claim or Interest, and (II) Approving the Form and Manner of Notice Thereof, dated April 15, 2010 [Docket No. 34].

18.    "Business Day" means any day except Saturday, Sunday, "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)) or any day on which commercial banks in Los Angeles, California are authorized by law to close.

19.    "Case" means the chapter 11 case number 2:10-bk-12927-ER under the Code, commenced by the Debtor on the Petition Date.

20.    "Cash" means legal tender of the United States of America or the equivalent thereof, and with respect to the Disputed Reserve, including bank deposits, checks and readily marketable securities or instruments issued by an Entity, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally-recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one

(1) year, at the then best generally available rates of interest for like amounts and like periods.

21.    "Causes of Action" means all claims, actions and causes of action, including, without limitation, causes of action by or against the United States Internal Revenue Service, the FDIC Causes of Action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and cross claims (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against Insiders and/or any other Entities, including Avoidance Actions) of the Debtor, the Reorganized Debtor and/or the Estate (including, without limitation, those actions set forth in the Plan Supplement) that are or may be pending on, or may be instituted by the Reorganized Debtor after the Effective Date against any Entity, based in law or equity, including, without limitation, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

22.    "Certificate" means any instrument evidencing a Claim against the Debtor, including, without limitation, any note, bond, indenture or other document evidencing or creating any indebtedness or obligation of the Debtor.

23.    "Charging Lien" means any Lien or other priority in payment arising prior to the Effective Date to which the Indenture Trustee is entitled pursuant to the provisions of the Indentures, against distributions to be made in accordance with the provisions of the Indentures.

24.    "Claim" means the term as defined in section 101(5) of the Code.

25.    "Claims Objection Bar Date" means the deadline for the Reorganized Debtor to object to Claims Filed in the Case (except for Administrative Claims), which deadline shall be the later of (a) 90 days after the Effective Date; or (b) 90 days after the relevant proof of Claim has been filed, except as extended by an agreement between the objecting Creditor and the Reorganized Debtor or by order of the Bankruptcy Court.

26.    "Claims Register" means the official register of proofs of Claim filed in the Case and maintained by the clerk of the Court.

27.    "Class" means a group of Claims or Interests classified together in a class designated in Article III.

28.    "Code" means the Bankruptcy Code.

29.    "Common Stock" means common stock of the Debtor.

30.    "Confirmation Date" means the date of Entry of the Confirmation Order.

31.    "Confirmation Hearing" means the hearing before the Bankruptcy Court to be held in accordance with section 1128(a) of the Code.

32.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Code.

33.    "Convenience Claim" means any Unsecured Claim, that is (i) an Allowed Claim for an amount of $7,500 or less or (ii) is an Allowed Claim in an amount greater than $7,500, but which is reduced to $7,500 by election of the holder thereof pursuant to such holder's ballot.  In no event shall any Convenience Claim exceed $7,500 for the purposes of allowance, treatment or Distribution under this Plan.

34.    "Creditor" means any Person that is the holder of a Claim.

35.    "Cure" means the payment of Cash by the Debtor or Reorganized Debtor, as applicable, or the distribution of other property (as the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the executory contract or unexpired lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (b) permit the Debtor to assume such executory contract or unexpired lease under sections 365 and 1123 of the Bankruptcy Code.

36.    "Cure Bar Date" means the date that is thirty (30) days after the Effective Date.

37.    "D&Os" means all of the Debtor's current and former directors and officers, including those who served in such capacity at any time prior to or following the Petition Date.

38.    "D&O Insurance Coverage" means coverage under any directors' and officers' liability insurance coverage provided to D&Os.

/ / /

39.      "Debenture Unsecured Claims" means Claims on account of the $150,000,000 in aggregate principal outstanding under the Debentures issued pursuant to the Indentures, together with any and all accrued and unpaid interest thereon as of the Petition Date.

40.      "Debentures" means collectively, the 2015 Debentures, the 2016 Debentures and the 2017 Debentures.

41.      "Debtor" means FirstFed Financial Corporation., in its capacity as a debtor and debtor in possession.

42.      "Disclosure Statement" means the Second Amended Disclosure Statement Re Second Amended Chapter 11 Plan of Reorganization Proposed by the Debtor and Holdco Advisors L.P. for Debtor FirstFed Financial Corporation Dated June 1, 2012 (and all annexes attached thereto or referenced therein) that relates to this Plan and is approved pursuant to section 1125 of the Code in an order Entered by the Bankruptcy Court, as such Disclosure Statement may be amended, modified or supplemented.

43.      "Disputed Claim" means any Claim which is not an Allowed Claim.

44.      "Disputed Reserve" means the reserve for Disputed Clams as set forth in Article VI.B. of the Plan.

45.      "Distribution" means any distribution of Cash or otherwise made under the Plan by the Debtor or the Reorganized Debtor, as applicable.

46.      "Distribution Date" means (i) the Initial Distribution Date, and (ii) any subsequent date on which a Distribution is made by the Reorganized Debtor.

47.      "Distribution Record Date" means the record date for determining the entitlement of Holders of Claims to receive Distributions under the Plan on account of Allowed Claims.  The Distribution Record Date shall be that date which is two (2) Business Days after the Confirmation Date or such other date as shall be established by the Bankruptcy Court in the Confirmation Order.

48.      "Effective Date" means the date which is ten (10) calendar days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; provided, however, that if, on or prior to such date, all conditions to the Effective Date set forth in ARTICLE IX of this Plan have not been satisfied or waived, then the Effective Date shall be the

first Business Day following the day that is ten (10) calendar days after the first date on which all such conditions to the Effective Date have been so satisfied or waived

49.    "Effective Date Deferral Election" means the right of Holdco to elect, in its sole and absolute discretion, to defer the occurrence of the Effective Date pursuant to Article IX C. below.

50.    "Election Pro Rata" means the ratio of the amount of an Allowed General Unsecured Claim in a particular Class to the aggregate amount of all General Unsecured Claims that have not yet been disallowed who elect and are entitled to receive the New Series B Common Stock Election pursuant to this Plan.

51.    "Entered" or "Entry" means the recording on the Bankruptcy Court docket for the Case by the clerk of the Bankruptcy Court.

52.    "Entity" or "Entities" means the term defined in section 101(15) of the Bankruptcy Code.

53.    "Escrow Account Stipulation" the Stipulation to Establish Escrow Account Relating to Income Tax Refunds [Docket No. 143] (the "Escrow Account Stipulation")

54.    "Escrow Account Order" means the Order Approving Stipulation to Establish Escrow Account Relation to Income Tax Refunds [Docket No. 150].

55.    "Estate" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

56.    "Exculpated Claim" has the meaning set forth in Article [  ].

57.    "Exculpated Party" means each of the following in its capacity as such:  (a) the Debtor; (b) the Reorganized Debtor; (c) Holdco;  and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' current and former officers and directors (including the D & Os) principals, partners, members, managers, employees, agents, professionals, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (whether current or former), , and including, without limitation, Landau Gottfried & Berger LLP, Manatt, Phelps and Phillips, LLP and Crowe Horwath LLP).

58.    "Executory Contract" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

59.    "Fair Market Value Price" means except as provided in Part D.4.c. of Article V of this Plan, a price equal to fair market value as determined by the New Board in good faith as of a date not more than 30 days prior to the closing date of the applicable transaction.

60.    "FDIC" means the Federal Deposit Insurance Corporation, either in its corporate capacity or in its capacity as receiver for the Bank.

61.    "FDIC Causes of Action" means the causes of action filed by the Debtor against the FDIC, as may be amended or supplemented from time to time, and any adversary proceeding or contested matter (i) seeking relief against the FDIC, or (ii) seeking to disallow, subordinate or recharacterize any claim asserted by or on behalf of the FDIC, including, without limitation, the adversary proceeding numbered and styled Complaint: (1) Objecting to Federal Deposit Insurance Corporation Proof of Claim No. 28; (2) Counterclaim for Declaratory Relief; and (3) for An Accounting Pursuant to 12 U.S.C. § 1821(d)(15)(C) filed by the Debtor against the FDIC on December 21, 2011, in the United States Bankruptcy Court for the Central District of California, Case No. LA11 -03218-ER.

62.    "FDIC Non-Priority Claims" means general unsecured Claims, if any, and if and to the extent Allowed, held by the FDIC, either in its corporate capacity or as receiver for the Bank, that are not FDIC Priority Claims.

63.    "FDIC Priority Claims" means unsecured Claims, if any, and if and to the extent Allowed, held by the FDIC for the Bank entitled to priority under sections 507(a)(9), or 365(o) of the Bankruptcy Code.

64.    "FDIC Priority Claims Determination" means entry of a Final Order estimating for voting purposes or determining the allowance or disallowance of all FDIC Priority Claims.

65.    "File" or "Filed" means, with respect to any pleading, entered on the docket of the Case and properly served in accordance with the Bankruptcy Rules or with respect to a Claim, a Claim for which a proof of Claim has been properly and timely filed in accordance with the Bar Date Order.

/ / /

66.     "Final Order" means an order or judgment Entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter of the Case and the parties: (i) that has not been reversed, stayed, modified or amended; (ii) as to which no appeal, certiorari proceeding, re-argument, or other review or rehearing has been requested or is still pending; and (iii) as to which the time for filing a notice of appeal or petition for certiorari shall have expired. Notwithstanding, and in lieu of the foregoing, with respect to the Confirmation Order, Final Order means an order or judgment of the Bankruptcy Court confirming the Plan and with respect to which no stay pending appeal is in effect; provided that for the FDIC Priority Claim Determination only (i) and (iii) of this definition applies.

67.     "Free Cash" means (a) Cash owned by the Debtor as of the Effective Date plus (b) Cash proceeds from (i) any loan participation, loan, investment financial instrument, or anything similar to any of the foregoing, that is owned by the Debtor as of the Effective Date; (ii) any Causes of Action (including the FDIC Causes of Action); and (ii) any other tangible or intellectual property assets that are owned by the Debtor as of the Effective Date plus (c) amounts, if any, refunded under the Debtor's insurance policies.

68.     "General Unsecured Claims" means Claims against the Debtor that are not Secured Claims, Administrative Claims, Priority Tax Claims, Non-FDIC Priority Claims, FDIC Priority Claims or Equity Interests, but shall include the Debenture Unsecured Claims, FDIC Non-Priority Claims and Convenience Class Claims.

69.     "Governmental Entity" means any legislature, agency, bureau, department, commission, court, political subdivision, tribunal or other instrumentality of government whether local, state, federal or foreign, and such other entities as defined and described in section 101(27) of the Code.

70.     "Holdco" means Holdco Advisors L.P.

71.     "Holdco Cash Out Election" means the right of Holders of Allowed Class 4, 5 and 6 Claims who vote to accept this Plan and do not elect to receive New Series B Common Stock on account of their Allowed Class 4, 5 or 6 Claims to elect to transfer and assign their respective right to receive distributions of shares of New Series A Common Stock to Holdco, a

designee of Holdco, an affiliate of Holdco, or a fund managed by Holdco in exchange for payment by Holdco, a designee of Holdco, an affiliate of Holdco, or a fund managed by Holdco to Holder that so elects of an amount equal to five percent (5%) of such Holder's Allowed Claim.

72.     "Holdco Fees" means the reasonable, documented third party fees and expenses (including, without limitation, professional fees and expenses for legal services or financial advisory services) of Holdco incurred through the Effective Date related to the Plan (including with respect to potential modifications thereof), the Disclosure Statement and all other Plan documents and matters related thereto.

73.     "Holder or Holders" mean any Entity or Entities holding a Claim against or an Interest in the Debtor.

74.     "Impaired" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

75.     "Indemnification Obligation" means the Debtor's obligations, if any, under an Executory Contract, the Debtor's articles of incorporation or by-laws, a corporate or other document, a postpetition agreement, through the Plan, or otherwise, to indemnify any Person, including directors, officers, attorneys, other professionals and agents, or employees of the Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law.

76.     "Indentures" means collectively, the 2015 Indenture, the 2016 Indenture and the 2017 Indenture.

77.     "Indenture Trustee" means Wilmington Trust Company, together with its successors and assigns, acting solely in its capacity as Indenture Trustee under the Indentures and not individually.

78.     "Indenture Trustee Fees" means any and all reasonable, documented fees, costs, disbursements, advances and expenses of the Indenture Trustee (including without limitation, (a) any and all such fees, costs and expenses of any and all attorneys, financial advisors and/or other

professionals of the Indenture Trustee, (b) any sums paid or to be paid in connection with indemnity Claims and (c) any and all such fees, costs, disbursements, advances and expenses of the Indenture Trustee incurred in connection with any Distributions made or to be made under this Plan), whether incurred prior to, on or after the Petition Date up to and including the Effective Date and, if incurred with the consent of the Reorganized Debtor, incurred after the Effective Date.

79. "Initial Distribution Date" means the Effective Date, or as soon as reasonably practicable after the Effective Date.

80. "Insider" means the term as defined in section 101(31) of the Code.

81. "Interests" means any equity interests, ownership rights, or shares in the Debtor (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, membership and other interests in a limited liability company, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim relating to or arising from any of the foregoing.

82. "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

83. "Investment Company Act" means the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq., as now in effect or hereafter amended.

84. "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

85. "Material Causes of Action" means any Causes of Action (i) seeking a recovery of more than $20,000 (including, without limitation, the FDIC Causes of Action) and

(ii)  the Receivership and Bank Sale Causes of Action.

86.  "Net Free Cash" means the amount of the Reorganized Debtor's Free Cash available after full payment or satisfaction of, or Net Free Cash Reserves for:  all Allowed Secured Claims, Allowed Administrative Claims, Allowed FDIC Priority Claims, Allowed Non-FDIC Priority Claims and Indenture Trustee Fees; and costs of administering and implementing the Plan; but not including any costs and expenses solely attributable to the business operations of the Reorganized Debtor.

87.  "Net Free Cash Reserves" means, for purposes of calculating Net Free Cash, reserves or holdbacks related to future payments of the following:  (a) all Allowed Secured Claims, (b) all Allowed Administrative Claims, (c) all Allowed FDIC Priority Claims, (d) all Allowed Non-FDIC Priority Claims; (e) all Indenture Trustee Fees; and (f) all costs of administering and implementing the Plan; including prosecution of the Causes of Action, but not including any costs and expenses solely attributable to the business operations of the Reorganized Debtor.

88.  "Net Recovery Proceeds"  means the aggregate amount of Cash which the Reorganized Debtor now or hereafter receives from, or as a result of, any Cause of Action (including, without limitation, the FDIC Cause of Action) which it is now or hereafter pursuing, whether due to, or as a result of, any judgment, order, settlement or otherwise (including, without limitation, and for avoidance of doubt, (a) any such Cash which the Reorganized Debtor now or hereafter receives from the Tax Refund Escrow Account and (b) any such Cash which the Reorganized Debtor now or hereafter receives from any sale, transfer or conveyance by the Reorganized Debtor to any Person of all of the rights, title and interests of the Reorganized Debtor in and to any such Cause of Action), after the payment in full by the Reorganized Debtor of (i) any reasonable and customary legal and other third party professional fees, costs and expenses incurred by the Reorganized Debtor in connection with such Cause of Action; and (ii) any then Allowed Administrative Claims which have not been otherwise paid in full in Cash; provided, however, that Net Recovery Proceeds shall be reduced as necessary to ensure that any payment of any Indenture Trustee Fees using such Net Recovery Proceeds shall not reduce the recoveries of or Distributions to Holders of Allowed FDIC Non-Priority Claims or Allowed Other Unsecured Claims.

89.    "New Board" means the board of directors of the Reorganized Debtor.

90.    "New Common Stock" means New Series A Common Stock and New Series B Common Stock.

91.    "New Series A Common Stock" means newly-issued shares of series A common stock of the Reorganized Debtor, if any, which shall be entitled to twenty votes per share and have a par value of $0.01 per share.

92.    "New Series B Common Stock" means the newly-issued shares of series B common stock of the Reorganized Debtor, if any, which shall be entitled to one vote per share and have a par value of $0.01 per share, if issued at all, all as described in this Plan.  Each share of New Series B Common Stock shall entitle the Holder thereof to exercise voting rights equal to 1/20 of the voting rights exercisable by each Holder of a New Series A Common Stock.

93.    "New Series B Common Stock Election" means the right of each Holder who so elects on the Ballot to receive a Pro Rata Distribution of Net Free Cash rather than New Series A Common Stock, which may be evidenced in part, at the Reorganized Debtor's option (if necessary to cause Section 382(l)(5) of the Internal Revenue Code to apply to the Plan) by a separate series or class of securities on the terms set forth below.

94.    "New Series B Common Stock Election Trust" means the disbursement trust described below.

95.    "New Series B Common Stock Election Trust Agreement" means the agreement, substantially in the form set forth in the Plan Supplement, between the Reorganized Debtor and the New Series B Common Stock Election Trustee, governing the New Series B Common Stock Election Trust.

96.    "New Series B Common Stock Election Trust Cash" means all Cash and Cash proceeds that holders of Allowed General Unsecured Claims that elect the New Series B Common Stock Election are entitled to receive under the Plan.

97.    "New Series B Common Stock Selection Trust Property" shall have the meaning given to that term in Article. V.P.5 of the Plan.

/ / /

98.    "New Series B Common Stock Election Trustee" means the Person who will serve as trustee of the New Series B Common Stock Election Trust, and who will be identified in the Plan Supplement.

99.    "New Series B Common Stock Election Trust Interests" means the beneficial interests in the New Series B Common Stock Election Trust issued to holders of Allowed General Unsecured Claims under the Plan that make the New Series B Stock Election.

100.    "Non-FDIC Priority Claims" means all Claims entitled to priority under sections 507(a)(3) through (a)(7) of the Bankruptcy Code.

101.    "Person" means an individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization, Governmental Entity, and such other entities as defined and described in section 101(41) of the Code.

102.    "Petition Date" means January 6, 2010.

103.    "Plan" means this Joint Chapter 11 Plan of Reorganization Proposed by the Plan Proponents dated as of June 1, 2012 (including all exhibits hereto), as modified or amended from time to time.

104.    "Plan Committee" means a committee established pursuant to Article V.B.2 of this Plan.

105.    "Plan Proponents" means Holdco and the Debtor.

106.    "Plan Supplement" means the compilation of documents and exhibits relevant to the implementation of the Plan that will be filed no later than within 10 days after distribution of this Disclosure Statement, and which may be amended, supplemented or modified through and including the date of the Confirmation Hearing.  The Plan Supplement shall include, but not be limited to:  the articles of incorporation and by-laws of the Reorganized Debtor; the form of the New Series B Common Stock Election Trust Agreement; the identities of the members of the New Board; the identity of the New Series B Common Stock Election Trustee; a list of Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtor; and a list of Causes of Actions to be retained by the Reorganized Debtor.  Holdco shall have the sole and exclusive right to

determine the contents of the Plan Supplement, provided that nothing in the Plan Supplement shall conflict with the terms of the Plan.

107.    "Priority Tax Claim" means a Claim entitled to priority under sections 502(i) and 507(a)(8) of the Code.

108.    "Pro Rata" means the ratio of the amount of an Allowed General Unsecured Claim in a particular Class to the aggregate amount of all General Unsecured Claims that have not yet been disallowed.

109.    "Professionals" means those Persons (a) employed in the Case under section 327 of the Code, and (b) entitled, under sections 330, 503(b), 506(b), or 507(a)(2) of the Code, to seek compensation for legal, accounting or other professional services and the costs and expenses related to such services from the Debtor or the Estate, including, without limitation, Landau Gottfried & Berger LLP, Manatt, Phelps & Phillips, LLP and Crowe Horwath LLP.

110.    "Quarterly Distribution Date" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30 and December 31 of each calendar year).

111.    "Receivership and Bank Sale Causes of Action" means any and all claims, demands and causes of action against any Entity (including, without limitation, the FDIC and/or the acquiror of the Bank's assets from the FDIC) arising from or related to the seizure of the Bank by the FDIC and the subsequent purchase and sale of the Bank's assets.

112.    "Released Parties" means the Releasees other than Debtor, but including (for the avoidance of doubt) all of the current and former directors, officers, (including the D & Os) members, partners, employees, attorneys, accountants, investment bankers, financial advisors and consultants (including their respective officers, directors, employees, members, and attorneys), including, but not limited to, Landau Gottfried & Berger LLP, Manatt, Phelps & Phillips, LLP and Crowe Horwath LLP.

113.    "Releasees" means, in their individual and representative capacities as such, the Debtor, Indenture Trustee, Holdco, all Entities controlled by or under common control with all of the foregoing, all Affiliates of all of the foregoing, and all of their respective current and former

directors, officers, (including the D & Os but excluding all persons who were officers of the Bank but not of the Debtor) members, partners, employees, attorneys, accountants, investment bankers, financial advisors and consultants (including their respective officers, directors, employees, members, and attorneys).

114.    "Releasing Parties" means, each of the following in its capacity as such:  (a) the Debtor and the Reorganized Debtor (and all parties claiming derivatively or through the Debtor or the Reorganized Debtor or their respective Estates); (b) Holdco; (c) each Holder of a Claim in a Class entitled to vote on the Plan who elects to opt in to the Third Party Releases by marking the appropriate place on the Ballot; and (d) each of the Releasees.

115.    "Reorganized Debtor" means the Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

116.    "Schedules" means the Schedule of Assets and Liabilities and Statement of Financial Affairs, as may have been amended, and as Filed by the Debtor in the Case.

117.    "Secured Claim" means a Claim against the Debtor secured by a lien on any property of the Estate.

118.    "Senior Debt Documents" means, collectively, the Indentures, the Debentures and any and all documents, instruments and agreements executed and delivered from time to time pursuant to or in connection with any or all of the Indentures or the Debentures.

119.    "Stock Pro Rata" means the ratio of the amount of an Allowed General Unsecured Claim in a particular Class to the aggregate amount of all General Unsecured Claims that have not yet been disallowed who receive New Series A Common Stock pursuant to this Plan.

120.    "Third Party Release" means the release granted by the Releasing Parties to the Releasees pursuant to Article VIII.D.2.

121.    "Treasury Regulations" means the United States Department of Treasury regulations promulgated under the Internal Revenue Code.

122.    "Unexpired Lease" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

---

1     123.   "Unimpaired" means not Impaired.

2     124.   "Unsecured Claim" means any Claim of a Creditor against the Debtor,

3 however arising, which is not an Administrative, Tax, Priority or Secured Claim.

4     125.   "Voting Classes" means Classes entitled to vote to accept or reject this Plan.

5     126.   "Voting Deadline" means that date and time set forth in the Disclosure

6 Statement Order by which the Solicitation Agent must receive Ballots from Holders of Allowed

7 Claims in Voting Classes.

8     127.   "Voting Record Date" means that date set forth in the Disclosure Statement

9 Order for determining which Holders of Claims and Interests are entitled to vote to accept or reject

10 the Plan.

11     128.   "2015 Debentures" means certain Fixed/Floating Rate Senior Debt Securities

12 Due 2015 issued on or about June 15, 2005 by the Debtor in the original principal aggregate amount

13 principal of Fifty Million and 00/100 Dollars ($50,000,000.00), pursuant to the provisions of the

14 2015 Indenture.

15     129.   "2016 Debentures" means certain Fixed/Floating Rate Senior Debt Securities

16 Due 2016 issued on or about December 29, 2005 by the Debtor in the original principal aggregate

17 amount principal of Fifty Million and 00/100 Dollars ($50,000,000.00), pursuant to the provisions

18 of the 2016 Indenture.

19     130.   "2017 Debentures" means certain Fixed/Floating Rate Senior Debt Securities

20 Due 2017 issued on or about April 26, 2007 by the Debtor in the original principal aggregate

21 amount principal of Fifty Million and 00/100 Dollars ($50,000,000.00), pursuant to the provisions

22 of the 2017 Indenture.

23     131.   "2015 Indenture" means that certain Indenture, dated as of June 15, 2005, by

24 and between the Debtor and the Indenture Trustee, pursuant to which, among other things, the

25 Debtor issued its 2015 Debentures.

26     132.   "2016 Indenture" means that certain Indenture, dated as of December 29,

27 2005, by and between the Debtor and the Indenture Trustee, pursuant to which, among other things,

28 the Debtor issued its 2016 Debentures.

133.    "2017 Indenture" means that certain Indenture, dated as of April 26, 2007, by and between the Debtor and the Indenture Trustee, pursuant to which, among other things, the Debtor issued its 2017 Debentures.

**B.**    Interpretation, Rules of Construction and Computation of Time

1.    Any term used in this Plan that is not defined herein or in the Disclosure Statement, whether in this Article II or elsewhere, or other exhibits hereto, but that is used in the Code or the Bankruptcy Rules has the meaning ascribed to that term in (and shall be construed in accordance with the rules of construction under) the Code or the Bankruptcy Rules.

2.    The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Plan as a whole and not to any particular Article, Section, subsection or clause contained in this Plan.

3.    Unless specified otherwise in a particular reference, a reference in this Plan to an "Article" or a "Section" is a reference to that Article or Section of this Plan.

4.    Any reference in this Plan to a document being in a particular form or on particular terms and conditions means that the document shall be substantially in such form or substantially on such terms and conditions.

5.    Any reference in this Plan to an existing document means such document, as it may have been amended, modified or supplemented from time to time as of the Effective Date.

6.    Whenever from the context it is appropriate, each term stated in either the singular or the plural shall include both the singular and the plural.

7.    Except as otherwise provided herein, the rules of construction set forth in section 102 of the Code shall apply to this Plan.

8.    In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.    All exhibits to this Plan are incorporated into this Plan, and shall be deemed to be included in this Plan, regardless of when filed with the Bankruptcy Court.

10.    The provisions of the Plan shall control over the contents of the Disclosure Statement.  The provisions of the Confirmation Order shall control over the contents of the Plan.

11.     Whenever the time for occurrence or happening of an event as set forth in the Plan falls on a day that is not a Business Day, then the time for the occurrence or happening of said event shall be extended to the next Business Day.

12.     Subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Code and Bankruptcy Rules.

13.     All references to statutes, regulations, orders, rules of court, and the like shall mean as amended from time to time, as applicable to the Case, unless otherwise stated.

14.     Captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

15.     Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

## ARTICLE III.

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

As required by the Code, the Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided in the Code.  The Plan states whether each Class of Claims or Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive under the Plan.  The following are the Classes in this Plan:

**A.** Unclassified Claims.

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Code.  As such, the Plan Proponents have not placed the following Claims in a Class.  The treatment of these Claims is provided below.

/ / /

/ / /

/ / /

1                                   1.   Administrative Claims.

2                                      a.   Treatment.

3        Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the

4 Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive Cash equal to

5 the unpaid portion of such Allowed Administrative Claim:  (I) on the later of (x) the Effective Date,

6 and (y) the date an order of the Bankruptcy Court allowing the Administrative Claim becomes a

7 Final Order, or (II) as otherwise ordered by the Bankruptcy Court.

8                         b.   Bar Date For Administrative Claims.

9        All applications, including final applications, for compensation of Professionals for services

10 rendered and for reimbursement of expenses incurred on or before the Effective Date, and any other

11 request for compensation by any Person for making a substantial contribution in the Case, and all

12 other requests for payment of an Administrative Claim incurred on or before the Effective Date

13 under sections 503(b) or 507of the Code (except only for Claims under 28 U.S.C. section 1930)

14 shall be filed no later than sixty (60) days after the Effective Date.

15        As to other administrative expenses, Creditors shall file such requests for an administrative

16 expense payment with the Bankruptcy Court and serve on the Reorganized Debtor and United

17 States Trustee no later than sixty (60) days after the Effective Date or by such other bar date as the

18 Bankruptcy Court may set.  Holders of claims for the provision of ordinary-course goods and

19 services post-petition to the Debtor need not file requests for payment of administrative expenses.

20        Any Administrative Claim not filed or submitted as explained above within the deadlines set

21 forth herein shall be forever barred, and any Creditor that is required to file a request for payment of

22 an administrative expense and that does not file such request by the applicable bar date shall be

23 forever barred from asserting such Claim or request against the Debtor, the Estate or the

24 Reorganized Debtor.

25                            2.   Priority Tax Claims.

26        Each holder of an Allowed Priority Tax Claim shall receive Cash equal to the amount of

27 such Allowed Priority Tax Claim on the later of (x) the Effective Date,  (y) the date an order of the

28 Bankruptcy Court allowing such Priority Tax Claim becomes a Final Order, unless otherwise

agreed to by the holder and the Debtor or the Reorganized Debtor, as applicable, and (z) the date

such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.  All interest and

penalties for Allowed Priority Tax Claims will accrue in accordance with applicable law, including

sections 511 and 506(b) of the Bankruptcy Code.

**B.**  Classified Claims And Interests.

A Claim or Interest shall be deemed classified in a particular Class only to the extent the

Claim or Interest qualifies within the description of the Class and shall be deemed classified in a

different Class to the extent that any remainder of such Claim or Interest qualifies within the

description of such different Class.  A Claim or Interest is classified in a particular Class regardless

of whether the Claim or Interest is an Allowed Claim or Interest in that Class, or only asserted as

such, but only to the extent that it has not been paid, released, disallowed or otherwise satisfied.

The treatment with respect to each Class of Claims and Interests provided for in this Article III shall

be in full and complete satisfaction and release of such Claims and Interests.  The following Classes

appear in this Plan:

| CLASS | CLAIMS | IMPAIRMENT/VOTING |
|---|---|---|
| 1 | SECURED | UNIMPAIRED – NOT ENTITLED TO VOTE |
| 2 | NON-FDIC PRIORITY CLAIMS | UNIMPAIRED – NOT ENTITLED TO VOTE |
| 3 | FDIC PRIORITY CLAIM | UNIMPAIRED – NOT ENTITLED TO VOTE |
| 4 | DEBENTURE UNSECURED CLAIM | IMPAIRED – ENTITLED TO VOTE |
| 5 | FDIC NON-PRIORITY CLAIMS | IMPAIRED – ENTITLED TO VOTE |
| 6 | OTHER UNSECURED CLAIMS | IMPAIRED – ENTITLED TO VOTE |
| 7 | CONVENIENCE CLAIMS | UNIMPAIRED – NOTE ENTITLED TO VOTE |
| 8 | INTERESTS | IMPAIRED – NOT ENTITLED TO VOTE |

1.      Class 1 (Secured Claims).

a.      Classification.  Class 1 consists of all Secured Claims.

b.      Impairment and Voting.  Class 1 is unimpaired under the Plan and the

holders of Class 1 Allowed Secured Claims, if any, are deemed to accept the Plan.

c.      Treatment.  The legal, equitable and contractual rights of the holders of

Allowed Secured Claims are unaltered by the Plan.  Unless otherwise agreed to by the holder of an

Allowed Secured Claim and Holdco, each holder of an Allowed Secured Claim shall receive on the

later of (x) the Effective Date, and (y) the date an order of the Bankruptcy Court allowing the

Secured Claim becomes a Final Order, on account of and in full satisfaction of its Allowed Secured

Claim, either of the following treatments at the election of (A) Holdco or (B) if after the Effective

Date, the Reorganized Debtor: (i) Cash equal to the amount of the Allowed Secured Claim or (ii)

possession of the property in which the holder of the Allowed Secured Claim has a perfected,

unavoidable and enforceable lien, security interest or other charge and relief from the automatic

stay provided by section 362 of the Code to foreclose, collect upon or set-off the property in

accordance with applicable non-bankruptcy law; provided, however, that any time after the

Confirmation Date but before the Effective Date, Holdco, in its sole discretion, can elect to give to

the holder of an Allowed Secured Claim the treatment provided in subparagraph (ii) above.

      2.    Class 2—Non-FDIC Priority Claims.

      a.    Classification.  Class 2 consists of all Non-FDIC Priority Claims.

      b.    Impairment and Voting.  Class 2 is Unimpaired by the Plan.  Each Holder of

a Non-FDIC Priority Claim is presumed to accept and therefore is not entitled to vote to accept or

reject the Plan.

      c.    Treatment.  The Reorganized Debtor shall pay each Holder of an Allowed

Non-FDIC Priority Claim, in full and final satisfaction of such Allowed Non-FDIC Priority Claim,

Cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable

treatment, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such

Allowed Non-FDIC Priority Claim becomes Allowed; and (iii) the date such Allowed Non-FDIC

Priority Claim is payable under applicable non-bankruptcy law.

      3.    Class 3—FDIC Priority Claims.

      a.    Classification.  Class 3 consists of all FDIC Priority Claims.

      b.    Impairment and Voting.  Class 3 is Unimpaired by the Plan.  Each Holder of

a Claim that, if Allowed, would constitute an FDIC Priority Claim, is conclusively presumed to

accept the Plan pursuant to section 1126(f) of the Code, and is not entitled to vote to accept or reject

the Plan.

      c.    Treatment. The legal, equitable and contractual rights of the holders of

Allowed Class 3 Claims are unaltered by the Plan.

/ / /

4.      Class 4—Debenture Unsecured Claims

     a.      Classification.  Class 4 consists of all Debenture Unsecured Claims.

     b.      Impairment and Voting.  Class 4 is Impaired by the Plan.  Each Holder of a Debenture Unsecured Claim is entitled to vote to accept or reject the Plan.

     c.      Treatment.  In full satisfaction, settlement, release, and compromise of and in exchange for each Allowed Debenture Unsecured Claim, each Holder of an Allowed Debenture Unsecured Claim shall receive on the Initial Distribution Date its Stock Pro Rata Distribution of the New Series A Common Stock.  Alternatively, and only if such Holder affirmatively so elects, instead of any of the foregoing, such Holder shall receive the New Series B Common Stock Election consisting of such Holder's Election Pro Rata share of the New Series B Common Stock Election Trust Interests, which, inter alia, shall entitle such Holder to receive its Election Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with this Plan and the New Series B Common Stock Election Trust Agreement.  The Reorganized Debtor reserves the right in addition to issue shares of New Series B Common Stock to Holders of Allowed Class 4 Claims making the New Series B Common Stock Election as is necessary to preserve certain tax attributes of the Debtor. Notwithstanding anything to the contrary in this Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 4 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.

5.      Class 5—FDIC Non-Priority Claims.

     a.      Classification.  Class 5 consists of all FDIC Non-Priority Claims.

     b.      Impairment and Voting.  Class 5 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute an FDIC Non-Priority Claim in Class 5 is entitled to vote to accept or reject the Plan.

     c.      Treatment.  In full satisfaction, settlement, release, and compromise of and in exchange for each FDIC Non-Priority Claim, each Holder of an Allowed FDIC Non-Priority Claim shall receive on the Initial Distribution (i) its Stock Pro Rata Distribution of the New Series A

Common Stock.  Alternatively, and only if such Holder affirmatively so elects, instead of any of the foregoing, such Holder shall receive the New Series B Common Stock Election consisting of such Holder's Election Pro Rata share of the New Series B Common Stock Election Trust Interests, which, inter alia, shall entitle such Holder to receive its Election Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with this Plan and the New Series B Common Stock Election Trust Agreement. Notwithstanding anything to the contrary in this Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 5 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.

6.      Class 6—Other Unsecured Claims.

a.      Classification. Class 6 consists of all Other Unsecured Claims.

b.      Impairment and Voting. Class 6 is Impaired by the Plan.  Each Holder of an Other Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

c.      Treatment.  In full satisfaction, settlement, release, and compromise of and in exchange for each Other Unsecured Claim, each Holder of an Allowed Other Unsecured Claim shall receive on the Initial Distribution Date (i) its Stock Pro Rata Distribution of the New Series A Common Stock.  Alternatively, and only if such Holder affirmatively so elects, instead of any of the foregoing, such Holder shall receive the New Series B Common Stock Election consisting of such Holder's Election Pro Rata share of the New Series B Common Stock Election Trust Interests, which, inter alia, shall entitle such Holder to receive its Election Pro Rata share of distributions of New Series B Common Stock Election Trust Cash from the New Series B Common Stock Election Trust in accordance with this Plan and the New Series B Common Stock Election Trust Agreement. The Reorganized Debtor reserves the right in addition to issue shares of New Series B Common Stock to Holders of Allowed Class 6 Claims making the New Series B Common Stock Election as is necessary to preserve certain tax attributes of the Debtor. Notwithstanding anything to the contrary in this Plan, at Holdco's election, in its sole and absolute discretion, any holder of an Allowed Class 4 Claim who may not be a holder of New Class A Common Stock consistently with

an exemption under the Investment Company Act that Holdco elects to use, may be deemed to have elected the New Series B Common Stock Election.

7. Class 7 (Convenience Claims).

a. Class 7 consists of Convenience Claims. Each holder of an Allowed Convenience Claim shall receive, on account of and in full satisfaction of its Allowed Convenience Claim, Cash equal to 100% of the amount of the Allowed Convenience Claim on the later of (x) the Effective Date, and (y) the date an order of the Bankruptcy Court allowing the Convenience Claim becomes a Final Order. Class 7 is unimpaired under the Plan and the holders of Class 7 Allowed Convenience Claims are deemed to accept the Plan pursuant to section 1126(f) of the Code.

8. Class 8 (Holders Of Interests).

a. Class 8 is comprised of holders of Interests. Holders of Class 8 Interests shall neither receive nor retain any property under the Plan and all Interests of the Debtor shall be cancelled as of the Effective Date. Class 8 is impaired under the Plan and the holders of Class 8 Interests are deemed to reject the Plan.

## ARTICLE IV.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.** Default Rejection of Executory Contracts and Unexpired Leases.

All Executory Contracts or Unexpired Leases of the Debtor, except (a) those previously assumed and assigned by Final Order and (b) those which are assumed under the Plan, are rejected. The Plan Proponents shall file a schedule of executory contracts and Unexpired Leases to be assumed, if any, in the Plan Supplement.

**B.** Procedural Issues.

The Plan shall constitute a motion to reject any executory contracts and unexpired leases not identified in the Plan Supplement as executory contracts or unexpired leases to be assumed, and the Debtor and Reorganized Debtor shall have no further liability thereunder. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, its Estate and all parties in interest in the Case.

**C.** Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article IV. A. of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article IV.A. for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in this Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan.

**D.** Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

1.    Cure of Defaults.

Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by a waiver of Cure agreed upon between the Plan Proponents and applicable non-debtor counterparty. Except with respect to executory contracts or unexpired leases in which the Plan Proponents and the applicable non-debtor counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure must be Filed on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any such Claim for Cure shall be deemed fully satisfied, released, and discharged, notwithstanding anything included in the Schedules or in any proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure

1    without further notice to or action, order, or approval of the Bankruptcy Court.

2             2.    Objections to Cure.

3                  If the Plan Proponents or Reorganized Debtor, as applicable, object to any

4    request for Cure or any other matter related to assumption, the Bankruptcy Court shall determine

5    the Allowed amount of such Cure and any related issues.  If there is a dispute regarding such Cure,

6    the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future

7    performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter

8    pertaining to assumption, then such Cure shall occur as soon as reasonably practicable after entry of

9    a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment),

10   or as may be agreed upon by the Reorganized Debtor and the counterparty to the executory contract

11   or unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object

12   timely to the proposed assumption of any executory contract or unexpired lease will be deemed to

13   have consented to such assumption.  The Plan Proponents and Reorganized Debtor, as applicable,

14   reserve the right, either to reject or nullify the assumption of any executory contract or unexpired

15   lease no later than thirty (30) days after a Final Order determining the Cure or any request for

16   adequate assurance of future performance required to assume such executory contract or unexpired

17   lease.

18            3.    Release and Satisfaction of Debtor upon Assumption.

19                 Assumption of any executory contract or unexpired lease pursuant to the Plan

20   or otherwise and after satisfaction of any Cure, shall result in the full release and satisfaction of any

21   Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting

22   the change in control or ownership interest composition or other bankruptcy-related defaults,

23   arising under any assumed executory contract or unexpired lease at any time prior to the effective

24   date of assumption.

25        **E.**  Reservation of Rights.

26                 Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement,

27   nor anything contained in the Plan, shall constitute an admission by the Plan Proponents that any

28   such contract or lease is in fact an executory contract or unexpired lease or that

the Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a

contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan

Proponents or Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a

Final Order resolving such dispute to alter their treatment of such contract or lease.

**F.**    Indemnification Obligations.

Notwithstanding anything herein to the contrary, except with respect to any D&O

that waives its releases form the Debtor, whether expressly or impliedly, as of the Effective Date,

any and all proofs of claim against the Debtor by the D&Os regarding any purported

Indemnification Obligations shall be deemed withdrawn without prejudice, and the D&Os shall be

deemed to have released the Debtor and the Reorganized Debtor from any purported

Indemnification Obligations; provided, however, that solely to the extent necessary to ensure that

the D & Os Insurance Coverage for all D & Os is fully preserved, the D&Os shall be permitted to

file proofs of claim against the Debtor or Reorganized Debtor (notwithstanding any applicable bar

dates) regarding purported Indemnification Obligations and the release of such Indemnification

Obligations by the D&O shall then be deemed null and void; provided further, however, that

nothing herein shall prevent or prohibit the Debtor or Reorganized Debtor from objecting to or

otherwise contesting the validity of or the amounts claimed under any purported Indemnification

Obligations. Nothing in the foregoing paragraph is intended to give any D&O the right to assert an

Indemnification Obligation if such D&O did not already possess such right, including claims for

Indemnification Obligations that were time-barred prior to the Effective Date, except to the extent

the only reasons such claims are time-barred is due to the failure to a D&O to file a claim by an

applicable deadline in the Case.

**G.**    Insurance Policies.

Each insurance policy owned by the Debtor that provides D&O Insurance Coverage

shall be assumed by the Reorganized Debtor effective as of the Effective Date, pursuant to sections

365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such

insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order;

provided, however, that any such assumption by the Debtor and the Reorganized Debtor shall

not result in the Debtor or the Reorganized Debtor being required to make any cash disbursements on account of such insurance policy. Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtor's insurers, if any, in any respect or the rights of the Debtors or any other party against the Debtor's insurers or in respect of any insurance of the Debtors or in connection with the provision of any insurance with respect to any claim or cause of action asserted against any of the D & Os. The rights of the Debtor's and the Debtor's insurers vis-à-vis one another shall be determined under their respective insurance policies and any related agreements with the Debtor, if any, subject to the rights of the Debtor to assume any such policy or agreement in accordance with this provision .

## ARTICLE V.

## MEANS OF IMPLEMENTATION OF THE PLAN

**A.** Corporate Existence.

Except as otherwise provided in the Plan or Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a separate corporate Entity with all the powers of a corporation pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the certificate of incorporation, charter and bylaws in effect prior to the Effective Date, except to the extent Holdco elects to reincorporate in another state or territory, or make any other amendments to such certificate of incorporation, charter or bylaws, pursuant to documents contained in the Plan Supplement, in which case such documents in effect prior to the Effective Date are deemed to be amended pursuant to the Plan and require no further action or approval. For the avoidance of doubt, the Reorganized Debtor may reincorporate, from and after the Effective Date, the state, territory or other political subdivision of the United States of America, as the Reorganized Debtor in its sole discretion may select.

/ / /

/ / /

/ / /

**B.** Directors/Officers of the Debtor on the Effective Date; Plan Committee.

1. Release and Discharge of Duties and Obligations of Directors and Officers.

On the Effective Date, the then current directors and officers of the Debtor shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtor or the Case.

2. Plan Committee.

As of the Effective Date, the Plan Committee shall be created and shall consist of three members of the New Board: Kenneth Tepper, Birge Watkins, and Michael Piracci. Although the Plan Committee will be a subset of the New Board, for all matters other than New Board Interested Transactions and Financing Arrangements (each as defined below), the Plan Committee will have substantially reduced voting power as compared to the other members of the New Board. During such time as the Plan Committee may be in existence, each member of the Plan Committee shall be compensated in an amount not to exceed $35,000 per year from the Reorganized Debtor, and shall receive no other form of compensation from the Reorganized Debtor in any other capacity. Each Plan Committee member shall serve for a term of five years, unless the Plan Committee has completed its duties hereunder and has been dissolved. In that case, each Plan Committee member's term shall expire on the next business day following the next meeting of the New Board that occurs after the dissolution of the Plan Committee. The New Board shall have absolutely no right, power or authority to remove any member of the Plan Committee or alter their compensation in any manner whatsoever. The Plan Committee shall oversee and have decision-making authority regarding any litigation and/or settlement of Causes of Action, including the FDIC Causes of Action, and the administration of Distributions. Without limiting the generality of the immediately preceding sentence, the Plan Committee shall have the power, right, authority and obligation to seek and implement the appropriate arrangement to compensate professionals and "Financing Arrangements (as defined below) (including financial advisors, employees, and attorneys, which may include any Entity or Person, including firms or individuals currently or prospectively affiliated or employed by the Debtor and/or the Reorganized Debtor, Persons who are Insiders, or Persons who may have conflicts of interest with the Reorganized Debtor, and may

1   include, without limitation, Holdco, its affiliates, attorneys or other professional advisors, but shall

2   exclude members of the Plan Committee) with respect to Causes of Action, which may include but

3   shall not be limited to one or a combination of contingency arrangements and/or dilutive capital

4   raising initiatives that may include contingent liens on future proceeds of the Causes of Action and

5   may dilute and impact the recoveries of all holders of New Common Stock and New Series B

6   Common Stock Election Trust Interests, including any holders who made the New Series B

7   Common Stock Election.

8   Notwithstanding any other provision in the Plan or Disclosure Statement, the Plan

9   Committee shall have the sole discretion to determine whether the Reorganized Debtor shall enter

10  into transactions in which any members of the New Board, other than the members of the Plan

11  Committee, have an interest (such transactions, "New Board Interested Transactions").  The

12  members of the New Board that are not Plan Committee members, in turn, shall have sole

13  discretion to determine whether the Reorganized Debtor shall enter into transactions in which any

14  member of the Plan Committee has an interest.

15  In addition, notwithstanding any other provision in the Plan or Disclosure Statement, the

16  Plan Committee shall have the unequivocal and sole authority to determine the appropriate

17  financing arrangement (the "Financing Arrangement") with respect to all Causes of Action and may

18  execute such documents relating to such Financing Arrangement which will be borne by and shall

19  be binding on holders of New Common Stock and holders of New Series B Common Stock

20  Election Trust Interests (including, for the avoidance of doubt, holders who made the New Series B

21  Common Stock Election). For the avoidance of doubt, the costs associated with the Financing

22  Arrangement shall be shared by all of the holders of interests described in the immediately

23  preceding sentence.  The fiduciary duties of the members of the Plan Committee (in their capacity

24  as Plan Committee members) shall run to all parties entitled to Distributions under the Plan,

25  whether or not such beneficiaries have elected the New Series B Common Stock Election.  The

26  Reorganized Debtor shall seek approval of any settlement of a Material Cause of Action from the

27  Bankruptcy Court by the filing of an appropriate motion, and such approval shall be governed by

28  Fed.R.Bankr.P. 9019, shall only come after a hearing, upon notice to all parties requesting service

pursuant to Bankruptcy Rule 2002 or to such Entities as the Court may order.

3.    Removal or Resignation of Plan Committee Members

i.    In the event one or more members of the Plan Committee resign or are removed for cause (as defined below), the remaining members of the Plan Committee (collectively, the "Remaining Members") shall fill the vacancy with a replacement member having equivalent or greater experience, knowledge and independence as the member being replaced.

ii.    If the Remaining Members are unable to agree on a replacement member within 60 days after the date on which the member being replaced gives notice of his or her resignation or is notified of his or her removal, then any Remaining Member of the Plan Committee may petition the Bankruptcy Court for the appointment of a replacement member.

iii.    No member may resign without giving at least 90 calendar days' prior written notice thereof to the Remaining Members of the Plan Committee.

iv.    If by the 60th calendar after the date on which the member being replaced gives notice of his or her resignation or is notified of his or her removal, a duly qualified replacement member has not been selected, agreed upon and appointed by the Remaining Members of the Plan Committee, then the Remaining Members of the Plan Committee shall promptly deliver to all of the beneficial holders of the Class A Stock and Class B Stock a written notice thereof.

v.    No member of the Plan Committee may be removed, except for cause, as determined by any of the following:

(a)    So long as the Plan Committee consists of three (3) members, the unanimous action of the two (2) other members of the Plan Committee; or

(b)    The Bankruptcy Court upon the petition of any member of the Plan Committee.

As used in this section, the term "cause" shall mean (i) the commission of an act of fraud, (ii) the willful and persistent neglect of his or her duties as a member of the Plan Committee, or (iii) the inability to perform his or her duties due to his or her mental or physical condition.

/ / /

/ / /

**C.** Cancellation of Debentures, Indentures and Equity Interests.

    1.    Cancellation of Debentures.

On the Effective Date, except to the extent otherwise provided herein (including for avoidance of doubt, Sections 2 and 3 of Article V.C. of this Plan), all notes, stock, instruments, certificates and other documents evidencing the Debenture Unsecured Claims and Equity Interests, including the Senior Debt Documents, shall be deemed automatically canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged.

    2.    Limited Survival of Senior Debt Documents.

Notwithstanding anything to the contrary contained in this Plan, (a) the Senior Debt Documents will continue in effect solely for purposes of (i) allowing the Indenture Trustee to receive and make the Distributions to be made pursuant to this Plan on account of Debenture Unsecured Claims, from Distributions received from the Reorganized Debtor in accordance with the Indentures and this Plan, and (ii) permitting the Indenture Trustee to maintain any rights or Charging Liens that it may have under the applicable Senior Debt Documents to receive Indenture Trustee Fees and indemnification, provided that the Reorganized Debtor will not have any obligation to the Indenture Trustee for payment of any Indenture Trustee Fees or indemnifications except as otherwise provided in this Plan, and (b) the Debentures will continue in effect solely for the purposes of permitting Holders thereof to receive Distributions from the Indenture Trustee in accordance with the applicable provisions of the Indentures and this Plan.

    3.    Limited Preservation of Indenture Trustee Rights to Charging Liens.

To the extent that, under the Senior Debt Documents, the Indenture Trustee is entitled to Charging Liens on account of unpaid Indenture Trustee Fees, recoveries under the Plan will be adjusted so that sufficient Cash Distributions are available to allow the Indenture Trustees to exercise such Charging Liens against Cash distributed under the Plan.  Payment of fees, if any, to the Indenture Trustees will reduce recoveries to all Holders of Debenture Unsecured Claims regardless of whether they make the New Series B Common Stock Election or receive the New Series A Common Stock.

1        4.       Payment of Holdco Fees.

2        The Reorganized Debtor shall pay the Holdco Fees as soon as reasonably practicable

3   after the Effective Date.  As a precondition to payment of any Holdco Fees, Holdco shall, after the

4   Effective Date, submit to the Bankruptcy Court its invoices and an application for payment of such

5   Holdco Fees. The Bankruptcy Court shall review each application for payment of Holdco Fees for

6   reasonableness, as required under section 1129(a)(4) of the Bankruptcy Code. After the Bankruptcy

7   Court has approved an application for payment of Holdco Fees as reasonable, the Reorganized

8   Debtor shall, as soon as practicable thereafter, reimburse Holdco in Cash for such Holdco Fees.

9   Payment of the Holdco Fees shall not reduce the recovery, if any, of the FDIC in connection with

10  any Allowed FDIC Non-Priority Claims, and the FDIC will be entitled to receive the same

11  Distribution it would otherwise be entitled to receive absent payment of the Holdco Fees.  If and

12  only if Holdco elects in its sole discretion, payment of the Holdco Fees shall not reduce the

13  recovery, if any, of the Holders of Allowed Other Unsecured Claims, and such Holders will be

14  entitled to receive the same Distributions they would otherwise be entitled to receive absent

15  payment of the Holdco Fees.

16       5.       Payment of Indenture Trustee Fees.

17  Subject to the provisions of paragraph (b) below, the Reorganized Debtor shall pay all of the

18  Indenture Trustee Fees in full in Cash; provided, however, so long as the Reorganized Debtor has

19  not received any Net Recovery Proceeds, such Indenture Trustee Fees shall only be due and payable

20  from the Debtor and/or the Reorganized Debtor, to the extent and only to the extent, that there is

21  any Cash remaining after the payment on or about the Effective Date of the following (the total

22  amount of said remaining Cash is hereinafter referred to as the "Indenture Trustee Fee Initial

23  Payment"):

24       (i)      all Allowed Administrative Claims as of the Effective Date;

25       (ii)     all of the Holdco Fees; and

26       (iii)    $300,000 in Cash to fund the operations of the Reorganized Debtor and the

27  New Series B Common Stock Election Trust.

28  ///

For avoidance of doubt, so long as the Reorganized Debtor has not received any Net Recovery Proceeds, neither the Debtor nor the Reorganized Debtor shall have any obligation whatsoever to pay any Indenture Trustee Fees pursuant to this paragraph (a) that are in excess of the Indenture Trustee Fee Initial Payment.

a.      As a precondition to the payment by the Reorganized Debtor of the Indenture Trustee Fees incurred prior to the Effective Date, the Indenture Trustee shall submit to the Bankruptcy Court (i) its invoices for such Indenture Trustee Fees (which invoices shall be in reasonable detail but may be redacted in order to preserve any privileges, work-products or legitimate confidentialities of the Indenture Trustee) and (ii) one or more applications for payment of such Indenture Trustee Fees. The Bankruptcy Court shall review each application for payment of Indenture Trustee Fees for reasonableness, as and to the extent required under section 1129(a)(4) of the Bankruptcy Code.  After the Bankruptcy Court has approved an application for payment of Indenture Trustee Fees as reasonable, the Reorganized Debtor shall, as soon as practicable thereafter (but in any event, within ten (10) calendar days after the Bankruptcy Court has entered an order so approving the payment of such Indenture Trustee Fees) pay the Indenture Trustee in Cash for such Indenture Trustee Fees.

b.      Payment of the Indenture Trustee Fees shall not reduce the recovery, if any, of the Holders of Allowed FDIC Non-Priority Claims or Allowed Other Unsecured Claims, such Holders will be entitled to receive the same distributions that they would otherwise be entitled to receive absent payment of such Indenture Trustee Fees, and the Reorganized Debtor is authorized to make future cash payments to such Holders, if necessary, in order to ensure that their recoveries are not reduced in connection with any future payment of the Indenture Trustee Fees.

c.      For any Indenture Trustee Fees that are not otherwise paid by the Indenture Trustee Fee Initial Payment for whatever reason whatsoever, as provided in paragraphs (a) and (b) above, upon receipt by the Reorganized Debtor of any Net Recovery Proceeds, the Reorganized Debtor shall promptly (but in any event within ten (10) calendar days of its receipt of any such Net Recovery Proceeds) pay using such Net Recovery Proceeds any then remaining unpaid Indenture Trustee Fees until all such remaining unpaid Indenture Trustee Fees have been paid in full in Cash

(all such payments by the Reorganized Debtor to the Indenture Trustee pursuant to this paragraph (d) are hereinafter sometimes referred to collectively as the "Indenture Trustee Fee Final Payment")(the Indenture Trustee Fee Initial Payment and the Indenture Trustee Final Payment are hereinafter sometimes referred to collectively as the "Indenture Trustee Payments").   For the avoidance of doubt, the Indenture Trustee Fee Final Payment shall be payable only from Net Recovery Proceeds.

d.       Upon its receipt of all of the Indenture Trustee Payments, the Indenture Trustee shall promptly (but in any event, within one (1) Business Day thereafter) confirm in writing to the Reorganized Debtor its receipt of the Indenture Trustee Payments (the date on which the Indenture Trustee so delivers such written confirmation to the Reorganized Debtor is hereinafter referred to as the "Charging Lien Termination Date").   Effective as of the Charging Lien Termination Date, all Charging Liens in favor of the Indenture Trustee shall immediately and automatically terminate and shall have no further force and effect.

e.       For avoidance of doubt, at all times prior to the Charging Lien Termination Date, (i) nothing contained in this Plan (including, without limitation, the provisions of paragraphs (a), (b), (c), (d) and (e) above) shall prohibit, prevent, restrict, limit or prejudice, in any way, the right of the Indenture Trustee to exercise its Charging Liens against any Distributions (whether in the form of Cash (including any Cash consisting of Net Recovery Proceeds), Common Stock or other property) to be made to the Holders of the Allowed Debenture Unsecured Claims in order to pay any unpaid Indenture Trustee Fees that may be due and owing to the Indenture Trustee; and (ii) any portion of the Indenture Trustee Fees which is not otherwise paid in full in Cash pursuant to the provisions of paragraphs (a) and (b) above shall be recoverable by the Indenture Trustee through the exercise of its Charging Liens before any Distributions are made to the Holders of the Allowed Debenture Unsecured Claims.

f.       Until the Charging Lien Termination Date, (i) the Indenture Trustee or its agent and representative shall receive and hold in its actual possession all shares of New Common Stock that are to be distributed under this Plan to the Holders of the Allowed Debenture Unsecured Claims, solely for the purpose of perfecting its Charging Liens in such shares; and (ii) the Reorganized

Debtor will consciously mark its stock register to acknowledge and reflect that such shares are encumbered by the Indenture Trustee's Charging Liens and may not be sold, transferred, assigned, pledged or otherwise conveyed to any Person, without the prior written consent of the Indenture Trustee, which consent may be withheld by the Indenture Trustee in its sole and absolute discretion. If, however, the Plan Proponents determine in their sole but reasonable discretion the provisions of this paragraph (g) may result in material adverse tax consequences for the Reorganized Debtor arising under Section 382(l)(5) of the Internal Revenue Code, the Plan Proponents and the Indenture Trustee will determine and implement, a different solution to preserve, and maintain the perfection and priority of, the Indenture Trustee's Charging Liens on such shares that do not result in material adverse tax consequences to the Reorganized Debtor.  Such renegotiated resolution shall not be considered a material or adverse modification to the Plan.

   **D.**  Reorganized Debtor Securities.

      1.    New Series A Common Stock.

         The Reorganized Debtor's equity interests shall consist of New Series A Common Stock, and, if the Reorganized Debtor elects (if necessary to cause Section 382(l)(5) of the Internal Revenue Code to apply to the Plan), the New Series B Common Stock, as provided in section V.D.2. below.  On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor shall issue or reserve for issuance all securities to be issued pursuant to the terms of the Plan, without need for any further corporate or shareholder action.  Shares of the New Series B Common Stock on account of the New Series B Common Stock Election, depending on the election of the applicable Holder of a particular General Unsecured Claim, shall be issued Pro Rata to (a) Holders of Allowed Debenture Unsecured Claims, (b) Holders of Allowed FDIC Non-Priority Claims, and (c) Holders of Allowed Other Unsecured Claims.

      2.    Issuance of New Series B Common Stock (Separate Series or Classes of Common Stock).

         a.    General Provisions.

            Unless Holdco determines in its sole discretion prior to the Effective Date that issuance of New Common Series B Common Stock is unnecessary to preserve the

Reorganized Debtor's tax attributes, on the Effective Date each Holder that has made a New Series

B Common Stock Election with respect to which the Reorganized Debtor chooses to issue New

Series B Common Stock shall be issued, in lieu of or in exchange for New Series B Common Stock

Election Trust Interests, New Series B Common Stock. In such case, the New Series B Common

Stock Election Trust Interests that would have been issued to such Holders will instead be issued to

a wholly owned, special purpose bankruptcy remote vehicle of the Reorganized Debtor and the

New Series B Common Stock Election Trust Agreement and the Reorganized Debtor's certificate

of incorporation shall provide that (i) any Distributions on account of such New Series B Common

Stock Election Trust Interests held by such special purpose vehicle shall be used exclusively for

funding dividend, distribution, or redemption payments on the New Series B Common Stock and

(ii) each holder of New Series B Common Stock shall be entitled to its Pro Rata share of Net Free

Cash as if such Holder had received New Series B Common Stock Election Trust Interests in

accordance with this Plan and the New Series B Common Stock Election Trust Agreement. If New

Series B Common Stock is issued to the Holders making a New Series B Common Stock Election

as provided above, then (x) the certificate of incorporation, charter and bylaws of the special

purpose vehicle referred to above shall be subject to the approval of Holdco and the Indenture

Trustee, (y) the rights, preferences and privileges of the New Series B Common Stock contained in

the certificate of incorporation, charter and bylaws of the Reorganized Debtor shall be subject to the

approval of Holdco and the Indenture Trustee; and (z) the certificate of incorporation of

Reorganized Debtor shall provide that (I) the holder of each share of New Series B Common Stock,

if any, shall be entitled to receive a dividend, distribution, redemption, or similar payment

corresponding to and from Distributions that are made from the New Series B Common Stock

Election Trust representing such Holder's pro rata share of the amount of such New Series B

Common Stock Election Trust Cash in accordance with this Plan and the New Series B Common

Stock Election Trust Agreement, (II) the holder of each share of New Series B Common Stock shall

be entitled to a liquidation preference in an aggregate amount equal to the their respective pro rata

share of the fair market value of the New Series B Common Stock Election Trust Property, as of the

date of the liquidation or dissolution of the Reorganized Debtor, which may be satisfied by the

distribution of the New Series B Common Stock Election Trust Interests held by the special purpose

vehicle created pursuant to this Plan to the holders of the New Series B Common Stock pursuant to

such liquidation or dissolution and (III) Reorganized Debtor may not be merged or consolidated

with any other Entity or liquidated or dissolved at any time that the New Series B Common Stock is

outstanding unless adequate provision is made to secure the right of the holders of the New Series B

Common Stock to receive Distributions of Net Free Cash as provided for in the Plan.  Alternatively,

the New Series B Common Stock Election Trust Agreement, the Reorganized Debtor's certificate

of incorporation, and the certificate of incorporation, charter and bylaws of the special purpose

vehicle referred to above, shall provide that at any time on or after the Effective Date, the New

Board shall in its discretion distribute the New Series B Common Stock Election Trust Interests

held by such special purpose vehicle to holders of New Series B Common Stock in the form of a

dividend, distribution, redemption, or any other type of payment, after which the Reorganized

Debtor shall have no further obligations to make distributions to holders of New Series B Common

Stock. Moreover, prior to the Effective Date and at the election of Holdco, in lieu of the creating a

special purpose vehicle, the Debtor may distribute New Series B Common Stock Election Trust

Interests directly to holders of New Series B Common Stock on the Effective Date, which such

distribution shall be in addition to, and not in lieu of the shares of New Series B Common Stock to

be distributed on such date.

　　　　　　　　　　　　b.　　　　Alternative Treatment.

　　　　　　　　　　　　　　　　Alternatively, to the extent the Reorganized Debtor issues the New

Series B Common Stock as one or more separate series or classes of common stock on account of

part of the New Series B Common Stock Election, which shall be in addition to, and not in lieu of,

the other Distributions to which a Holder making the New Series B Common Stock Election is

entitled to receive under the Plan), each Holder who elects to receive the New Series B Common

Stock Election:

　　　　　　　　　　　　　　　　(a)　　　　shall be entitled on account of such New Series B Common

Stock to a pro rata share (such share to be calculated based on such Holder's number of shares of

such New Series B Common Stock divided by the total outstanding shares as of the Effective Date

---

1   of New Series B Common Stock issued to Holders who elect to receive the New Series B Common

2   Stock) of any Net Free Cash that constitutes net proceeds of the Causes of Action, pursuant to

3   redemption upon the terms set forth in the Reorganized Debtor's charter upon entry of a Final Order

4   resolving the Causes of Action; and

5                      (b)      shall also be entitled to a right of payment equal to such

6   holder's Pro Rata share of Net Free Cash that does not constitute the proceeds of the Causes of

7   Action.

8          Each share of New Series B Common Stock shall entitle the Holder of such share to

9   exercise voting rights equal to 1/20 of the voting rights exercisable by each of Holder of New Series

10  A Common Stock.

11                 3.      FDIC Priority Claims Determination.

12                 If the Effective Date occurs prior to the entry of a n order of the Bankruptcy

13  Court resolving the FDIC Priority Claims, the Reorganized Debtor shall not make any Cash

14  Distributions to Holders of New Series A Common Stock or the New Series B Common Stock

15  Election Trust, and the New Series B Common Stock Election Trustee shall not make any Cash

16  distributions to the Holders of New Series B Common Stock Election Trust Interests until the entry

17  of an order of the Bankruptcy Court resolving the FDIC Priority Claim.  Following the Effective

18  Date, if (a) there is a Final Order that makes FDIC Priority Claims Allowed Claims and (b) the Plan

19  Committee determines, in its sole discretion, that the Allowed FDIC Priority Claims exceeds the

20  aggregate total of Estate assets available for distribution, the Plan Committee shall administer the

21  orderly liquidation of the Reorganized Debtor's assets (and consistent with its fiduciary duties shall

22  continue to maximize the value of such assets) and make distributions to Holders of Allowed

23  Claims in accordance with all applicable laws and payment priorities (statutory or contractual).

24  Notwithstanding anything to the contrary, the Plan Committee shall only be obligated to make

25  payments to any party in accordance with the foregoing when it has Net Free Cash available to do

26  so.

27  / / /

28  / / /

4.    Dividends, Other Attributes.

a.    Dividends.

Except as otherwise provided by applicable law or in the corporate documents that will be included in the Plan Supplement, the holders of New Series A Common Stock and the New Series B Common Stock, if any, shall share ratably in all dividends and other distributions, whether in respect of liquidation or dissolution (voluntary or involuntary) or otherwise. Without limiting the generality of the immediately preceding sentence, Holders of Allowed Claims who properly and timely make the New Series B Common Stock Election shall not receive an amount greater than the Pro Rata portion of Net Free Cash that such Holders would have received if all Net Free Cash was Distributed Pro Rata to all Holders of Allowed General Unsecured Claims, and all Cash received by such Holders, whether on account New Series B Common Stock Election Trust Interests or New Series B Common Stock, shall be applied in reduction of such amount.

b.    Other Attributes of New Series A and B Common Stock.

Shares of New Series A Common Stock and the New Series B Common Stock, if any, shall have conversion rights, redemption rights, preemptive rights, transfer restrictions and other rights, responsibilities and restrictions typically associated with common stock, all as set forth in the Plan Supplement, in order to preserve and maximize the value of all tax attributes that are or will be held by the Reorganized Debtor from and after the Effective Date.

c.    Redemption of Common Stock.

The New Board may elect to redeem all shares of New Common Stock held by a particular stockholder as set forth in this Plan, so long as the New Common Stock is redeemed for Fair Market Value Price. For purposes of the redemption of the New Common Stock, to determine whether the New Common Stock is redeemed for Fair Market Value, the New Board shall rely on a nationally recognized accounting or valuation firm selected by the Plan Committee to determine the Fair Market Value Price for the New Common Stock. Prior to making a final determination to exercise the Reorganized Debtor's redemption right under this paragraph, the Reorganized Debtor shall send a written notice to such stockholder (at the notice address appearing in the Reorganized Debtor's records) advising the stockholder of the Reorganized Debtor's intention to exercise its

redemption right.  In the event that the stockholder notifies the Reorganized Debtor in writing (within 60 days after the date of the Reorganized Debtor's notice) that such stockholder objects to the redemption of its shares, then the Reorganized Debtor shall not exercise the redemption right. In the event that the stockholder does not respond to the Reorganized Debtor's notice within 60 days the stockholder is deemed to have consented to the proposed redemption.  In the event that the stockholder does not respond to the Reorganized Debtor's notice within 60 days after the date of the Reorganized Debtor's notice (or the stockholder notifies the Reorganized Debtor that it approves or does not object to  such  redemption), then the New Board shall be entitled to make a final determination to exercise the redemption right.  In the event that the New Board makes such a final determination, then the redemption shall take place on a date determined by the New Board (but such redemption date shall be no later than 30 days after the New Board's final determination) and shall be at a price equal to the Fair Market Value Price.  The purchase price payable in any such redemption shall be paid in cash or by check on the closing date.  Such redemption shall be effective on the closing date of the redemption regardless of whether or not the stockholder participates in the closing or delivers his or its stock certificate to the Reorganized Debtor for cancellation.  No New Common Stock shall be redeemed pursuant to this section until the conclusion of determination of the FDIC Causes of Action.

    **E.** Exemption from the Registration Requirements of the Securities Act; Investment Company Act.

        1. Exemption from Securities Act.

        The offering, issuance, and distribution of securities pursuant to the Plan shall be exempt from the registration requirements of section 5 of the Securities Act as one or more private placements pursuant to any and all applicable exemptions, including, as applicable, exemptions provided by Section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and/or Rule 506 of Regulation D under the Securities Act, based on the number of creditors receiving securities under the Plan, the Reorganized Debtor's belief as to their status as accredited investors, and other factors.  As a result, the securities issued under the Plan likely will be "restricted securities" for purposes of the federal securities laws.  The Reorganized Debtor also

reserves all rights to rely, if necessary in its sole discretion, on other exemptions to the registration

requirements of section 5 of the Securities Act.

2.    Investment Company Act.

In addition, the Reorganized Debtor expects to rely on one or more of the exemptions

contained in the Investment Company Act, which exemptions may include, without limitation,

exemptions under Sections 3(c)1 and 3(c)7.  Companies that are investment companies within the

meaning of the Investment Company Act, and that do not qualify for an exemption from the

provisions of such Act, are required to register with the Securities and Exchange Commission and

are subject to substantial regulations with respect to capital structure, operations, transactions with

affiliates and other matters. In the event such companies do not register under the Investment

Company Act, they may not, among other things, conduct public offerings of their securities in the

United States or engage in interstate commerce in the United States.

**F.**    Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the

Reorganized Debtor may take all actions as may be necessary or appropriate to effect any

transaction described in, approved by, contemplated by or necessary to effectuate the Plan,

including:  (1) the execution and delivery of appropriate agreements or other documents of merger,

consolidation or reorganization containing terms that are consistent with the terms of the Plan and

that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate

instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty

or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates

of incorporation, charter, merger or consolidation with the appropriate governmental authorities

pursuant to applicable law; and (4) all other actions that the Reorganized Debtor determines are

necessary or appropriate.

/ / /

/ / /

/ / /

/ / /

**G.** Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate, financing or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, the directors of the Debtor or any other Entity.  Without limiting the foregoing, such actions will include:  the adoption and (as applicable) filing of amended and restated certificate of incorporation, charter, bylaws and other governance documents; the appointment of officers and (as applicable) directors for the Reorganized Debtor; the issuance of the New Series A Common Stock and any security or instrument issued by the Reorganized Debtor on account of part of the New Series B Common Stock Election, and all related documents and instruments (as applicable).  The Reorganized Debtor shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

**H.** Effectuating Documents; Further TransactionsOn and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, and the Reorganized Debtor may make non-material modifications to the documents set forth in the Plan Supplement, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**I.** Exemption from Certain Transfer Taxes and Recording FeesPursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or

other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification,

consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing

of additional indebtedness by such or other means; (3) the making, assignment, or recording of any

lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of

transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale,

assignments, or other instrument of transfer executed in connection with any transaction arising

out of, contemplated by, or in any way related to the Plan, shall not be subject to any document

recording tax, sales tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real

estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee,

regulatory filing or recording fee, or other similar tax or governmental assessment, and the

appropriate state or local governmental officials or agents shall forego the collection of any such

tax or governmental assessment and to accept for filing and recordation any of the foregoing

instruments or other documents without the payment of any such tax or governmental assessment.

**J.**  Board RepresentationThe New Board shall be disclosed by the Plan

Proponents in the Plan Supplement to be filed in accordance with section 1129(a)(5) of the

Bankruptcy Code.  Holdco will select the members of the New Board.  The initial members of the

New Board, other than the Plan Committee, shall serve staggered terms of one and two years, as

designated.  The New Board shall be elected on a staggered three-year basis by the holders of New

Series A Common Stock and (as applicable and as may be in accordance with the Reorganized

Debtor's articles of incorporation) holders of New Series B Common Stock.  The New Board shall

have all authority to make business decisions under applicable law with respect to all matters

affecting the Reorganized Debtor, including investment activity and the Causes of Action.

**K.**  Senior ManagementSenior management of the Reorganized Debtor shall

also be selected by Holdco and disclosed by the Plan Proponents in the Plan Supplement, and the

New Board will select members of the senior management as needed after the Effective Date.  The

Reorganized Debtor may, but shall not be required, to, enter into one or more contracts with one or

more Entities to outsource or

subcontract certain management functions, and the identity or identities of such Entities with whom the Reorganized Debtor may contract as of the Effective Date shall be disclosed in the Plan Supplement, and thereafter the New Board may enter into such contracts with one or more such Entities.  These members of senior management or Entities as described in this section may include, without limitation, firms or individuals currently or prospectively affiliated or employed by the Debtor and/or the Reorganized Debtor, Persons who are Insiders, or Persons who may have conflicts of interest with the Reorganized Debtor, and may include, without limitation, Holdco, its affiliates, principals, members, attorneys or other professional advisors.  To the extent permitted by the law of the state or territory in which the Reorganized Debtor is incorporated, the Reorganized Debtor's charter, by laws or other governing documents  may provide that the members of the Plan Committee shall serve as special directors solely for purposes of voting whether to approve any such contract with respect to which existing members of the New Board may have an interest.

**L.**  Vesting of Assets in the Reorganized DebtorExcept as otherwise provided in this Plan (including for avoidance of doubt, Sections 2 and 3 of Part C of Article V of this Plan) or in any agreement, instrument or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate, all property of the Debtor (including, without limitation, any and all assets acquired by the Debtor after the Petition Date) shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be provided in this Plan or the Confirmation Order, including without limitation with respect to the New Series B Common Stock Election Trust, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of its property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**M.**  Prohibition Against Pledging AssetsNotwithstanding anything to the contrary contained herein, the Reorganized Debtor shall be precluded from, and the Confirmation Order shall expressly prohibit the Reorganized Debtor from, pledging any interest in (a) the Disputed Reserve or the assets therein; (b) the New Series B Common Stock Election Trust or the assets therein; or (c) any assets, or the proceeds thereof, that

are or could become part of the New Series B Common Stock Election, including without limitation any Causes of Action or the proceeds thereof.  The Confirmation Order shall also provide that any such pledge in violation of this section of the Plan is null and void.

**N.**  DeregistrationAs soon after the Effective Date as is practicable, the Reorganized Debtor shall terminate its registration under the Securities and Exchange Act of 1934 by filing a Form 15 "Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 12 and 15(d) of the Securities and Exchange Act of 1934" with the United States Securities and Exchange Commission and shall otherwise comply with the statutory or regulatory requirements of a publicly traded company, including, but not limited to, seeking to deregister the Equity Interests.

**O.**  Allowance of Debenture Unsecured ClaimsThe Debenture Unsecured Claims will be deemed to be Allowed Claims in the amount set forth in the proofs of claim filed by the Indenture Trustee.

**P.**  New Series B Common Stock Election TrustGeneralOn or before the Effective Date, the New Series B Common Stock Election Trust Agreement, in form and substance satisfactory to Holdco and substantially as set forth in the Plan Supplement, will be executed and all other necessary steps will be taken to establish the New Series B Common Stock Election Trust and the beneficial interests therein, which will be for the benefit of the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, that chooses the New Series B Common Stock Election.  In the event of any conflict or inconsistency between the terms of this Plan and the terms of the New Series B Common Stock Election Trust Agreement, then the terms of the New Series B Common Stock Election Trust Agreement will govern.  The New Series B Common Stock Election Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that (i) such powers, duties, and authorities do not affect the status of the New Series B Common Stock Election Trust as a liquidating trust for United States federal income

tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims, (ii) such powers, duties and authorities do not operate to confer standing upon the New Series B Common Stock Election Trustee to be a party to, or to participate in, the Reorganized Debtor's activities including litigation and/or settlement of Causes of Action, including the FDIC Causes of Action, and (iii) such powers, duties, and authorities are limited to the administration of distributions on account of the New Series B Common Stock Election Trust Interests.  The New Series B Common Stock Election Trust Agreement shall expressly provide that, prior to the Charging Lien Termination Date, (a) all distributions made to beneficiaries of the New Series B Common Stock Election Trust that are Holders of Allowed Debenture Unsecured Claims are subject to, and encumbered by, the Charging Liens of the Indenture Trustee, and (b) no such distributions shall be made to the beneficiaries of the New Series B Common Stock Election Trust that are Holders of Allowed Debenture Unsecured Claims.  This Section V.Q. is qualified in its entirety by the terms of and is subject to the terms of the New Series B Common Stock Election Trust Agreement.

2.   Purpose of New Series B Common Stock Election TrustThe New Series B Common Stock Election Trust will be established for the sole purpose of liquidating the New Series B Common Stock Election Trust Property and distributing the New Series B Common Stock Election Trust Cash, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to achieve, and consistent with, the liquidating purpose of the New Series B Common Stock Election Trust.

3.   Costs and Expenses of New Series B Common Stock Election TrustThe costs and expenses of the New Series B Common Stock Election Trust, including the fees and expenses of the New Series B Common Stock Election Trustee and its retained professionals, will be paid out of the New Series B Common Stock Election Trust Property, and the Reorganized Debtor will not be responsible for any fees, expenses or costs of the New Series B Common Stock Election Trust.

///

4.    New Series B Common Stock Election Trust PropertySubject to and in accordance with this Plan and the New Series B Common Stock Election Trust Agreement, on the Effective Date or as soon as reasonably practical thereafter, the Debtor will assign and transfer to the New Series B Common Stock Election Trust all of its rights, title and interests in and to the portion of the following assets to which Holders making the New Series B Common Stock Election are entitled under this Plan (collectively, the "New Series B Stock Election Trust Property"):

(a)    The interest in the Trust Tax Refund Assets as provided below;

(b)    the portion of Net Free Cash existing as of the Effective Date (which, for the avoidance of doubt, shall be net of any Net Free Cash Reserves) allocable to the Holders that elected the New Series B Common Stock Election; and

(c)    an undivided beneficial interest in and to the other New Series B Common Stock Election Trust Cash existing as of the Effective Date (including the Net Free Cash Reserves, which for clarification purposes may be fully overseen, spent, reduced and otherwise controlled, in the sole and absolute discretion of the Plan Committee, by the Reorganized Debtor as provided in the Plan).

Notwithstanding the foregoing, the New Series B Common Stock Election Trustee shall not be entitled to receive Cash, which, in the aggregate (when added to all Cash received previously), exceeds what it otherwise would have been entitled to receive in the aggregate had all aggregate Cash proceeds generated from New Series B Common Stock Election Trust Property been received by the Debtor by such date and then subsequently conveyed to the New Series B Common Stock Election Trust pursuant to the "Turnover Obligation" as defined below ("Cash Limitation Provision).  In the event that Reorganized Debtor receives on account or in respect of any New Series B Common Stock Election Trust Property any distribution or payment of Net Free Cash (after taking into account Net Free Cash Reserves and full payment or satisfaction of all Allowed Secured Claims, Allowed Administrative Claims, Allowed FDIC Priority Claims, and Allowed Non-FDIC Priority Claims; and costs of administering and implementing the Plan; but not including any costs and expenses solely attributable to the business operations of the

Reorganized Debtor) the Reorganized Debtor shall segregate and hold in trust (as property of the New Series B Common Stock Election Trustee on behalf of the beneficiaries of the trust) for the benefit of, and immediately upon receipt thereof, shall pay over or deliver to, the New Series B Common Stock Election Trustee such distribution or payment for application in accordance with the terms of this Plan (the "Turnover Obligation").  Such transfers will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax and, except as otherwise may be set forth specifically herein, will be free and clear of any liens, claims and encumbrances and no other entity (other than the New Series B Common Stock Election Trustee and General Unsecured Creditors receiving rights under this Plan), including the Debtor or the Reorganized Debtor, will have any interest, legal, beneficial, or otherwise, in the New Series B Common Stock Election Trust or the New Series B Common Stock Election Trust Property upon their assignment and transfer to the New Series B Common Stock Election Trust (other than as provided herein or in the New Series B Common Stock Election Trust Agreement).  Upon delivery of the New Series B Common Stock Election Trust Property to the New Series B Common Stock Election Trust, the Reorganized Debtor will be deemed released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims with respect to the New Series B Common Stock Election Trust Property, and will have no further obligations to the New Series B Common Stock Election Trust or the New Series B Common Stock Election Trustee except the Turnover Obligation referred to above and the Net Free Cash Reserve Obligation referred below.

> 5.   Conveyance of Trust Tax Refund Assets Subject to the Cash Limitation Provision (as defined above), promptly after the Charging Lien Termination Date the Reorganized Debtor will convey, transfer and assign, without recourse or warranty, to the New Series B Common Stock Election Trustee, for the benefit of the Holders making the New Series B Common Stock Election, all of Debtor's right, title and interest in the Cash in the Tax Refund Escrow Account ultimately determined to be distributable to the Reorganized Debtor ("Determined Tax Refund Assets"), equal to the portion of Net Free Cash that all of the Holders who make the New Series B Common Stock Election are entitled under the terms of this Plan solely on account of Determined Tax Refund Assets in accordance with the New

Series B Common Stock Election Trust Agreement (the "Trust Tax Refund Assets"). In addition, the New Series B Common Stock Election Trustee, for the benefit of the Holders electing the New Series B Common Stock Election, shall be entitled to an additional amount payable out of Reorganized Debtor's interest in the Tax Refund Escrow Account (after the transfer referred to above) equal to the portion of Net Free Cash Reserves that all of the Holders who make the New Series B Common Stock Election are entitled under the terms of this Plan attributable to the FDIC Causes of Action (and such allocation determined in the discretion of the Plan Committee) ("Reserve Escrow Payment") remaining upon the conclusion of the FDIC Causes of Action (the "Net Free Cash Reserve Obligation") but such amount shall only be payable solely to the extent that the New Series B Common Stock Election Trustee has not at such time received Cash from the Reorganized Debtor on account of its undivided beneficial interest in Net Free Cash Reserves attributable to the FDIC Causes of Action ("Unpaid Reserve Interest"); and further, to the extent that such Reserve Escrow Payment is made, it shall be deemed to be made on account of the New Series B Common Stock Election Trustee's undivided beneficial interest in Net Free Cash Reserves attributable to the FDIC Causes of Action and the Reorganized Debtor shall no longer have Turnover Obligations with respect to such asset.

6.   Appointment of a New Series B Common Stock Election

Trustee  Prior to the Effective Date, the Plan Proponents will identify the New Series B Common Stock Election Trustee, who will be selected by Holdco.  The salient terms of the New Series B Common Stock Election Trustee's employment, including the New Series B Common Stock Election Trustee's duties and compensation, will be set forth in the New Series B Common Stock Election Trust Agreement.  The New Series B Common Stock Election Trust Agreement will specify the procedures for replacing the New Series B Common Stock Election Trustee.

7.   Transferability and Form of New Series B Common Stock Election

Trust Interests  The New Series B Common Stock Election Trust Interests shall not be transferable, unless otherwise provided for in the New Series B Common Stock Election Trust Agreement.  To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then

EXHIBIT A
198

1  such securities shall be exempt from the requirements of applicable non-bankruptcy law to the

2  maximum extent permitted by 11 U.S.C. §1145.  The New Series B Common Stock Election Trust

3  Interests shall not be certificated.

4        8.   Federal Income Tax Treatment of New Series B Common Stock

5  Election TrustFor all federal income tax purposes, all parties (including,

6  without limitation, the Debtor, Reorganized Debtor, the New Series B Common Stock Election

7  Trustee, and the holders of Allowed General Unsecured Claims) will treat the transfer of the New

8  Series B Common Stock Election Trust Property to the New Series B Common Stock Election

9  Trust, including any amounts or other assets subsequently transferred to the New Series B

10  Common Stock Election Trust (but only at such time as actually transferred) for the benefit of the

11  holders of Claims entitled to receive New Series B Common Stock Election Trust Interests,

12  whether Allowed on or after the Effective Date, as (A) a transfer of the New Series B Common

13  Stock Election Trust Property directly to the holders of such Allowed Claims, followed by (B) the

14  transfer by such Persons to the New Series B Common Stock Election Trust of such New Series B

15  Common Stock Election Trust Property in exchange for beneficial interests in the New Series B

16  Common Stock Election Trust.  Accordingly, the holders of such Allowed Claims will be treated

17  for federal income tax purposes as the grantors and owners of their respective shares of the

18  applicable New Series B Common Stock Election Trust Property.  The foregoing treatment shall

19  also apply, to the extent permitted by applicable law, for state and local income tax purposes.

20        9.   New Series B Common Stock Election Trust a "Liquidating

21  Trust"Subject to definitive guidance from the IRS or a court of competent jurisdiction

22  to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the New

23  Series B Common Stock Election Trustee of a private letter ruling if the New Series B Common

24  Stock Election Trustee so requests one, or the receipt of an adverse determination by the IRS upon

25  audit if not contested by the New Series B Common Stock Election Trustee), all parties will treat

26  the New Series B Common Stock Election Trust as a "liquidating trust" in accordance with

27  Treasury Regulation section 301.7701-4(d), of which the holders of Allowed Claims described

28  above,

whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the New Series B Common Stock Election Trust is required for federal income tax purposes, the New Series B Common Stock Election Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the New Series B Common Stock Election Trust, and (if applicable) anyone who subsequently becomes a holder, of such alternative treatment.  The New Series B Common Stock Election Trustee will file returns for the New Series B Common Stock Election Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The New Series B Common Stock Election Trustee also may send annually to each record holder of a beneficial interest in the New Series B Common Stock Election Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The New Series B Common Stock Election Trustee will also file (or cause to be filed) any other statements, returns, or disclosures relating to the New Series B Common Stock Election Trust that are required by any governmental unit.  Except as may otherwise be provided, the New Series B Common Stock Election Trust's taxable income, gain, loss, deduction or credit will be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the New Series B Common Stock Election Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the New Series B Common Stock Election Trust Agreement, up to the tax book value of the New Series B Common Stock Election Trust Property treated as contributed by the holders of Allowed Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the New Series B Common Stock Election Trust. Similarly, taxable loss of the New Series B Common Stock Election Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

10. Tax Withholding by New Series B Common Stock Election

TrusteeThe New Series B Common Stock Election Trustee may withhold and pay to the appropriate government authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of New Series B Common Stock Election Trust Interests. All such amounts withheld and paid to the appropriate government authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of New Series B Common Stock Election Trust Interests for all purposes of the New Series B Common Stock Election Trust Agreement. The New Series B Common Stock Election Trustee shall be authorized to collect such tax information from the holders of New Series B Common Stock Election Trust Interests shall be required to identify themselves to the New Series B Common Stock Election Trustee and provide tax information and the specifics of their holdings, to the extent the New Series B Common Stock Election Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the New Series B Common Stock Election Trustee for these purposes. The New Series B Common Stock Election Trustee may refuse to make a distribution to any holder of a New Series B Common Stock Election Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered; provided, however, that, if such information is not furnished to the New Series B Common Stock Election Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such New Series B Common Stock Election Trust Interest; and, provided, further, that, upon the delivery of such information by a holder of a New Series B Common Stock Election Trust Interest, the New Series B Common Stock Election Trustee shall make such Distribution to which the holder of the New Series B Common Stock Election Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, provided, further that, if the New Series B Common Stock Election Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the New Series B Common Stock Election Trustee is later held liable for the amount of such withholding, such holder shall reimburse the New Series B Common

EXHIBIT A
201

Stock Election Trustee for such liability (to the extent such amounts were actually distributed to such holder).

**Q.** Holdco Cash Out ElectionHow MadeEach Holder of an Allowed Class 4, 5 and 6 Claim shall be entitled to make the Holdco Cash Out Election by checking the appropriate box on the Ballot provided to each such Holder.

2.   When Payment MadeHoldco shall make payment to each Holder properly and timely making the Holdco Cash Out Election on the later of the Effective Date or the date such Holder's Claim becomes an Allowed Claim.  The Holdco Cash Out Election may further be governed by documents in the Plan Supplement.

3.   Effect of PaymentFor all purposes of this Plan, Holdco or its designee shall be deemed to be the Holder of all Claims for which payment is made pursuant to the Holdco Cash Out Election as of the Effective Date, and any and all Distributions (of New Common Stock or otherwise) the original Holder of such Claim received prior to receipt of payment by Holdco, if any, shall be deemed transferred, assigned and conveyed to Holdco nunc pro tunc as of the Effective Date, and Holdco shall have and enjoy such rights, benefits and privileges accorded to Holders of Allowed Class 4, 5 and 6 Claims, as applicable, as if Holdco had been the Holder of such Claims as of and on the Effective Date.

4.   Holdco to Elect to Proceed with Holdco Cash Out ElectionNotwithstanding anything in this Plan or any other document, no Holder shall have the right to receive the benefits of the Holdco Cash Out Election unless, within 10 days prior to the Effective Date, Holdco has filed with the Bankruptcy Court a notice in its sole and absolute discretion indicating that it intends to proceed with the Holdco Cash Out Election.  Absent the timely filing of such notice by Holdco in its sole and absolute discretion, the Holdco Cash Out Election shall be deemed null, void and of no effect, and Holders shall have no rights related to the Holdco Cash Out Election notwithstanding such Holder's checking of the appropriate box on the Ballot electing the Holdco Cash Out Election, and in such event such Holder shall receive New Series A Common Stock as if such Holder had not made the Holdco Cash Out Election.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.** Initial Distribution DateOn the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

**B.** Disputed ReserveEstablishment of Disputed ReserveOn the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Reserve for Disputed Claims, which Disputed Reserve shall be administered by the Reorganized Debtor. The Reorganized Debtor shall reserve a number of shares of New Series A Common Stock, an amount of Cash, or any other security or equity interest issued under the Plan, depending on the election of the Holder of such Disputed Claims and whether the Debtor elects to issue a security on account of part of the New Series B Common Stock Election, sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

2.   Maintenance of Disputed ReserveThe Reorganized Debtor shall hold unissued New Series A Common Stock and Cash in the Disputed Reserve in trust, segregated from and not to be commingled with any other assets of the Reorganized Debtor, for the benefit of the Holders of Claims ultimately determined to be Allowed.  The Reorganized Debtor shall, in its sole discretion, distribute such amounts (net of any expenses, including taxes, relating thereto), as provided herein, as such Disputed Claims are resolved by a Final Order, and such New Series A Common Stock and Cash (or other security) will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

**C.** Tax Refund Litigation EscrowThe tax refunds that are the subject of the FDIC Causes of Action are to be held in the Tax

Refund Escrow Account pending determination of the FDIC Causes of Action, and are subject to the Escrow Account Stipulation and the Escrow Account Order.  The Reorganized Debtor shall be deemed a party to the Escrow Account Stipulation, the Escrow Account Order, and the Tax Refund Escrow Account, and the parties to such documents shall execute any further documents as may be

1    necessary to ensure that the Reorganized Debtor shall succeed to the Debtor and be bound by the

2    provisions thereunder.

3        **D.**   Quarterly DistributionsOn each Quarterly Distribution Date or as soon

4    thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions

5    required to be made under the Plan on such date.  Any Distribution that is not made on the Initial

6    Distribution Date or on any other date specified herein because the Claim that would have been

7    entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the

8    Reorganized Debtor as applicable, in the Disputed Reserve and distributed on the first Quarterly

9    Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid

10   amount of any Distribution paid on a Quarterly Distribution Date.  Distributions from the New

11   Series B Common Stock Election Trust shall be supervised by the Plan Committee.

12       **E.**   Record Date for DistributionsExcept as otherwise provided in a Final Order

13   of the Bankruptcy Court or as otherwise stipulated by the Plan Proponents or Reorganized Debtor,

14   as applicable, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on

15   or prior to the Distribution Record Date will be treated as the Holders of those Claims for all

16   purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the

17   transfer may not have expired by the Distribution Record Date. The Reorganized Debtor shall have

18   no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.

19   In making any Distribution with respect to any Claim, the Reorganized Debtor shall be entitled

20   instead to recognize and deal

21   with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with

22

23

24

25

26

27

28

respect thereto or on the Schedules as the Holder thereof as of the close of business on the

Distribution Record Date and upon such other evidence or record of transfer or assignment that are

known to the Reorganized Debtor as applicable, as of the Distribution Record Date.

**F.**  Delivery of DistributionsGeneral Provisions; Undeliverable

DistributionsSubject to Bankruptcy Rule 9010 and except as otherwise provided herein,

Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor at (i) the

address of each Holder as set forth in the Schedules, unless superseded by the address set forth on

proofs of Claim Filed by such Holder or (ii) the last known address of such Holder if no proof of

Claim is Filed or if the Plan Proponents or Reorganized Debtor, as applicable, has been notified in

writing of a change of address; provided, however, that Distributions paid by the Reorganized

Debtor for the benefit of Holders of Debentures shall only be made directly to the Indenture

Trustee under the Indentures.  The Indenture Trustee shall, in turn, administer the Distributions to

the respective holders of Debenture Unsecured Claims in accordance with the Plan and the

Indentures.  Subject to Article V.C.5 of the Plan, Distribution to the Indenture Trustee shall be

promptly remitted by the Indenture Trustee to the Holders of the Debenture Unsecured Claims

entitled thereto (i.e., the Holder of the relevant Debenture on the applicable Distribution Record

Date) in accordance with this Plan and the Indentures, and each such Distribution by the

Reorganized Debtor to the Indenture Trustee shall be deemed to have discharged the obligation of

the Reorganized Debtor to make such Distribution to the Holders of Debenture Unsecured Claims

represented by the Indenture Trustee.  The Indenture Trustee shall not be required to give any bond

or surety or other security for the performance of their duties unless otherwise ordered by the

Bankruptcy Court.  The Indenture Trustee shall only be required to make Distributions in

accordance with the terms of the Plan and the Indentures and shall have no liability for actions

taken in accordance with the Plan or in reliance upon information provided to the Indenture

Trustee in accordance with the Plan (except for liabilities resulting from its own gross negligence

or willful misconduct as determined by a court of competent jurisdiction that is not subject to

review on appeal).  If any Distribution is

returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to

determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate, but no Distribution to any Holder shall be made unless and until the Reorganized Debtor has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code. The Reorganized Debtor shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

2.   Unclaimed Property Except with respect to property not distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of such one-year period, the Claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim. Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

**G.**   Surrender of Canceled Instruments and Securities Generally Except as set forth in this Plan, as a condition precedent to receiving any Distribution hereunder on account of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to this Plan, other than securities held in book entry form through the Depository Trust Company, the Holder of such Claim shall tender such instrument,

security or other documentation evidencing such Claim to the Reorganized Debtor.  In the event an Allowed Claim is evidenced by securities held in book entry form through the Depository Trust Company, such securities shall be cancelled in accordance with usual Depository Trust Company practices.  Any Distributions pursuant to the Plan on account of any Claim evidenced by such instruments, securities or other documentation, other than securities held in book entry form through the Depository Trust Company, shall, pending such surrender, be treated as an undeliverable Distribution; provided, however, that Holders of the Debentures shall tender the Debentures to the Indenture Trustee.  All payments to Holders of Debenture Unsecured Claims, other than Debenture Unsecured Claims evidenced by securities held by the Depository Trust Company, shall only be made after such surrender, or in the event such certificate is lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth in this Plan. Upon surrender of such Debentures, the Indenture Trustee shall cancel and destroy such Debentures.  As soon as practicable after surrender of the Debentures, the Indenture Trustee shall distribute to the Holder thereof, as the case may be, such Holder's Pro Rata share of the Distribution pursuant to the terms of the Indentures, but subject to the rights of the Indenture Trustee to assert (a) its Charging Lien to the extent the Indenture Trustee Fees or any other fees owed to the Indenture Trustee under the Indentures, including without limitation, fees and expenses (including fees and expenses of its professionals), accrued prior to the Petition Date, are not paid pursuant to the Plan; or (b) any other rights or arguments to payment other than asserting its Charging Lien.

2.    Failure to Surrender Canceled Instruments If any Holder of an Allowed Claim evidenced by instruments, securities or other documentation canceled as set forth in this Plan, fails to surrender such instrument, security or other documentation or comply with the provisions of this Plan within one year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such Holder shall be forever barred from asserting such Claim against the Reorganized Debtor or its property. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in this Plan.

**H.** Lost, Stolen, Mutilated or Destroyed Instrument or Security Any Holder of

an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to this Plan that has been lost, stolen, mutilated or destroyed, shall, in lieu of surrendering such instrument, security or documentation: (i) deliver to the Reorganized Debtor (or in the case of the Debentures, the Indenture Trustee) (a) an affidavit of loss reasonably satisfactory to the Reorganized Debtor (or in the case of the Debentures, the Indenture Trustee) setting forth the unavailability of such instrument, security, or other documentation and (b) such additional security or indemnity as may reasonably be requested by the Reorganized Debtor to hold the Reorganized Debtor (or, in the case of the Debentures, required by the Indenture Trustee to hold the Indenture Trustee) harmless from any damages, liabilities, or costs incurred in treating such Entity as a Holder of an Allowed Claim; and (ii) satisfy any other requirement under the Indentures or any other relevant document. Upon compliance with this paragraph by a Holder of an Allowed Claim evidenced by such instrument, security or other documentation, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such instrument, security or other documentation.

       **I.**   Manner of Cash Payments Under the PlanCash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor, or by wire transfer from a domestic bank, at the option of the Reorganized Debtor.

       **J.**   Time Bar to Cash Payments by CheckChecks issued by the Reorganized Debtor on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this paragraph shall be made directly to the Reorganized Debtor by the Holder of the Allowed Claim to whom the check was originally issued. Any claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Initial Distribution Date or Quarterly Distribution Date on which such check was issued. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Reorganized Debtor as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in this Plan.

       **K.**  Limitations on Funding of Disputed ReserveExcept as expressly set forth in

the Plan, neither the Debtor nor the Reorganized Debtor shall have any duty to fund the Disputed

Reserve.

**L.**   Compliance with Tax RequirementsIn connection with making Distributions

under the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax

withholding and reporting requirements imposed on it by any governmental unit, and all

Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

Notwithstanding the above, each Holder that is to receive a Distribution under the Plan shall have

the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such

Holder by a governmental unit, including income, withholding and other tax obligations, on

account of such Distribution.  The Reorganized Debtor may withhold the entire Distribution due to

any Holder of an Allowed Claim until such time as such Holder provides the necessary

information to comply with any withholding requirements of any governmental unit.  Any property

so withheld will then be paid by the Reorganized Debtor to the appropriate authority, including,

without limitation, a signed and completed Internal Revenue Service Form W-8 or W-9, as

applicable.  If the Holder of an Allowed Claim fails to provide the information necessary to

comply with any withholding requirements of any governmental unit within 90 days from the

Reorganized Debtor's request for such information, then such Holder's Distribution shall be

treated as an undeliverable Distribution and such Holder's Claims shall not be Allowed.

**M.**   No Payments of Fractional DollarsNotwithstanding any other provision of

the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.

Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the

actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

///

**N.**   Interest on ClaimsExcept as specifically provided for in the Plan or the

Confirmation Order, interest shall not accrue on Claims and no Holder of a Claim shall be entitled

to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid

on any Disputed Claim in respect of the period from the Petition Date to the date a final

Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except

as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim

shall be Allowed to the extent that it is for postpetition interest or other similar charges.

**O.**   No Distribution in Excess of Allowed Amount of ClaimNotwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

**P.**   Setoff and RecoupmentThe Debtor and the Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

**Q.**   No Distribution to General Unsecured CreditorsNo Distribution of Cash may be made to Holders of General Unsecured Claims until any Allowed FDIC Priority Claim is paid in full.

**R.**   Cap and Limitation on Total Cash Payments to Creditors Who Make the New Series B Common Stock ElectionNotwithstanding anything in the Plan or in any documents executed or delivered pursuant to or to implement this Plan, Holders of Allowed Claims who properly and timely make the New Series B Common Stock Election shall not receive an amount of Cash greater than the Pro Rata

portion of Net Free Cash that such Holders would have received if all Net Free Cash was Distributed Pro Rata to all Holders of Allowed General Unsecured Claims, and all Cash received by such Holders, whether on account of New Series B Common Stock Election Trust Interests or New Series B Common Stock, shall be applied in reduction of such amount.

## ARTICLE V

## DISPUTED CLAIMS

**A.**    No Distribution Pending AllowanceDistributions on Disputed ClaimsExcept as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties and subject to the establishment of the Disputed Reserve, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as reasonably practicable after such Disputed Claims become Allowed Claims; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Case (this does not include Professional fees and costs incurred by the Debtor during the Case which shall be paid in accordance with Article III.A.1) or assumed by the Debtor on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with the Plan.

2.    No Partial PaymentsNotwithstanding any provision otherwise in the Plan and except as otherwise agreed by the Reorganized Debtor no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  Any Entity that holds both an Allowed Claim and a Disputed Claim shall only receive a Distribution on the Allowed Claim after all objections to the Disputed Claim have been resolved by settlement or Final Order.
///

**B.**  Resolution of Disputed Claims        Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation

and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code and as to

Holdco Fees and as to Indenture Trustee Fees), to make, File, prosecute, settle, compromise,

withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims, and

to administer and adjust the Claims Register to, among other things, reflect any such settlements,

compromises and withdrawals.

**C.**  Objection Deadline    All objections to Disputed Claims shall be Filed and

served upon the Holders of each such Claim on or before the Claims Objection Bar Date or the

Administrative Claim Objection Bar Date. If an objection has not been Filed to a proof of Claim or

request for payment of an Administrative Claim by the respective bar dates, then such Claim or

Administrative Claim shall be treated as an Allowed Claim for all purposes under the Plan unless

otherwise ordered by the Bankruptcy Court after notice and a hearing.

**D.** Estimation of Claims  At any time, subsequent to the Effective Date, the

Reorganized Debtor may request that the Bankruptcy Court estimate any contingent or

unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of

whether the Debtor or Reorganized Debtor has previously objected to such Claim or whether the

Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have

jurisdiction to estimate any Claim at any time during litigation concerning any objection to such

Claim, including during the pendency of any appeal relating to any such objection.

**E.** Disallowance of Claims        Except as otherwise agreed, any and all proofs

of Claim Filed after the applicable bar date shall be deemed disallowed and expunged as of the

Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and

Holders of such Claims may not receive any Distributions on account of such Claims, unless on or

before the Confirmation Date the

---

Bankruptcy Court has entered an order deeming such Claim to be timely filed.

## ARTICLE VI

## EFFECT OF PLAN CONFIRMATION

**A.** Satisfaction of ClaimsExcept to the extent otherwise provided in the Plan, the treatment of all Claims or Interests in the Debtor under the Plan shall be in exchange for and in complete satisfaction and release of, all Claims or Interests in the Debtor of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, or against the Estate.  Except as otherwise provided in the Plan, upon the Effective Date, all Claims and Interests in the Debtor and the Estate shall be satisfied and released in full in exchange for the consideration provided under the Plan.  Except as otherwise provided in the Plan, all Persons shall be precluded and enjoined from asserting against the Debtor, the Estate or the Reorganized Debtor any Claims or Interests or other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

**B.** DischargeExcept as otherwise specifically provided in this Plan or in the Confirmation Order, pursuant to section 1141(d) of the Code, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of all Claims, including any interest or penalties accrued on such Claims from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against and Interests in the Debtor, or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights and Interests, including but not limited to, Claims and Interests that arose before the Confirmation Date, including all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of Claim or Interest based upon such Claim, debt, right or Interest is Filed or deemed Filed under section 501 of the Code; (b) a Claim or Interest based upon such Claim, debt, right or Interest is allowed under section 502 of the Code, or (c) the Holder of such a Claim, debt, right, or Interest accepted this Plan.  The Confirmation Order shall constitute a determination of the discharge of all of the Claims against and Interests in the Debtor, subject to the occurrence of the Effective Date.

**C.** Compromise and Settlement Pursuant to section 363 of the Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Interests on the terms set forth in the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and Holders of Claims and Interests.  Entry of the Confirmation Order also shall constitute the Bankruptcy Court's approval of the releases set forth in the Plan pursuant to Bankruptcy Rule 9019 and its finding that the releases are: (i) in exchange for good and valuable consideration; (ii) a good faith settlement and compromise of the Claims released by releases set forth in the Plan; (iii) in the best interests of the Debtor and all Holders of Claims; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtor or the Reorganized Debtor (or anyone claiming through or derivatively on behalf of the Debtor or Reorganized Debtor) and the Holders of Claims against the Debtor asserting any Claim released by the Releasing Parties set forth in the Plan against any of the Releases.

**D.** Releases Releases by the Debtor, the Debtor's Estate and the Reorganized Debtor

Notwithstanding anything contained herein to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on the Confirmation Date and effective as of the Confirmation Date, for good, valuable and adequate consideration, including: (1) the settlement, release, and compromise of debt and all other good and valuable consideration paid pursuant hereto; and (2) the services of the D & Os and advisors in facilitating the expedient implementation of the restructuring transactions contemplated hereby, the Debtor, the Reorganized Debtor and the Debtor's Estate

(including all parties claiming derivatively or through the Debtor or the Reorganized Debtor or the Estate) or their affiliates (excluding the D&Os, as provided in the Plan) discharge and release and shall be deemed to have provided a full discharge and release to each of the Released Parties and their respective property (the "Debtor Release") from any and all claims, obligations, debts, rights, suits, damages, remedies, rights of setoff, causes of action, and liabilities whatsoever (including any derivative claims asserted on behalf of the Debtor) whether known or unknown, matured or unmatured, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the effective date in law, equity or otherwise, whether for tort, contract violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtor, the Case, the issuance of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor, any Released Parties, the restructuring of Claims and Interests prior to or in the case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including those that the Debtor would have been legally entitled to assert in its own right or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert on behalf of the Debtor or its Estate; provided, however, that the foregoing Debtor Release shall not operate to waive or release any claims or liabilities of the Debtor: (1) arising under any contractual obligation owed to the Debtor that are preserved by the Plan, the Plan Supplement, or related documents; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; or (3) against the Bank or the FDIC (in any capacity, whether in its corporate capacity or as receiver of the Bank); further provided, however, that notwithstanding the foregoing proviso (including clause (1) contained therein) to the contrary, the foregoing Debtor Release is, and shall operate as, a release of, among other things, any and all claims or liabilities of the Debtor arising under the Senior Debt Documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related

provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Releasing Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtor or the Reorganized Debtor asserting any claim or cause of action released pursuant to the Debtor Release.

2.    Releases of Third Parties By Others.

Unless otherwise expressly provided in the Plan, on the Confirmation Date and effective as of the Confirmation Date, the Releasing Parties shall be deemed to provide a full release to the Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, and all direct claims, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including those in any way related to the Case or the Plan; provided, however, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or intentional or willful misconduct or fraud; provided, further, however, that other than as set forth in the Plan, nothing in the Plan or the Confirmation Order shall affect, release, enjoin or impact in any way the prosecution of any claims by the FDIC against any non-Debtor, including the Releasees; provided further, however, that the foregoing third-party release shall not operate to release claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of any Releasing Party: (1) against a releasing party or a party releasing under this third-party release arising from any contractual obligations owed to the Releasing Party if (a) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents or (b) such release would negatively impair any insurance covering any act or omission of any of the D&Os (and solely to the extent that such release would negatively impair any insurance covering any act or omission by any of the D&Os; or (2) against the Bank or the

1    FDIC (in any capacity, whether in its corporate capacity or as receiver of the Bank).

2         Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval,

3    pursuant to Bankruptcy Rule 9019, of the third-party release described herein, which includes by

4    reference each of the related provisions contained herein, and further, shall constitute the

5    Bankruptcy Court's finding that the third-party release is (1) in exchange for the good and valuable

6    consideration provided by the Releasing Parties; (2) good-faith settlement and compromise of the

7    claims released by the third-party release; (3) in the best interests of the Debtor and all Holders of

8    Claims and  Interest; (4) fair, equitable and reasonable; (5) given and made after due notice and

9    opportunity for hearing; and (6) a bar to any Releasing Parties asserting any claim or cause of

10   action released pursuant to such third-party release.

11                    3.   Waiver of Statutory Limitations On Releases.

12        Each of the Releasing Parties in each of the releases contained in the Plan expressly

13   acknowledges that although ordinarily a general release may not extend to claims which the

14   Releasing Party does not know or suspect to exist in his favor, which if known by it may have

15   materially affected its settlement with the party released, they have carefully considered and taken

16   into account in determining to enter into the above releases the possible existence of such unknown

17   losses or claims. without limiting the generality of the foregoing, each Releasing Party, pursuant to

18   the Plan, expressly waives any and all rights conferred upon it by any statute or rule of law which

19   provides that a release does not extend to claims which the claimant does not know or suspect to

20   exist in its favor at the time of executing the release, which if known by it may have materially

21   affected its settlement with the released party, including, without limitation, California Civil Code

22   Section 1542, which provides:

23        **A general release does not extend to claims which the creditor does not know or**

24        **suspect to exist in his or her favor at the time of executing the release, which if**

25        **known by him or her must have materially affected his or her settlement with the**

26        **debtor.**

27        The releases contained in the Plan are effective regardless of whether those released

28   matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY HOLDCO ADVISORS L.P., DATED JUNE 1, 2012

71

### 4. Exculpation.

The Exculpated Parties shall neither have, nor incur any liability to any entity for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement, the restructuring transactions, the issuance and/or distribution of any security under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Plan or the restructuring of the Debtor (collectively, "Exculpated Claims"); provided, that the foregoing provisions of this exculpation shall have no effect on any post-effective date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; provided, further, that each exculpated party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

### 5. Injunction.

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Interests, causes of action or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) are subject to exculpation pursuant to the Plan, including Exculpated Claims (but only to the extent of the exculpation provided in the Plan); or (4) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the effective date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind, including on account of any claims, interests, causes of actions or liabilities that have been compromised or settled against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the property or estate of any entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled,

1   compromised, or exculpated claims, interests, causes of action or liabilities; (b) enforcing,

2   attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order

3   against the Debtor, the Reorganized Debtor, or any entity so released or exculpated (or the

4   property or estate of the Debtor, the Reorganized Debtor, or any entity so released or exculpated)

5   on account of or in connection with or with respect to any such released, settled, compromised, or

6   exculpated claims, interests, causes of action, or liabilities; (c) creating, perfecting or enforcing any

7   lien, claim, or encumbrance of any kind against the Debtor, the Reorganized Debtor, or any entity

8   so released or exculpated (or the property or Estate of the Debtor, the Reorganized Debtor, or any

9   entity so released or exculpated) on account of or in connection with or with respect to any such

10  released, settled, compromised, or exculpated claims, equity interests, causes of action, or

11  liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any

12  obligation due from the Debtor, the Reorganized Debtor, or any entity so released or exculpated

13  (or the property or Estate of the Debtor, the Reorganized Debtor, or any entity so released or

14  exculpated) on account of or in connection with or with respect to any such released, settled,

15  compromised, or exculpated claims, interests, causes of action or liabilities unless such holder has

16  filed a timely Proof of Claim with the Bankruptcy Court preserving such right of setoff pursuant to

17  section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any

18  manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or

19  any entity so released or exculpated (or the property or Estate of the Debtor, the Reorganized

20  Debtor, or any entity so released or exculpated) on account of or in connection with or with respect

21  to any such released, settled, compromised, or exculpated claims, interests, causes of action, or

22  liabilities released, settled or compromised pursuant to the Plan; provided that nothing contained

23  herein shall preclude an Entity from obtaining benefits directly and expressly provided to such

24  Entity pursuant to the terms of the Plan; provided, further, that  nothing contained herein shall be

25  construed to prevent any Entity from defending against claims objections or collection actions

26  whether by asserting a right of setoff or otherwise to the extent permitted by law.

27  In addition, nothing contained in the foregoing injunction provisions or in the Plan's release

28  provisions shall apply to any defense, offset, counterclaim, or similar right that a Releasing Party

1    may hold against an entity that pursues, asserts, or litigates a claim against that Releasing Party.

2        Neither the Plan, nor confirmation thereof shall be deemed to waive, diminish, impair,

3    release or otherwise affect the FDIC's right to assert, pursue, resolve, prosecute, litigate or defend

4    claims that it is the owner of and entitled to possess to the exclusion of all others proceeds arising

5    from (a) any and all tax refunds now owed or payable or hereafter owed or payable or paid by any

6    federal or state taxing authority as a result of tax returns filed by First Federal Bank of California,

7    its subsidiaries or affiliates, or the consolidated tax group of which First Federal Bank of

8    California is a member; (b) any claims or causes of action against any persons or entities arising

9    from or related to the malfeasance, breaches of duties, errors and omissions of any such persons or

10    entities; (c) interests in financial institutions, banker bonds or insurance policies; (d) claims for

11    refunds, reimbursement or loss under any bonds or insurance policies; and (e) any other claims

12    asserted in the Proof of Claim that it filed in this Case.

13             6.      Releases of the D & Os; D & Os Insurance Coverage.

14        For the avoidance of doubt, the provisions in the Plan shall not prevent any of the D&Os or

15    any insurance carrier or other insurer providing D&O Insurance Coverage from bringing a claim

16    against the Debtor or Reorganized Debtor, as applicable, to the extent that (i) such claim is

17    necessary to preserve coverage under any directors' and officers' liability insurance provided to

18    such D&O (such coverage, "D&O Insurance Coverage"), (ii) such claim is a direct result of

19    litigation or claims initiated or prosecuted  by the Debtor, the Reorganized Debtor or Holdco

20    against any entity other than FDIC, (iii) such claim constitutes costs of representation or defense as

21    a witness in any litigation or claim by or against the Debtor or the Reorganized Debtor; or (iv) any

22    of the  D&Os determines to waive the release provided by the Debtor to such person (the "Waiving

23    D&O"), in which case the waiving D&O, and only the Waiving D&O, shall be entitled to bring

24    claims against the Debtor notwithstanding any of the foregoing. Nothing herein shall constitute an

25    admission by the Debtor or the Reorganized Debtor as to the validity, priority, or amount of any

26    such claims, and the Debtor and the Reorganized Debtor reserve all rights to object to or otherwise

27    dispute the validity, priority, or amount of any such claims.  In addition, nothing contained in the

28    Plan shall constitute a release of any claims, rights, or defenses by an insurance carrier or other

insurer providing D&O Insurance Coverage against any of the D&Os, or by the D&Os against any such carrier or insurer.

Further, to the extent that any D&O (or any insurance carrier or other insurer providing D&O Insurance Coverage, as the case may be) brings any claims or commences any litigation against the Debtor or the Reorganized Debtor on account of pre-Effective Date acts, omissions, or anything related to pre-Effective Date issues other than pursuant to (i), (ii), or (iii) in the preceding paragraph, the Debtor or the Reorganized Debtor shall be entitled to assert any and all claims it holds against such D&O (or the insurance carrier or other insurer providing D&O Insurance Coverage) that brought such claims or commenced such litigation, and such action on the part of the D&O (or the insurance carrier or other insurer providing D&O Insurance Coverage) shall operate to nullify and avoid any and all releases, exculpation, or injunctions in the Plan that may otherwise prohibit the Debtor or Reorganized Debtor from bringing such claims against such D&O (or the insurance carrier or other insurer providing D&O Insurance Coverage).  Moreover, in the event that the Debtor or the Reorganized Debtor is entitled to bring such claims, they shall vest exclusively in a trust established for the purpose of holding and bringing such claims (the D&O Litigation Trust), which trust shall be deemed to have been created nunc pro tunc to the Effective Date.

Consistent with the foregoing, the Plan Proponents and the D&Os shall cooperate to ensure that the releases provided by the D&Os pursuant to the Plan do not adversely impact any D&O Insurance Coverage or access to proceeds of any D&O insurance for any of the D&Os, and shall take such steps as are necessary and reasonably practicable and not unduly burdensome to the Reorganized Debtor to ensure that the D&O Insurance Coverage for all D & Os is fully preserved.

In the event any of the releases, exculpation, or injunction provisions in the Plan with respect to the D & Os are not in full force and effect on and after the Effective Date, any surviving claims or causes of action held by the Debtor or the Estate (or any Entity claiming by or derivatively through the Debtor or the Estate) (the "Surviving D&Os Claims") shall vest exclusively in the D&O Litigation Trust; provided, however, that, subject to the terms of the Plan, immediately following the Effective Date, D&O Litigation Trust shall release any Surviving

D&Os Claims.

### 7.   Good Faith Solicitation

Upon entry of the Confirmation Order, pursuant to section 1125(e) of the Code, the Debtor and Holdco, and their respective present and former members, officers, and directors (including the D & Os), employees, agents, advisors, representatives, successors or assigns, and any Professionals (acting in such capacity) employed by any of the foregoing Persons will be deemed to have solicited votes on the Plan in good faith and in compliance with the Code and any applicable non-bankruptcy law, and, therefore, shall have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

The Plan is deemed to be a motion under sections 105, 363, and 1123 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for approval of the releases described in Article [  ] of the Plan.  The confirmation of the Plan shall constitute approval of such motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

Nothing herein shall constitute an admission by the Debtor or the Reorganized Debtor as to the validity, priority, or amount of any indemnity or reimbursement claim of any kind that may be asserted by any of the D&Os against the Debtor or the Reorganized Debtor, and the Debtor and the Reorganized Debtor reserve all rights to object to or otherwise dispute the validity, priority, or amount of any such claims.

### 8.   Release Provisions Relating to the FDIC

Nothing in the Plan or the Confirmation Order shall affect, release, enjoin or impact in any way the prosecution of any claims by the FDIC against any non-Debtor, including the Releasees. Neither this Plan, nor Confirmation thereof shall be deemed to waive, diminish, impair, release or otherwise affect the FDIC's right as receiver of the Bank to assert, pursue, resolve, prosecute, litigate or defend the FDIC's claims that it is the owner of and entitled to possess to the exclusion of all others proceeds arising from (a) any and all tax refunds now owed or payable or hereafter owed or payable or paid by any federal or state taxing authority as a result of tax returns filed by

First Federal Bank of California, its subsidiaries or affiliates, or the consolidated tax group of which First Federal Bank of California is a member; (b) any claims or causes of action against any persons or entities arising from or related to the malfeasance, breaches of duties, errors and omissions of any such persons or entities with respect to the Bank; (c) interests in financial institutions, banker bonds or insurance policies; (d) claims for refunds, reimbursement or loss under any bonds or insurance policies; and (e) any other claims asserted in the Proof of Claim that it filed in this Bankruptcy Case.

In addition, nothing contained herein or in the Confirmation Order shall impair the right of any Entity, including the Debtor, the Reorganized Debtor, or the D & Os, to pursue and prosecute any claims, or to defend against, assert affirmative defenses, counterclaims or cross claims, against the FDIC or the Bank, including against the FDIC as receiver of the Bank.

**E.** Preservation of Causes of ActionVesting of Causes of ActionExcept as expressly released or otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Code, the Reorganized Debtor exclusively shall be vested with and shall retain and may enforce any and all Causes of Action that the Debtor or the Estate may hold or have against any Person or Entity (including, without limitation, the FDIC Causes of Action), all of which are hereby preserved, including all Causes of Action, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect to claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate or the Reorganized Debtor.  Except as otherwise provided in the Plan, such claims, rights and causes of action shall remain assets of and vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such claims, rights and causes of action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court.  Except as provided in the Plan or the Confirmation Order, neither the Debtor, the Estate nor the Reorganized Debtor waives, releases, relinquishes, forfeits, or abandons (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action or defenses that constitute property of the

Debtor or its Estate: (a) whether or not such claims, rights, causes of action, or defenses have been listed or referred to this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such claims, rights and causes of action, or defenses are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such claims, rights or causes of action filed a proof of Claim in the Case, filed a notice of appearance or any other pleading or notice in the Case, voted for or against this Plan, or received or retained any consideration under this Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, (x) the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and causes of action, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the right of the Reorganized Debtor, to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action, that the Debtor, its Estate, may have as of the Petition Date and the Effective Date, and (y) from and after the Effective Date, the Reorganized Debtor shall have exclusive standing and authority to prosecute any Causes of Action, including, without limitation, any FDIC Causes of Action.

2.    Reservation of Causes of ActionExcept as provided in the Plan and the releases contained therein, the Debtor expressly reserves all its Causes of Action, including, without limitation, all claims, rights, Causes of Action, including the FDIC Causes of Action, and defenses for later adjudication by the Reorganized Debtor, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action, and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Reorganized Debtor expressly reserves the right to pursue or adopt claims, rights and causes of action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any entity, including

the plaintiffs or co-defendants in such lawsuits.  Any entity to whom the Debtor has incurred an

obligation (whether on account of services, purchase, sale of goods or otherwise), or who has

received services from the Debtor, or who has received money or property from the Debtor, or

who has transacted business with the Debtor, or who has leased equipment or property from or to

the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by

the Reorganized Debtor subsequent to the Effective Date and may be the subject of an action after

the Effective Date, whether or not: (a) such entity has filed a proof of Claim against the Debtor in

this Case; (b) such entity's proof of Claim has been objected to by the Debtor; (c) such entity's

Claim was included in the Debtor's Schedules; or (d) such entity's scheduled Claim has been

objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or

disputed.

3.    Reservation of Rights Regarding Claims

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the

Debtor or any other Person to object to any Claim for purpose of voting, the failure of the Debtor

or any other Person to object to a Claim or Administrative Claim before confirmation or

consummation of the Plan or the Effective Date, the failure of any Person to assert a Claim or

cause of action before confirmation or consummation of the Plan or the Effective Date, the

absence of a proof of Claim having been filed with respect to a Claim nor any action or inaction of

the Debtor or any other Person with respect to a Claim or Administrative Claim, other than a

legally effective express waiver or release, shall be deemed a waiver or release of the right of the

Debtor or the Reorganized Debtor before or after solicitation of votes on the Plan or before or after

the Confirmation Date or the Effective Date to (a) object to or examine such Claim or

Administrative Claim in whole or in part or (b) retain and either assign or exclusively assert,

pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against

the holder of any such Claim.

**F.**    Good Faith Solicitation

Upon entry of the Confirmation Order, pursuant to section 1125(e) of the Code, the Debtor and

Holdco, and their respective present and former members, officers and directors (including the

D & Os), employees, agents, advisors, representatives, successors or assigns, and any Professionals

(acting in such capacity) employed by any of the foregoing Persons will be deemed to have

solicited votes on the Plan in good faith and in compliance with the Code and any applicable non-

bankruptcy law, and, therefore, shall have no liability for the violation of any applicable law, rule

or regulation governing the solicitation of votes on the Plan.

### G.    Cramdown

Notwithstanding anything to the contrary contained herein, the Plan Proponents reserve the right

to seek confirmation of the Plan pursuant to section 1129(b) of the Code in the event any impaired

Class of Claims or Interests does not vote to accept the Plan.

### ARTICLE VII

### CONDITIONS PRECEDENT

**A.**    Conditions to ConfirmationThe only condition precedent to

confirmation of the Plan is that the Bankruptcy Court shall have Entered the Confirmation Order in

form and substance acceptable to the Plan Proponents.

**B.**    Conditions to the Effective DateThe following are conditions

precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in

accordance with Section D of this Article IX:

(i)    T he Confirmation Order shall be a Final Order;

(ii)    all other actions and all agreements, instruments or other documents

necessary to implement the terms and provisions of the Plan shall have been

effected, and in each case, shall have been duly and validly executed and delivered

by the parties thereto and all conditions to their effectiveness shall have been

satisfied or waived in accordance therewith,

(iii)    the Plan Proponents shall have received all authorizations, consents, rulings,

opinions, or other documents that are determined by the Plan Proponents,  to be

necessary to implement the Plan and that are required by law, regulation, or order.

(iv)    Holdco shall not have exercised the Effective Date Deferral Election.

///

**C.** Effective Date Deferral ElectionAt Holdco's election, which may be made by Holdco from time to time, the occurrence of the Effective Date may be deferred to a date selected by Holdco in its sole discretion, which date may be further extended by Holdco from time to time in Holdco's sole discretion, provided, however, the Effective Date cannot be deferred past, and must occur no later than, the date that is three (3) Business Days after the date any order determining the FDIC Priority Claims Determination is a Final Order.

**D.** Waiver of Conditions to ConfirmationThe conditions set forth in Article IX, Sections A and B, supra, may be waived, in whole or in part, by the Plan Proponents, without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**E.** Effect of Failure of ConditionsIf the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, any holder of a Claim or Interest, or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, any Creditors, or holders of Interests, or any other Person in any respect.

## ARTICLE VIII

### RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT

**F.** Retention and Scope of Jurisdiction of the Bankruptcy CourtFollowing the Effective Date, the Bankruptcy Court shall retain such jurisdiction to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

1. To determine the allowability, amount, classification, or priority of Claims upon objection by the Reorganized Debtor;

2. To construe and to take any action to execute and enforce this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and consummation

of this Plan, and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date;

3.    To rule on any and all applications for allowance of compensation and expense reimbursement of Professionals for periods on or before the Effective Date;

4.    To rule on any request for payment of any Administrative Claim;

5.    To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of this Plan;

6.    To resolve all applications, adversary proceedings, contested matters, and other litigated matters instituted on or before the Effective Date;

7.    To hear and determine any actions related to the Causes of Action, whether or not such actions are pending on or commenced after the Effective Date and to recover any assets of the Debtor's Estate;

8.    To determine such other matters and to perform other functions as may be provided in the Plan and the Confirmation Order;

9.    To modify this Plan under section 1127 of the Code, to remedy any apparent nonmaterial defect or omission in this Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes;

10. To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

11. To issue such orders in aid of execution of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any entity, to the full extent authorized by the Code;

12. To hear and determine any tax disputes concerning, and to determine and declare any tax effects under the Plan; and

13. To enter a final decree closing the Case.

Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or any of the exhibits thereto, nothing herein is intended to, nor shall anything herein be construed in

1  any manner to, modify, limit or otherwise affect the FDIC's, right, if any, to seek or to oppose (a)

2  the entry of any and all final orders in any and all non-core matters entered only after de novo

3  review by the United States District Court; (b) trial by jury in any proceedings as to any and all

4  matters so triable therein, whether or not the same be designated legal or private rights, or in any

5  case, controversy or proceeding related thereto, whether or not such jury trial right is pursuant to

6  statute or the United States Constitution; (c) withdrawal of the reference of any matter by the

7  United States District Court in any matter or proceeding subject to mandatory or discretionary

8  withdrawal; or (d) the enforcement or exercise in any manner of any other rights, claims, actions

9  defenses, setoffs, recoupments or other matters to which the FDIC is entitled under any agreements

10  or at law or in equity or under the United States Constitution; nor shall anything therein be

11  construed in any manner to, modify, limit or otherwise affect the FDIC's right, if any, to object to

12  the jurisdiction or authority of any court (including, without limitation, the Bankruptcy Court) to

13  resolve any dispute between the FDIC on one hand, and the Debtor, the Reorganized Debtor, or the

14  New Series B Common Stock Election Trustee, on the other hand, all of which rights are expressly

15  reserved.

16  ### ARTICLE II.

17  MISCELLANEOUS

18  **A.  Governing Law**Except to the extent that the Code or the Bankruptcy Rules

19  are applicable, the rights and obligations arising under the Plan shall be governed by the laws of

20  the State of California.

21  **B.  Successors and Assigns**The rights, benefits and obligations of any Person

22  named or referred to in this Plan are binding on, and will inure to the benefit of, any permitted

23  heirs, executors, administrators, successors or assigns of such Person.

24  ///

25  **C.  Modification of the Plan**Prior to the Effective Date, the Plan may be altered,

26  amended, or modified pursuant to section 1127 of the Bankruptcy Code solely upon the mutual

27  written agreement between the Debtor and Holdco, unless the other party has withdrawn as a

28  proponent of the Plan.  After the Effective Date, the Reorganized Debtor shall have the sole

authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the

Bankruptcy Code.  Holdco shall have the sole and exclusive right to determine the contents of the Plan Supplement, provided that nothing in the Plan Supplement shall conflict with the terms of the Plan.  Notwithstanding the foregoing, the definitions of Confirmation Order, Exculpated Party, Released Parties, Releasees, Releasing Parties and Articles IV.F, IV.G, VIII.D, XI.C, and XI.D of the Plan shall not be amended or modified at any time without the express written consent of the D & Os, which consent may be granted or withheld in the D & Os' sole discretion.  The D & Os are express third party beneficiaries of, and shall have the right to enforce, this provision.

In addition, subject to any express or implied waiver by the D&Os of the releases provided under the Plan, the releases provided under the Plan shall be irrevocable.

**D.**  Provisions SeverableShould any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.  Notwithstanding the foregoing, the definition of Confirmation Order Exculpated Party, Released Parties, Releasees, Releasing Parties and Articles IV.F, IV.G, VIII.D, XI.C, and XI.D of the Plan cannot be severed from the Plan or limited in any way (whether in connection with their enforceability, operative effect or otherwise) without the express written consent of the Ds & OS, which consent may be granted or withheld in the Ds & Os sole discretion.  The Ds & Os are express third party beneficiaries of, and shall have the right to enforce, this provision.

**E.**  Headings Do Not ControlIn interpreting this Plan, the headings of individual Sections are provided for convenience only, and are not intended to control over the text of any Section.  The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner

EXHIBIT A
230

affect the provisions of the Plan.

      **F.**  Post-Confirmation Notices or RequestsFrom and after the Effective Date, any Person who desires notice of any pleading or document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as to which the Code requires notice to be provided, shall file a request for post-confirmation notice and shall serve the request on the Reorganized Debtor.

      **G.**  Successors/Representatives of the DebtorAs of the Effective Date, the Reorganized Debtor shall be the representatives of the Estate under section 1123(b)(3) of the Code and successors to the Debtor under section 1142 of the Code.

**ARTICLE III.**

CONFIRMATION REQUEST

      The Plan Proponents request confirmation of the Plan pursuant to section 1129 of the Code.

Dated: June 1, 2012            Respectfully submitted,

                      HOLDCO ADVISORS, L.P.

                      By:

                          Vikaran Ghei

                          Member

                      FIRSTFED FINANCIAL CORP.

                      By:_____

                      [NAME]

                      [TITLE]

# EXHIBIT B

# PROJECTIONS

**Income Statement - Base Case Scenario**

*($ millions)*

| | | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|
| **Revenue** | $ | (0.0) | $ 2.6 | $ 5.2 | $ 5.6 |
| Operating Expenses | | 0.1 | 0.3 | 0.5 | 0.5 |
| Operating Income | | (0.1) | 2.3 | 4.7 | 5.1 |
| Interest Expense | | 0.0 | 0.5 | 1.1 | 1.2 |
| Pre-Tax Income | | (0.1) | 1.8 | 3.6 | 3.9 |
| Income Tax | | 0.0 | 0.0 | 0.0 | 0.0 |
| **Net Income** | $ | (0.1) | $ 1.8 | $ 3.6 | $ 3.9 |

**Balance Sheet - Base Case Scenario**

*($ millions)*

| ASSETS | | | | At Year End | | |
|---|---|---|---|---|---|---|
| | | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 |
| Cash | $ | 0.2 | $ 0.2 | $ 1.9 | $ 3.4 | $ 2.9 |
| Other Assets | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cause of Action [1] | | 24.0 | 24.0 | 0.0 | 0.0 | 0.0 |
| Investment in Assets | | 0.0 | (0.0) | 45.4 | 49.5 | 57.9 |
| Excess of Reorganization Value over Assets | | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 |
| **Total Assets** | $ | 30.3 | $ 30.2 | $ 53.4 | $ 59.0 | $ 66.9 |

| LIABILITIES AND EQUITY | | | | At Year End | | |
|---|---|---|---|---|---|---|
| | | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 |
| Liabilities: | | | | | | |
| Project-level Debt Incurred | $ | - | $ - | $ 21.4 | $ 23.4 | $ 27.3 |
| **Total Liabilities** | | 0.0 | 0.0 | 21.4 | 23.4 | 27.3 |
| Equity: | | | | | | |
| Retained earnings | $ | - | $ (0.1) | $ 1.7 | $ 5.3 | $ 9.3 |
| Enterprise Equity | | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 |
| **Total Equity** | | 30.3 | 30.2 | 32.0 | 35.6 | 39.5 |
| **Total Liabilities & Equity** | $ | 30.3 | $ 30.2 | $ 53.4 | $ 59.0 | $ 66.9 |

[1] Assumes a contingent asset at emergence that is monetized in year 2.

**Statement of Cash Flows - Base Case Scenario**

*($ millions)*

| | | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|
| **Net Income** | $ | (0.1) | $ 1.8 | $ 3.6 | $ 3.9 |
| Add: interest expense | | 0.0 | 0.5 | 1.1 | 1.2 |
| Proceeds from Cause of Action | | 0.0 | 24.0 | 0.0 | 0.0 |
| **Net Cash Flow from Operations** | | (0.1) | 26.3 | 4.7 | 5.1 |
| Investment in Assets | | 0.0 | (45.4) | (4.1) | (8.4) |
| Net Cash Flow from Investing Activities | | 0.0 | (45.4) | (4.1) | (8.4) |
| Project-level Debt Incurred | | 0.0 | 21.4 | 2.0 | 4.0 |
| Interest expense | | 0.0 | (0.5) | (1.1) | (1.2) |
| Principal repayment | | 0.0 | 0.0 | 0.0 | 0.0 |
| Net cash Flow from Financing Activities | | 0.0 | 20.9 | 0.9 | 2.8 |
| Beginning cash | | 0.2 | 0.2 | 1.9 | 3.4 |
| change in cash | | (0.0) | 1.8 | 1.4 | (0.5) |
| **Ending cash** | $ | 0.2 | $ 1.9 | $ 3.4 | $ 2.9 |

**EXHIBIT C**

**Biographies**

**Ken Tepper**

Kenneth Lewis Tepper ("Ken") has accumulated significant professional experience in the insured institutions industry that includes courtappointed bankruptcy, regulatory and private sector leadership roles. Ken presently serves as CEO for a Kildare Capital, Inc. (a privately-held financial services company) and as Liquidation Trustee for Guaranty Financial Group, Inc., the tenth largest bank failure in US History. A graduate of Emory University in Atlanta, Georgia ('84) and Villanova University Law School ('88), he is a career banker and senior executive with 20+ years of corporate experience including roles as Corporate Counsel, Chief Executive Officer and Chairman of the Board on behalf of a number of private and public enterprises.  In both regulatory and private sector capacity, Ken is expert in the operation, intervention, and liquidation of FDIC insured institutions and their holding companies. He obtained extensive receivership and conservatorship experience during the nation's "S&L crisis" while assigned among the country's most significant failures (including $10 billion City Federal and $2 billion Fulton Federal). While at the Resolution Trust Corporation, he authored the Eastern Regional Office policy on non-performing assets, "The REO Continuum – How to manage or otherwise resolve impaired debt in receivership or conservatorship capacity" and sponsored large-scale credit cases for resolution of debt under appropriate Delegated Authority.

In May 2011, Ken was appointed Liquidation Trustee on behalf of Guaranty Financial Group, Inc. ("GFG") by the Bankruptcy Court for the Northern District of Texas. GFG is the holding company for "Guaranty Bank", the 10th largest bank failure in US history with over $13 billion of assets and 162 branches upon intervention. As Trustee, Ken is responsible for all aspects of holding company liquidation, identification and prosecution of claims, asset management, liquidity and reporting. Under his leadership, the Estate has directed 2004 depositions, instigated preference/avoidance actions in excess of $6 million and filed causes of actions requesting recovery of approximately $3

billion from prior owners, directors and officers.  Ken also supervises various complex tax aspects of the Estate that relate to potential recovery on behalf of creditors.  Ken has been an active participant in community and civil service. He was elected Chairman of the Republican State Finance Committee and selected by Gubernatorial appointment to the Pennsylvania Industrial Development Authority Board ("PIDA") during both Republican and Democratic administrations. As CEO at TRM, Ken was the 2004 inaugural recipient of the "Montgomery Medal" awarded by the United States National Guard for support of Operation Iraqi Freedom. He is a member of the Bar of Pennsylvania and admitted to practice before the Supreme Court of the Unites States. His professional affiliations include the Turnaround Management Association, American Bankruptcy Institute, Association of Insolvency and Restructuring Advisors, National Association of Consumer Bankruptcy Attorneys, International Association of Restructuring, Insolvency, & Bankruptcy Professionals. Professional credentials include FINRA license(s) 7, 63 & 79. Ken lives in Gladwyne, Pennsylvania with his wife and four children. A former elected Judge of Elections, he continues to serve in a number of philanthropic roles throughout his community and is a member of the Board of Directors of Integrity Health, a leading municipal insurance benefits manager in the region.

Ken is currently Chief Executive Officer of Kildare Financial Group, Inc., a full-service, middle  market investment banking company focused upon banking and underserved financial markets. Its' FINRA-regulated corporate finance group provides comprehensive restructuring, capital markets, mortgage finance and asset management services from Philadelphia and New York. Clients include public and private enterprises comprised of hedge funds, money managers, investment advisors and issuers of municipal securities.. The Firm offers highly effective auction rate programs for student loan asset backed securities with a portfolio over $15.0 billion and was nationally ranked "top ten" by MSRB. Specializing in ARS secondary markets, Kildare has facilitated over $2.0 billion of ARS transactions over the past year.

**Birge Watkins**

Birge Watkins has held leadership and senior level positions in business, government and the non-profit sector for over 35 years. He is a partner in Encompass Real Estate Advisors, Chairman and a member of the Board of Commissioners of the Vint Hill Economic Development Authority, President and Director of the Land Trust of Virginia, and serves on the board of The Lowell Group, the owner of the New World Trust. He recently became Vice Chairman of the Council of American Universities Abroad where he is involved with university feasibility studies in Romania and Mongolia. During the early 1990's and at the request of the Chairman of the FDIC, L. William Seidman, he organized and managed the RTC's National Investor Outreach Program. As Director, he was involved with marketing and portfolio sales, the national land sale, numerous single asset sales, and securitization. The program contributed to sales of real estate and real estate assets in excess of $300 billion. Other past positions include private sector development and education at USAID; real estate investment and development with various firms, including an affiliate of Trammell Crow Corporation and two of the largest regional real estate firms in Washington, DC; management and development for non-profit organizations; Vice President in the Private Client Group at FBR Investment Management Inc.; and private equity investments in real estate and the financial sector. Mr. Watkins served as Staff Assistant to the President in the Office of Economic Affairs at the White House during the Ford Administration. Later he served as Assistant Director of President Reagan's Task Force on International Private Enterprise and Deputy Assistant Secretary of the U.S. Department of Agriculture. He was also a member of President George H.W. Bush's transition team and has Capitol Hill experience in a Congressional office. He also served as an elected at-large member of the Warrenton, Virginia town council. He received a B.A. from Alma College, an M.B.A. from the London Business School, and an M.P.A. from the Harvard Kennedy School.

1

**Michael J. Piracci**

2

3

Mr. Piracci served as Assistant Regional Director of the FDIC for 17 years, and worked for the

4

FDIC for 35 years.  He started his career with the nation's Largest Examiner and Supervisor of

5

banks in 1967. He then served at the FDIC until 2004, with responsibility for financial institutions in

6

New Jersey, Pennsylvania, Maryland, Delaware, the District of Columbia and Puerto Rico as well as

7

administration for the New York region. He has been a Director of Royal Bancshares of

8

Pennsylvania Inc., and its subsidiary, Royal Bank America since May 20, 2010.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D**

**HYPOTHETICAL LIQUIDATION ANALYSIS**

**Introduction**

The Hypothetical Liquidation Analysis of the Debtor pursuant to Chapter 7 (the Liquidation Analysis) was prepared by Holdco based on: (a) unaudited information contained in the Statement of Financial Affairs and the Schedules filed with the Bankruptcy Court; (b) the Debtor's Monthly Operating Reports through March 31, 2012 as filed with the Bankruptcy Court; and (c) information that Holdco has received since the filing of the Debtor's March 31, 2012 monthly operating report.

This Liquidation Analysis presents the estimated net value of the Debtor's assets as of July 31, 2012, the assumed effective date when the Chapter 11 Case is converted to Chapter 7, if the Debtor's assets were to be liquidated under the provisions of Chapter 7 of the United States Bankruptcy Code and the net proceeds of such liquidation were to be distributed to the Debtor's creditors entitled to distributions pursuant to Chapter 7 of the Bankruptcy Code.

All amounts contained in this Liquidation Analysis and described in the Notes to this Liquidation Analysis are Holdco' good faith estimate and belief of the amounts the Debtor would receive from liquidating the assets and the estimated allowed claims against the Debtor.  The amounts, descriptions, and other information contained herein do not constitute an admission or a denial of the existence or values of the assets or liabilities, and are not to be used as such in any legal action, administrative proceeding, or otherwise.

The information contained in this Liquidation Analysis is as of the filing date of this Disclosure Statement and Holdco is  under no obligation, and expressly disclaims any obligation to publicly update any of the information contained herein, whether as a result of new information, future events, or otherwise.

The statements in the Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Bankruptcy Court in making the findings required under section 1129(a)(7) and they may not be used or relied upon for any other purpose.

THE PLAN PROPONENTS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES
AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE
INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND
OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF
THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS,
NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED
OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH
STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC
ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT
VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE
LIQUIDATION ANALYSIS.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DETAILED LIQUIDATION ANALYSIS

The following tables provide detailed calculations of recoveries under a Chapter 7 liquidation and should be read in conjunction with the accompanying notes.

**FirstFed Financial Corp. - Liquidation Analysis**

**Estimated Liquidation Proceeds**

*($ millions)*

|  | Estimated Liquidation Value | Notes |
|---|---|---|
| Net Liquidation Proceeds |  |  |
| Cash | $0.0 | *1* |
| Net Tax Refund Recovery | 26.4 | *2* |
| Total Net Proceeds | 26.4 |  |
| Costs of Liquidation |  |  |
| Chapter 7 legal fees | 0.0 | *3* |
| Chapter 7 transition costs | 0.7 | *4* |
| Chapter 7 Trustee fees | 0.8 | *5* |
| Total Liquidation Costs | 1.5 |  |
| *Net Proceeds Available for Distribution* | *$24.9* |  |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FirstFed Financial Corp. - Liquidation Analysis**

**Estimated Liquidation Distribution**

*($ millions)*

| | Estimated Recovery | | |
|---|---|---|---|
| | $ | % | *Notes* |
| *Net Proceeds Available for Distribution* | $24.9 | *100%* | |
| Secured Claims | - | | *6* |
| *Proceeds Available for Administrative/Priority Claims* | 24.9 | | |
| Administrative Claims | | | |
| Chapter 11 Administrative claims | 0.0 | | *7* |
| *Proceeds Available for Priority Claims* | 24.9 | | |
| Priority Claims | | | |
| Priority claims | 0.0 | | *8* |
| *Proceeds Available for Unsecured Claims* | 24.9 | | |
| General Unsecured Claims | | | |
| Senior Debt Unsecured claims | 157.8 | *15.8%* | *9* |
| FDIC Claim | 0.0 | *15.8%* | *2* |
| Other Unsecured claims | 0.0 | *15.8%* | *10* |
| Total Unsecured claims | $157.8 | | |
| *Proceeds Available for Equity Interests* | - | | |

**Notes**

The following Notes are an integral part of the Liquidation Analysis:

*1.      Cash*

The Cash balance reflects the projected Cash balance as of July 31, 2012, the assumed Effective Date, and is net of outstanding checks.  The projected Cash balance is based on the Cash balance as of March 31, 2011 reduced by estimated disbursements for case professionals/ accountants of $300 thousand, HoldCo fees of $600 thousand, and indenture trustee fees of $1 million.

*2.      Net Tax Refund Recovery*

As a base case, Holdco believes that it is reasonable and appropriate to assume that the Debtor will recover $30.0 million of tax refunds as a result of the FDIC Causes of Action.  This number is assumed to be net of expenses for litigation including but not limited to financial advisors, attorneys and any other professionals which may be paid in cash, on a contingency basis or with some alternate form of financing.  It is further assumed that in connection with a settlement the FDIC will not assert any claim. These are simply assumptions made for purposes of establishing a base case analysis for valuation purposes.

This analysis assumes that the income tax refunds are received by the Reorganized Debtor one and one half years from the Effective Date.  As a result, the analysis shows the present value of those payments as of the effective date assuming a discount rate of 9.0%.

*3.      Chapter 7 Legal Fees*

It is assumed that the tax refunds recovered as part of the FDIC Causes of Action are net of any legal and professional fees.  See Note 2 above.

*4.      Chapter 7 Conversion Costs*

Assumes the liquidation takes 18 months to complete and that accounting fees, claims agent fees, office and utility costs and other transition costs approximate $0.75 million in the aggregate.

*5.      Chapter 7 Trustee Fees*

It is assumed that the Chapter 7 Trustee fees are paid in accordance with limits established by

section 326 of the Bankruptcy Code.

> 6.    *Secured Claims*

It is assumed that the secured claim of $3,125 will be satisfied prior to the Effective Date.

> 7.    *Chapter 11 Administrative Claims*

It is assumed that all Chapter 11 professional fee holdbacks, Convenience Claims, and accrued fees will be paid in full at the Effective date.

> 8.    *Priority Claims*

It is assumed that there are no allowed Priority Claims and that the FDIC will not file a FDIC Priority Claim which, if filed, may have priority status and potentially could eliminate all recoveries to unsecured creditors.

> 9.    *Unsecured Debenture Claims*

This analysis assumes that the Allowed amount for these claims will be $157.8 million as set forth in the Schedules.

> 10.    *Other Unsecured Claims*

This analysis assumes that all allowed Other Unsecured Claims are *de minimis* and will be converted Convenience Claims and paid in full.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
LANDAU GOTTFRIED & BERGER LLP 1801 Century Park East, Suite 700, Los Angeles, California 90067

A true and correct copy of the foregoing document entitled (*specify*): ***SECOND AMENDED DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND HOLDCO ADVISORS L.P. DATED JUNE 1, 2012*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 29, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

    Cathrine M Castaldi   ccastaldi@rusmiliband.com
    Louis J Cisz   lcisz@nixonpeabody.com
    Jon L Dalberg   jdalberg@lgbfirm.com, ncereseto@lgbfirm.com;jcasillas@lgbfirm.com
    Daniel K Fujimoto   wdk@wolffirm.com
    Elaine T Fuller   elaine.t.fuller@irscounsel.treas.gov
    Barry S Glaser   bglaser@swjlaw.com
    Allan H Ickowitz   aickowitz@nossaman.com, mbonilla@nossaman.com
    John J Immordino   john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
    John Mark Jennings   jjennings@shblp.com
    Jeff D Kahane   jkahane@duanemorris.com
    Ivan L Kallick   ikallick@manatt.com, ihernandez@manatt.com
    John W Kim   jkim@nossaman.com
    Paul H Kim   Pkim@counsel.lacounty.gov
    Rodger M Landau   rlandau@lgbfirm.com, gguidetti@lgbfirm.com;rmartin-patterson@lgbfirm.com

        ☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **June 29, 2012**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

        ☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 29, 2012**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**BY PERSONAL DELIVERY**
Honorable Ernest Robles
USBC - Central District of California
255 East Temple Street, Suite 1560
Los Angeles, CA  90012

        ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 29, 2012 | Joseph Casillas | *(signature)* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NEF (Continued)**:

Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-law.com
Sandra W Lavigna    lavignas@sec.gov
Joel S. Miliband    jmiliband@rusmiliband.com
Michael W Tan    michael.w.tan@irscounsel.treas.gov
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Alan Steven Wolf    wdk@wolffirm.com
Hatty K Yip    hatty.yip@usdoj.gov
Roye Zur    rzur@lgbfirm.com, jcasillas@lgbfirm.com

2. **SERVED BY UNITED STATES MAIL (Continued)**:

U.S. Securities and Exchange Commission
Attn: Sandra W. Lavigna
Senior Bankruptcy Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036

INTERNAL REVENUE SERVICE
300 N LOS ANGELES ST
STOP 5022
LOS ANGELES, CA 90012 -3478

The Federal Deposit Insurance
Corporation as
Nossaman LLP
c/o Allan H. Ickowitz
445 S. Figueroa St., 31st Floor
Los Angeles, CA 90071·1635

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012·3332

David W Anderson
2961 Coleridge Dr
Rossmoor CA 90720-4014

Douglas Goddard
628 Knight Way
La Canada Ca 91011·2660

FirstFed Financial Corporation
10900 Wilshire Blvd Ste 850
Los Angeles CA 90024 -6531

Grant Thornton LLP
1000 Wilshire Blvd Suite 300
Los Angeles, CA 90017-1728

Hexagon Securities LLC
555 Madison Ave 25th Floor
New York, NY 10022-3339

Crowe Horwath LLP
Attn: Howard Grobstein
15233 Ventura Blvd, 9th Floor
Sherman Oaks, CA 91403·2250

Manatt, Phelps & Phillips LLP
11355 West Olympic Blvd
Los Angeles, CA 90064 -1664

United States Trustee (LA)
Attn: Hatty K. Yip
725 S Figueroa St., 26th Floor
Los Angeles, CA 90017-5413

Babette E Heimbuch
7326 El Manor Ave
Los Angeles CA 900 45-1347

Delaware Secretary of State
Delaware Franchise Tax
Division of Corp Dept 74072
Baltimore, MD 21274

FBR Capital Markets
1001 Nineteenth Street North
Arlington, VA 22209·1739

Franchise Tax Board
Bankruptcy Section MS A340
Po Box 2952
Sacramento, CA 95812 -2952

Grazia M Galuppo
27145 Manor Circle
Santa Clarita, CA 91354-2691

Internal Revenue Service
300 N Los Angeles St
M/S 5022
Los Angeles, CA 90012·3351

FirstFed Financial Corp .
4000 Barranca Parkway Ste 250
Irvine, CA 92604·1713

RUS, MILIBAND & SMITH, APC
2211 MICHELSON DRIVE
SEVENTH FLOOR
IRVINE, CA 92612 ·1384

Wilmington Trust Company as
Indenture Trust
c/o Louis J. Cisz , III
Nixon Peabody LLP
One Embarcadero Center, 18th Floor
San Francisco, CA 94111 ·3716

Brenda J Battey
5310 Maymont Dr
Los Angeles CA 90043·1531

Diana A. Wright
1707 S. Sherbourne Dr.
Los Angeles Ca 90035-4328

First Federal Bank of California
12555 West Jefferson Blvd
Los Angeles, CA 90066-7007

Fulcum Capital
10940 Wilshire blvd. # 1626
Los Angeles CA 90024 -3915

HQ Global Workplaces
6320 Canoga Avenue Suite 1500
Woodland Hills, CA 91367-2563

James P Giraldin
20370 Skyhawk Ln
Topanga CA 90290-3360

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

NICHOLAS C BIASE
C/0 FINDIM GROUP
14 EAST 60TH ST STE 501
NEW YORK NY 10022 -7140

R R Donnelley
355 South Grand Ave
Los Angeles, CA 90071-1560

Shannon Millard
2121 No Beverly Dr
Beverly Hills CA 90210-1616

Vikas Arora
1410 N Curson Ave #205
Los Angeles CA 90046 -7806

Cathrine M Castaldi
Rus, Miliband & Smith, APC
2600 Michelson Dr
Ste 700
Irvine, CA 92612-6528

Manatt Phelps & Phillips LLP
695 Town Center Drive 14th Floor
Costa Mesa, CA 92626-7223

Nixon Peabody LLP
437 Madison Ave
New York, NY 10022-7039

R R Donnelley
Attn: Robert Larsen
3075 Highland Pkwy 5th Flr
Downers Grove IL 60515 -1288

Steven Soboroff
1101 Montana Ave Ste A
Santa Monica CA 90403-1664

William P Rutledge
237 Toyopa Dr
Pacific Palisades CA 90272-4463

HOWARD Grobstein
15233 Ventura Boulevard, 9th Floor
Sherman Oaks, CA 91403-2250

Jesse Casso
Casmar Capital Partners LLC
11611 San Vicente Blvd Ste 650
Los Angeles CA 90049-6502

Morrison and Foerster LLP
555 West Fifth Street Suite 3500
Los Angeles, CA 90013 -1024

Office of the United States Trustee
21051 Warner Center Lane Suite 115
Woodland Hills, CA 91367 -6550

Registrar and Transfer Company
ATTN Dan Flynn
10 Commerce Drive
Cranford, NJ 07016 -35 72

UCLA Anderson School of
Management
110 Westwood Plaza.
# B523 box 951
Los Angeles CA 90095-0001

Wilmington Trust Company
ATTN Patrick Healy
1100 North Market Street
Wilmington, DE 1989 0-0001

Joel S. Miliband
2600 Michaelson Dr Ste 700
Irvine, CA 92612-6528

L.A County Treasurer
and Tax Collector
Po Box 54110
Los Angeles, CA 90054 -0110

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**